# EXHIBIT A

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 2 of 139 Page ID #:194
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

1        UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA

3

_____
4                                      )
SAMUEL S. SORIA  A/K/A SAMUEL S.   )
5    LIERA,                            )
                                       )
6          Plaintiff,                  )
                                       )
7             vs.                      ) Case No:8:17-cv-
                                       ) 00603CJC(KESx)
8    US BANK (N.A.), AND EQUIFAX       )
     INFORMATION SERVICES, LLC,        )
9                                      )
           Defendants.                 )
10   _____)

11

12

13             CONFIDENTIAL TRANSCRIPT

14

15           VIDEOTAPED DEPOSITION OF

16              SAMUEL SORIA LIERA

17            COSTA MESA, CALIFORNIA

18          TUESDAY, NOVEMBER 20, 2018

19

20

21

22   REPORTED BY:  GEHANE CASSIS
     CSR No: 13020
23   JOB No: 39630

24
     DEPO INTERNATIONAL, LLC
25   (800)591.9722 | (763)591.0535

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 3 of 139 Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1948

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    _____
                                            )
5    SAMUEL S. SORIA  A/K/A SAMUEL S.       )
     LIERA,                                  )
6                                            )
             Plaintiff ,                     )
7                                            )
              vs.                            ) Case No: 8:17-cv-
8                                            ) 00603CJC(KESx)
     US BANK (N.A.), AND EQUIFAX            )
9    INFORMATION SERVICES, LLC,             )
                                            )
10           Defendants.                     )
     _____)

11

12

13

14

15

16

17

18

19

20           Deposition of SAMUEL SORIA LIERA,  taken on

21    behalf of Defendants, at 600 Anton Boulevard, Suite

22    2000, Costa Mesa, California, beginning at 8:49 a.m. and

23    ending at 3:00 p.m. on Tuesday, November 20, 2018,

24    before GEHANE CASSIS, Certified Shorthand Reporter, No.

25    13020.

1    APPEARANCE OF COUNSEL:

2

     For Plaintiff:

3

4            LAW OFFICES OF F. JAY RAHIMI

5            BY: F. JAY RAHIMI

6            Attorney at Law

7            7136 Haskell Avenue

8            Number 333

9            Van Nuys, California 91406

10           818.510.0555

11

12           KAZEROUNI LAW GROUP

13           BY: MATTHEW M. LOKER

14           Attorney at Law

15           (Telephonically)

16           1303 East Grand Avenue

17           Suite 101

18           Arroyo Grande, California 93420

19           800.400.6808

20

21

22

23

24

25

```
 1    APPEARANCE CONTINUED:

 2

 3    For Defendant:

 4              LAW OFFICES OF DORSEY & WHITNEY

 5              BY: ERIC R. SHERMAN

 6              Attorney at Law

 7              50 South Sixth Street

 8              Suite 1500

 9              Minneapolis, Minnesota 55402

10              612.492.6609

11

12    Also present:

13              Craig Ellingson, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 6 of 139 Page ID #:1931

```
 1                    I N D E X

 2

 3    TUESDAY, NOVEMBER 20, 2018

 4

 5    WITNESS                               EXAMINATION

 6    SAMUEL SORIA LIERA

 7

 8        By MR. SHERMAN                        12

 9        By MR. RAHIMI                        230

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 7 of 139   Page ID
#:1952
Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

```
 1                    DEPOSITION EXHIBITS

 2                    SAMUEL SORIA LIERA

 3

 4    NUMBER              DESCRIPTION            IDENTIFIED

 5

 6    Exhibit 172    Southwestern Medical             92

 7                   Laboratory lab results

 8

 9    Exhibit 173    Precision Analytical, Inc.       94

10                   Hormone Testing Summary

11

12    Exhibit 174    Pacific Medical Laboratory       95

13                   lab results

14

15    Exhibit 175    Dr. Shah's Wellness Medical      97

16                   Clinic & Thyroid Treatment

17                   Center Supplement

18                   Instructions

19

20    Exhibit 176    Quest Diagnostic lab results     99

21

22    Exhibit 177    I-797, Notice of Action         108

23

24

25
```

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 8 of 139   Page ID
#:1953
Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

```
 1    EXHIBITS (Continued):

 2    NUMBER                    DESCRIPTION                    IDENTIFIED

 3

 4    Exhibit 178    Application for Employment            110

 5                   Authorization

 6

 7    Exhibit 179    I-797, Notice of Action               113

 8

 9    Exhibit 180    Business Plan Discussions             130

10

11    Exhibit 181    2015 Form 1099-K                      131

12

13    Exhibit 182    Payment Solutions and                 134

14                   Statements

15

16    Exhibit 183    2015Form 1040                         137

17

18    Exhibit 184    2016 Form 1120                        138

19

20    Exhibit 185    2016 Form 1040                        139

21

22    Exhibit 186    2017 Form 1040                        141

23

24

25
```

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

```
 1   EXHIBITS (Continued):

 2   NUMBER              DESCRIPTION              IDENTIFIED

 3

 4   Exhibit 187    Adverse Action Notice              149

 5

 6   Exhibit 188    Adverse Action Notice              150

 7

 8   Exhibit 189    Complaint for Damages              155

 9

10   Exhibit 190    Plaintiff Samuel S. Liera's        164

11                  Amended Supplemental

12                  Responses to Defendant U.S.

13                  Bank's Interrogatories, Set

14                  One

15

16   Exhibit 191    Signature Card - Consumer          168

17

18   Exhibit 192    U.S. Bank Statements               170

19

20   Exhibit 193    Letter dated July 3, 2014,         172

21                  with attachments

22

23   Exhibit 194    Copy of deposit slip               180

24

25
```

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 10 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1955

```
 1    EXHIBITS (Continued):

 2    NUMBER                DESCRIPTION                IDENTIFIED

 3

 4    Exhibit 195    Copy of deposit slip              181

 5

 6    Exhibit 196    Signature Card - Consumer         193

 7

 8    Exhibit 197    U.S. Bank Statements              194

 9

10    Exhibit 198    U.S. Bank Statements              202

11

12    Exhibit 199    Letter dated June 16, 2015        204

13

14    Exhibit 200    U.S. Bank Statements              205

15

16    Exhibit 201    U.S. Bank Statements              206

17

18    Exhibit 202    Letter dated May 16, 2016         209

19

20    Exhibit 203    U.S. Bank Statements              212

21

22    Exhibit 204    Audio Recording file No. 1        215

23

24

25
```

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

```
 1    EXHIBITS (Continued):

 2    NUMBER                  DESCRIPTION                 IDENTIFIED

 3

 4    Exhibit 205    Audio Recording file No. 2          215

 5

 6    Exhibit 206    Letter dated May 16, 2016           216

 7

 8    Exhibit 207    Credit Report                       220

 9

10    Exhibit 208    Letter dated January 12, 2017       221

11

12    Exhibit 209    Identity Theft Victim's             222

13                   Complaint and Affidavit

14

15    Exhibit 210    U.S. Bank Business Loan             226

16

17    Exhibit 211    Letter dated January 30, 2017       228

18

19

20

21

22

23

24

25
```

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 12 of 139   Page ID
#:1357

1   Costa Mesa, California, Tuesday, November 20, 2018
2                8:49 A.M.
3            - o0o -
4
5           THE VIDEOGRAPHER:  Good morning.  We're on the
6   record.  My name is Craig Ellingson, I'm a notary public
7   contracted by Depo International, I am not financially
8   interested in this action nor am I a relative or
9   employee of any of the attorneys or any of the parties.
10          Today's date is November 20th, 2018, the time
11  on the video monitor is 8:49 a.m.  This video deposition
12  is taken at 600 Anton Boulevard, Suite 2000, Costa Mesa,
13  California 92626.  The name of the case is Samuel Soria
14  versus U.S. Bank et al. filed in the Central District of
15  California, Southern Division.  Case
16  Number 817-CV-0603-CJC-KES.  This is Volume I of the
17  videotaped deposition of Samuel Soria.
18          Would the attorneys, please, introduce
19  themselves and state who you represent.
20          MR. RAHIMI:  F. Jay Rahimi, Attorney for
21  Plaintiff Samuel Soria.
22          MR. SHERMAN:  Eric Sherman, Dorsey & Whitney
23  for Defendants U.S. National Association.
24          THE VIDEOGRAPHER:  The court reporter today is
25  Gigi Cassis with Depo International.

Page 11

1   Would the Reporter, please, swear in the
2   witness.
3            SAMUEL SORIA LIERA,
4       having been administered an oath, was
5       examined and testified as follows:
6
7            EXAMINATION
8   BY MR. SHERMAN:
9   Q   Good morning, Sir.
10  A   Good morning.
11  Q   Can you please state your name and spell the
12  last name for the record.
13  A   Samuel Liera Soria, S-O-R-I-A.
14  Q   Do you sometimes go by a different name?
15  A   Samuel Liera.
16  Q   Can you explain to me the circumstances which
17  determine, you know, kind of which name you go by for a
18  particular purpose?
19  A   Sam Liera my actual last name.  I don't know
20  why they put Soria, I think it's what it states on the
21  birth certificate.  It's my -- birth certificate is
22  Samuel Soria, yes.
23  Q   So let me unpack this, so your birth
24  certificate says Samuel Soria?
25  A   Yes.

Page 12

1   Q   And so for what purposes do you go by Samuel
2   Liera?
3   A   Cause my last name.  In Mexico it's -- I guess
4   they kind of put it different than they probably put it
5   here so that's why it's -- so that's why it's Samuel
6   Soria on my driver license on not Samuel Liera, but it's
7   supposed to be Samuel Liera.
8   Q   Okay.  So -- okay.  Did you do anything to
9   prepare for your deposition today?
10  A   Not really.  Just studied a little bit the
11  accounts.
12  Q   Okay.  What did you study?
13  A   Just the account numbers, like the last four
14  days, that's it.
15  Q   Okay.  Did you meet with your lawyer,
16  Mr. Rahimi?
17  A   No, just this morning when -- we just walked
18  in, that's it.
19  Q   When did you first -- when is the first time
20  you met Mr. Rahimi in person?
21  A   I don't remember the date.  It was the last
22  time we -- I don't remember, I don't remember the date.
23  Q   Okay.  How many times have you met Mr. Rahimi
24  in person?
25  A   Once.

Page 13

1   Q   Have you met any other attorneys concerning
2   this matter, in person?
3   A   No.
4   Q   No?
5   A   No.
6   Q   Okay.  Have you talked on the phone with other
7   attorneys concerning this matter?
8   A   No.
9   Q   Okay.  So let me just go over one very
10  important ground rule for today's deposition.
11          I'm going to be asking you a number of
12  questions.
13  A   Okay.
14  Q   And if you answer my question, I'm going to
15  assume that you understood it; is that fair?
16  A   Yes.
17  Q   If at any time you don't understand a question
18  I'm asking, please just let me know and I'll try to
19  rephrase it or clear up the -- clear up the issue.  Is
20  that okay?
21  A   Okay.
22  Q   I'd like to begin, Mr. Soria, by -- and is
23  that what I should call you today, Mr. Soria?
24  A   Yeah.
25  Q   Okay -- by asking you to just tell me in your

Page 14

Samuel Soria Liera - CONFIDENTIAL     11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 13 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1958

**Page 15**

1 own words what led you to sue U.S. Bank?

2     A   Well, I was -- didn't want to sue, it's just I

3 kept calling U.S. Bank that it wasn't my account, but

4 they kept calling me every day, I think from Monday to

5 Saturday. I lost count how many phone calls I got in a

6 day. They called my personal, they called my business,

7 and I kept telling them that it wasn't me, that wasn't

8 my account. Then told me they were going to stop

9 calling me for that account, but then they called me --

10 some day it would be the same person calling me again,

11 but after I hung up with them, they called me right --

12 right away. And then it was like that every day.

13     Q   Okay. You made reference to telling someone

14 that "they weren't my accounts" can you tell me about

15 that?

16     A   Yeah, I told them that I didn't open those

17 accounts, I never signed for those accounts and I didn't

18 even know about those business loans that I -- I found

19 out the day of -- of my aunts funeral.

20     Q   Okay. How did you find out about the business

21 loans that you just mentioned?

22     A   They called me the day of my aunt's funeral

23 and they told me I was -- they were going to send me

24 collections I didn't know for what 'cause I never got

25 any loans, I was told that I wasn't approved for any

**Page 16**

1 loans.

2     Q   Do you remember the month and day that your

3 aunt's funeral was on?

4     A   I honestly -- I don't remember.

5     Q   Okay. And so when you got that phone call,

6 what did you do?

7     A   I -- I was trying to get a hold of Daniel

8 'cause he was my banker and he didn't answer. And I --

9 I -- I called my friends 'cause they known -- we known

10 each other since we were kids so they know him as well.

11 And that's when I found out that he opened another

12 account under my other friend's name. And he didn't say

13 anything, I didn't know until I found out that day and I

14 called him. And was looking for Daniel and couldn't

15 find him.

16     Q   So which friends did you call?

17     A   I called my friend David. I don't -- and

18 called my friend Rafa Vasquez. No -- I just called

19 David and he called me and then I called Rafa right

20 after.

21     Q   And what was David's last name?

22     A   Anguino, A-N-G-U-I-N-O.

23     Q   And you said "Rafa" is that short for

24 something?

25     A   Vasquez Rafael.

**Page 17**

1     Q   So you called David first and what did David

2 tell you?

3     A   He just said what happened, he goes I don't

4 know (inaudible) Daniel. I mean, he's like "For what?"

5 I'm like -- I'm like "I need to call Daniel" then I told

6 him (inaudible) --

7     THE REPORTER: Excuse me, please speak up, I

8 can't hear you.

9     A   Yeah, I just -- I called him and he just told

10 me "What happened?" And I just told him (inaudible).

11 He told me like "What do you do?" And he told me "What

12 did he do?" I'm like "Well, I just found out these

13 accounts." He goes "Just to let me know, he did the same

14 thing to Rafa and Rafa found out a while ago." And I

15 didn't know that, I just found out that day through my

16 other friend. So I called my other friends and I told

17 them to go check to make sure they -- they -- all the

18 accounts that are open on their names. Cause it's like

19 a common friend Paul, Hourash. And I told them to check

20 their accounts and -- just to be safe. Cause I didn't

21 know and then Rafa didn't know either, he just found out

22 before I did.

23     Q   So let me back up a bit. So you just

24 mentioned a couple other names that I didn't quite

25 catch. Was there a Paul?

**Page 18**

1     A   Yeah, Paul Cortez.

2     Q   How could you spell Cortez?

3     A   Z, yeah. C-O-R-T-E-Z.

4     Q   Okay. And then Hourash?

5     A   Yeah, Hourash Razei.

6     Q   Can you spell Hourash last name?

7     A   R-A-Z-E-I.

8     Q   Okay. And did Paul or Hourash tell you that

9 the same thing happened to them?

10     A   No.

11     Q   No?

12     A   They just said they're going to check. So

13 they checked everything.

14     Q   What did Rafael tell you about --

15     A   He just told me that -- that he didn't know

16 his wife tried to get a car on -- she tried to get a car

17 and I guess they said Rafael had bad credit and -- and

18 then he went and found out that I guess he owed like

19 15,000, I believe. $15,000.

20     Q   Okay.

21     A   And then -- and he looked and found out

22 that -- Daniel told him it was him.

23     Q   And so after you got the call about the

24 business loans, when did you first speak to anyone at

25 U.S. Bank?

1    A  The next day. Cause I had to go to the
2 funeral.
3    Q  Right.
4    A  And then I -- I was looking for Daniel. I
5 looked for him all day and night.
6    Q  Where did you go to look for him?
7    A  I went to his house like three or four times,
8 and then I went to where he hangs out, and I went to
9 this place called "Peps' cause he always hangs out
10 there. And they wouldn't tell me so I just pretended
11 to -- I told them "Oh, I'm here to meet Daniel" and they
12 go -- they told me where he was and I finally found him
13 I think around 9:00 o'clock at night or 10:00. Cause I
14 kept going back and forth to -- I went to the funeral
15 and went back and then went back to the house and kept
16 going back to the house 'cause my whole family was at
17 the house.
18      THE REPORTER: Please slow down.
19    Q  Do you remember what day of the week the
20 funeral was?
21    A  I believe -- I'm not sure. It might have been
22 on a Friday. I'm not sure.
23    Q  And so where did you finally find Mr. Berrera?
24    A  I found him at a bar called "Harvest."
25    Q  And what happened when you found him at

Page 19

1 Harvest?
2    A  I guess -- I was looking for him. He looked
3 at me, he got all scared, I mean -- and then I told him
4 "We need to talk." He goes -- he goes -- I'm like --
5 and I talked to him about it, he goes "Don't worry about
6 it." I told him "What do you mean don't worry about
7 it?" He said "Don't worry. Did you sign anything?" I
8 go "I didn't even know about this. What's going on?"
9 He goes -- he goes "Don't worry about it, you'll be
10 fine."
11    Q  Okay. A did you say anything to him to prompt
12 him saying "Don't worry about it?"
13    A  No. We just went outside and we're talking,
14 I'm like "I just found out about these accounts, did you
15 open them?" He goes -- he goes "Yeah, but don't worry
16 about it." That's all he told me. And then like we
17 just talked for a while. I was mad, we talked for a
18 while, I was just pissed. And I go "You better face
19 this. You better tell them it was you. You better pay
20 this money back 'cause I have no idea."
21    Q  At that point what did you know about the
22 accounts that you suspected Mr. Berrera --
23    A  I just knew about the -- the business loan.
24 The one business loan, that's it, that's all I knew.
25    Q  Just one business loan?

Page 20

1    A  Yeah, just one business loan.
2    Q  Did you later learn of other accounts that you
3 believed Mr. Berrera had opened without your
4 authorization?
5    A  Yes. I went on I think -- I believe on a
6 Saturday morning where he worked.
7    Q  Okay.
8    A  And that's when I found out.
9    Q  And where was it that Mr. Berrera worked that
10 you went?
11    A  The Santa Ana branch.
12    Q  Okay. And what happened when you got to the
13 branch?
14    A  When I got to the branch, I asked to speak to
15 the manager or -- and then like I spoke to him and he
16 told me all the accounts that were open and they were --
17 I guess that I owed money on them.
18    Q  Okay. And what do you recall about what they
19 told you about the accounts?
20    A  I just -- they said it was two business loans
21 under U.S. Bank and some reserve lines and checking
22 accounts that I didn't know about, that weren't mine.
23    Q  So what was the checking account that you
24 didn't know about that was --
25    A  The reserve line I didn't know about was --

Page 21

1 I'm not sure, there is so many of them.
2    Q  Other than Mr. Vasquez is there anyone else
3 who you believed who have been a victim of this sort of
4 thing with Mr. Berrera?
5    A  No.
6    Q  Have you come to a view of when you think this
7 all first started?
8    A  No.
9    Q  You don't know?
10    A  No, I don't.
11    Q  What's the earliest date that you're aware
12 that any account was opened by Mr. Berrera without your
13 authorization?
14    A  I don't know exactly. Maybe -- when I found
15 out in May, that was the first thing I knew about the
16 business -- the loan. That's all I knew, I didn't know
17 anything else.
18    Q  All right. When did you first consult an
19 attorney about the situation?
20    A  Well, I was trying to fix it with U.S. Bank so
21 I kept telling them that it wasn't me and what I could
22 do. They told me to pay it and I just -- I told my wife
23 to look of somebody that would help me out.
24    Q  What's your wife's name?
25    A  Kim Do.

Page 22

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 15 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1900

**Page 23**

1  Q   And how long have you been married?
2  A   Three years.
3  Q   And so did -- is it okay if I call her Kim?
4  A   Yes.
5  Q   Okay.  Did Kim find you the lawyer?
6  A   She tried, yeah, and then eventually we just
7  kept calling and then we found a lawyer that would
8  finally help me out.
9  Q   And who was that?
10 A   We called Jay.
11 Q   And when did you first call Jay?
12 A   I don't remember.
13 Q   Was there a lawyer that you had named
14 Calderon?
15 A   That lawyer, I think -- I might have spoke to
16 him once.  He said -- I guess he couldn't take the case,
17 but he just wrote letters to U.S. Bank so they could
18 cease sending me letters that I owed money and try to
19 take me off collections.
20 Q   Did you say he said he couldn't take the case?
21     MR. RAHIMI:  Objection, privileged.  Don't
22 answer that.
23 BY MR. SHERMAN:
24 Q   Did you sign an engagement letter with
25 Mr. Calderon?

**Page 24**

1     MR. RAHIMI:  Objection, privileged.  Don't
2  answer that.
3     MR. SHERMAN:  You are going to follow your
4  attorney's instruction not to answer the question?
5     MR. RAHIMI:  Don't answer the question.
6  BY MR. SHERMAN:
7  Q   Did Mr. Calderon ever send you a bill?
8  A   No.
9  Q   Did you ever pay Mr. Calderon any money?
10 A   No.
11 Q   Okay.  Were there any accounts that you
12 believed Mr. Berrera opened in your name other than at
13 U.S. Bank?
14 A   I know there was Rise -- I think -- Rise.  I
15 called them, they took me off collection right away.
16 And National Funding.  That's all I know.
17 Q   What is Rise?
18 A   I -- probably like fast cash.  I -- I have no
19 idea.
20 Q   Okay.  How about National Funding?
21 A   They're just -- I don't know what they are.
22 Q   Okay.  Have you ever borrowed money yourself
23 from Rise?
24 A   No.
25 Q   Have you ever yourself borrowed money from

**Page 25**

1  National Funding?
2  A   No.
3  Q   Okay.  So how old were you when you first met
4  Mr. Berrera?
5  A   I believe I was about 7 or eight years old.
6  Q   Okay.  And how -- how did you meet him?
7  A   Elementary school.
8  Q   And where was that?
9  A   It was Hansen Elementary in Anaheim.
10 Q   Are there any -- so what -- if you were 7,
11 that was probably, what, First Grade?
12 A   I believe so.
13 Q   Is that right?
14 A   Yes.
15 Q   Okay.  Are there any other people from kind of
16 that period in your life where you still keep up with?
17 A   Yes.  David Andriano, Andreas Jimenez.
18 Q   Is it J-I-M-E-N-E-Z?
19 A   Yes.  And Paul Cortez.  Yeah, we're friends
20 since then.
21 Q   And have you kept in contact with those three
22 ever since elementary school?
23 A   Yes, we still talk.
24 Q   Did you go to middle school and high school
25 together?

**Page 26**

1  A   Yes.  And they -- some of them go to my gym
2  and we still hang out.
3  Q   Did you earn a high school diploma?
4  A   Yes.
5  Q   And have you taken any -- do you have a
6  college degree?
7  A   I did some college courses.
8  Q   Okay.  Where was that?
9  A   Golden West College.
10 Q   And where in the world is Golden West College?
11 A   Huntington Beach.
12 Q   I'm sorry?
13 A   Huntington Beach.
14 Q   Huntington Beach.  Okay.  And what were those
15 courses in?
16 A   English.  I took Sociology, took all the
17 classes.  The only one -- I had Math, that was pretty
18 hard.
19 Q   Was that -- were those courses in pursuit of a
20 particular degree that you were --
21 A   I was still trying to figure out what I wanted
22 to do and then I started wrestling, but then I got
23 injured, I couldn't breath 'cause I popped my rib.  And
24 the following year I -- I -- I -- I rolled my arm
25 and messed up my shoulder and I couldn't sit down 'cause

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 16 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1961

**Page 27**

1    I was in pain all the time. I wouldn't take medication.

2    Q   So can you kind of summarize for me what your

3   relationship with Mr. Berrera kind of has been over the

4   years?

5    A   Before all this?

6    A   Yeah.

7    A   Well, we all hung out and that's -- we were

8   really good friends, like talked.

9    Q   Okay. Now, Mr. Berrera worked for a bank

10  before U.S. Bank; correct?

11    A   Yes.

12    Q   When did you first, you know, bring your

13  banking business, I guess, to Mr. Berrera?

14    A   When I first opened in 2012.

15    A   And when you say you first opened --

16    A   The business.

17    Q   Okay. And that's Hardcore Fitness Center?

18    A   Yes.

19    Q   And so you opened that business in 2012?

20    A   Yes, June 12, 2012.

21    Q   All right. And so, of course, you needed some

22  bank accounts?

23    A   Just the business. Checking and savings.

24    Q   Okay. And where was Mr. Berrera working in

25  June of 2012?

**Page 28**

1    A   Wells Fargo.

2    Q   And so did you open an account there?

3    A   Yes.

4    Q   How many accounts did you open there?

5    A   I just had the business checking and savings,

6  and my personal checking savings, that's it.

7    Q   Okay. When you would address Mr. Berrera,

8  what would you call him? Dan or did he have --

9    A   Daniel.

10    Q   Just Daniel. Okay. And how often would you

11  hang out with him, let's say, in a college and after?

12    A   College, not as much. After college, once in

13  a while 'cause he drinks too much, I don't want to hang

14  out with him, he drinks a lot.

15    Q   Let's say, after college, about how often

16  would you see him?

17    A   Maybe like twice a month, maybe.

18    Q   Okay. And was it usually in the context of

19  business or would you go out to bar? What would you do

20  with him?

21    A   Never business. It was just hanging out.

22    Q   Did you ever live together?

23    A   No.

24    Q   Have you ever done any business with

25  Mr. Berrera other than banking?

**Page 29**

1    A   No.

2    Q   Have you ever lent him any money?

3    A   Yes, I did.

4    Q   How many times did you lend him money?

5    A   One time.

6    Q   When was that?

7    A   I don't remember.

8    Q   Do you know approximately how many years ago?

9  Has it been a long time?

10    A   It's been a long time, yes.

11    A   After college or before?

12    A   After college.

13    Q   Can you give me the approximate years you were

14  in -- taking college courses?

15    A   Probably, 2003 to 2006.

16    Q   How much money did you lend him?

17    A   300.

18    Q   Has he ever lent you money?

19    A   No.

20    Q   Has he ever helped with Hardcore Fitness?

21    A   Just with the accounts, that's about it.

22    Q   Just with the banking?

23    A   Yeah.

24    Q   He's never worked there?

25    A   No, he's never worked there.

**Page 30**

1    Q   Have you ever authorized him to sign papers of

2  any kind on your behalf?

3    A   No.

4    Q   When did you last see Mr. Berrera?

5    A   I don't remember. I know -- I don't know, I

6  don't know.

7    Q   Has it been, you know, since that day at

8  Harvest?

9    A   I seen him once or twice after that day in

10  Harvest.

11    Q   How recently do you think?

12    A   Probably in the same month.

13    Q   All right. And so was that May of 2016?

14    A   Yes.

15    Q   Okay. What do you remember about the time

16  that you saw him after Harvest?

17    A   I was trying to get him to take care of the

18  U.S. Bank stuff.

19    Q   And you saw him in person?

20    A   While he was hiding from me but, yes.

21    Q   Okay. Where did you find him the second time?

22    A   I found him at his house. I kept knocking at

23  his house.

24    Q   What did he say to you when you showed up at

25  his house?

**Page 31**

1    A   He said he was taking care of it.

2    Q   Have you communicated with him by any other

3    means since going to his house?

4    A   No, I just wrote him on -- on Instagram or

5    Facebook, one of those.  I'm telling him to take care --

6    I emailed -- sorry, not email -- Instagram just to pay

7    the accounts and take care of it.

8    Q   So what's your, I guess, user I.D. or your

9    handle on Instagram?

10   A   I don't really use it much, it's just for

11   business and I just post the business pictures, that's

12   it.  I don't really go on there to -- I don't put

13   pictures of myself or anything like that.

14   Q   Okay.  But you have an account; right?

15   A   Yes.

16   Q   And what's the name on the account?

17   A   Sam Liera, and the other one is, I guess,

18   "Hardcore Fitness center."

19   Q   And what's Mr. Berrera's name on Instagram; do

20   you know?

21   A   He deleted it.  I don't know what he did.

22   Q   Okay.  So you don't recall what his kind of

23   handle is?

24   A   No, I don't.

25   Q   Okay.  Would you typically text with

**Page 32**

1    Mr. Berrera at all?

2    A   I would text, yeah, but after the whole thing,

3    I think he changed his number or blocked.  I don't know

4    what he did.

5    Q   Do you remember what his number used to be?

6    A   I don't remember it by memory, I don't.

7    Q   From what number would you text him?  What was

8    your number?

9    A   My phone number is ██████████.

10   Q   Okay.  And how about email; would you email

11   with him?

12   A   No, I don't know his email address.

13   Q   Any other way that you would communicate with

14   him?

15   A   No, just the phone.

16   Q   Okay.  Did you ever open up a joint bank

17   account with Mr. Berrera?

18   A   Yes.  One joint checking account.

19   Q   Okay.  At what bank was that?

20   A   U.S. Bank.

21   Q   What did you do?

22   A   He said he would like to save money 'cause I

23   guess he likes to drink so he wants to save some money

24   and that way he can't touch it, I said okay, I helped

25   him out.

**Page 33**

1    Q   That's the reason he gave you for opening a

2    joint account?

3    A   Yeah, he said he wanted to save money.

4    Q   Okay.  Did you understand that, you know, if

5    both your names were on the account, that he could draw

6    on that account, withdraw money from it whenever he

7    wanted?

8    A   Yes, I knew that.

9    Q   Okay.  So how -- how was it that having a

10   joint account with you was going of help him save money?

11   MR. RAHIMI:  Objection, argumentative.

12   MR. SHERMAN:  You can answer.

13   THE WITNESS:  I don't know.  He wanted to save

14   money and I said okay.

15   BY MR. SHERMAN:

16   Q   Okay.  Do you remember the last four digits on

17   the account that you had joint with Mr. Berrera?

18   A   I believe it might -- I don't know, I forgot

19   the number right now.

20   Q   Okay.  And you said it was only one account

21   that he held jointly with Mr. Berrera?

22   A   Yes, that's it.

23   Q   Okay.  Did you ever have a joint account with

24   Mr. Berrera before the account at U.S. Bank?

25   A   No.

**Page 34**

1    Q   So let's talk about the accounts that you had

2    at U.S. Bank.

3    A   Okay.

4    Q   You had some accounts for Hardcore Fitness;

5    right?

6    A   Yes.

7    Q   Do you remember off the top of the head which

8    numbers those were?

9    A   I believe -- no, I don't.

10   Q   Yeah.  How about -- does the account ending

11   6876 ring a bell?

12   A   Yes.

13   Q   I'm sorry?

14   A   Yes.

15   Q   Okay.  And you authorized that account being

16   opened?

17   A   Yeah, that account he helped me open it.  That

18   was through the business.

19   Q   Okay.  And that was like a business checking

20   account?

21   A   Yeah, business checking account.

22   Q   Okay.  And did you have -- you used the term

23   "reserve line" before?

24   A   Yes.

25   Q   What's your understanding of what a reserve

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 18 of 139 Page ID #:1903
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

1 line is?

2 **A What he told me it was like -- if I want to**

3 **open a reserve line like -- if you ever need money, you**

4 **just take it out of that, and then if you pay it back,**

5 **you will just pay interest on it. I'm like "I don't**

6 **really understand" but I'm like "Do you want it?" I'm**

7 **like "Okay. Just in case, you know, if I need to make a**

8 **payment or something, and then I'll put the money right**

9 **back." That's it.**

10 Q And do you know when it means to overdraw on

11 your account or have an overdraft?

12 **A Yes.**

13 Q What's your understanding of what an overdraft

14 is?

15 **A Overdraft, I know that if you don't make**

16 **the -- if you take too much I think they charge you.**

17 Q You understand that it's basically taking more

18 money out of your checking account than you have for a

19 balance in your checking account?

20 **A Yes, I know.**

21 Q Okay. Were there any other checking accounts

22 that you opened up for Hardcore Fitness?

23 **A I think -- I'm not sure, I believe that was**

24 **it.**

25 Q How about one ending in 6590; does that ring a

Page 35

bell?

2 **A No.**

3 Q Do you have any accounts for Hardcore Fitness

4 at U.S. Bank, as we sit here today?

5 **A Yes.**

6 Q Do you know what the last four digits on that

7 account?

8 **A Actually, I do not.**

9 Q Okay.

10 **A Yeah.**

11 Q All right. Let's talk about credit cards for

12 your business. Did you open up a business credit card

13 at U.S. Bank?

14 **A Yes.**

15 Q How many accounts did you open?

16 **A I believe I just have one business checking.**

17 **I think it was one credit card.**

18 Q And do you remember the last four?

19 **A No.**

20 Q How about the 0359?

21 **A 0359. Okay. Yes, that's flex Perks card.**

22 Q Is that your business card at U.S. Bank?

23 **A I believe so.**

24 Q Was there also a 0367?

25 **A I don't know.**

Page 36

1 Q Okay. If I used the term "central billing"

2 for a credit card, do you understand what I was talking

3 about?

4 **A No.**

5 Q Okay. All right. Let's talk about -- did you

6 have any other business accounts at U.S. Bank credit

7 card or a deposit that you can remember?

8 **A No.**

9 Q How about personal accounts?

10 **A Yes, I had a checking and savings.**

11 Q Okay. And so that's two accounts -- two

12 deposit accounts total for your personal business?

13 **A There was the business checking and savings,**

14 **and there is my personal checking and savings.**

15 Q Okay. Was the savings account -- I take it

16 again, you don't remember the digits; right? Or do you?

17 **A No, I do not.**

18 Q Okay. Does 0128 ring a bell?

19 **A No.**

20 Q How about 3978?

21 **A Yes, that one does.**

22 Q What was that for? That account.

23 **A I'm not sure if that was my business -- my**

24 **business account or my personal account.**

25 Q Okay. So you're not sure whether that was

Page 37

1 business or personal?

2 **A No.**

3 Q How about 6967?

4 **A 6967, I believe that one was the checking**

5 **account, joint account with Daniel.**

6 Q Okay. Did you -- did Daniel give you

7 anything, you know, in exchange for, you know, having a

8 joint account with you?

9 **A No.**

10 Q Okay. And then let's talk about personal

11 credit cards. Do you remember how many you had?

12 **A I had a business one and a personal one, I**

13 **believe.**

14 Q Okay. Does 09 -- so would 0949, does that

15 ring a bell?

16 **A I believe so.**

17 Q Okay. And do you know if that was business or

18 personal?

19 **A I think that might have been a personal.**

20 Q At the same time you had these accounts open

21 at U.S. Bank did you have accounts at other banks?

22 **A No.**

23 Q Just U.S. Bank?

24 **A Just U.S. Bank.**

25 Q ==How would you keep track of your accounts?==

Page 38

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 19 of 139  Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1962

**Page 39**

1    A   I don't really keep track of my accounts,
2  yeah.  I just know how much I spend and not to spend.  I
3  make payments to it, that's it.
4    Q   Okay.  Would you ever go to U.S. Bank's
5  website?
6    A   Yes.
7    Q   When did you first start going into U.S.
8  Bank's website?
9    A   I think, after I opened it and that was it.
10   Q   Okay.  Do you remember what your username was
11  that you used?
12   A   I don't remember 'cause I changed it.  I --
13  I -- I honestly don't remember.
14   Q   Do you remember how many different usernames
15  you've had?
16   A   With that one -- probably in this one.  But
17  the new one is two.  I believe, two.
18   Q   Okay.  And do you have one that you use right
19  now for your checking account?
20   A   Yes.
21   Q   What's that one?
22   A   ████████
23   Q   Just out of curiosity, is there a reason that
24  you chose that --
25   A   ████████

**Page 40**

1  ████████
2    Q   And what's -- oh, Kim's last name is Do?
3    A   Yeah, Do.
4    Q   Okay.  That makes sense.
5        And so was it when you married Kim that you
6  changed your usernames?
7    A   No.
8    Q   Was it before or after?
9    A   After the whole thing with Daniel.
10   Q   After -- after the whole thing with Daniel.
11  Okay.  And you don't -- do you remember at all the
12  username you used before?
13   A   I honestly don't remember.
14   Q   And when you say "the whole thing with Daniel"
15  you mean like kind of May 2016?
16   A   Yes.
17   Q   Okay.  Were there any accounts that -- do you
18  know how when you go to the website, there's a screen
19  that kind of lists your accounts?
20   A   Yes.
21   Q   Were there any accounts there that you
22  couldn't see?
23   A   I don't think so.
24   Q   And did you ever give anyone else your
25  username and password?

**Page 41**

1    A   Anyone else?  I didn't give anybody my
2  username and password.  I just know Daniel helped me set
3  it up, that's it.
4    Q   When was it that Daniel helped you set up a
5  username and password?
6    A   When I went to U.S. Bank.  When (inaudible) I
7  don't remember the date.
8    Q   Did you tell Mr. Berrera what password you
9  chose?
10   A   Actually, he's the one that did everything for
11  me.
12   Q   Okay.  And so did he choose your password?
13   A   No, I chose my password.  I just -- he made me
14  type it on his computer, or something like that.
15   Q   Okay.  And so did Mr. Berrera leave that
16  interaction knowing your password, as far as you know?
17   A   As far as I know, he probably did.
18   Q   Okay.  Did you change it after that?
19   A   No.
20   Q   You kept the same password the whole time?
21   A   Yes.
22   Q   Where did that interaction with Mr. Berrera
23  take place?
24   A   At the branch in Santa Ana.
25   Q   And do you remember the approximate timing of

**Page 42**

1  that?
2    A   No, I do not.
3    Q   Would it have been when you opened your
4  business?
5    A   No.  When I opened up my business, it was at
6  Wells Fargo and then he switched banks.
7    Q   Okay.
8    A   Yes.
9    Q   And do you remember about when that was?
10   A   No, I do not.
11   Q   Have you ever used the mobile app?
12   A   No.
13   Q   Have you ever accessed any U.S. Bank account
14  from your mobile phone?
15   A   I -- I don't even know how to download the
16  apps.
17   Q   What -- you have a smart phone?
18   A   Yes.
19   Q   What kind of phone do you have?
20   A   IPhone.  IPhone 6S.
21   Q   And, I guess, what apps do you use on your
22  IPhone?
23   A   The ones that my wife put on there.  Just
24  Pandora and Spotify.
25   Q   Okay.  How about Instagram?

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 20 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1965

**Page 43**

1    A    Yeah, and Instagram and Facebook.  And then
2  she put something for Uber, I guess.
3    Q    Okay.  Have you ever downloaded an app
4  yourself?
5    A    No.
6    Q    It's always Kim who puts the apps on your
7  phone?
8    A    Yes.
9    Q    Okay.  How often do you use Instagram?
10    A    Every day, gym purposes.
11    Q    How about Facebook?
12    A    Facebook, every day.  Gym.
13    Q    And so never accessed your U.S. Bank account
14  from your mobile phone?
15    A    Not that I know of, I don't.
16    Q    Would you look at your monthly account
17  statements?
18    A    Not really.  Sometimes I would.  Not a lot.
19    Q    Do you recall whether they were available to
20  you online?
21    A    My statements?  I never really checked on
22  online for statements.
23    Q    Okay.  Do you have any reason to believe that
24  they weren't available to you online?
25    A    I honestly don't know.

**Page 44**

1    Q    Okay.  Let me ask you this:  Would -- would
2  anybody else -- would you ever let anybody else access
3  your U.S. Bank accounts through your mobile phone?
4    A    No.
5    Q    So does Kim -- do you know if Kim has the U.S.
6  Bank now?
7    A    No, she only has the Wells Fargo.
8    Q    Okay.  Does Kim have your username and
9  password for U.S. Bank?
10    A    No, she just has -- she just has the ▮▮▮▮▮▮
11  that's about it.  She doesn't know my password.
12    Q    So she doesn't know your password to get on to
13  the U.S. Bank website?
14    A    No, she doesn't.
15    Q    Okay.  How about anybody associated with your
16  business?
17    A    No.
18    Q    Okay.  So I take it, you don't track your
19  accounts through any kind of software like Quicken or
20  Quickbooks or --
21    A    I don't even know that.
22    Q    Do you have an accountant for your business?
23    A    No.
24    Q    Or a bookkeeper?
25    A    No.

**Page 45**

1    Q    How many -- let me ask you this:  Have you
2  ever let anybody else use your credit card?
3    A    No.
4    Q    Have you ever taken a cash advance on a credit
5  card?
6    A    No.
7    Q    So never taken a cash advance at U.S. Bank on
8  a credit card?
9    A    No, I have not.
10    Q    Never taken one at Wells Fargo?
11    A    No.
12    Q    Have you ever had a credit card anywhere
13  besides U.S. Bank?
14    A    I don't -- maybe Wells Fargo, I'm not sure
15  but --
16    Q    Did you experience any fraud when you had your
17  accounts at Wells Fargo?
18    A    No, no.
19    Q    How many employees does Hardcore Fitness have?
20    A    Right now just one.
21    Q    And who is that?
22    A    Chris Vitasa (phonetically).
23    Q    How do you spell Chris?
24    A    C-H-R I-S.
25    Q    Okay.

**Page 46**

1    A    V-I-T-S-A.
2    Q    V-I-T-S-A?
3    A    Sorry, V-I-T-I-S-A.
4    Q    Okay.  And is Chris a man or a woman?
5    A    A man.
6    Q    What does Chris do for Hardcore Fitness?
7    A    He teaches boxing.
8    Q    In the past, has anyone else ever worked for
9  Hardcore Fitness?
10    A    Just my business partner, Vince.  He worked as
11  an employee.  He was my business partner.
12    Q    And what's Vince's last name?
13    A    Alalaatoa, A-L-A-L-A-A-T-O-A.
14    Q    What's Vince's phone number; do you know?
15    A    No, we don't talk anymore.
16    Q    When did you stop talking to Vince?
17    A    After I asked him to get his own -- what was
18  that -- insurance for teaching at the gym.  Yeah, 'cause
19  I wasn't going to pay for the insurance for both of us.
20  Just for myself.
21    Q    Who carries the insurance on the gym?
22    A    I do.
23    Q    Got it, but which company provides insurance?
24    A    Martial Arts, Inc., or something like that.
25    Q    Okay.  So who does the books for the gym, like

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 21 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1906

**Page 47**

1  who pays the bills?
2  A  I pay the bills.
3  Q  You do it all yourself?
4  A  I do it all myself.
5  Q  Okay.  Who opens the mail?
6  A  I open the mail.
7  Q  Have you ever had any trouble getting mail
8  where the gym is?
9  A  Not that I know of.  No.
10  Q  Okay.  Do you sometimes get mail in the gym
11  that's addressed to you personally:  Samuel Soria or Sam
12  Liera?
13  A  Yes.
14  Q  Okay.  Is that routine?
15  A  Yeah, it come to Hardcore Fitness.  Usually
16  Hardcore Fitness.
17  Q  But if it -- well, let's first establish.
18  What's the address?
19  A  ███
20  Q  Okay.
21  A  ███████████████.
22  Q  And so if something came addressed to, you
23  know, Sam Soria at ███████████████ in
24  Fullerton, you would could get that; right?
25  A  Yes.

**Page 48**

1  Q  And if something came addressed to Sam Liera
2  at ███████████████ in Fullerton, you would get that
3  mail; right?
4  A  Yes.
5  Q  All right.  So do you ever recall getting a
6  U.S. Bank statement at work?
7  A  Yes.
8  Q  Okay.  So what do you do with them?
9  A  I rip them up and I throw them in the trash.
10  Q  Okay.  How about at home; have you gotten U.S.
11  Bank statements at home?
12  A  I don't think so.  No.
13  Q  Okay.  So where do you live today?
14  A  ███████████████, Fullerton.
15  Q  Where did you live before that?
16  A  I lived with my wife at Deer Park.  I don't
17  know the address.
18  Q  Do you remember when you moved to Acacia?
19  A  Probably 2015.
20  Q  How about before Deer Park?
21  A  I lived at ███  I don't remember the address
22  either.
23  Q  Okay.  And before Dale?
24  A  I lived -- I don't know the address, but it's
25  still in Stanton.

**Page 49**

1  Q  Was there an at ███████████
2  A  Yeah, there you go, ███████.  That one.
3  Q  Who else lived with you at ███████████?
4  A  My brothers.
5  Q  And what are their names?
6  A  Carlos Liera.
7  Q  And --
8  A  Osiel Liera, O-S-I-E-L.  Alejandro Liera.
9  Q  Okay.  So how many brothers do you have?
10  A  Three.
11  Q  Any sisters?
12  A  No.
13  Q  So when you moved away from the ███████████
14  address, did your brothers continue to live there?
15  A  No.
16  Q  You all moved away together?
17  A  Yes.
18  Q  Did you forward your mail from ███████████
19  A  ███████████ no -- oh, yeah, I think I did -- I
20  did a whole --
21  Q  You went down to the post office, filled out a
22  form and said this is where I'm moving to?
23  A  Yes.
24  Q  And did that work for you?  Did you get your
25  mail?

**Page 50**

1  A  I didn't -- I didn't receive much mail.
2  Q  Okay.  Who was your landlord at ███████████?  I
3  guess I should ask:  Did you rent?
4  A  Yes.
5  Q  And do you remember who your landlord was?
6  A  No.
7  Q  And do you have any idea when you moved away
8  from ███████████
9  A  No, I do not.
10  Q  But the four of you all moved away kind of on
11  the same date or same period of time?
12  A  Yes, yes.
13  Q  Okay.  About how much revenue does Hardcore
14  Fitness generate every year?
15  A  Honestly, I don't know.  I just know what --
16  from the taxes and then I get a -- a lot of people pay
17  cash, and then I have clients, private clients.
18  Q  So -- okay.  Some people pay you in cash?
19  A  Yes.
20  Q  Okay.  And then are there other methods of
21  payment that your customers use?
22  A  Yes.  People set up something -- they put
23  their card down and they pay monthly every month.
24  Q  So like a credit or a debit card?
25  A  Yes.  Usually a debit card.

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 22 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1907

**Page 51**

1  Q  And so who -- who handles those transactions
2  for you and make sure that the business gets paid?
3  A  I do.
4  Q  But is there a bank?
5  A  Yeah, it's -- I think it goes to U.S. Bank.
6  The company name is Elavon.  Elavon.
7  Q  Okay.  Does anybody ever pay by check?
8  A  Sometimes they pay by check but not -- not
9  really.
10  Q  So, I mean, is there anyone who would be able
11  to tell me how much the business revenue generates every
12  year?
13  A  No.
14  Q  Okay.  How about expenses; do you track
15  expenses for your business?
16  A  No, I don't.
17  Q  Do you file tax returns every year?
18  A  Yes.
19  Q  Okay.  How do you come up with the numbers
20  that you put on the tax return if you don't know what --
21  A  It's just the taxes -- whatever I get from
22  Elavon, like the W-2, that's the one I take to my taxes.
23  Q  Okay.  So you get a form from Elavon every
24  year that shows --
25  A  Yes.

**Page 52**

1  Q  -- how much you've taken in credit card sales?
2  A  Yeah, yeah.
3  Q  How do you account for the cash sales?
4  A  I don't -- that's what I need to start doing.
5  Q  Okay.  Could you estimate for me the
6  proportion of your cash sales to your credit card sales?
7  Is it like -- is it mostly credit card?  It's mostly
8  cash?
9  A  It's mostly cash.  Yeah, it's a small business
10  so I deal with everything.
11  Q  Okay.  And so when the cash comes in, what do
12  you do with it?  Do you put it in the bank?  Do you
13  spend it?
14  A  I just put it away.
15  Q  Put it away where?
16  A  In a can in my house.
17  Q  Okay.  And then do you ever take it out to
18  spend it or you just got a can that you just keep
19  filling with cash?
20  A  I spend it, buy stuff on the gym, go out on
21  vacations, stuff like that.
22  Q  Okay.  Have you ever had anybody help you
23  prepare a tax return?
24  A  I just -- the only one that does my taxes is
25  Martin Raigoza, that' it.

**Page 53**

1  Q  Did you say Martinez Mendoza?
2  A  Raigoza.  He's my tax guy.
3  Q  Can you spell that?
4  A  R-A-I-G-O-Z-A.
5  Q  And does he do business like under a business
6  name?
7  A  I don't know.
8  Q  Does he have an address?
9  A  I could get it on my phone.
10  Q  Yeah, go ahead.
11  A  ███████████
12  Q  ███████
13  A  Yeah, C███████
14  Q  ████████████
15  A  Yes.
16  Q  Okay.
17  A  Riverside.  Zip Code ███████
18  A  ██████.  Okay.  And so he prepares your tax
19  returns?
20  A  He does my taxes.
21  Q  Okay.  For how long has he done that?
22  A  Probably six years, maybe.
23  Q  For the past six years?
24  A  I believe so.
25  Q  Have you filed a return for tax year 2017?

**Page 54**

1  A  I did all the taxes, 2017, 2015.
2  Q  Okay.  So besides Samuel Liera Soria and
3  Samuel Soria Liera, have you ever gone by any other
4  names?
5  A  No.
6  Q  What's your date of birth?
7  A  ████/1983.
8  Q  Your social security number?
9  A  ████-5340.
10  Q  We already got -- have you had the same mobile
11  number?
12  A  Yes.
13  Q  For how many years?
14  A  Since college.  Probably --
15  Q  That's good.  Any other phone numbers that you
16  use?
17  A  No.
18  Q  How about is there a landline at Hardcore
19  Fitness?
20  A  No.  It all goes to my cell phone, my wife did
21  it.  Business calls, there is a business number, it goes
22  directly to my cell phone.
23  Q  Oh, okay.  What's the business number that
24  people call?
25  A  ████████.

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 23 of 139   Page ID
#:1968

| | | |
|---|---|---|
| 1 | Q | How about email addresses? |
| 2 | A | ████████████████ |
| 3 | Q | Is this a dash or is it an underscore? |
| 4 | A | **Dot. Little period.** |
| 5 | Q | Oh, a dot? |
| 6 | A | **Yeah.** |
| 7 | Q | Any other email addresses that you use? |
| 8 | A | ████████████████ |
| 9 | Q | Does the 57 have any kind of significance? |
| 10 | A | **Just when I played football in high school,** |

that was the number I used.

| 12 | Q | Yeah, okay. Where did you go to high school? |
| 13 | A | **Western High School.** |
| 14 | Q | Western. Is that in Anaheim? |
| 15 | A | **Yes.** |
| 16 | Q | All right. And you say you are on Facebook? |
| 17 | A | **Yes.** |
| 18 | Q | And what email address do you use for that? |

19  The Hotmail one?

| 20 | A | **I think so.** |
| 21 | Q | Okay. |

22      MR. RAHIMI: Let me jump in real quick. Sam,
23  just make sure you let him finish his question before
24  you answer 'cause sometimes there is like halfway
25  through the question.

                                                        Page 55

1      THE WITNESS: Okay. Okay.
2  BY MR. SHERMAN:
3      Q    And what name do you use? Sam Liera? Sam
4  Soria?
5      **A    Sam Liera.**
6      Q    Sam Liera. Okay.
7          And where -- since you started the gym, have
8  you had any other, you know, employment or work?
9      **A    I worked at Meridian Sports Club.**
10     Q    What did you do there?
11     **A    I was a trainer.**
12     Q    During what period of time?
13     **A    2011 to 2012, I believe.**
14     Q    And when you left Meridan, did you leave on
15  your own terms?
16     **A    Yes, my terms.**
17     Q    Okay. Did you work anywhere else since you
18  started the gym?
19     **A    Yes. I worked at NOC Boxing.**
20     Q    And what did you do there?
21     **A    I was a trainer as well.**
22     Q    During what period of time?
23     **A    I don't remember. I know I left 2011.**
24     Q    And was that to take the job at Meridian?
25     **A    Yes.**

                                                        Page 56

1      Q    Where is Meridian located?
2      **A    It's in Fullerton.**
3      Q    How about NOC Boxing?
4      **A    Fullerton.**
5      ==Q    So Mr. Liera, you're also an MMA fighter;==
6  ==right?==
7      ==A    Yes.==
8      Q    When did you get started with that?
9      **A    2006 -- 2005, I think, or 2006.**
10         MR. RAHIMI: Eric, I'm sorry, if we're headed
11  down a new topic, do you mind if we just take break?
12         MR. SHERMAN: Yeah, sure.
13         THE VIDEOGRAPHER: Off the record. The time
14  is 9:41 a.m.
15             (Recess taken.)
16         THE VIDEOGRAPHER: Going back on the record.
17  The time is 9:48 a.m.
18  BY MR. SHERMAN:
19     Q    So, Mr. Liera, before the break, there was
20  something I meant to ask you and is that: Does Kim
21  work?
22     **A    Yes, she works.**
23     Q    Where does she work?
24     **A    She works at Meridian Sports Club.**
25     Q    Oh, okay. And what does she do there?

                                                        Page 57

1      **A    She's a manager and -- she does a few things,**
2  I don't know what they are. She does a lot.
3      Q    Is that how you became employed at Meridian?
4      **A    No.**
5      Q    Okay. How long have you known Kim?
6      **A    I met her back in when I started at L.A.**
7  Boxing in 2017 maybe -- no, sorry 2007.
8      Q    And, sorry, where Boxing?
9      **A    L.A. Boxing.**
10     Q    L.A. Boxing?
11     **A    Yeah, L.A. Boxing.**
12     Q    Did you mention an NOC Boxing?
13     **A    Yeah, NOC Boxing.**
14     Q    Okay. And did you also work at L.A. Boxing?
15     **A    Yes.**
16     Q    Okay. And when was that?
17     **A    I worked there from 2006 'till they closed it**
18  down. May 2010 maybe or '9.
19     Q    Got it. And then did you work anywhere
20  between there and Meridian?
21     **A    No.**
22     Q    So did you and Kim start at Meridian at the
23  same time?
24     **A    No, she was already working there. She'd been**
25  there for a while, I don't know how long.

                                                        Page 58

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 24 of 139   Page ID
#:1369
Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

1   Q   Okay.  Did she work anywhere before Meridian;
2 do you know?
3   A   I don't know.
4   Q   And she still works at Meridian today?
5   A   Yes.
6   Q   Okay.  So then we were talking about your MMA
7 career, and you said you started 2005; right?
8   A   Yes.
9   Q   How does that work?  Do you fight in a
10 particular organization or league or --
11   A   There is different organizations.  There is
12 a -- I think King of the Cage and LFA and Strike Force,
13 and a few other ones I can't remember.
14   Q   And can you kind of describe the style of
15 fighting that you do?  I mean, do you kick?  Do you
16 punch?
17   A   Yeah, kick, punch wrestle, submissions,
18 everything?
19   Q   And is that the goal -- so you're fighting one
20 other person; right?
21   A   Yes.
22   Q   And you're in a cage; right?
23   A   Yes.
24   Q   And what's it shaped like?  How big is it?
25   A   It's -- well, there's different sizes, some

Page 59

1 are small, some are pretty big.  I'm not sure about the
2 size exactly, but sometime they could be a cage,
3 sometimes it could be a boxing rink.
4   Q   And rectangular or an octagon?
5   A   Octagon.
6   Q   An octagon?
7   A   Yes.
8   Q   Okay.  And with netting around the sides?
9   A   Yes, fence.
10   Q   How many fights like that have you been in?
11   A   Thirty-three maybe.  Thirty-three.
12   Q   All between 2005 and today?
13   A   Thirty-five and there were two -- fights I
14 didn't count?
15   Q   There were two what?
16   A   Amateur fights.  It's before you go
17 professional.
18   Q   Okay.  How long have you been professional?
19   A   Since 2006.
20   Q   When is the last time you had a fight?
21   A   September 28th of this year.
22   Q   Of 2018?
23   A   Yes.
24   Q   Okay.  And about how often do you do them?
25   A   Usually, I used to like to fight four times a

Page 60

1 year, whatever I can.  Depends, sometimes you get
2 injured, takes longer.
3   Q   How old are you?
4   A   34.
5   Q   I guess, what's the usual, I guess, maximum
6 age for an MMA fighter?
7   A   I think the usual when we stop fighting
8 basically -- the oldest I seen was 40.
9   Q   And then does it cost money to enter a fight?
10   A   It doesn't cost money to enter the fight, you
11 only got to pay your medicals, or sometimes there is
12 promotion that pays for your medicals.
13   Q   And what's required with respect to medical
14 examination?
15   A   For professional they require MRI, EKG, EEG,
16 eye exam.  You gets your eyes dilated.  And blood work,
17 make sure you don't have any like diseases or anything
18 like that, and -- and a physical.
19   Q   And do you do that exam all at once before a
20 fight?
21   A   Some of them last for four years or five
22 years, but the blood works you do it every six months.
23   Q   And you have to have had so many exams before
24 you can be in a fight?
25   A   When I first fight, you have to get all those

Page 61

1 done.  And then if you want to keep fighting, I guess --
2 like you don't have to pay for any money.  Once the six
3 months are up, you have to get your eyes dilated again,
4 I believe, and blood work.  Those are the biggest thing.
5   Q   And about how much does that cost, kind of,
6 per fight?
7   A   Medicals, close to a thousand.
8   Q   Are there any banned substances in MMA
9 fighting?
10   A   Steroid and some other stuff.  I don't know.
11 That's all I know.  I'm pretty sure there is a long
12 list.
13   Q   And is that why the blood work is every six
14 months?
15   A   That, and they want to know people don't have
16 any like herpes or anything like that that he gives to
17 another fighter.
18   Q   Right.  Cause I take it, it's a usual
19 occurrence during these fights for somebody to end up
20 weeding?
21   A   Yes.
22   Q   Have you ever tested positive for banned
23 substance?
24   A   No.
25   Q   Do you go to the same doctor every time for

Page 62

Samuel Soria Liera - CONFIDENTIAL          11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 25 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1976

1  your medicals?
2    A  No.
3    Q  So who have you gone to most recently?
4    A  I don't know her name -- her name is Rose, she
5  was the primary doctor where I used to go, but she
6  passed away and -- I heard in 2016.
7    Q  She passed away in 2016?
8    A  Yeah, she passed away in 2016 and it was
9  closed in 2016.  I went there once.
10   Q  Was it a clinic where you would see her or a
11 hospital?
12   A  A clinic.
13   Q  And do you remember the name of it?
14   A  No, I do not.
15   Q  Do you remember where it was?
16   A  San Pedro.
17   Q  Do you remember Rosa's last name?
18   A  No, I do not.
19   Q  Was Rosa a medical doctor?
20   A  I -- I did know she worked at -- a
21 receptionist at Dr. Glukman's.
22   Q  So Rosa was a receptionist?
23   A  Yeah, she just have doctors that worked for
24 her.
25   Q  She had doctors that worked for her?

Page 63

1    A  I believe so.
2    Q  So Rosa is a receptionist in a medical clinic?
3    A  Yeah, she did -- she worked with all the
4  fighters, got all the information.  So I think she just
5  decided to open up her own thing and just hired doctors
6  to do the blood works for the fighters.
7    Q  Okay.  And so when you went to go get your
8  medical exam with Rose [sic], it might be a different
9  doctor every time --
10   A  She doesn't -- when you go to Dr. Glukman's
11 you go see different doctors.  They send you to this
12 place to get your -- your eyes dilated, they send you to
13 another place to get your blood work done --
14       THE REPORTER:  Please slow down.
15   Q  And, I'm sorry, you mentioned a name
16 "Glukman?"
17   A  Yeah, Dr. Glukman.
18   Q  Dr. Glukman.  And does he have a first name?
19   A  I just know him by Dr. Glukman.
20   Q  And where do you go see Dr. Glukman?
21   A  San Pedro.
22   Q  And what address?
23   A  I do not know the address.
24   Q  When is the last time you were to see
25 Dr. Glukman or Rose in San Pedro?

Page 64

1    A  I don't remember the last time I saw
2  Dr. Glukman.  Rose, I might have seen her 2015 or '16, I
3  don't remember.
4    Q  Would you have seen Dr. Glukman more recently
5  or further in the past than you saw Rose?
6    A  Further in the past.
7    Q  Further in the past.  And was there like one
8  fixed address where you would go see these people?
9    A  Dr. Glukman, yes.
10   Q  What about Rose?
11   A  Rose, I just saw her once.  That's the only
12 address I knew.
13   Q  So, Mr. Soria, are you claiming that something
14 that U.S. Bank has done has harmed your health?
15   A  It made it worse.  The anxiety -- I -- after
16 that whole incident, I was sleeping two hours, sometimes
17 I wouldn't know if I slept at all.
18   Q  And when did this start?
19   A  The whole sleeping thing, I think in -- after
20 I found out from the fraud stuff, I was stressed out
21 over it.
22   Q  I'm sorry, after what?
23   A  After I found out about all the fraud and I
24 tried to fix it, I didn't even know how to fix, but I
25 couldn't sleep, it kept me up all night.  And because my

Page 65

1  wife and my parents were telling me stuff all the time,
2  and I kept trying to fix every and I couldn't.  And
3  that's what kept me up all night just thinking about it.
4    Q  When you say your wife was telling you stuff,
5  what was that?
6    A  Like "How did you let Daniel get the loans?
7  How didn't you know that?"
8    Q  Okay.  And what are your parents' names?
9    A  Alejandro Liera.
10   Q  And?
11   A  Sylvina Soria.
12   Q  S-Y-L-V-I-N-A?
13   A  S-O-R-I-A.
14   Q  And where do they live?
15   A  They live in -- I believe, La Habra, I think.
16   Q  Do you ever go to visit?
17   A  Yes.
18   Q  What's the --
19   A  Oh, no, I'm sorry, La Mirada.  I don't know
20 the address.
21   Q  Can you spell La Mirada?
22   A  L-A and then M-A.
23   Q  N-A?
24   A  No, it's La and then Mirada is different.
25 M-I -- sorry -- M-I-R-A-D-A.

Page 66

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 26 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1871

**Page 67**

1  Q  La Mirada.  And is that in California?

2  A  Yes, it's -- it's Fullerton then Brea then La

3  Mirada.

4  Q  Okay.  And you don't know their address?

5  A  No, I do not.

6  Q  Okay.  How about their phone number?

7  A  Can I get my phone?

8  Q  Sure.

9  A  My mom's number is ███ --

10  Q  Okay.

11  A  -- ████████

12  Q  Okay.  Your dad?

13  A  My dad, his phone had been acting up, he's

14  usually with my mom, but the previous number

15  ████████

16  Q  So did you talk to your parents about your

17  anxiety and sleeplessness?

18  A  No, I didn't talk to them about that.

19  Q  How about Kim?

20  A  Yes, she knew.  She had to deal with it every

21  day.

22  Q  You got to sleep in the same bed?

23  A  Yes.

24  Q  Did you talk to anybody else about the

25  symptoms that you were experiencing?

**Page 68**

1  A  I don't know.

2  Q  Okay.  When did -- when did you first start

3  feeling anxious?

4  A  Like the sleeplessness?  What --

5  Q  Can you -- can you tell me what -- what does

6  anxiety mean to you?  What do you understand that

7  anxiety is?

8  A  Anxiety is you just can't stop thinking about

9  it and like -- I can't even explain it, sorry.

10  Q  Sure.  When did you first hear the term

11  "anxiety"?

12  A  I was just reading for something to see what's

13  going on with me, like --

14  Q  No, I'm sorry, when did you first hear the

15  word "anxiety"?

16  A  I don't know.  I heard it a long time ago

17  probably.  I see anxiety, I'm like okay.

18  Q  How did you come to describe what you were

19  experiencing as anxiety?

20  A  I was reading online and I see what caused

21  these symptoms.  It's anxiety and adrenal deficiency, so

22  I'm just reading things, so I'm trying to see maybe it's

23  one of those or it's altogether, I don't know.

24  Q  Okay.  And the sleeplessness, had you ever

25  experienced that sort of sleeplessness?

**Page 69**

1  A  I have, but it's only like one day.  This

2  was -- this was every day.  And sometimes I didn't feel

3  I slept for three days.

4  Q  Okay.  And so when did that start that you

5  would go three days without sleeping?

6  A  After I found out about the fraud and the bank

7  calling me every day, I'd be up and I couldn't get any

8  sleep.

9  Q  Have you found anything that helps that?

10  A  No.  I tried -- I tried melatonin.  And I

11  would have to rely sometimes on sleep aid.

12  Q  Okay.  Did you see a medical professional

13  about your anxiety and sleeplessness?

14  A  Not the anxiety.  Just the sleeplessness.

15  Q  Okay.  Who did -- who did you see about your

16  inability to sleep?

17  A  Right now I've been talking to Dr. --

18  Dr. Shaw.

19  Q  Is that S-H-A-H?

20  A  S-H-A-W.

21  Q  Does Dr. Shaw have a first name?

22  A  I don't know.

23  Q  You don't know?

24  A  No.

25  Q  Where do you go to see Dr. Shaw?

**Page 70**

1  A  I see him in Diamond Bar.

2  Q  I'm sorry?

3  A  Diamond Bar.

4  Q  Diamond Bar, California?

5  A  Yes.

6  Q  And is he with a clinic?

7  A  Yes.

8  Q  What's the name of the clinic?

9  A  I don't know.

10  Q  How many times have you been to see Dr. Shaw?

11  A  Maybe six times.

12  Q  And when is the first time you saw Dr. Shaw?

13  A  I don't know.

14  Q  Was it before or after May of 2016?

15  A  After.

16  Q  And what sort of doctor is Dr. Shaw?

17  A  He's a hormone doctor.

18  Q  I'm sorry?

19  A  Hormone doctor.  Endocrinologist.

20  Q  He's a hormone doctor?

21  A  Yes.

22  Q  So you went to go see Dr. Shaw about your

23  sleeplessness or for some other reason?

24  A  Sleeplessness and -- mostly sleeplessness

25  'cause I -- I couldn't -- the sleeping thing was really

Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 27 of 139  Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1772

1  driving me crazy, it was stressing me out and putting me
2  in a bad mood.
3      Q    And before May of 2016, the only trouble you
4  had sleeping was maybe a night here or there?
5      A    Yeah, a night here or there, but not almost
6  every night in a week or two weeks straight.
7      Q    And so how long did that last?  I think you
8  mentioned three nights in a row maybe you didn't sleep.
9          How long did that last after you found out
10  about the fraud?
11      A    How long would that last?  I'm not sure.  I
12  don't know if I slept ten minutes, five minutes, an
13  hour.
14      Q    Okay.  How are you sleeping now?
15      A    I'm sleeping better now.
16      Q    Okay.  When did you start sleeping better?
17      A    Honestly, I don't remember.
18      Q    Have you kept track at all?  Have you kept
19  like a diary or log?
20      A    I don't -- I don't do diaries.
21      Q    No?
22      A    Yeah.
23      Q    Okay.  How soon after May 2016 was the first
24  time you saw Dr. Shaw?
25      A    Dr. Shaw, I probably saw him 2017 maybe.

Page 71

1  2017.
2      Q    Do you remember what month?
3      A    No.
4      Q    Do you remember, winter?  Spring?  Summer?
5  Fall?
6      A    I don't remember.
7      Q    Okay.  Besides the anxiety and sleeplessness
8  is there anything else that has happened to your health
9  that you are saying is the result of something U.S. Bank
10  did?
11      A    Just like medical?
12      Q    Uh-huh, yes.
13      A    Just I know when I compete, my body shuts
14  down, I can't -- now so far it's been like a minute into
15  the fight and I can't even close -- make a fists, and
16  then my body gets very fatigued.
17      Q    Okay.  And do you think that's because of
18  something U.S. Bank did?
19      A    Yes.  Cause if I'm not sleeping, I can't
20  perform my best.
21      Q    Okay.  So how many fights have you had since
22  May of 2016?
23      A    I don't remember.
24      Q    Okay.  And so you think the sleeplessness
25  associated with things that U.S. Bank did were affecting

Page 72

1  your performance in the cage?
2      A    Yes.
3      Q    Can you quantify that for me?  Like have you
4  won a fight since May of 2016?
5      A    I think I had to put me on medication and it
6  worked and then the whole like -- probably not.  I don't
7  remember.
8      Q    Okay.  Did has Dr. Shaw prescribed anything
9  for you?
10      A    Yeah, he did.
11      Q    What did he prescribe?
12      A    He prescribed -- what's it called -- I forgot
13  the name of the medication.
14      Q    What does it do for you?
15      A    It's supposed to like -- this is -- they say
16  it's my -- my -- my -- my testosterone levels, but
17  everything was normal, but it didn't work out.  Yeah, I
18  don't know what they call it, but it's supposed to like
19  help me sleep better and bring my -- my levels back up.
20      Q    Bring your testosterone levels up?
21      A    Yeah.  Because it was so low 'cause I haven't
22  slept.  And usually sleeping does -- it like lowers your
23  testosterone a lot.  And, yeah, the lack of sleep was
24  really hurting me.
25      Q    And so Dr. Shaw, you said, he's a hormone

Page 73

1  doctor; right?
2      A    Yes.
3      Q    So is he an endocrinologist?
4      A    It's endocrinologist, hormone doctors.
5      Q    He's not a psychologist?
6      A    No.
7      Q    He's not a psychiatrist?
8      A    No.
9      Q    He's not a clinical social worker?
10      A    No.
11      Q    Have you ever seen a mental health
12  professional about your anxiety or your sleeplessness?
13      A    No, I was told to see one but I never have.
14      Q    Who told you to see one?
15      A    My wife.
16      Q    Okay.  And when did she tell you that?
17      A    She told me that in 2016, '17, '18.
18      Q    Okay.  And did she tell you why she thought
19  that would be beneficial?
20      A    Maybe it would like help me be not be
21  stressing about all that big stuff, and just maybe I'd
22  get some sleep 'cause she was a little mad 'cause she
23  couldn't sleep either 'cause I was up all night walking
24  around.
25      Q    And you said you're sleeping better now?

Page 74

Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 28 of 139 Page ID
#:1973
Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

| | |
|---|---|
| 1    **A**   **Yes.** | 1    Q   So he did something with your urine? |
| 2    Q   When did you get better? | 2    **A**   **Yes.** |
| 3    **A**   **I got better -- I started sleeping better --** | 3    Q   Okay. And you don't know what kind of doctor |
| 4   **was it -- this year I started sleeping better and** | 4   he is? |
| 5   **towards the end of last year, I believe.** | 5    **A**   **No.** |
| 6    Q   So last year was 2017. So about when in 2017 | 6    Q   And does he have an office? |
| 7   did you start sleeping better? | 7    **A**   **Yes.** |
| 8    **A**   **Maybe December. I'm not sure.** | 8    Q   Where is that? |
| 9    Q   Has Dr. Shaw ever given you a diagnosis | 9    **A**   **I think it's Beverly Hills.** |
| 10   besides low testosterone? | 10    Q   Okay. And do you see him at his office? |
| 11    **A**   **I don't remember. He said a lot of things, I** | 11    **A**   **No, never saw him at his office.** |
| 12   **don't remember everything.** | 12    Q   So where -- when he got a urine sample from |
| 13    Q   Okay. When you see him, does he ask you | 13   you, where did you give it? |
| 14   questions about how well you're sleeping? | 14    **A**   **When he called me.** |
| 15    **A**   **Yes.** | 15    Q   Okay. And so you just did it at home and -- |
| 16    Q   Does he ask you about how you're feeling about | 16    **A**   **Yeah, did it at home and then I sent it** |
| 17   yourself? | 17   **through the mail.** |
| 18    **A**   **No.** | 18    Q   You send it through the mail? |
| 19    Q   Okay. Does he ask you about, you know, your | 19    **A**   **Yeah.** |
| 20   level of concentration? | 20    Q   Okay. And for what purpose? |
| 21    **A**   **No.** | 21    **A**   **Cause he was trying to see what was causing me** |
| 22    Q   Does he ask you about your appetite? | 22   **to like -- my body shut down in competitions.** |
| 23    **A**   **Yes.** | 23    Q   Okay. And did he give you a diagnosis? |
| 24    Q   What does he ask you about your appetite? | 24    **A**   **I believe so. I don't remember what exactly** |
| 25    **A**   **He just says "How is your appetite?" And I** | 25   **he said.** |
| Page 75 | Page 77 |
| 1   said "It's fine." | 1    Q   Did he ever perform a physical exam on you? |
| 2    Q   Does he ask you about whether you find | 2    **A**   **No.** |
| 3   pleasure in doing the things that you usually do all | 3    Q   How about Dr. Shaw; when you go to Dr. Shaw, |
| 4   day? | 4   does he give you a physical exam? |
| 5    **A**   **No.** | 5    **A**   **Yeah, he gives -- he just saw my -- I mean, he** |
| 6    Q   Have you ever found out kind of an inventory, | 6   **gets my blood pressure and that's it.** |
| 7   like a -- like a checklist of things like the questions | 7    Q   Okay. He doesn't, you know, look in your ears |
| 8   I mentioned? Has he ever had you do that? | 8   and nose and mouth? |
| 9    **A**   **I don't think so. I -- I don't remember.** | 9    **A**   **Yes.** |
| 10    Q   Okay. Have you seen anyone besides Dr. Shaw | 10    Q   He does do that? |
| 11   for this problem of sleeplessness? | 11    **A**   **Yes.** |
| 12    **A**   **I saw Dr. Sheih.** | 12    Q   Okay. And he takes your blood pressure; does |
| 13    Q   How do you spell Sheih? | 13   he do anything else? |
| 14    **A**   **S-H-E-I-H.** | 14    **A**   **No, and then he just takes blood samples,** |
| 15    Q   And what kind of doctor is Dr. Sheih? | 15   **that's it.** |
| 16    **A**   **I don't know, he's just -- I just -- all he** | 16    Q   About how many times did you see Dr. Shaw? |
| 17   **did was just talk to me. He went to one of my fights** | 17    **A**   **Dr. Shaw?** |
| 18   **and he sent for me to do a blood work, and then he sent** | 18    Q   Yeah. |
| 19   **it over and he read it for me.** | 19    **A**   **I think six times. Six or more times, I** |
| 20    Q   He took your blood and gave you the results? | 20   **believe.** |
| 21    **A**   **No, it's not the blood, it's -- what's it** | 21    Q   Six or more times? Okay. And Dr. Sheih? |
| 22   **called -- it's a test, you just -- you just pee in a** | 22    **A**   **Only once.** |
| 23   **little strip and you keep putting away for three days** | 23    Q   Just -- |
| 24   **and then you send it out, and then they send the results** | 24    **A**   **Yeah, that one time.** |
| 25   **to him.** | 25    Q   The one urine analysis? |
| Page 76 | Page 78 |

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 29 of 139  Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1772

**Page 79**

1  A  Yes.
2  Q  Okay.  Have you seen anybody else about this
3  problem?
4  A  I was talking to Dr. Thermos.
5  Q  Okay.  And what kind of doctor is Dr. Thermos?
6  A  I do not know.
7  Q  A man or a woman?
8  A  Man.
9  Q  Does Dr. Thermos have an office?
10  A  He used to be at Kesler's office in Tustin,
11  but he's not there anymore.  He would just be there
12  every other Thursday or every Thursday.
13  Q  Okay.  And is Kesler a doctor?
14  A  Sports doctor.
15  Q  So does Dr. Sheih have a medical degree?
16  A  Dr. Sheih?
17  Q  Yeah.
18  A  I believe so.
19  Q  And Dr. Thermos, does he have a medical
20  degree?
21  A  Pretty sure he does.
22  Q  And Dr. Kesler?
23  A  I don't know.
24  Q  Don't know about Dr. Kesler?
25  A  No.

**Page 80**

1  Q  But he has an office?
2  A  Yeah, he has an office.
3  Q  What's the office called?
4  A  Kesler's.
5  Q  Kesler's?
6  A  Yeah.
7  Q  Dr. Kesler -- I mean, what is it?
8  A  I -- I -- I -- I don't know.  Yeah, I don't
9  know.
10  Q  Kesler.  Okay.  And how many times did you see
11  Dr. Thermos?
12  A  Dr. Thermos, I think maybe two or three times.
13  I'm not sure.
14  Q  Okay.  And why did you see Dr. Thermos?
15  A  First, I saw Dr. Thermos because I -- I pulled
16  my hamstring.
17  Q  Okay.  Pulled hamstring.  Okay.  So you didn't
18  see him because of the anxiety or sleeplessness, it was
19  cause --
20  A  That was later on, I told him that I
21  couldn't -- like my fighting was -- I got to the second
22  round or third round, I started getting like kind of
23  fatigued a little bit but it wasn't as bad.
24  Q  So these fights that you do, is there a perse?
25  A  Yes.

**Page 81**

1  Q  Okay.  And so like your last fight -- if you
2  had one round that you did, like what how much would
3  you have won?
4  A  Probably 3000.
5  Q  $3000?
6  A  Yes.
7  Q  And is that typical of your fights, the perse
8  would be --
9  A  No.  Usually, I used to make 5- or 6-.
10  MR. RAHIMI:  Is it all right if we define
11  perse?  Sorry.
12  BY MR. SHERMAN:
13  Q  Sure.  When I say "Is there a perse for a
14  fight?"  What do you understand that to mean?
15  A  After the fight, if I win or lose that's what
16  they give me.
17  Q  They give you money for winning?
18  A  Yes.
19  Q  They don't give you money for losing?
20  A  They do.
21  Q  They do?
22  A  Yeah.
23  Q  How much do you get for losing?
24  A  Sometimes you get half of that or less than
25  that.

**Page 82**

1  Q  Oh, okay.  Is that typical to get half if you
2  lose?
3  A  Yes.
4  Q  And are there expenses involved in the
5  fighting, you know, apart from -- I mean, you said you
6  had to pay for the medical; right?
7  A  Well, usually, 'cause I was winning, the King
8  of the Cage was paying for the medicals.
9  Q  I'm sorry, what did you say?  What's the last
10  thing you said?
11  A  Sorry.  The organization will pay for the
12  medicals, I just pay for where I go train, and that's
13  it.
14  Q  How much would you say you spend on training
15  per fight?
16  A  I just go -- I just pay a $100 a month and I
17  just keep training at the gym, and that's all -- that's
18  all the training I do.
19  Q  Okay.  Any other doctors that you've seen
20  about your sleeplessness?
21  A  No, just -- I believe --
22  Q  Just those?
23  A  Yes.
24  Q  As part of your training do you take any
25  dietary supplements?

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 30 of 139   Page ID
#:1975
Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

## Page 83

1   A   No.
2   Q   None?
3   A   No.
4   Q   Do you ever promote dietary supplements to the
5   folks who come to your gym?
6   A   Some people who want to lose wait, that's it.
7   Q   Okay.  So what does that mean?
8   A   Like a supplement that gives you energy and
9   burns fat, that's it.
10   Q   Are there companies that make nutritional
11   supplements that give them to you as kind of a
12   promotional thing?
13   A   No, I have a Sponsor, Max Muscle, they just
14   give me protein, vitamins, whatever I need.
15   Q   So you've never taken dietary supplements as
16   part of your MMA?
17   A   I don't think so.
18   Q   No?  Ever taken any type of steroid?
19   A   I took a -- Dr. Shaw put me on a steroid one
20   time.
21   Q   Do you remember what it was called?
22   A   No.  I was like -- I just know it was like a
23   shot .5 millimeter, or something.  That's it.
24   Q   Do you know what a steroid precursor is?
25   A   No.

## Page 84

1   Q   Have you ever taken anything that contains a
2   substance called prasterone?
3   A   I don't know.
4   Q   Do you know what that is?
5   A   No.
6   Q   How about DHEA?
7   A   I heard of that.
8   Q   Okay.  Have you ever taken anything that
9   contains it?
10   A   For my adrenal glands, yes.
11   Q   So when you say you took it for your adrenal
12   glands, how -- how did that happen?
13   A   Just trying to see if it was -- like my
14   adrenal deficiency, they said DHEA would help.
15   Q   Who said that?
16   A   Dr. -- Dr. Thermos.  And the Vitamin J.
17   Q   So, sorry, it was Dr. Thermos and who?
18   A   My -- my -- my vitamin guy.  My sponsor.
19   Q   Okay.  Your vitamin guy --
20   A   Sponsoring for fights.
21   Q   And is that Max Muscle?
22   A   Yes.
23   Q   So what is the arrangement with Max Muscle?
24   Do they give you money?  Do they give you products?
25   A   Products.  I just put the name on the shorts,

## Page 85

1   I -- I (inaudible).
2   Q   And what do you do with the products that Max
3   Muscle gives you?
4   A   I take them.
5   Q   So you do take those supplements?
6   A   Yeah, it's protein and vitamins.
7   Q   Okay.  And do you know what other ingredients
8   there might be in the supplements that you take?
9   A   No.
10   Q   How often do you take them?
11   A   Only when I fight.  I don't really --
12   Q   Have you -- since when you started in 2005; is
13   that right?
14   A   Fighting?
15   Q   Yeah.
16   A   Yes.
17   Q   Have you taken any extended breaks from
18   fighting, or have you kind of always been working on
19   your next fight?
20   A   No, I think 2007 I took a little break 'cause
21   I -- I -- I had a slight tear in my ACL, I believe.
22   Q   Only in 2007?
23   A   I think.  I'm not -- I don't remember the
24   date.
25   Q   So but other than 2007, you're kind of always

## Page 86

1   working on your next fight?
2   A   Yes.
3   Q   And does that mean that you're also -- also
4   taking your supplements?
5   A   Just when -- probably a month.  The month that
6   I'm competing for, that's it.  I don't like it to take
7   stuff really.
8   Q   Do you know if the supplements have any impact
9   on your hormone levels?
10   A   No.
11   Q   When you say no, you don't know or --
12   A   I don't think they have.  They never did
13   anything bad before.
14   Q   Okay.  And are you under a doctor's
15   supervision when you're taking this stuff or you just
16   take what Max Muscle give you?
17   A   Max Muscle, I just -- I had to go get few
18   things -- simple things, basic everybody gets.  Protein,
19   just liquid vitamins and -- and pre-workout, that's it.
20   Q   Besides the situation with U.S. Bank do you
21   have any other sources of stress that you've experienced
22   since May of 2016?
23   A   In 2016?
24   Q   Yeah.
25   A   No.

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 31 of 139   Page ID
#:1576
Samuel Soria Liera - CONFIDENTIAL          11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**Page 87**

1  Q   You did mention you had an aunt who died?

2  A   Yes.

3  Q   Were you very close with her?

4  A   Not so much.  I know her when we were younger,

5  see her here and there but not really.

6  Q   So that didn't contribute to your

7  sleeplessness?

8  A   No.

9  Q   Is there any stress involved with being an MMA

10  fighter?

11  A   No, just the stress that I don't know what's

12  going on with me no.

13  Q   Okay.  Have you taken any vacations --

14  A   Yes.

15  Q   Where have you gone?

16  A   Hawaii and San Diego.

17  Q   And were you able to enjoy those?

18  A   Yes.

19  Q   Do you generally enjoy your life with Kim?

20  A   Yes.

21  Q   Okay.  And besides the sleeplessness has

22  whatever U.S. Bank did had any impact on that?

23  A   Sorry, what was that?

24  Q   Besides what U.S. Bank have you had any -- has

25  what U.S. Bank did have any impact on your ability to

**Page 88**

1  kind of enjoy life?

2  A   Sometimes.  When everything happened, it was

3  hard to teach, hard to do anything.  I even stopped

4  training people, I just -- I felt kind of depressed a

5  little bit.

6  Q   So how many classes do you teach a week?

7  A   Right now I teach probably eight to nine

8  classes a week.

9  Q   And have you kept that pace up, you know,

10  pretty much constantly, or how has -- how has your

11  ability to teach been effected since May of 2016?

12  A   When I used to teach, I got kind -- well, not

13  lazy, but I wasn't in the mood to teach and I didn't

14  want to be at the gym, I didn't want to do anything,

15  really.

16  Q   Okay.  But you still came in and you taught;

17  right?

18  A   I had to.

19  Q   Okay.  So you didn't miss any work?

20  A   No, I didn't.

21  Q   Okay.  So is there a value that you would put

22  on the medical -- say -- damages that you've incurred,

23  pain and suffering?

24       MR. RAHIMI:  Objection.  Calls for

25  speculation.

**Page 89**

1  BY MR. SHERMAN:

2  Q   Do you know what you're seeking in the lawsuit

3  for -- for out-of-pocket medical and pain and suffering,

4  et cetera?

5  A   I don't know.

6  Q   You don't know?

7  A   No.

8  Q   So have you ever seen a document that attested

9  to that put a value on that?

10       MR. RAHIMI:  Objection.  Privileged.  Work

11  product.

12  BY MR. SHERMAN:

13  Q   What's your answer?

14  A   No.

15  Q   As you sit here today, I mean, how much do you

16  think U.S. Bank ought to pay for medical expenses,

17  damage to your physical and emotional?

18       MR. RAHIMI:  Objection.  Calls for

19  speculation.  Legal conclusion.  You can answer.

20  BY MR. SHERMAN:

21  Q   What are you asking the Bank to pay?

22  A   I don't know.

23  Q   You don't know?

24  A   No.

25  Q   I mean, can you give me a ballpark figure?

**Page 90**

1       MR. RAHIMI:  Objection.  Calls for

2  speculation.

3  BY MR. SHERMAN:

4  Q   You can answer.

5  A   I -- I -- I off the top of my head right now I

6  can't.

7  Q   Okay.  The doctors that you've seen would you

8  have seen them anyway in the course of your MMA

9  training?

10  A   No.

11  Q   No.  Okay.  Do they send you bills?

12  A   I pay cash upfront when I go.

13  Q   You pay cash?

14  A   Yes.

15  Q   And they never present you with a bill?

16  A   I just tell them how much it is and I just pay

17  it right there and then.

18  Q   Okay.  You never get like a bill in the mail?

19  A   Only -- the only time is when I broke my hand,

20  my knuckle in half, and any fight injury, that's when I

21  get a bill.  But then fighting insurance take care of

22  that.

23  Q   How much -- do you have any record at all of

24  how much you spent on doctors that you would attribute

25  to helping you with the problems that you say U.S. Bank

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 32 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1373

1 caused?

2 A  I spent a lot of money, I -- I don't remember

3 how much.

4 Q  I mean, how would I -- how would I figure out

5 what that number is?

6 A  I don't know.  Different medications, saw

7 different doctors, some were -- I mean, I just pay

8 whatever I need to pay.  I needed to figure out what's

9 wrong with me so I just saved money and I just paid it.

10 Q  Okay.  And you wouldn't have had any of those

11 visits except for what happened with U.S. Bank?

12 A  Yeah, I don't think I would.

13 Q  You wouldn't have gone to see a doctor about

14 your hormone issues in the process of training for MMA

15 or bodybuilding or anything like that?

16 MR. RAHIMI:  Objection.  Calls for

17 speculation.  You can answer.

18 THE WITNESS:  Okay.  Probably see a doctor

19 maybe, but I wouldn't have to be going constantly to see

20 different hormone doctors or different kind of doctors.

21 BY MR. SHERMAN:

22 Q  And did you see any hormone doctors prior to

23 May of 2016?

24 A  I believe I saw one doctor just --

25 Q  Okay.  And how often?

Page 91

1 A  Just once.

2 Q  And what was the reason you went to that

3 hormone doctor?

4 A  Cause I felt like dehydrated, I wondered why I

5 pulled my hamstring so bad.

6 Q  And what did that doctor tell was the reason?

7 A  I don't remember.

8 Q  Did they draw any blood?

9 A  Yes, they did blood.

10 Q  Okay.  And did you give urine too?

11 A  I believe it was just blood.

12 Q  And what were the results?

13 A  I don't remember.  I saw so many, I don't

14 remember.

15 Q  Okay.  Do you have health insurance?

16 A  No.

17 Q  This is going to be 172.

18 (Exhibit 172 was marked for

19 identification by the court reporter

20 and is attached hereto.)

21 Q  So, Mr. Soria, I've handed you what's been

22 marked as Exhibit 172.  Can you tell me what this is?

23 A  This is blood work that Dr. Thermos ordered.

24 Q  Okay.  And when -- when did you go see

25 Dr. Thermos to have a blood work?

Page 92

1 A  This one, I don't know.

2 Q  Okay.  So do you see at the top where it says

3 17 March 2016?

4 A  Yes.

5 Q  Okay.  Is that when you went to Dr. Thermos

6 and had this blood work ordered?

7 A  Yes.

8 Q  And so that was before you knew anything had

9 happened at U.S. Bank; right?

10 A  Yes.

11 Q  Okay.  And so why before anything had happened

12 at U.S. Bank were you going to see Dr. Thermos?

13 A  Cause I pulled my hamstring really bad and I

14 cut a lot of weight, so he just said go get a blood

15 test.

16 Q  And do you remember what the results were of

17 the test that Dr. Thermos ordered here on Exhibit 172?

18 A  No, I don't remember.

19 Q  Do you have a copy of the results?

20 A  I don't -- not with me, I don't think so.

21 Q  Okay.  Did you hurt your elbow in 2017?

22 A  I had pieces of bones floating around and my

23 arm kept locking in.

24 Q  Okay.  This is 173.

25 (Exhibit 173 was marked for

Page 93

1 identification by the court reporter

2 and is attached hereto.)

3 Q  Do you recognize Exhibit 173?

4 A  Yes.

5 Q  What is this?

6 A  This is the test that Dr. Sheih ordered.  Made

7 me -- wanted me to take a urine test.

8 Q  Okay.  And can you tell me anything about what

9 these results mean?  I mean, this is a report results

10 from that testing; is that right?

11 A  Okay.

12 Q  No, I'm asking you.

13 A  Yes.

14 Q  Okay.  Can you tell me what it means?

15 A  I don't even know.  To be honest with you, I

16 don't even -- I don't know how to read this.

17 Q  Okay.  And when you went to see Dr. Sheih and

18 he ordered this test, what did you tell him about why

19 you had come to see him?

20 A  Well, he went to one of my fights and he saw

21 that my arms were like really cramped up like really

22 tight, and I couldn't close my hand.

23 Q  Okay.  And so what happened in that fight?

24 Did you ask to stop the fight?

25 A  No, I don't ask to stop the fights.

Page 94

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 33 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1078

**Page 95**

1   Q  You were able to keep fighting?

2   A  No.

3   Q  No?

4   A  No, I was going and then it just -- I just

5 couldn't get up, my legs just gave out and my arms gave

6 out.

7   Q  About how long in the fight went on when you

8 experienced that?

9   A  I don't remember.

10   Q  Okay.  174.  Do you recognize Exhibit 174.

11     (Exhibit 174 was marked for

12     identification by the court reporter

13     and is attached hereto.)

14   A  No, I don't.

15   Q  Can you tell me anything about what

16 Exhibit 174 means?

17   A  No.

18   Q  This refers to a Dr. Soni.  Do you know who

19 Dr. Soni is?

20   A  No, I don't know who that is.

21   Q  And then it says, Sonisk Pain Management.

22 What is that?

23   A  I don't know.  I don't remember.

24   Q  Have you ever seen a Dr. Soni?

25   A  Not that I -- I don't remember the name.

**Page 96**

1   Q  How did you come to have Exhibit 174?

2   A  I don't know.

3   Q  You don't know?

4   A  No, I don't know.

5   Q  Do you recall having an ultrasound in June of

6 2017?

7   A  I think so, yeah, they sent me to ultrasound

8 of my organs.

9   Q  Why -- why did you have that?

10   A  I don't remember.  The doctor said just --

11 it's to make sure it's not an organ issue, what's going

12 on with me.

13   Q  Okay.  And get a diagnosis after you had the

14 ultrasound?

15   A  Yes.  I don't remember what it was, but I did

16 get one.

17   Q  Okay.  And you don't remember what the

18 diagnosis was.  Did you have any treatment as a result

19 of the ultrasound?

20   A  No.

21   Q  Is there any relation between, you know, the

22 issues you had with U.S. Bank and you getting this

23 ultrasound?

24   A  I'm pretty sure it is.

25   Q  Okay.  What would that be?

**Page 97**

1   A  Stress.

2   Q  So you had an ultrasound for stress?

3   A  Well, I don't know.  That's what they sent me,

4 is for stress and to see what's going on with me, make

5 sure there's nothing.

6     (Exhibit 175 was marked for

7     identification by the court reporter

8     and is attached hereto.)

9   Q  Do you recognize Exhibit 175?

10   A  I believe so.

11   Q  What's Exhibit 175?

12   A  It's a medication Dr. Shaw put me in.

13   Q  Okay.  What are these medications?

14   A  Adrenal.  I don't remember this one.  I know

15 he gave me a vitamin, he said it's a natural vitamin,

16 male energy natural vitamin.  And then he put me on -- I

17 don't know what this one is -- oh, it's just like a

18 powder.  He said it's just a vitamin.  And then the

19 testosterone I did it for ten weeks, but I didn't fight

20 between that time because I don't like to take any

21 steroid like that.

22   Q  Would that even be legal for your --

23   A  No, that's why I don't.  Cause they suspend

24 you for two years if they catch you with that.

25   Q  Okay.  And then what was the last thing on

**Page 98**

1 Exhibit 175?

2   A  HEG, I don't know what that is, but I did --

3 it was two different shots.  HEG, I don't know what that

4 one does.

5   Q  Have you heard of a substance called "Human

6 chorionic gonadotropin?

7   A  No.

8   Q  Do you know if that's what the reference in

9 Exhibit 175 is to?

10   A  I don't even know.

11   Q  Okay.  Are any of these substances listed on

12 Exhibit 175 ones that, you know, an MMA fighter might

13 take to improve?

14   A  The only one is testosterone one.

15   Q  How about any of the others?

16   A  No.

17   Q  Is it common MMA fighting for fighters to take

18 supplements?

19   A  What kind of supplements?  Like vitamins?

20   Q  Well, any kind of nutritional supplement.

21   A  Well, I know they all take vitamins, but some

22 of them, I'm pretty sure, are on steroid.

23   Q  Why is -- okay.  How common is steroid used

24 in --

25   A  Cause they want to perform better and not get

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

1 tired.
2    Q   Right.  And -- and when fighters take
3 steroids, that has an impact on their hormone levels;
4 right?
5    A   Yeah.  It shoots their testosterone up and
6 then it makes them -- we're not getting tired.
7    Q   Right.  Why is Max Muscle interested in
8 sponsoring you?
9    A   Cause every fighter usually has a vitamin --
10 because I could send people to them from my gym, that's
11 why.  So I have something to offer.  And then when I
12 fight, it's usually on TV and they see their logo on TV.
13 Advertisement.
14       (Exhibit 176 was marked for
15       identification by the court reporter
16       and is attached hereto.)
17    Q   Showing you what's been marked as Exhibit 176.
18 Can you tell me what Exhibit 176 is?
19    A   It's a blood test.
20    Q   It's the results of a blood test; right?
21    A   Yes.
22    Q   And if you turn to the third page of the
23 Exhibit, there is actually two different ones; correct?
24    A   Yes.
25    Q   And can you tell me anything about what these

Page 99

1 supplements I take.
2    Q   Okay.  And, in fact, we saw that he's actually
3 prescribing -- Dr. Shaw is prescribing you some
4 supplements; right?
5    A   Yes.
6    Q   Okay.  Do you know what blood doping is?
7    A   When you freeze the blood and they inject it
8 back into your body?
9    Q   Yeah.  Have you ever done that?
10    A   No.
11    Q   If you turn to the third page of Exhibit 176,
12 do you recall if Dr. Shaw ever, you know, talked to you
13 about these results?
14    A   Yeah, he just said that my estrogen levels
15 were really high.
16    Q   And did he tell you why he thought that was?
17    A   Maybe the medication.  This is the last one.
18 I think he told me to get off the medication.
19    Q   And what was the medication?
20    A   It might have been Chlomib.
21    Q   Chlomib?
22    A   Yes.
23    Q   How do you spell that?
24    A   C-H-L-O-M-I-B.
25    Q   Is it Dr. Shaw who had prescribed that for

Page 101

1 results mean?
2    A   On the first page it's -- I don't know what
3 Albumin is or Bilirubin.
4    Q   Bilirubin?
5    A   Yeah, or AST, I don't know what that is.  But
6 Estradiol is estrogen.
7    Q   Has any doctor ever told you that your liver
8 is being stressed?
9    A   I -- I believe so.
10    Q   Okay.  And did they tell you what they thought
11 the cause of that was?
12    A   No.  They just said you have daily stresses.
13    Q   Could it have anything to do with, you know,
14 supplements that you're taking?
15    A   No.
16    Q   No?  How about your AST level; do you know
17 what that is?
18    A   No.
19    Q   Has Dr. Shaw talked to you about your elevated
20 AST level?
21    A   He talked to me, but there is so many thing
22 they talk about, I forget.
23    Q   And again you're not aware of any link between
24 that and any supplements you might be taking?
25    A   No.  Cause I -- I told him what

Page 100

1 you?
2    A   Yeah, because I told him I don't want to take
3 the shots, the testosterone shots.
4    Q   Okay.  What is Chlomib?
5    A   Honestly, I have no idea.
6    Q   Okay.  Did Dr. Shaw tell you why he was giving
7 you Chlomib?
8    A   Yeah, he told me because I don't want to take
9 the testosterone, he want to me to keep continuing taking
10 it.  I said no because I don't want to get in trouble
11 for taking steroid, and I don't want to rely on that
12 either.  So he said "I'll give you something that you
13 don't have to take shots and you won't get in trouble
14 for."  I said okay.
15    Q   Do you know what a testosterone steroid
16 precursor is?
17    A   No.
18    Q   Okay.  So -- okay.  And you don't have any
19 bills from any of the doctors you've seen since May of
20 2016?
21    A   No.  Every time I go there, I pay upfront.
22    Q   Okay.
23    A   I don't like dealing with that stuff.
24    Q   And you haven't kept track of total?
25    A   No, don't.

Page 102

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 35 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1930

1    Q    And apart from going around to every
2 individual doctor, can anybody in the world tell me how
3 much you spent on doctors as a result of what you claim
4 U.S. Bank did to you?
5    A    No.
6    Q    Are you also claiming that U.S. Bank harmed
7 your immigration status?
8    A    Yes.
9    Q    How so?
10   A    I got approved for the I-130, I was supposed
11 to go to Mexico for -- go two days, just have a letter
12 from -- 'cause I was going to go visit my aunt, she
13 needed somebody to take care of her.
14   Q    Okay.
15   A    So I got all the paperwork together and I
16 needed a doctor's note for Mexico and I was going to go.
17 I had three weeks to do it before Trump got sworn in,
18 and I told the lawyer what happened and she said that I
19 couldn't do it anymore.  I had everything ready to go.
20 And then I said after I come back, I'll be able to leave
21 the country and I'll be fine, I'll go anywhere in the
22 country.  And I couldn't to it.
23   Q    What was the name of the lawyer?
24   A    Meredith Brown.
25   Q    Okay.  And so what did she tell you about

Page 103

1 how -- you know -- what happened with U.S. Bank would
2 have an impact on you -- you being able to reenter the
3 United States from Mexico?
4    A    Well, if I didn't have this fraud against me,
5 I would go to Mexico and come back, but they said -- she
6 didn't want to risk for them any reason -- if they find
7 out -- I forgot the amount -- if they found out anything
8 like that, it's kind of like a crime so they wouldn't
9 let me back in just for that.  So she wouldn't want to
10 risk it.
11   Q    Do you know what an advance parole is?
12   A    No.
13   Q    So you don't know if you've ever applied for
14 advance parole?
15   A    No, I haven't.  I don't think so.  I don't
16 know.
17   Q    Okay.  What was the reason for you going to
18 Mexico?
19   A    That way, when I go to Mexico and come back,
20 it shows that I'm coming back to the U.S. legally.
21   Q    And so you've never asked for any sort of
22 advanced permission from the Immigration authorities to
23 be able to go to Mexico and guarantee that you'd be able
24 to get back in?
25   A    Well, I talked to the lawyer and they said I

Page 104

1 can't do that.  But I guess when I got married and did
2 all the paperwork, I was able to go and then come back.
3    Q    So where did you get married?
4    A    I got married in Fullerton courthouse.
5    Q    I'm sorry, you said you'd left the country
6 before?
7    A    No, no, no.  I just said I would be able to.
8    Q    That you would be able to?
9    A    Yeah.
10   Q    If there hadn't -- you hadn't been the victim
11 of a fraud?
12   A    Yes.
13   Q    Okay.  Are there any other reasons why you
14 might not be able to get back into the country?
15   A    No, that was it.
16   Q    That's it?
17   A    That's the only reason.
18   Q    Okay.  Your parents brought you here from
19 Mexico; correct?
20   A    Yes.
21   Q    When was that?
22   A    When I was 5.
23   Q    Okay.  And did they have a visa at that time?
24 Did you have a visa?
25   A    I didn't have a visa.

Page 105

1    Q    So you entered the United States illegally?
2    A    Yes.
3    Q    So do you have any awareness as to whether,
4 you know, there is a law that says that you wouldn't be
5 able to reenter the United States after leaving when you
6 had a illegal entry in the first place?
7    A    Well, she told me that I would be -- I would
8 be okay to reenter.  It wouldn't be a problem.  If not,
9 she wouldn't have sent me to go to Mexico.  She said I
10 got married, I got approved for my I-130, I got all my
11 paperwork.  All I had to do is just get some things
12 on -- on -- on the list she gave me to get done, and
13 then just go in and come back and everything would -- I
14 would be fine.
15   Q    Okay.  Even without getting advance permission
16 from the United States government?
17   A    I think -- I -- I -- I -- I don't know.
18   Q    You don't know.  And as far as you know,
19 you've never applied for advance permission or advance
20 parole to reenter the United States after leaving?
21   A    I don't remember.
22   Q    Okay.  What's Attorney Brown's phone number?
23   A    I have her number with me, let me check.  I
24 don't have it with me.
25   Q    Do you know what her address is?

Page 106

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 36 of 139   Page ID #:1981

1    A    No.
2    Q    Does her law office have a name other than her
3  name?
4    A    I think it's the Law Offices of Meredith
5  Brown.
6    Q    Do you currently have an employment
7  authorization card?
8    A    Yes.
9    Q    That's valid?
10    A    Yes.
11    Q    Okay.  When was that most recently renewed; do
12  you know?
13    A    It expires next year.
14    Q    Do you have a -- besides the card itself, do
15  you have a document that -- that you got from the
16  government that says that was approved?
17    A    Yes.
18    Q    Okay.  What's your understanding about what
19  the Trump Administration did, you know, with respect
20  to -- let me back up.
21        You know what DACA status is?
22    A    Yes.
23    Q    In fact, you have DACA status right now?
24    A    Yes.
25    Q    And what's your understanding of what

Page 107

1  President Trump's Administration has done with respect
2  to people with DACA status being able to get advance
3  approval to leave the country and come back?
4    A    All I know, they just took the DACA away, but
5  then he's waiting for something -- to replace it with
6  something else.
7    Q    Okay.
8        (Exhibit 177 was marked for
9        identification by the court reporter
10        and is attached hereto.)
11    Q    I've just handed you what's been marked
12  Exhibit 177.  Do you know what Exhibit 177 is?
13    A    No.
14    Q    So if you look at the second paragraph, it
15  says the above petition has been approved.
16        Do you know what that is?
17    A    Yes.
18    Q    So what is that?
19    A    That we both got married legally.
20    Q    And the next sentence says:  The petition
21  indicates that the person for whom you are petitioning
22  is in the United States and will apply for an adjustment
23  status.  See that?
24    A    Yes.
25    Q    So I take it, you'd like to get a green card

Page 108

1  if you could?
2    A    Yes.
3    Q    But then it goes on to say that the evidence
4  that he or she is not eligible to file an adjustment of
5  status application.  Do you know what that means?
6    A    No.
7    Q    Okay.  Do you understand whether you're able
8  to get a green card in your presence status?
9    A    I don't know.
10    Q    You don't know?
11    A    No.
12    Q    So nobody ever told you that because you
13  entered the United States illegally, you can't get a
14  green card?
15    A    Yeah, they told me because of that.  But then
16  if I go to Mexico and come back, then it's like I got
17  into the U.S. legally.
18    Q    And in addition to that, have they told you
19  whether you should have advance permission to leave and
20  come back?
21    A    Well, she said it would be fine.  Yeah, I did
22  my interview and everything, I got approved.  And she
23  said it would be fine.
24    Q    You got approved for what?
25    A    I got I-130 that we got married legally and it

Page 109

1  was a legal marriage not a fake one.  And then --
2  yeah -- so we just got -- whatever list she gave me, go
3  to Mexico and come back and then I'll be able to leave
4  the U.S.  Cause you're saying you left the U.S. but you
5  came back legally.
6    Q    And -- but you've never applied for advance
7  parole?
8    A    I -- I don't know.
9    Q    You don't know.  Okay.
10        (Exhibit 178 was marked for
11        identification by the court reporter
12        and is attached hereto.)
13    Q    And handing you what's been marked as
14  Exhibit 178.  Do you know what's Exhibit 178?
15    A    Yes.
16    Q    What's Exhibit 178?
17    A    This is for my work permit.
18    Q    This is -- in fact, Exhibit 178 is the
19  application you've filed to renew your work permit?
20    A    Yes.
21    Q    And this application, Exhibit 178, was
22  approved?
23    A    Yes.
24    Q    Is information in Exhibit 178 true and
25  correct?

Page 110

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Samuel S. Soria a/k/a Samuel Soria Liera vs. US Bank (N.A.), et al.
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 37 of 139   Page ID #:1992

Page 111

1    A   Yes.
2    Q   Did you fill it out yourself?
3    A   No, Meredith did it and then me and my wife
4  did it at the house.  Cause we usually go there, you pay
5  her and then you pay the application.
6        MR. RAHIMI:  Do you have an extra copy for me?
7        MR. SHERMAN:  Oh, I'm sorry.
8        MR. RAHIMI:  No worries.  Thanks.
9  BY MR. SHERMAN:
10   Q   And so after it was filled out, did you read
11 Exhibit 178?
12   A   Just to confirm that name and address was
13 correct.
14   Q   Okay.  And what about the other information?
15   A   The other information is what Meredith filled
16 out, so we just filled out the name and address.
17 Address change and that's it.
18   Q   And then on Page 2 of Exhibit 178 that's
19 marked 250 USB in the bottom left-hand corner, on that
20 page do you see your signature?
21   A   Yes.
22   Q   And that is your signature?
23   A   Yes.
24   Q   Okay.  And you understand that you -- by
25 signing, you're certifying under penalty of perjury that

Page 112

1  everything in Exhibit 178 was true and correct?
2    A   Yes.
3    Q   The page marked 251 you value your annual
4  income at $35,000; is that right?
5    A   Yes.
6    Q   And your annual expenses are $31,000?
7    A   Yes.
8    Q   How much of -- how much of the 35,000 is from
9  Hardcore and how much is from your other employment?
10   A   It's the whole 35,000 is from Hardcore.
11   Q   Okay.  When you work teaching boxing at the
12 places that we talked about earlier, do you get a W-2
13 from them?
14   A   Yeah, I don't work for them anymore, I just
15 work for my own business now.  Since 2012 I haven't
16 worked for anybody else.
17   Q   Okay.  And then if you turn to Page 256 on the
18 bottom left-hand corner.  You have to flip one more.
19 That's your signature again; correct?
20   A   Yes.
21   Q   On Page 256 of Exhibit 178?
22   A   Yes.
23        MR. RAHIMI:  Let me know if it's an okay time
24 for a break, but we can keep going.
25        MR. SHERMAN:  I just have one.

Page 113

1        MR. RAHIMI:  Yeah.
2        (Exhibit 179 was marked for
3        identification by the court reporter
4        and is attached hereto.)
5  BY MR. SHERMAN:
6    Q   Do you recognize Exhibit 179?
7    A   Yes.
8    Q   What's Exhibit 179?
9    A   That I got approved.
10   Q   Okay.  And so you were -- you were able -- you
11 had DACA status before July of 2017; correct?
12   A   Yes.
13   Q   And you renewed that in July of 2017; correct?
14   A   I believe so, yes.
15   Q   And am I correct that Exhibit 179 is the
16 document that the government sent that told you you were
17 renewed?
18   A   Yes.
19   Q   And your DADA status expires in July of 2019
20 coming up?
21   A   Yes.
22   Q   And you'd have to reapply again?
23   A   Yes.
24   Q   And depending on what happens with the Trump
25 Administration, you may or may not get approved; right?

Page 114

1    A   If they pass the law and they put back
2  (inaudible) I'd be able to get my -- everything is fine,
3  I'd be able to leave the country.
4    Q   If they pass the law?
5    A   If they pass the law.
6    Q   And in the current moment, whether or not you
7  get reapproved for DACA status has nothing to do with
8  what happened at U.S. Bank; is that fair?
9    A   Sorry, what was that?
10   Q   I say, in the current situation before there
11 is a law passed, nothing that happened at U.S. Bank is
12 going to affect whether you get reapproved for DACA or
13 not?
14   A   Well, if they take DACA away, then I won't
15 DACA anymore.
16   Q   And when you say "If they take DACA away" you
17 mean if the United States --
18   A   Yeah, if they take it away then --
19   Q   Right.  And that's what will determine whether
20 you get your DACA status or not?
21   A   Yes.
22        MR. RAHIMI:  Object to form.
23        MR. SHERMAN:  We can take that break now.
24        MR. RAHIMI:  Okay.  Cool.
25        THE VIDEOGRAPHER:  Of the record.  The time is

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 38 of 139 Page ID
#:1983
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**Page 115**

1  10:54 a.m.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  Going back on the record.
4  The same is 11:03 a.m.
5  BY MR. SHERMAN:
6       Q   So, Mr. Soria, are you claiming in this
7  lawsuit that something U.S. Bank did is preventing you
8  from growing your business?
9       A   Yes.
10      Q   Okay.  Tell me -- tell me why that is?
11      A   I wasn't able to move locations, find a new
12  building -- a bigger building and get out of the area
13  where I'm at right now.
14      Q   And so right now you're at ████████
15      A   No,
16      Q   I'm sorry, ████████████ in Fullerton;
17  right?
18      A   Yes.
19      Q   And who is your landlord there?
20      A   Al Booker.
21      Q   Al -- sorry, what was the last name?
22      A   Booker, B-O-O-K-E-R.
23      Q   And so does he own the building?
24      A   Yes.
25      Q   Okay.  And you rent it from him?

**Page 116**

1       A   Yes, I rent from him.
2       Q   And how big is the space you have there?
3       A   1900 square feet.
4       Q   And what's the rent?
5       A   The rent is 1100 right now.
6       Q   And do you have a written lease?
7       A   Yeah, I do.  I have a written lease.
8       Q   What's the term on the lease?
9       A   It's month-to-month now.
10      Q   Month-to-month.  Okay.  And so you'd like to
11  move out and find a bigger space?
12      A   Yes.
13      Q   Have you located a space?
14      A   I've been having trouble finding a space now.
15  Everything that was open is not available anymore.
16      Q   Okay.  Is there any time between May of 2016
17  and now that you found a space that you had -- you're
18  saying you had to pass up because of something U.S. Bank
19  did?
20      A   Yes.
21      Q   What space was that?
22      A   I don't know the address.  It was on ████████
23  it was 5000 square feet.
24      Q   And who was the landlord there?
25      A   I don't know.

**Page 117**

1       Q   Did you make an application to rent this
2  space?
3       A   No, I couldn't.
4       Q   Why not?
5       A   Because my credit was bad.
6       Q   So you didn't even try?
7       A   No.
8       Q   Do you have any idea whether you would have
9  been approved or not?
10      A   I don't -- I don't.
11      Q   Okay.  What was the rent gonna be in the 5000
12  square foot space?
13      A   My partner -- well, Albert told me it would be
14  about 3200 a month.
15      Q   Who is -- you said your partner Albert; who is
16  that?
17      A   Well, he's my real estate agent and he was
18  going to invest into the business.
19      Q   He's a real estate agent and he was going to
20  invest?
21      A   Yes.
22      Q   And so what was the nature of Albert's
23  investment gonna be?
24      A   He -- he said he would put $20,000.
25      Q   And on kind of what terms?

**Page 118**

1       A   We didn't get to the whole talking, so I don't
2  know.
3       Q   So you didn't -- I mean, did you talk about
4  whether it would be a loan or whether he would actually
5  buy a part of Hardcore Fitness?
6       A   He wanted to be a part of the gym.
7       Q   Okay.  So he wanted -- do you know what the
8  difference between debt and equity financing is?
9       A   No.
10      Q   You know what a loan is; right?
11      A   Yes.
12      Q   And you know what it means to buy part of a
13  business?
14      A   Yes.
15      Q   So what -- what Albert wanted to do is buy a
16  part of Hardcore?
17      A   Yes.
18      Q   And then you would have to share the income
19  from Hardcore with Albert?
20      A   Okay.
21      Q   No, I'm asking you.  Is that --
22      A   Yes, that was -- that was what he wanted to
23  do, yeah.
24      Q   And is that something that you were willing to
25  do?

Samuel Soria Liera - CONFIDENTIAL        11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 39 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1984

**Page 119**

```
 1    A   I -- I was 'cause I really want to move out of
 2  where I'm at right now.
 3    Q   Okay.  Did you guys put anything down in
 4  writing as to how that would work?
 5    A   We didn't get that far.
 6    Q   Okay.  Was there anybody -- how do you know
 7  Albert?
 8    A   I train his wife and his son.
 9    Q   Okay.  How long have you known Albert?
10    A   About six years.
11    Q   Okay.  And before you trained his wife and his
12  son, you didn't know him before that?
13    A   I don't remember.
14    Q   And was that at Hardcore Fitness where they
15  came and trained?
16    A   Yes.
17    Q   Okay.  And what is -- besides him being a real
18  estate agent who you used to look for real estate for
19  your business, can you describe your relationship with
20  Albert Soto?
21    A   We don't really talk much.  He just -- his
22  wife and his son come to the gym.
23    Q   Has he sponsored you for any of your fights?
24    A   Yes.
25    Q   So what is -- how does that work?  Like how
```

**Page 120**

```
 1  does that arrangement work?
 2    A   Sponsor -- the people give you money and
 3  depends on how much they give you where -- where put the
 4  logo on the shorts.  You put it all on the shirts and
 5  the back and then they just pay you for just putting
 6  them on the shorts being sponsored.
 7    Q   Okay.  And so he's a real estate agent so he's
 8  always looking for advertise?
 9    A   Yes.
10    Q   And how much does he pay you to sponsor your
11  fights?
12    A   He paid me about 2- to 400.
13    Q   Per fight?
14    A   Yes.
15    Q   Has he ever lent you money before?
16    A   No.
17    Q   Ever given you any money other than for the
18  sponsorships?
19    A   Just when I trained his wife and son.
20    Q   And that's just the regular fee that you
21  charge everybody who trains with you?
22    A   Just him, he pays that fee.
23    Q   He pays the fee.  So that his wife and son can
24  train with you?
25    A   Yes.
```

**Page 121**

```
 1    Q   And how much is that?
 2    A   500 a month.
 3    Q   And so why didn't it work out with Mr. Soto,
 4  the investment?
 5    A   I was (inaudible) I couldn't put the building
 6  under my name.
 7    Q   And you're saying the reason -- were you going
 8  to buy a building or lease a building?
 9    A   I was gonna lease a building, but leasing a
10  building, I had to put it under my name and my credit
11  wasn't -- I think it was 500 or something like that.
12    Q   So Mr. Soto is not a bank; right?
13    A   No.
14    Q   I mean, for purposes of this investment he's
15  just a guy that you know?
16    A   Yes.
17    Q   Did he pull your credit?
18    A   No.
19    Q   Okay.  So how did he find out about what was
20  going on with U.S. Bank?
21    A   Cause I knew my credit.  No.  I knew my
22  credit.  I told him what my credit was.
23    Q   Okay.  And did he ask?
24    A   I just told him.
25    Q   You just told him?
```

**Page 122**

```
 1    A   Yeah, 'cause he's trying to invest, I don't
 2  want to lie to him.
 3    Q   Right.  But he didn't ask?
 4    A   No.
 5    Q   And you guys didn't talk about any other forms
 6  of -- you didn't get far enough to talk about, you know,
 7  any of the other terms of his investment?
 8    A   No, we were just looking, we were just
 9  looking.  And then he said "We'll talk afterwards, but
10  just look for a building."
11    Q   And you say you found one?
12    A   Well, we found a few but -- yeah, we found one
13  that I really liked.
14    Q   How long was it available?
15    A   I honestly don't know.
16    Q   You don't know.  Okay.
17        So did you make -- you didn't make an
18  application for that space; right?
19    A   No.
20    Q   You didn't make an application for any other
21  space?
22    A   No.
23    Q   Did you talk to Mr. Soto about putting it in
24  his name?
25    A   He didn't want to put it in his name, and I
```

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 40 of 139   Page ID
#:1985
Samuel Soria Liera - CONFIDENTIAL         11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**Page 123**

1 wouldn't put it in his name either.

2    Q   But he was -- he was proposing to buy a

3 portion of the business; right?

4    A   I would never put my business under somebody

5 else's name.

6    Q   Okay. I mean, what was preventing you from

7 putting the lease in the name Hardcore Fitness, LLC?

8    A   I don't know.

9    Q   Is that something you explored with the

10 landlord at the place that you found?

11    A   No.

12    Q   Is there anybody else who was looking to

13 invest in your business?

14    A   Rene Espinoza and Ali Mas.

15    Q   So who is Rene Espinoza?

16    A   He's a friend, I known him since 2012, I

17 believe.

18    Q   And, I'm sorry, it's a he?

19    A   Yeah.

20    Q   Okay. You've known him since 2012. How did

21 you meet Mr. Espinoza?

22    A   I met him at Lous Training System where --

23 doing conditioning.

24    Q   Spell Lous.

25    A   L-O-U-S.

**Page 124**

1    Q   Training Systems?

2    A   Yes.

3    Q   What kind of business is that?

4    A   He trains athletes all the time. Gets them

5 very far in either soccer, basketball football, whatever

6 it is.

7    Q   Is it physical conditioning? Is it nutrition?

8 Is it -- what is it?

9    A   He does everything. Nutrition, but I never

10 done nutrition with him, but it's just conditioning.

11    Q   Okay. And what has the nature of your

12 relationship with Mr. Espinoza been since meeting him?

13    A   He helped me train, we go training at

14 different gyms together.

15    Q   So you guys are kind of training partners?

16    A   Yes.

17    Q   And this Company, this Ali Mas, Inc. that's

18 A-L-I M-A-S?

19    A   Yes.

20    Q   Incorporated?

21    A   Yes.

22    Q   Okay. What is that?

23    A   It's business with -- him and Rene are in

24 business together.

25    Q   Him -- and so Ali Mas is a person?

**Page 125**

1    A   It's a business. Rene is in business with --

2 with -- with Ali Mas. I don't know much about it,

3 that's all I know. They said they were going to

4 invest -- invest or be partner.

5    Q   Okay. So just 'cause I want like to kind of

6 set the table here, you know the difference between like

7 a person and a business; right?

8    A   Yes.

9    Q   Sam Soria is a person?

10    A   Yeah.

11    Q   Hardcore Fitness OC, LLC is a business; right?

12    A   Yes.

13    Q   Is Ali Mas a person or a business?

14    A   I -- honestly, I don't know.

15    Q   Okay. Your attorney have let us know that Ali

16 Mas is a corporation. Do you know what a corporation

17 is?

18    A   Yes.

19    Q   Would it surprise you to learn that I searched

20 the California Secretary State's website and there is no

21 entry for Ali Mas?

22    A   I don't know.

23    Q   Can you give me any information about what Ali

24 Mas is?

25    A   I don't know. I just know Rene, he owns the

**Page 126**

1 two offices and that's it.

2    Q   Do you know if -- so who owns Ali Mas?

3    A   I don't know.

4    Q   Have you ever heard of a person called Ali

5 Mas?

6    A   No.

7    Q   Okay. So it is a business?

8    A   I'm guessing. I don't know.

9    Q   You're guessing?

10    A   Yeah.

11    Q   Okay. So how much was Ali Mas going to

12 invest --

13    A   It was Rene. 30,000.

14    Q   And so what were the terms of Mr. Espinoza's

15 investment?

16    A   We talked about either ownership of the

17 business or as a loan.

18    Q   Okay. And how much did you get with

19 Mr. Espinoza?

20    A   We were just looking for a building, that's

21 about it. We didn't get anything in writing. We were

22 about to but we didn't.

23    Q   So there's nothing in writing yet with

24 Mr. Espinoza?

25    A   No, we didn't get that far.

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 41 of 139  Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1986

**Page 127**

1   Q   Okay. Did either Mr. Espinoza or Mr. Soto ask
2   you for financial information regarding Hardcore
3   Fitness?
4   A   No.
5   Q   Let me ask you this: Did Mr. Espinoza know
6   anything about any situation between you and U.S. Bank?
7   A   I told him that I had that stuff under my
8   name, and he just said to hold on.
9   Q   Okay. And did Mr. Espinoza ask?
10  A   No.
11  Q   Okay. Did he pull your credit?
12  A   No.
13  Q   Okay. And you know what it means when I say
14  "pull your credit;" right?
15  A   Yes.
16  Q   What does that mean to you?
17  A   See my credit report.
18  Q   Mr. Espinoza never did that; right?
19  A   No.
20  Q   Mr. Soto never did that?
21  A   No.
22  Q   You just volunteered the information that you
23  had a situation with U.S. Bank?
24  A   Yes.
25  Q   Do you know what a balance sheet is?

**Page 128**

1   A   No.
2   Q   Do you know what an income statement is?
3   A   I guess, how much you make a year.
4   Q   Yeah, for a business.
5   A   Yeah.
6   Q   Do you have -- you don't have an income
7   statement for Hardcore Fitness; right?
8   A   No.
9   Q   Can you tell me what Hardcore Fitness is worth
10  if you were going to sell it today?
11       MR. RAHIMI: Objection. Calls for
12  speculation. You can answer.
13       THE WITNESS: I don't know.
14  BY MR. SHERMAN:
15  Q   What -- what was the nature of your plan to be
16  able so afford a larger space?
17  A   My plan was to have more classes and have kids
18  class 'cause I can't have a kids class where I'm at
19  right now. It's -- at the time it doesn't work and
20  there is not enough space to do a class at the same
21  time.
22  Q   And how were you going to do that?
23  A   I hire different people that teach Jiu Jitsu
24  and kickboxing and boxing. And then I was going to
25  teach the kids Jiu Jitsu and then have somebody else

**Page 129**

1   teach the cardio class while I teach Jiu Jitsu at the
2   same time.
3   Q   And you would have needed those folks to make
4   use of a larger space; right?
5   A   Yes. We had kids before, but it didn't work
6   out. I couldn't -- the timeframe didn't work, I had to
7   cancel it. They were upset but --
8   Q   And did you identify specific individuals who
9   had filled those roles?
10  A   For classes?
11  Q   Yeah.
12  A   No, I haven't talked to them yet. I -- I just
13  didn't know who I even talk to.
14  Q   Did you seek out any more -- well, you didn't
15  seek out any other sources of financing business
16  besides -- excuse me -- Mr. Espinoza or Mr. Soto?
17  A   I tried to -- I talked to Daniel about U.S.
18  Bank, but he said I didn't qualify for any loans.
19  Q   I take it, this was before the problem?
20  A   Yeah. After that, I just stopped.
21  Q   Okay. When -- when was the last time you
22  talked to Mr. Berrera about that?
23  A   Probably 2015. Somewhere in 2015.
24  Q   Okay. And he said you wouldn't qualify for --
25  A   He said I wouldn't qualify for any loans.

**Page 130**

1   Q   And obviously the reason that you didn't
2   qualify had nothing to do with the state of your credit
3   at that time?
4   A   No.
5   Q   Do you have a website?
6   A   I -- I let it go 'cause I couldn't get into
7   the website access. The guy that was -- that did it for
8   me, I couldn't get a hold of him. So my wife and --
9   she's creating a new one.
10  Q   Who hosted your website?
11  A   Carlo Lewis.
12  Q   And then was there like a go daddy or --
13  A   Go daddy.
14  Q   Okay. That's -- that's the organization that
15  had your website?
16  A   Yes.
17  Q   Okay. Did you have any kind of advertising
18  plan to expand your business?
19  A   Advertising -- what I do for my business,
20  Facebook, Instagram and I go pass the flyers in my
21  neighborhood, like around the area where I'm at.
22  Q   Okay.
23       (Exhibit 180 was marked for
24       identification by the court reporter
25       and is attached hereto.)

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 42 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1863

**Page 131**

1    Q   So, Mr. Soria, I handed you what's been marked

2    as Exhibit 180.  What's Exhibit 180?

3    A   Business Plan Discussions.

4    Q   When was Exhibit 180 written?

5    A   I don't remember.

6    Q   Who wrote Exhibit 180?

7    A   I think it was me and my wife.

8    Q   Was Exhibit 180 created before or after you

9    sued U.S. Bank?

10   A   I don't remember.

11   Q   You don't remember?

12   A   Yeah, I don't remember.

13   Q   What prompted you to create Exhibit 180?

14   A   I don't remember.

15   Q   So Exhibit 180 is not a document that you

16   shared with Mr. Espinoza?

17   A   No.

18   Q   And Exhibit 180 is not a document that you

19   shared with Mr. Soto?

20   A   No.

21   Q   Neither of those gentlemen have ever seen

22   Exhibit 180?

23   A   I don't think so.

24       (Exhibit 181 was marked for

25       identification by the court reporter

**Page 132**

1    and is attached hereto.)

2    Q   Handing you what has been marked as

3    Exhibit 181.  What's Exhibit 181?

4    A   Tax returns.

5    Q   Sorry?

6    A   Taxes.

7    Q   Okay.  What -- what information can I learn

8    from reading Exhibit 181?

9    A   How much the gym made the year of 2015.

10   In total or just credit card transactions?

11   A   Credit card transactions.

12   Q   Okay.  Has -- and I see, they're broken out by

13   month here.  These are your total credit card receipts

14   at Hardcore Fitness per month for the year 2015;

15   correct?

16   A   Yes.

17   Q   That's what's reflected on 181?

18   A   Okay.

19   Q   Well, I'm asking you:  Is that your

20   understanding?

21   A   I don't know.

22   Q   You don't know.  So you can't tell me what

23   Exhibit 181 is?

24   A   No.

25   Q   Okay.  So just looking at the document, Box 1A

**Page 133**

1    says:  Gross amount of payment card third party network

2    transaction and it says $33,405; right?

3    A   Yes.

4    Q   And that's close to the $31,000 that you

5    estimated your income is on your employment application

6    to the government; is that right?

7    A   Yes.

8    Q   And has that been typical for Hardcore Fitness

9    to generate that kind of money from card credit

10   transactions during that time?

11   A   Yes.

12   Q   And has that really changed since 2015?

13   A   It went -- it's less now.

14   Q   I'm sorry?

15   A   It's less now.

16   Q   And what's the reason for that?

17   A   I wasn't really into the business anymore.

18   Stopped advertising, stopped doing --

19   Q   Well, your website shut down because the guy

20   who helped you with your website ghosted on you; right?

21   A   Well, I couldn't make changes to the website

22   so I just -- I -- I could have paid for it again, but I

23   didn't want to.  I just wasn't like in the mood to do it

24   anymore.

25   Q   So what were the things you were doing in 2015

**Page 134**

1    that you're not going now?

2    A   Advertising.  I'd go pass flyers around the

3    schools 'cause we're next to two colleges and high

4    schools and around the neighborhood.

5    Q   And is that something you could do today if

6    you wanted to?

7    A   Yes.

8    Q   And what's the reason that you haven't done

9    it?

10   A   I don't know, I just lost my motivation.  I've

11   been trying to get out of that space for a while, so I

12   really lost my motivation for it.

13   Q   Because you -- 'cause you want to move into a

14   bigger space and bigger gym?

15   A   That, and I'm tired being where I'm at, it's

16   not a good spot.

17   Q   Okay.  I have to grab something behind me,

18   excuse me.

19       (Exhibit 182 was marked for

20       identification by the court reporter

21       and is attached hereto.)

22   Q   So this is Exhibit 182.  And just flip through

23   it and let me know if you can tell me what I see here in

24   Exhibit 182.

25       So what's Exhibit 182?

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 43 of 139   Page ID #:1988

**Page 135**

1　A　Gym year in 2017.
2　Q　I'm sorry?
3　A　The gym -- the year 2017, December.
4　Q　So these -- these are statements you get from
5　U.S. Bank; right?
6　A　I think so.
7　Q　Okay. Have you ever looked at a statement
8　like we see on the first page of Exhibit 182?
9　A　No.
10　Q　Okay. Do you know where -- do you know how
11　your lawyers were able to get these to hand them over to
12　us?
13　　　MR. RAHIMI: Objection, privilege.
14　BY MR. SHERMAN:
15　Q　Did you give the documents that comprise
16　Exhibit 182 to your lawyers?
17　A　I don't -- I don't know.
18　Q　You don't know. Okay? So you have no idea
19　how your lawyers got Exhibit 182?
20　A　I -- I -- I don't remember.
21　Q　Okay. Can you tell me what, if anything, this
22　exhibit shows?
23　A　The deposits.
24　Q　The deposit for what?
25　A　The -- the people paid with credit card.

**Page 136**

1　Q　At the gym?
2　A　Yes.
3　Q　And this shows you what those credit card
4　receipts are and the amount for your gym?
5　A　Yes.
6　Q　So I've gone through this documents, and we
7　appear to be missing statements for January, February,
8　March and April of 2016. Do you know where those would
9　be?
10　A　I don't know.
11　Q　Do you keep statements like this in a
12　particular place?
13　A　No.
14　Q　Do you have like an online access so we can go
15　and look at things like Exhibit 182; do you know?
16　A　No.
17　Q　Do you have anybody that kind of keep track of
18　that sort of stuff for you?
19　A　No.
20　Q　So, really, all you know is that at the end of
21　the month you get an amount deposited on a bank account
22　and that's your credit card receipts for the month?
23　A　Yes.
24　　　(Exhibit 183 was marked for
25　　　identification by the court reporter

**Page 137**

1　and is attached hereto.)
2　Q　Handing what's been marked as Exhibit 183.
3　What's Exhibit 183?
4　A　Individual income. Tax return.
5　Q　For what tax year?
6　A　2015.
7　Q　Did you create Exhibit 183?
8　A　I believe so.
9　Q　I should say, did you fill it in?
10　A　With my name, yes.
11　Q　What about the numbers?
12　A　No, I didn't.
13　Q　Who -- who filled out Exhibit 183?
14　A　My tax guy. Martin.
15　Q　If you turn to Page 2 of Exhibit 183, there is
16　no signatures on it?
17　A　Oh.
18　Q　You see that?
19　A　Yes.
20　Q　Can you tell me why there are no signatures on
21　Exhibit 183?
22　A　I don't know.
23　Q　Do you know if Exhibit 183 was filed with the
24　IRS in this form?
25　A　I don't know. I don't think so.

**Page 138**

1　Q　You don't think Exhibit 183 was filed with the
2　IRS?
3　A　No, I don't know. I don't know.
4　Q　You don't know? Okay. Do you know if there
5　were -- do you know if you've filed a tax return in
6　2015?
7　A　Yes.
8　Q　But you can't tell me whether Exhibit 183 is
9　the tax return that you filed or not?
10　A　I don't know.
11　Q　Okay.
12　　　(Exhibit 184 was marked for
13　　　identification by the court reporter
14　　　and is attached hereto.)
15　Q　Handing you what's been marked as Exhibit 184.
16　What's Exhibit 184?
17　A　The corporation income tax return.
18　Q　For what tax year is Exhibit 184?
19　A　2016.
20　Q　So you signed Exhibit 184; right?
21　A　Yes.
22　Q　And it says that you prepared this return; is
23　that right?
24　A　Yeah -- I don't know.
25　Q　Okay. Well, do you see where -- the box at

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 44 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1989

1  the bottom that says:  Prepared signature?
2  **A  Yes.**
3  Q   Do you see where it says:  Self-prepared
4  return?
5  **A  Yes.**
6  Q   What does that mean, a self-prepared return?
7  **A  That I prepared it myself.**
8  Q   And is that in fact what happened in
9  Exhibit 184?
10  **A  I don't know.**
11  Q   You don't have any recollection of filling
12  this out?
13  **A  No -- I -- I -- I -- I don't know.**
14  Q   And so do you know if Exhibit 184 was filed
15  with the IRS?
16  **A  I don't know.**
17  Q   You don't know.  Okay.
18  (Exhibit 185 was marked for
19  identification by the court reporter
20  and is attached hereto.)
21  Q   Handing you what's been marked as Exhibit 185.
22  Do you recognize Exhibit 185?
23  **A  Yes.**
24  Q   What's Exhibit 185?
25  **A  Tax return.  Me and my wife.**

Page 139

1  Q   And who filled out Exhibit 185?
2  **A  Martin.**
3  Q   Is there a reason Martin doesn't put his name
4  on your tax returns when he prepares them?
5  **A  I have no idea.**
6  Q   Is Martin like a CPA or does he work at like
7  an H&R Block or --
8  **A  I don't know.**
9  Q   How did you come to get Martin to prepare your
10  taxes?
11  **A  Somebody told me about him at my gym and I did**
12  **my tax with him.**
13  Q   So Exhibit 185 was not filed with the IRS in
14  this form; right?
15  **A  I don't know.**
16  Q   Cause you didn't sign Exhibit 185?
17  **A  I don't -- I don't know.**
18  Q   Well, I mean, turn to Page 2 of Exhibit 185.
19  Do you see your signature or any signature on
20  Exhibit 185?
21  **A  No.**
22  Q   And Kim did not sign Exhibit 185?
23  **A  I don't know.**
24  Q   And so -- I mean, you can't tell me whether
25  Exhibit 185 is an accurate reflection of your family's

Page 140

1  income tax for 2016 or not?
2  **A  I don't know.**
3  Q   Okay.
4  (Exhibit 186 was marked for
5  identification by the court reporter
6  and is attached hereto.)
7  Q   Handing you what's been marked Exhibit 186.
8  This appear to be a form 1040 for the tax year 2017;
9  correct?
10  **A  Yes.**
11  Q   And it appears that it has your name and your
12  wife's name and your social security numbers on the
13  first page; correct?
14  **A  Yes.**
15  Q   But, again, Exhibit 186 hasn't been signed;
16  correct?
17  **A  No.**
18  Q   And there is no indication of who prepared
19  Exhibit 186; correct?
20  **A  Yes.**
21  Q   That's correct?
22  **A  Yeah, I don't see.**
23  Q   Okay.  And you can't tell me if Exhibit 186 is
24  an accurate reflection of your income in 2017 or not;
25  correct?

Page 141

1  **A  I don't know.**
2  Q   Okay.  So if I wanted to get a handle on what
3  your income has been in the past, who would I talk to?
4  **A  I just know it by my tax returns, that's it.**
5  Q   Okay.  You go by what we've just looked at,
6  Exhibit 183 through 186?
7  **A  Yes.**
8  Q   Okay.  Have you made any applications for
9  credit since May of 2016?
10  **A  Credit increase?**
11  Q   Any kind of credit.  Credit increase, new
12  account.
13  **A  Credit increase and Orange County Credit**
14  **Union, my -- my bank.**
15  Q   Okay.  What kind of credit did you apply for
16  at Orange County Credit?
17  **A  I don't remember the amount.  Just a credit**
18  **increase, that's it.**
19  Q   And so you don't know what kind of account
20  you're asking the increased credit on?
21  **A  On my credit card.  My credit card -- I think**
22  **I wanted like a thousand dollars limit more.**
23  Q   So I think earlier I asked you if you had
24  credit cards at any other banks and your answer was
25  "Maybe at Wells Fargo."

Page 142

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 45 of 139   Page ID
Samuel S. Soria a/k/a Samuel Soria Liera vs. US Bank (N.A.), et al.
#:1996

1    A    Before, Wells Fargo -- I don't know if I had
2    one at Wells Fargo.  I just know, after U.S. Bank, I
3    just got credit union.
4    Q    So you went to a credit union?
5    A    Yes.
6    Q    And do you have a credit card from Orange
7    County Credit Union?
8    A    Yes.
9    Q    Okay.  When did you get it?
10    A    I don't remember.
11    Q    And so when did you apply -- well, what was
12    the nature of the application to OCCU -- if I call
13    Orange County Credit Union 'cause it's a lot to say --
14    OCCU, will you understand what I mean?
15    A    Yes.
16    Q    Okay.  So, I mean, just tell me about how it
17    came to be that you applied for credit there after May
18    of 2016?
19    A    I wanted to get a -- pay the business
20    insurance and buy some stuff for the gym.
21    Q    Okay.  And so what did you do to try to be
22    able to afford that stuff?
23    A    Well, I just tried to apply for it but now --
24    save money to just pay for it myself.
25    Q    I'm sorry?

Page 143

1    A    I'm sorry, can you repeat the question,
2    please?
3    Q    Yeah.  So -- I mean, so you wanted to buy some
4    stuff for the gym; right?
5    A    Yes.
6    Q    And is there something else you wanted to do?
7    A    I'd just buy stuff for the gym and pay the
8    insurance for the gym.
9    Q    Pay the insurance?
10    A    Yes.
11    Q    And that's the insurance that's carried by?
12    A    Martial Arts.
13    Q    Martial Arts.  What is the whole name of the
14    company that provides the insurance?
15    A    I don't know.
16    Q    You don't know.  Okay.  But you applied to
17    Orange County Credit Union?
18    A    Yes.
19    Q    So how -- how -- how did you do that?
20    A    I went to branch and I applied.
21    Q    Okay.  And when you went into the branch, when
22    was that?
23    A    I don't remember.
24    Q    Did you go kind of on your own volition or did
25    somebody else recommend that you do that?

Page 144

1    A    On my own.
2    Q    And at that time you already had an Orange
3    County Credit Union credit card?
4    A    Yes.
5    Q    Okay.  And so what sort of increase did you
6    ask for?
7    A    I think it was about a thousand, that's it.
8    Q    And you said something earlier about just
9    paying for it yourself.  What were you saying?
10    A    Well, saving up money and just pay for it
11    later on.
12    Q    Can you say that again?
13    A    Save money up and just pay for the stuff
14    myself.
15    Q    Okay.  So eventually you just decided to save
16    your money and buy the equipment later?
17    A    I put it on the credit card.  I wanted to pay
18    the insurance right away, I wanted to pay the whole, but
19    I didn't have enough so I just made payments on it
20    monthly.
21    Q    And you were able to put that on a payment
22    plan?
23    A    Yeah, I was able to, but I didn't want to.  I
24    wanted to pay it upfront because there were extra
25    charges.

Page 145

1    Q    Okay.  What were the extra charges that you
2    incurred to pay your insurance over time?
3    A    I don't know.  Maybe like a hundred dollars
4    more.
5    Q    For a year?
6    A    No, I just -- it's 500-something.  If not,
7    600-something over, I think, for the year.
8    Q    So, I'm sorry, 500 -- so how much more per
9    year does it cost to pay the insurance over time?
10    A    I think they charge you $100 more -- like
11    extra.  It's $500-something, I don't know exactly the
12    number.  And then they charge you $200 upfront and then
13    you pay $60 every month until it's paid off.
14    Q    So they charge you a $100 to kind of spread
15    the premium out; is that what you're saying?
16    A    I think so.  I don't know the amount, the
17    exact amount, but it's a little -- it's interest.  If
18    you're making the payments, it's interest.
19    Q    Okay.  And if I wanted to find this
20    organization that provides this Martial Arts insurance,
21    how would I find it?
22    A    Through martial arts insurance for a gym,
23    that's it.
24    Q    And there's only one company through the
25    United States that provides insurance to --

Page 146

Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 46 of 139  Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1991

**Page 147**

1   A   I don't know.  That's the one I've been
2 dealing with, so I don't know.
3   Q   Do they have a web address?
4   A   I'd just look for martial arts insurance.
5   Q   So you just Google martial arts insurance?
6   A   Yes.
7   Q   And do you have any papers from them that
8 reflect -- do you have like a paper insurance policy
9 from them?
10   A   Yes.  They send it to me.
11   Q   Where is it?
12   A   It's in the house.
13   Q   How about a bill from them; do you have that?
14   A   Email.
15   Q   Email?
16   A   Yeah.
17   Q   So you have emails that have bills?
18   A   Yes, I believe so.
19   Q   And does the email break out how much more it
20 cost you to pay the premium?
21   A   I'm not sure.
22   Q   What is the total premium per year?
23   A   I don't know, I -- yeah, I don't know.  The
24 total is 653.
25   Q   653 per month?

**Page 148**

1   A   No, for the year.  If you paid up, it's 653
2 for the year.
3   Q   Okay.  And because you pay it over time, it's
4 how much?
5   A   I don't know.  If it's payment, I don't know.
6   Q   You don't know.  So as -- as you sit here you
7 can't tell me how much more it cost you not to get that
8 credit at Orange County and pay it all at once?
9   A   No, I don't know.
10   Q   Did the denials of credit that you experienced
11 at OCCU harm you in any other way?
12   A   Just pay to get more stuff for the gym, pay
13 some bills.
14   Q   But you were going to pay that money back?
15   A   Yes.
16   Q   What was your plan to pay it back?
17   A   I -- I always pay my bills back.  I don't
18 know, save money, pay the bills.
19   Q   And so how -- how much credit were you looking
20 to get?
21   A   Just -- I'm not sure.
22   Q   And at what interest rate?
23   A   I don't know.
24   Q   And what would your monthly payment be?
25   A   Right now it's probably like $59 a month or

**Page 149**

1 maybe a $100 a month.
2   Q   So you were going to pay the minimum payment?
3   A   I was gonna to pay the minimum payment.
4   Q   Okay.  How much more were you going to pay?
5   A   I don't know.
6        THE REPORTER:  I'm sorry, you said "I was
7 gonna pay the minimum payment"?
8        THE WITNESS:  No, I wasn't gonna pay the
9 minimum.  I pay more.
10        THE REPORTER:  Okay.  Please speak up, I can
11 barely hear you.
12        MR. RAHIMI:  Yeah.  Sorry, Eric, if you can
13 just go a little bit higher since the air is on.
14        MR. SHERMAN:  Sure.  Sure.
15        MR. RAHIMI:  Sam, you need to speak up.
16        THE WITNESS:  Okay.
17        (Exhibit 187 was marked for
18        identification by the court reporter
19        and is attached hereto.)
20 BY MR. SHERMAN:
21   Q   So showing you what's been marked as
22 Exhibit 187.  What's Exhibit 187?
23   A   This is what they sent me, they denied me
24 because the office numbers are delinquent.
25   Q   So I think you had said earlier that you

**Page 150**

1 wanted an increase on your credit limit on your credit
2 card; is that right?
3   A   Yes.
4   Q   Okay.  Is that what Exhibit 187 is talking
5 about?
6   A   Yes.  I was trying to get increase also
7 because I want to transfer the money from my credit
8 cart, I don't want to pay U.S. Bank, I want to transfer
9 it over.
10   Q   Okay.  So -- and so you were -- Exhibit 187
11 says Amount of loan requested $6,000.
12      Is that the increase that you were asking for?
13   A   Yeah, that one was for to transfer the money
14 from my credit card from U.S. Bank.  I don't want to
15 deal with U.S. Bank anymore, I want to transfer, but
16 they denied me.
17   Q   Okay.  And Exhibit 187 is what they sent you
18 explaining why?
19   A   Yes.
20   Q   Okay.  Were the terms that you were going to
21 get from Orange County Credit Union were going to be
22 more favorable than from U.S. Bank?
23   A   I don't know.
24        (Exhibit 188 was marked for
25        identification by the court reporter

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 47 of 139   Page ID
#:1932
Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**Page 151**

1    and is attached hereto.)
2    Q  Handing you what's been marked as Exhibit 188.
3  Do you recognize Exhibit 188?
4    A  No.
5    Q  I'm sorry?
6    A  No.
7    Q  You can't tell me what Exhibit 188 is?
8    A  Just a credit increase of 500.
9    Q  Okay.  Did you make a second application for
10  credit at OCCU?
11    A  Yeah, I tried to go lower, hopefully.
12    Q  Okay.  And Exhibit 188 is what they sent you
13  to tell you that they denied it; right?
14    A  Yes, yes.
15    Q  So were your reasons for seeking more credit
16  from OCCU any different at the time from Exhibit 188
17  than they were --
18    A  Just gym stuff.
19    Q  Just gym stuff?
20    A  Yes.
21    Q  You just wanted more stuff for the gym?
22    A  Yes.
23    Q  Do you have any kind of plan about what you
24  were going to buy?
25    A  Pads, kick pads and punching pads.

**Page 152**

1    Q  Any other credit denials that you experienced
2  as -- well -- after May of 2016?
3    A  Credit denial, I don't know.  I think I
4  stopped trying 'cause I'm going to keep getting denied,
5  there is no point.
6    Q  In answers to written questions your lawyers
7  told us something about a condo you were trying to get?
8    A  Yeah, but I don't remember the information
9  about that.
10    Q  So you can't -- did you make an application to
11  rent a new place?
12    A  No.
13    Q  Okay.  So you didn't sign an application to
14  rent a new residence?
15    A  I don't -- I don't know.
16    Q  Okay.  How about Macy's, did you apply to
17  Macy's?
18    A  They actually -- they -- I had a $1000 limit
19  and they brought it down to a $100.
20    Q  Okay.
21    A  They gave it to me when my credit went up and
22  they brought it back down when my credit --
23    Q  How often did you use your Macy's card?
24    A  Just holidays when I buy gifts, that's it.
25    Q  So once a year?

**Page 153**

1    A  Yeah, not that much.
2    Q  So has that, you know, prevented you from
3  doing anything that you would otherwise do?
4    A  Just buy gifts for holidays, yeah.
5    Q  And it went down from a 1000 to a 100 is
6  what --
7    A  I believe it's like a 1000 to a $100.
8    Q  Any other credit denials?
9    A  I don't know.
10    Q  So we know, arising out of the same incident,
11  you sued Equifax, right, 'cause they were in this case?
12  Do you recall that?
13    A  Yes.
14    Q  And you reached a settlement with Equifax?
15    A  Yes.
16    Q  Tell me about your involvement in the
17  settlement process?
18    A  I don't know.
19    Q  I mean, I take it, at some point did you
20  approve a settlement between yourself and Equifax?
21    A  Yes.
22    Q  And how much did you get from them?
23      MR. RAHIMI:  Objection, confidential.  Do not
24  answer that question.
25  ///

**Page 154**

1  BY MR. SHERMAN:
2    Q  Are you going to follow your lawyer's
3  instruction?
4      MR. RAHIMI:  Yes, don't answer that.
5  BY MR. SHERMAN:
6    Q  Have you sued anybody else arising out of what
7  you say Mr. Berrera did?
8    A  If I sued anybody else?
9    Q  Right.
10    A  I think it was National Funding.
11    Q  I'm sorry, what?
12    A  National Funding.
13    Q  National Funding?
14    A  Yes.
15    Q  And where is that lawsuit filed?
16    A  I don't know.
17    Q  Okay.  Is that lawsuit going or is it over
18  with?
19    A  It's over with.
20    Q  Did you reach a settlement with National
21  Funding?
22    A  Yes.
23    Q  And what were the terms of that settlement?
24      MR. RAHIMI:  Objection.  Confidentiality.  Do
25  not answer that.

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 48 of 139   Page ID
#:1935

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

BY MR. SHERMAN:

1  BY MR. SHERMAN:
2      Q    Your lawyer has instructed you not to answer,
3  and I take it, you're going to follow his instruction?
4      A    Yes.
5      Q    Okay.  Besides National Funding and Equifax
6  and U.S. Bank, have you sued anybody else?
7      A    No.
8      Q    Does the name Scabo mean anything to you,
9  S-C-A-B-O?
10     A    I don't know.
11     Q    Before this lawsuit have you ever sued anybody
12  before in your life?
13     A    I don't think so.  I don't know, I don't think
14  I ever sued anybody.
15     Q    Okay.
16         (Exhibit 189 was marked for
17          identification by the court reporter
18          and is attached hereto.)
19     Q    Handing you what's been marked as Exhibit 189.
20  Do you recognize Exhibit 189?
21     A    Yes.
22     Q    What's Exhibit 189?
23     A    It's the document of U.S. Bank versus myself.
24     Q    When is the first time you saw Exhibit 189?
25     A    I don't remember.

Page 155

1      Q    Has it been recently?  Has it been a number of
2  months?
3      A    I'm not sure.  Maybe a couple of months, I
4  don't know.
5      Q    So I would just tell you, Exhibit 189 is what
6  we call a complaint.
7      A    Okay.
8      Q    And it contains the allegations you're making
9  in court against U.S. Bank and Equifax; do you
10  understand that?
11     A    Yes.
12     Q    Okay.  So I wanted to look at some of the
13  paragraphs where -- actually, let me just ask one
14  question before that.
15         Did you approve Exhibit 189 before it was
16  filed in court?
17     A    I don't know.
18     Q    You don't know.  Do you have any awareness
19  that Exhibit 189 was filed in court?
20     A    I -- I don't know.
21     Q    No idea.  Okay.
22         So let go to Paragraph 41 which is on Page 7
23  of Exhibit 189.  And Paragraph 41 says:  On or about
24  May 14 of 2016, Plaintiff -- and that's you, you
25  understand that; right?

Page 156

1      A    Yes.
2      Q    -- discovered multiple U.S. Bank loans,
3  reserve lines and credit cards have been fraudulently
4  opened in your name; correct?
5      A    Yes.
6      Q    And then you list all the ones that you
7  discovered in May of 2016?
8      A    Yes.
9      Q    Okay.  And did -- did you review and approve
10  this litigation before it was filed in court?  Do you
11  have any recollection of that?
12     A    I believe so.
13     Q    You believe you did?  Okay.  And so did you
14  verify that this list was accurate?
15     A    Yes.
16     Q    Okay.  Let's go to Paragraph 52 on Page 9 of
17  Exhibit 189.  By the way, I take it, you did not write
18  Exhibit 189; right?
19     A    No.
20     Q    Exhibit 189 was written for you by your
21  lawyers; right?
22     A    I -- I don't know.
23     Q    You don't know.  Okay.
24         Exhibit -- excuse me -- Paragraph 52 of
25  Exhibit 189 says:  Despite the July 26 letter notifying

Page 157

1  Defendant U.S. Bank of Plaintiff's representation by Mr.
2  Calderon, Defendant U.S. Bank continued to call
3  Plaintiff directly a total of 232 times between
4  July 27th, 2016 and January 20th, 2017.  Do you see
5  that?
6      A    Yes.
7      Q    Where did that number come from?
8      A    I had phone records.
9      Q    Phone records.  Okay.
10         From whom did the phone records come?  What
11  company?
12     A    T-Mobile.
13     Q    T-Mobile.  And was that on your cell phone?
14     A    Yes.
15     Q    Because your business also rings through your
16  cell phone; right?
17     A    Yes.
18     Q    So if a call came to your business or your
19  cell phone, it all ended up on your T-Mobile bill?
20     A    I don't know.  I -- I -- I don't know.
21     Q    Do you have those bills?
22     A    I think I still do, yeah.
23     Q    Okay.  Have you provided those bills to your
24  lawyers?
25     A    Bills?

Page 158

Samuel Soria Liera - CONFIDENTIAL        11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 49 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1994

**Page 159**

1    Q   Yeah, the T-Mobile bills.

2    A   Not, the T-Mobile bills.  I don't know about
3    the T-Mobile bills.  You mean the phone calls?

4    Q   Yeah.

5    A   Yes.

6    Q   So I guess if -- if the phone records weren't
7    bills, what -- what form did the phone records take?

8    A   I don't know.  I don't know if it say phone
9    records.  I don't know.

10   Q   Okay.  How did you get the phone records?

11   A   I called T-Mobile.

12   Q   Did you get calls from U.S. Bank other than on
13   your T-Mobile cell phone?

14   A   No.

15   Q   Did you record any of the calls?

16   A   Record it?  No.  I don't know.

17   Q   So the 232 calls that you got from U.S. Bank,
18   can you describe what the calls were about?

19   A   They were calling me that I owed money in some
20   accounts; that -- but told them I didn't know what they
21   were talking about and I told them it wasn't me.

22   Q   Okay.  And in every one of the 232 instances
23   was U.S. Bank calling to try to get money from you?

24   A   I -- honest, I don't remember.  I don't know.

25   Q   Is it possible that for some of the 232 times

Page 159

**Page 160**

1    U.S. Bank was contacting you about your fraud claim?

2    A   I didn't answer all the calls so I don't know.

3    Q   Okay.  So, I mean, as you sit here you can't
4    tell me how many of the 232 calls were to try to get
5    money from you; is that right?

6    A   Most of them that I spoke to they were
7    trying -- they were trying to -- for me to pay it and
8    that I owed the money, but I kept telling them that it
9    wasn't me and I wasn't going to pay something that I
10   didn't take.

11   Q   Okay.  So how many of the 232 calls -- let me
12   strike that and start over.

13       In how many of the 232 calls on your T-Mobile
14   records did someone from U.S. Bank ask you to pay money?

15       MR. RAHIMI:  Objection.  Calls for
16   speculation.  He already answered that he doesn't know
17   exactly how many.  Go ahead.

18       THE WITNESS:  Yeah, I don't.

19   BY MR. SHERMAN:

20   Q   How many of the -- were any of the 232 times
21   that are referred to in Exhibit 189 times when you
22   didn't pick up the phone?

23   A   I'm not sure.  I don't know.  I picked up the
24   phone most of the time.  I don't know, I can't give you
25   a specific number.

Page 160

**Page 161**

1    Q   So when was the first time that you U.S. Bank
2    called you to ask you to pay money for one of the
3    accounts that you say you didn't open?

4    A   I don't know.

5    Q   Do you know -- I mean, do you know how close
6    it was to when you went into the branch and started
7    investigating?

8    A   No, I don't.

9    Q   Did you -- did you wait?  I mean, if I
10   misunderstood your testimony, please tell me, but my
11   understanding was, you got a call saying you owe this
12   money; right?

13   A   Yes.

14   Q   And then started looking for Mr. Berrera?

15   A   Yes.

16   Q   How long did you wait before beginning to look
17   for Mr. Berrera?

18   A   That same day.

19   Q   Okay.  So you got the first call asking you
20   for money; right?

21   A   Yes.

22   Q   And I think we talked about that being on a
23   Friday; right?

24   A   I believe so.

25   Q   The day of your aunt's funeral; right?

Page 161

**Page 162**

1    A   Yes.

2    Q   Okay.  And you immediately started looking for
3    Mr. Berrera?

4    A   Yes.

5    Q   And then you went into U.S. Bank the following
6    Saturday; right?

7    A   Yes.

8    Q   And you talked to the branch personnel about
9    how the accounts weren't yours; right?

10   A   Yes.

11   Q   And these 232 calls -- excuse me -- one more
12   question in that line.

13       That was in May of 2016 that you went into the
14   branch; right?

15   A   Yes.

16   Q   Okay.  And Exhibit 189 says that after a
17   July 26 letter, you got 232 calls; right?

18   A   Yes.

19   Q   So all of those 232 calls came after you
20   recorded the fraud to U.S. Bank; right?

21   A   I -- I -- I don't know.

22   Q   Okay.  You don't know.  You know that
23   July 26th, 2016 happened after May of 2016?

24   A   Yes.

25   Q   Okay.  And I guess the bottom line is, you

Page 162

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 50 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1995

1  can't tell me many of those 232 phone calls were ones in
2  which U.S. Bank was asking you to pay money?
3      MR. RAHIMI:  Objection.  Asked and answered.
4  Calls for speculation.  Argumentative.  He's answering
5  this like three times, let's move on.
6  BY MR. SHERMAN:
7  Q    What's the answer?
8  A    I don't know.
9  Q    Okay.  So if we could go back to Exhibit 189
10 and turn to Paragraph 82.  Paragraph 82 says that:
11 "Upon reviewing his Equifax credit report, Plaintiff
12 discovered U.S. Bank furnished negative and inaccurate
13 information regarding certain and U.S. Bank accounts
14 ending in 5258, 0949, 6967 and 3978 to Equifax."  Is
15 that right?
16 A    I don't remember.  I don't know.
17 Q    Do you remember pulling your Equifax credit
18 report?
19 A    I -- I don't remember.
20 Q    I don't remember.  Okay.
21     So can you explain to me how it is you came to
22 have your Equifax credit report to review it?
23 A    Honestly, I don't know.  I -- I -- I don't
24 remember.
25 Q    Okay.  And if you could turn to Paragraph 109,

Page 163

1  which is on Page 15 of Exhibit 189.
2      So Paragraph 109 says that -- and I'm going to
3  start on the line at the very bottom of Page 15 or just
4  a couple words before that.  "The information Defendant
5  U.S. Bank was reporting was inaccurate and patently
6  misleading because it suggested that the disputed U.S.
7  Bank accounts ending in 5258, 0949, 6967 and 3978
8  belonged to and were the responsibility of Plaintiff."
9  Right?
10 A    I don't know.
11     MR. RAHIMI:  Is there a question?
12 BY MR. SHERMAN:
13 Q    Is that what you're challenging this lawsuit,
14 the fact that U.S. Bank reported these accounts to
15 Equifax?
16 A    I -- I didn't open them.
17 Q    Okay.  So you didn't open any of these four
18 accounts?
19 A    I don't -- I don't know.  I --
20     (Exhibit 190 was marked for
21     identification by the court reporter
22     and is attached hereto.)
23 Q    Handing you what's been marked as Exhibit 190.
24 Can you tell me what Exhibit 190 is?
25 A    It's myself versus U.S. Bank and Equifax.

Page 164

1  Q    Right.  And do you know what interrogatories
2  are?
3  A    No.
4  Q    Okay.  So interrogatories are written
5  questions that we send to your lawyers to be answered.
6  A    Okay.
7  Q    Okay.  And if you turn to the last page of
8  Exhibit 190, there is something that we call a
9  "Verification"?
10 A    Okay.
11 Q    Do you see a signature on the last page of
12 Exhibit 190?
13 A    Yes.
14 Q    Whose is it?
15 A    Mine.
16 Q    Okay.  And so when did you put your signature
17 on the last page of Exhibit 190?
18 A    11/17.
19 Q    Okay.  Before you did that, did you read the
20 18 pages that precede this in Exhibit 190?
21 A    Yes.
22 Q    You did?  Okay.
23     And you understood that by signing the last
24 page of Exhibit 190, you were attesting under oath that
25 these answers were true?

Page 165

1  A    Yes.
2  Q    You have to answer out loud.
3  A    Oh, yes.
4  Q    Okay.  So if we could turn to Page 3 of
5  Exhibit 190.  Actually, sorry, let's skip ahead to
6  Page 6 of Exhibit 190.  There's an interrogatory
7  Number 7 which asked you to identify by account number,
8  transactions and amount each debt to U.S. Bank that you
9  contend was a result of identity theft.  Do you see
10 that?
11 A    Yes.
12 Q    Okay.  And then your answer begins on Page 7
13 after some objections that your lawyers made.  Do you
14 see that?
15 A    Yes.
16 Q    And so what I see on Page 7 and 8 is your
17 answer as to which of the accounts at U.S. Bank you're
18 claiming were identity theft by Mr. Berrera; right?
19 A    Yes.
20 Q    Okay.  So let's --
21     MR. RAHIMI:  I'm sorry, can you go back and
22 repeat that question that you just asked?
23     MR. SHERMAN:  You want to read it back?
24     MR. RAHIMI:  Yeah.
25     (The following record was read by the

Page 166

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 51 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1996

**Page 167**

1  reporter:
2      "And so what I see on Page 7 and 8 is your
3  answer as to which of the accounts at U.S. Bank you're
4  claiming were identity theft by Mr. Berrera; right?")
5      MR. RAHIMI:  Okay.  And I think that misstates
6  the -- the actual interrogatory, but you can proceed.
7  BY MR. SHERMAN:
8      Q   Let's -- I guess we can get into specifics
9  here.
10         So about a third of the way down on Page 7 of
11  Exhibit 190 there is a heading for Reserve Lines; right?
12     A   Yes.
13     Q   And then it has an account number ending in
14  6967; correct?
15     A   Yes.
16     Q   And you know that to be an account number of a
17  reserve line in your name at U.S. Bank; right?
18     A   Yes.
19     Q   Okay.  And you're saying that any transaction
20  made using funds from this reserve Line was fraud?
21     A   Yes.
22     Q   And that you were unaware any reserve line was
23  ever opened and did not know that it existed?
24     A   I -- I didn't open this account, I didn't
25  authorize it either.

**Page 168**

1      Q   Okay.  So you didn't open a reserve line for
2  6967?
3      A   No.
4      Q   And you didn't authorize anyone to open a
5  reserve line for 6967?
6      A   No.
7          (Exhibit 191 was marked for
8          identification by the court reporter
9          and is attached hereto.)
10     Q   Okay.  Handing you what's been marked as
11  Exhibit 191.  Do you recognize Exhibit 191?
12     A   No.
13     Q   Do you see your signature on Exhibit 191?
14     A   Yes.
15     Q   Okay.  Do you know what a signature card is?
16     A   No.
17     Q   But, twice, this is your signature on
18  Exhibit 191; right?
19     A   I don't know.
20     Q   Okay.  You're not contesting that the checking
21  account numbered 6967 was opened for you, right, just
22  the reserve line?
23     A   Sorry, what was that?
24         MR. RAHIMI:  Objection, form.
25  ///

**Page 169**

1  BY MR. SHERMAN:
2      Q   Do you acknowledge that you authorized the
3  opening of a checking account with an account number
4  ending in 6967 at U.S. Bank?
5      A   Yes, with Daniel Berrera I authorized that
6  checking account.
7      Q   Right.  It's just the reserve line that you
8  say was unauthorized; is that right?
9      A   Yes, that was unauthorized.
10     Q   Okay.  Do you remember going into the branch
11  and signing your name on a little electronic pad to open
12  that account in November of 2015?
13     A   I honestly don't remember.
14     Q   But you don't dispute that you did it?
15     A   No, not the checking account.  I don't.
16     Q   Where were you living in November of 2013?
17     A   I don't remember.  Maybe 14 -- I don't know.
18     Q   Sorry?
19     A   I don't remember.
20     Q   So if we could just for a minute go back to
21  Exhibit 190 on Page 8 of Exhibit 190.
22         In interrogatory Number 8 we asked you what
23  are all the places that you've lived since January 1 of
24  2010.  And if you turn to the next page, your answer
25  was:  From 2010 to 2014 you've lived at ███████████

**Page 170**

1  Stanton, California; correct?
2      A   Yes.
3      Q   Okay.  And is that -- is that true?
4      A   Yes.
5      Q   Does seeing Page 9 of Exhibit 190 refresh your
6  memory as to when you lived -- or where you lived in
7  November of 2013?
8      A   Sorry, repeat one more time.
9      Q   Yeah.  Does seeing Page 9 of Exhibit 190
10  refresh your memory as to where you were living in
11  November of 2013?
12     A   Yeah, the address, I see -- that's the same.
13  20 -- 2013.
14     Q   Yeah, you lived at ████████████ --
15     A   Yes.
16         (Exhibit 192 was marked for
17          identification by the court reporter
18          and is attached hereto.)
19     Q   So Exhibit 192 is all the statements for this
20  checking account ending in 6967.  They're in kind of
21  reverse order, so the earliest statements are at the
22  back.  So maybe you can turn to the last one which is
23  November of 2013.
24     A   Okay.
25     Q   So when you first opened account 6967 it was

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 52 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1991

**Page 171**

1  without Mr. Berrera; right?
2  A  6967?
3  Q  Yeah.
4  A  I don't know.
5  Q  You don't know?  Okay.
6       In any event, I mean, on the November 2013
7  statement for account 6967 it's just your name; right?
8  A  Yes.
9  Q  You agree that at some point you authorized
10  Mr. Berrera to hold this account jointly with you;
11  correct?
12  A  I don't -- I don't remember.
13  Q  Okay.  Well, you had a joint account with
14  Mr. Berrera?
15  A  Yes, I did.
16  Q  Okay.  And so if we look, for example, at the
17  very first page of Exhibit 192, you see it has both your
18  names on it; right?
19  A  What month?
20  Q  Just the very first one, November of 2016.
21  The first one in the book.
22  A  Okay.  Yeah, it just has my name -- oh, yeah
23  Daniel Berrera as well.
24  Q  And if -- if you go now back to the end, there
25  is no reserve line on this account; right?

**Page 172**

1  A  No.
2  Q  When did you move away from the Fulton Way
3  address?
4  A  I -- I don't remember.  I was living in Fulton
5  Way and I was living with my wife.  At the time she was
6  my girlfriend.
7  Q  Okay.  And you had your mail forwarded?
8  A  It was going still to Fulton Way.
9  Q  And you never had your mail forwarded from
10  that address?
11  A  No.
12  Q  And you can't tell me when it was that you
13  moved away?
14  A  No.
15      (Exhibit 193 was marked for
16      identification by the court reporter
17      and is attached hereto.)
18  Q  Handing you what's been marked as Exhibit 193.
19  Have you ever seen Exhibit 193 before?
20  A  No, no.
21  Q  Were you living at Fulton -- the Fulton Way
22  address in July of 2014?
23  A  I don't know.
24  Q  You don't know.
25      When you moved away from the Fulton Way

**Page 173**

1  address, did you update your address with U.S. Bank?
2  A  I don't -- I don't know.
3  Q  And do you have any reason to dispute that
4  U.S. Bank sent you Exhibit 193 in July of 2014?
5  A  I don't know.
6  Q  You can't think of a reason to dispute that
7  U.S. Bank mailed --
8       MR. RAHIMI:  Objection.  Argumentative.  Calls
9  for speculation.
10  BY MR. SHERMAN:
11  Q  You don't know?
12  A  Yeah, I -- I don't know.
13  Q  Okay.  So returning to Exhibit 192, the
14  binder.  And you have these tabs down by months.  I'd
15  like you to go to 2014 and then to July.
16  A  Okay.
17  Q  And in July of 2014, at least according to the
18  statement marked USB 1406 for the period ending July 16,
19  2014, it's still just your name on this account; do you
20  see that?
21  A  The July 2014?
22  Q  Yeah.  So are you on Page 1406 at the bottom
23  right-hand corner?  Do you see under your left hand it
24  it's says USB 001406?
25  A  Yes.

**Page 174**

1  Q  Okay.  This is the July 2014 statement for
2  your account at U.S. Bank.
3  A  Okay.
4  Q  And at this point Mr. Berrera's name is not on
5  your statements; right?
6  A  Yes.
7  Q  Okay.  If you look at the bottom of Page 1406,
8  you see a reference to a reserve line there.  Do you see
9  that?
10  A  Yes.
11  Q  And the balance on the reserve line is $2,018;
12  do you see that?
13  A  Yes.
14  Q  Did you open that reserve line?
15  A  No, I did not.
16  Q  Okay.  So, I mean, I invite you to look at the
17  statements between this July statement to the back of
18  the exhibit.  And the balance in your account is never
19  more than a few hundred dollars; do you see that?  At
20  least at the end of the month.
21  A  Yeah.
22  Q  Does that seem accurate to you?
23  A  I -- I -- I honestly don't remember.
24  Q  Okay.  You had a debit card on this account;
25  right?

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 53 of 139   Page ID
#:1998
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**Page 175**

1   A   The 6967?
2   A   Yeah.
3   A   I -- I -- I don't -- I don't remember.
4   Q   You don't know?
5   A   Yeah, I don't know.
6   Q   All right. Well, if -- if -- you know, you're
7   on Page 1406; right?
8   A   Yes.
9   Q   If you turn just two pages in to Page 1408, we
10  have a list of debit card transactions; right?
11  A   Yes.
12  Q   Okay. And that's you making those
13  transactions; right?
14  A   I don't know. I -- I -- I don't know.
15  Q   You don't know?
16  A   No, I don't know.
17  Q   Do you shop -- or did you shop at the
18  Albertons in Fullerton in 2014?
19  A   Yes, I did.
20  Q   And how about at Ralphs?
21  A   Yes.
22  Q   How about T-Mobile, is that where you still
23  had your cell phone back then?
24  A   Yes.
25  Q   And Sansai Japanese, is that a place you used

**Page 176**

1   to eat?
2   A   I don't know.
3   Q   How about the Target in Fullerton, did you
4   shop at the Target in Fullerton?
5   A   Yes.
6   Q   And Sprouts?
7   A   Yes.
8   Q   Okay. So do you have any doubt that -- you
9   know -- do you recall having a debit card that ended in
10  9591?
11  A   A debit card 9 --
12  Q   Ending in 9591.
13  A   No, I -- I don't.
14  Q   You don't recall that?
15  A   No.
16  Q   Do you dispute that you did have one?
17  A   I -- I don't know. Yeah, sorry, I don't.
18  Q   Okay. But these are all places that you
19  shopped; right?
20  A   Yes.
21  Q   Okay. And then if you look -- go back to
22  Page 1406, you've got $365.84 in your checking account;
23  right?
24  A   Yes.
25  Q   Okay. And then you got the savings account

**Page 177**

1   ending in 0128; is that also your account?
2   A   I -- I don't know.
3   Q   You don't remember?
4   A   Yeah.
5   Q   Okay. And then you've got a reserve line
6   balance for $2018?
7   A   No, that's not me.
8   Q   That's not you?
9   A   Yeah.
10  Q   But it's written there, right, on the first
11  page?
12  A   Yeah, the reserve line.
13  Q   I'm sorry?
14  A   Yeah, this is reserve line.
15  Q   Okay.
16      MR. RAHIMI: Eric, you're making statements on
17  the record. Can you please start asking questions that
18  are objective?
19      MR. SHERMAN: Okay.
20      MR. RAHIMI: Thank you.
21  BY MR. SHERMAN:
22  Q   Do you see at the bottom of Page 1406 where it
23  says reserve line?
24  A   Yes.
25  Q   And do you see where it says a balance of

**Page 178**

1   $2018?
2   A   Yes.
3   Q   Okay. And --
4      MR. RAHIMI: And, Samuel, if you don't get an
5   actual question --
6      THE WITNESS: Yeah.
7      MR. RAHIMI: -- don't answer it.
8      THE WITNESS: Okay.
9      MR. RAHIMI: -- until he asks an actual
10  question.
11      THE WITNESS: Okay.
12      MR. RAHIMI: Cause he keeps doing that. And
13  he's making it sound like you're -- he's putting words
14  in your mouth.
15      MR. SHERMAN: I'm going to need the speaking
16  objections to stop.
17      MR. RAHIMI: Well, I'm going to need the
18  statements to stop.
19  BY MR. SHERMAN:
20  Q   If you could turn to Page USB 1409. Do you
21  see an entry on July 2nd for a customer withdrawal in
22  the amount of $2000?
23  A   Yes.
24  Q   And then if turn one more page, do you see
25  that there was an advance that happened on this reserve

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 54 of 139   Page ID
#:1959
Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

1  line on July 2nd for $2000?
2      A   Yes.
3      Q   And those transactions happened on the same
4  day; right?
5      A   Yes.
6      Q   Okay.  You also made, you know, some deposits
7  in this account; right?  You would go to the bank and
8  make deposits?
9      A   I -- I -- honestly, I don't know.
10     Q   Yeah.  I mean, you've been to the Bank branch
11  in Fullerton; right?  Or, excuse me, in Santa Ana and
12  made deposits before?
13     A   I mostly did deposit in Fullerton.
14     Q   Oh, you do them in Fullerton?
15     A   Yeah, I don't live in Santa Ana.  It's too far
16  from where I am.
17     Q   Okay.  So just to take an example, let's go
18  all the way to the back again to that November 2013
19  statement, the last one.  And you see on Page 1440 you
20  made a deposit for 700 -- well, it lists a deposit for
21  $706; do you see that?
22     A   For November?
23     Q   Yeah, on Page 1440.
24     A   I don't have 1440.
25     Q   One more tab.

Page 179

1      Q   Okay.  So you -- you're depositing money into
2  your checking account here; correct?
3      A   Yes.
4      Q   Okay.  And it looks like you got -- you
5  know -- you came in with, you know, $856 and you asked
6  for $50 back.  Do you see where it says "Less cash
7  received"?
8      A   Yes.
9      Q   And so the total of your deposit was 706;
10  right?
11     A   Yes.
12     Q   And that number on Exhibit 194 matches the
13  deposit entry that we saw on Page 1440 of Exhibit 192;
14  right?
15     A   I guess.  I don't know.
16     Q   Yeah.  I mean, Exhibit 194 has a total of
17  $706; right?
18     A   Yes.
19     Q   And we looked at a $706 deposit on Page 1440?
20     A   Yes.
21     Q   And, I mean, do you have any reason to doubt
22  that it was you making that deposit?
23     A   I don't -- I don't know.
24         (Exhibit 195 was marked for
25         identification by the court reporter

Page 181

1      A   Oh, okay.
2      Q   You see a deposit -- a deposit listed for
3  November 1 for $706?
4      A   No, I don't see.
5      Q   Okay.  May I point it out to you?
6      A   Yes, please.
7      Q   Right there.
8      A   Okay.
9      Q   You see that?
10     A   Yes.
11     Q   Okay.
12         (Exhibit 194 was marked for
13         identification by the court reporter
14         and is attached hereto.)
15     Q   Handing you what's been marked as Exhibit 194.
16  Can you tell me what Exhibit 194 is?
17     A   Deposit -- counter-deposit?  Yeah, I don't
18  know.
19     Q   Have you ever gone into a U.S. Bank branch and
20  filled out a deposit slip?
21     A   Yes.
22     Q   Okay.  Do you see a signature on Exhibit 194?
23     A   Yes.
24     Q   Whose signature is it?
25     A   It looks like my signature.

Page 180

1  and is attached hereto.)
2      Q   Handing you what's been marked Exhibit 195.
3  Do you recognize Exhibit 195?
4      A   Yes.
5      Q   What's Exhibit 195?
6      A   A deposit of $2000.
7      Q   Actually, no, do you see where it says counter
8  withdrawal?
9      A   Oh, okay.
10     Q   Okay.  Did you ever go to U.S. Bank and make a
11  withdrawal from your account?
12     A   Yes, I made --
13         MR. RAHIMI:  Objection, vague as to which
14  account.
15  BY MR. SHERMAN:
16     Q   I'm sorry, what was the answer?
17     A   I made a lot of withdrawals, I don't know.
18     Q   You made a lot of withdrawals?
19     A   Yeah, from the account -- yeah, my account.
20     Q   And do you recall when you made withdrawals,
21  you'd have to, you know, sign a slip for the withdrawal?
22     A   Yes.
23     Q   Okay.  And do you see a signature on
24  Exhibit 195?
25     A   Yes.

Page 182

Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 55 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1600

**Page 183**

1  Q   And whose signature is on Exhibit 195?
2  A   It looks like my signature.
3  Q   Okay.  And so on July 2nd of 2014, you went
4  into a U.S. Bank branch and withdrew $2000; correct?
5  A   Yes.
6  Q   And you did that from the account ending in
7  6967; is that right?
8  A   I don't remember.
9  Q   Okay.  Well, there is an account number
10  written on the withdrawal slip; do you see that?
11  A   Yes.
12  Q   And that account number ends in 6967; correct?
13  A   Yes.
14  Q   And that account number matches the account
15  numbers that are on the statements that we see in
16  Exhibit 192; do you agree with that?
17  A   Yes.
18  Q   Okay.  So if we go to the statement that
19  covers July 2nd of 2014 -- so turn to 2014.  And,
20  actually, let me ask you to turn one more, the one for
21  June starting on Page 1412.  You got 1412?
22  A   Yes.
23  Q   Okay.  Page 1412 of Exhibit 192 shows that
24  your balance on June 16th in the 6967 account was
25  $121.56; do you see that?

**Page 184**

1  A   Yes.
2  Q   Okay.  Now, if we go to the July statement
3  which goes towards the front of the book, just by one.
4  Okay?  Your balance had been less than $200, yet, you're
5  withdrawing $2000 from this account in July; right?
6      MR. RAHIMI:  Objection.  Misstates facts not
7  in evidence.
8      THE WITNESS:  I -- I don't know.
9  BY MR. SHERMAN:
10  Q   Can you explain to me how you would have
11  gotten $2000 out of an account containing less than 200,
12  unless you borrowed the money or a reserve line?
13  A   I -- I never took money from a reserve line.
14  I -- I -- I don't know.
15  Q   You don't know?
16  A   Yeah, I would never leave my -- my account
17  negative.
18  Q   We looked at Exhibit 195; right?
19  A   Yes.
20  Q   And you acknowledged that the signature on
21  Exhibit 195 is your signature?
22  A   Looks like my signature, yes.
23  Q   And, in fact, it looks similar to the deposit
24  that you made that's reflected on Exhibit 194; correct?
25  A   Yes.

**Page 185**

1  Q   Is it possible you just don't remember --
2      MR. RAHIMI:  Objection.  Calls for
3  speculation.
4  BY MR. SHERMAN:
5  Q   -- making -- you know -- authorizing the
6  opening of this reserve line in July of 2014?
7  A   I -- I don't remember.  I would never leave my
8  account negative.  I never done that.
9  Q   Okay.  I mean, at this point this -- this is a
10  bank account that, you know, you're using to live your
11  life; right?  In July of 2014 you're making debit
12  purchased; correct?
13  A   I don't -- I don't remember.
14  Q   You don't remember?
15  A   Yes.
16  Q   If you turn to Page 1408 -- that's 1410, you
17  got to go flip back, there you go -- there are a number
18  of deposits here; whose making those deposits?
19  A   I -- I believe it's a merchant company.
20  Q   Okay.  So -- so, for example, on Page 1408 of
21  Exhibit 192 there is an electronic deposit that says on
22  June 30th:  From Hardcore Fitness in the amount of
23  2/22/12, and then it says "Direct debt" under that?
24  A   Sorry, direct what?
25  Q   It says "Direct Deb" and then some numbers.

**Page 186**

1  May I point it out to you?
2  A   Yes.
3  Q   Right there; do you see that?
4  A   Yes.
5  Q   Can you tell me what that is?
6  A   I don't know.
7  Q   Okay.  It's coming from your business; right?
8  A   Yes.
9  Q   Into your account; right?
10  A   Yes.
11  Q   And then you're shopping also that month at
12  all the places that we talked about; you're paying for
13  your T-Mobile phone with your debit card to this
14  account; right?
15  A   Right.
16      MR. RAHIMI:  Objection.  Assumes facts not in
17  evidence.
18  BY MR. SHERMAN:
19  Q   And you're making purchases at Sprouts on this
20  account in July of 2014?
21      MR. RAHIMI:  Objection.  Assumes facts not in
22  evidence.
23      THE WITNESS:  Yeah, I did shop at Sprouts in
24  Fullerton.
25  ///

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 56 of 139   Page ID
#:1001

BY MR. SHERMAN:

1  BY MR. SHERMAN:

2     Q   I'm sorry, what?

3     A   I did shop at Sprouts in Fullerton.

4     Q   Okay.  And you did that in July of 2014;
5  correct?

6     A   I believe so.

7     Q   And you did that using your U.S. Bank debit
8  card; correct?

9     A   Yes.

10    Q   I mean -- Mr. Soria, I mean, what evidence do
11  you have to point to that it was anyone other than you
12  back in July of 2014 that withdrew $2000 on the reserve
13  line for this account?

14    A   Honestly, I don't know.  I never --

15        MR. RAHIMI:  Objection.  Legal conclusion.

16        THE WITNESS:  I mean, I never took money out
17  of my account negative.  I'd never even withdraw money
18  and leave the account negatively like that, $2000.  I
19  don't think the bank does that.

20        MR. RAHIMI:  Can we break?

21        MR. SHERMAN:  Yeah.

22        MR. RAHIMI:  If you have more questions, just
23  go for it, but I'd actually like to take a lunch break.

24        MR. SHERMAN:  Okay.

25        THE VIDEOGRAPHER:  Off the record.  The time

Page 187

1  is 12:33 p.m.

2        (Recess taken.)

3        THE VIDEOGRAPHER:  Going back on the record.
4  The time is 1.23 p.m.

5  BY MR. SHERMAN:

6     Q   So, Mr. Soria, you know, before we broke, you
7  said that you never took any of your U.S. Bank accounts
8  into the negative.  Do you remember that testimony?

9     A   Yes.

10    Q   In fact, when we were off the record, we just
11  had your answer read back to you.  Do you remember that?

12    A   Yeah, I never had my accounts -- I never left
13  my accounts negative.

14    Q   How do you know that?

15    A   Because I never -- I never done that.

16    Q   What -- what did you do to keep track of what
17  your balance was in the 6967 account in July of 2014?

18    A   I -- if I go to the bank, I pull the
19  statements out and then I see how much money I have in
20  there.

21    Q   Where did you think that that $2000 came from
22  in July 2014?

23        MR. RAHIMI:  Objection.  Calls for
24  speculation.  Lack of personal knowledge.

25        THE WITNESS:  I don't know.

Page 188

1  BY MR. SHERMAN:

2     Q   Okay.  And when did you first become aware
3  that there was a reserve line attached to the 6967
4  account?

5     A   After I found out about the fraud.

6     Q   So that would have been after May of 2016?

7     A   Yes.

8     Q   Okay.  And I assume that if before that -- if
9  anybody from U.S. Bank would have contacted you about
10  that reserve line, you would have done something about
11  it; right?

12    A   Well, I didn't know it was under my name.  I
13  mean -- because I never opened anything.

14    Q   Okay.  Do you recall talking to someone from
15  U.S. Bank named Juan in February of 2016?

16    A   No, I do not.

17    Q   I'd like to play a recording for you.  I'm
18  going to turn up the volume to make sure we can all hear
19  it.

20        (Audio recording playing.)

21    Q   Okay.  Before we go on, I just want to ask you
22  a question about what you've just heard.

23        Is that your voice on the recording?

24    A   Honestly, I -- I -- I don't know.

25    Q   Okay.  Do you have any reason to dispute that

Page 189

1  it is your voice on the recording?

2     A   I don't know.

3        MR. RAHIMI:  Objection.  Calls for
4  speculation.

5  BY MR. SHERMAN:

6     Q   Now, you said that the number for your
7  business rings through to your cell phone; right?

8     A   Yes.

9     Q   And then you also get calls directly on your
10  cell phone?

11        MR. RAHIMI:  Objection, form.

12        THE WITNESS:  My personal, yes.

13  BY MR. SHERMAN:

14    Q   Okay.  And are those the phone numbers that
15  you gave to U.S. Bank for you?

16    A   Yes, my personal and my business.

17    Q   Okay.  And you heard the -- the person who has
18  called here recite a date of birth; correct?

19    A   Yes.

20    Q   And that was your date of birth; right?

21    A   Yes.

22    Q   And identified that you work at Hardcore
23  Fitness Center; right?

24    A   Yes.

25    Q   Okay.  And so is there any, you know, proof

Page 190

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 57 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1602

1 that you can offer me that that's not you on the
2 recording that I played?
3   A   Honestly, I don't know.
4       MR. RAHIMI:  Objection.  Calls for
5 speculation.  Lacks personal knowledge.  Asked and
6 answered.
7 BY MR. SHERMAN:
8   Q   I backed it up a few seconds and we'll resume
9 roughly where he left off.  Okay?
10      (Audio recording playing.)
11   Q   So, I mean, Mr. Soria, that -- that's your
12 voice on the recording; right?
13   A   I -- I -- I don't know.
14   Q   Okay.  Well, you heard that the caller from
15 U.S. Bank, Juan, identified the account to you as the
16 6967 account; right?
17   A   Yes.
18   Q   And you heard that you said that you would go
19 online and check on that account; right?
20   A   Yes.
21   Q   And you heard him identify that there was a
22 reserve line on that account; right?
23   A   Yes.
24   Q   Okay.  And so did you then go online and check
25 on your reserve line on the 6967 account?

Page 191

1   A   I don't know.
2   Q   Okay.  Well, I mean, you certainly didn't in
3 February of 2016 report to U.S. Bank that that reserve
4 line on the 6967 had been opened fraudulently; right?
5   A   I don't know.
6   Q   And you didn't do that in March of 2016;
7 right?
8   A   I don't know.
9   Q   And you didn't do it in April of 2016?
10   A   I don't know.
11   Q   Okay.  All right.  Going back to Exhibit 190.
12 If you turn to Page 6 of Exhibit 190 -- I'm sorry, my
13 mistake, 7.  Page 7 of Exhibit 190.  Do you see an
14 account referenced 3978?
15   A   Yes.
16   Q   And your answer under oath to this
17 interrogatory was that any transaction made using funds
18 from this reserve line was fraud; you are unaware of
19 this reserve line even existed; is that right?
20   A   I don't know.  I don't know if that's the
21 business reserve line.
22   Q   But we'll look at the statements in a second.
23   A   Okay.
24   Q   You acknowledge you did open at least a
25 checking account that ended in 3978; right?

Page 192

1   A   I don't know.
2   Q   You don't know?
3       If you don't remember opening a checking
4 account, is it possible you also don't remember opening
5 a reserve line?
6   A   No.  I only have one reserve line and that's
7 to the business, that's it.  I don't know, I don't know
8 a reserve line.
9   Q   But that reserve line was the one on account
10 6876; right?
11   A   I don't know.  There were so many accounts, I
12 don't remember.
13   Q   I mean, why did you have so many accounts?
14   A   I just have my business and my personal.
15   Q   Okay.
16      (Exhibit 196 was marked for
17       identification by the court reporter
18       and is attached hereto.)
19   Q   Mr. Soria, handing you what's been marked as
20 Exhibit 196.  Do you recognize Exhibit 196?
21   A   Yes.
22   Q   What is Exhibit 196?
23   A   This is for account Number 3978.
24   Q   Right.  And do you see a signature on account
25 Number 3978?

Page 193

1   A   Yes.
2   Q   Whose signature is that?
3   A   Looks like my signature.  I don't know.
4   Q   Do you recall, you know, opening this account
5 in August of 2014?
6   A   I don't know.
7   Q   Okay.  Do you have any reason to dispute that
8 you authorized the opening of this account in August of
9 2014?
10   A   I don't know.
11   Q   ==Now, remind me, did you testify this morning==
12 ==that you never used your mobile phone to access your==
13 ==U.S. Bank accounts?==
14   A   ==I never used my mobile phone.==
15   Q   Okay.
16      (Exhibit 197 was marked for
17       identification by the court reporter
18       and is attached hereto.)
19   Q   Handing you what's been marked Exhibit 197.
20 Do you recognize Exhibit 197?
21   A   Statements.
22   Q   So these statements are arranged, basically,
23 identically to the ones that we looked at before for the
24 6967 account; the earliest ones are at the back, the
25 latest ones are at the front.

Page 194

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 58 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1003

1 Can you please turn with me to the very last
2 one which is for the period ending August 21, 2014.
3  **A   August 21?  Oh, yes.**
4  Q   Yeah, that's right.
5      Now, I think you testified this morning that
6 the bank statements that arrived at Hardcore Fitness you
7 would tear up and throw away; right?
8  **A   Yes.**
9  Q   What about the ones that arrived at your
10 house?
11 **A   I didn't open many statements.**
12 Q   And before today, have you ever looked at any
13 bank statement?
14 **A   Today?  No.**
15 Q   Other than today, you've never looked at U.S.
16 Bank statements?
17 **A   I -- Yeah, I have some at the house that's --**
18 **after the fraud.**
19 Q   Okay.  I mean, as somebody who was running a
20 business, did you think that was a good practice?
21 **A   I don't know.  I mean --**
22 Q   I mean, 'cause nobody else was doing this for
23 you; right?
24 **A   No.**
25 Q   It was really up to you to keep track of how

Page 195

1 much money you had in the account; do you agree --
2  **A   Yes.**
3  Q   And you weren't doing that?
4  **A   It wasn't --**
5      MR. RAHIMI:  Object to form.  Argumentative.
6 Irrelevant.
7 BY MR. SHERMAN:
8  Q   So as far as you know, in August 2014 you were
9 in control of your U.S. Bank accounts; right?
10 **A   I -- as far as I know.**
11 Q   Okay.  So if you would look with me at
12 Page 597, which is -- I think you're on the very last
13 page and what I want you to do is go to the first page
14 of the last statement.  Does that make sense?  We're all
15 together on Page 597?
16 **A   I don't know.**
17 Q   You don't know what?
18 **A   I don't know these numbers from 6967.**
19 Q   There are a number of transfers here; do you
20 see that?
21 **A   Yes.**
22 Q   I mean, at this point in time you had the 6967
23 account that you had authorized opening; right?
24 **A   For Daniel, yes.**
25 Q   Okay.  And you had the 6876 for your business

Page 196

1 right?
2  **A   I don't recall.  I don't know.**
3  Q   So, I mean, here back in August of 2014, there
4 are -- we're just counting about deposits 1, 2, 3, 4,
5 5, 6, 7, 8 mobile transfers; do you see that?
6  **A   Yes.**
7  Q   Okay.  And that's you making those mobile
8 transfers; is that right?
9  **A   No.**
10     MR. RAHIMI:  Objection.
11 BY MR. SHERMAN:
12 Q   No?  I mean, you do acknowledge that, you
13 know, you would -- you would go online to look at your
14 accounts; right?
15 **A   Rarely.**
16 Q   Rarely?
17 **A   Yes.**
18 Q   But from time to time you went?
19     MR. RAHIMI:  Objection to form.
20 BY MR. SHERMAN:
21 Q   Did you ever look at, you know, the activity
22 that was going on on this account?
23 **A   No.**
24 Q   Who -- who carries your car insurance?
25 **A   Allstate.**

Page 197

1  Q   Can you please turn with me to the 2015 tab
2 and then all the way back to January of 2015, and so
3 hopefully we'll all land together on Page 577 of
4 Exhibit 197.
5  **A   577?**
6  Q   Yeah.  And then the particular transaction I
7 want to look at is actually a couple pages in, so please
8 turn to 579.  You see a debit transaction on January 5th
9 for AIC Motor Club?
10 **A   Yes.**
11 Q   And that's Allstate Insurance; right?
12 **A   That is for the -- I -- I think so, I'm not**
13 **sure.**
14 Q   What about these other debit card purchases,
15 do you, for example, shop at Ralphs?  Or what is Ralphs,
16 do you know, in Fullerton?
17 **A   Ralphs grocery store?**
18 Q   Yeah.
19 **A   Yeah, I shop at Ralphs.**
20 Q   Okay.  How about at Walgreen's Fullerton?
21 **A   Not so much.**
22 Q   Sprouts?  I think we already talked about
23 that, you shop there; right?
24 **A   Yeah, I shop at Sprouts.**
25 Q   Okay.  So what we see reflected on Page 579 of

Page 198

1  Exhibit 197 are your debit card purchases; right?
2     A    I don't know.
3     Q    I guess, with respect to this account what
4  steps did you take, if any, to ensure that you didn't
5  overdraw the account?
6     A    I just -- I don't know.
7     Q    So if you could turn now to the statement
8  ending in September of 2015.
9        MR. RAHIMI:  Sorry, where are we turning to?
10       MR. SHERMAN:  Actually, I'm sorry, turn one
11  more to August.
12       MR. RAHIMI:  Of 2015?
13       MR. SHERMAN:  Of 2015, yeah.
14  BY MR. SHERMAN:
15    Q    And you see -- so if you look at Page 547 of
16  Exhibit 197, you see that there is a reserve line listed
17  there; right?
18    A    Yes.
19    Q    And there is a balance of a little over $1900;
20  do you see that?
21    A    Yes.
22    Q    What evidence or proof do you have that it was
23  anyone other than you who was drawing on that reserve
24  line?
25       MR. RAHIMI:  Objection.  Legal conclusion.

Page 199

1  Speculation.  Lack of personal knowledge.
2        THE WITNESS:  I didn't open that reserve line.
3  BY MR. SHERMAN:
4     Q    Okay.  I mean, other than your word that you
5  didn't open it, do you have any other proof that it
6  wasn't you who was withdrawing on that line?
7        MR. RAHIMI:  Objection.  Legal conclusion.
8  Speculation.  Personal knowledge.
9        THE WITNESS:  I don't know.
10  BY MR. SHERMAN:
11    Q    So if -- if not you, who was it then who was
12  drawing on that line?
13       MR. RAHIMI:  Objection.  Calls for
14  speculation.
15       THE WITNESS:  I don't know.
16  BY MR. SHERMAN:
17    Q    So according to Exhibit 190, it's just --
18  talking only about reserve lines now, it's only those
19  two reserve lines that you say you never opened; is that
20  right?
21    A    What page?
22    Q    Sorry, Page 7.
23       MR. RAHIMI:  Objection to form.  Confusing.
24       THE WITNESS:  I don't know.
25  ///

Page 200

1        MR. RAHIMI:  Misstates testimony.
2  BY MR. SHERMAN:
3     Q    Well, there's three reserve lines listed on
4  Page 7 of Exhibit 190; right?
5     A    Yes.
6     Q    And the one for 6867 you acknowledge you
7  authorized opening; is that right?
8     A    Sorry, what was that?
9     Q    Well, let's just read your answer about 6876
10  account.
11    A    Okay.
12    Q    You recall that this interrogatory was asking
13  you about, you know, which accounts and transactions
14  were identity theft; right?
15    A    Yes.
16    Q    Okay.  And for 6876 your answer was that
17  you've provided documents highlighting all charges,
18  transactions, payments, transfers or automatic
19  withdrawals initiated by or authorized to be initiated
20  by you; right?
21    A    Yes.
22    Q    Okay.  And is that something you did?  Do you
23  recall sitting down with the bank statements and
24  highlighting transactions that you had done?
25    A    Yes.

Page 201

1     Q    Okay.
2        (Exhibit 198 was marked for
3         identification by the court reporter
4         and is attached hereto.)
5     Q    We talked this morning about a checking
6  account that you had for your business ending in 6590.
7        MR. RAHIMI:  I'm just -- Objection, misstates
8  the testimony.
9  BY MR. SHERMAN:
10    Q    You don't --
11    A    I don't recall.
12    Q    -- know anything about that?
13       So let's turn to -- let's turn to the
14  March 2016 statement.  And if you turn to Page 846, you
15  see a single transaction highlighted there?
16    A    Yes.
17    Q    How -- did you make that mark on this page?
18    A    Yes.
19    Q    Okay.  And how did you determine which
20  transactions were yours and which weren't?
21    A    Cause I have --
22       THE REPORTER:  Sorry, can you repeat that.
23    A    I had SoCal Edison automatic payment.
24    Q    I see a number of transfers on this page -- or
25  at least two.  Out of the 6876 account to account 6590

Page 202

**Samuel Soria Liera - CONFIDENTIAL   11/20/2018**
**Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.**

1  there is one on March 2nd; do you see that?
2  **A   Yes.**
3  Q   Okay.  And then one on March 22nd?
4  **A   Yeah.**
5  Q   Okay.  Now, did you make those transfers?
6  **A   I don't know.**
7  Q   Do you understand that there is an account for
8  Hardcore Fitness ending in 6590?
9  **A   I don't remember.**
10  Q   You don't know?
11  **A   Yeah, I don't remember.**
12  Q   You can put that exhibit away.  Let's move on
13  to the part of your claim that deals with credit cards.
14  **A   Okay.**
15  Q   So if we go back to Exhibit 190, part of your
16  claim, if you look at Page 7, is with respect to the
17  0359 account?
18  **A   Okay.**
19  Q   Is that correct?
20  **A   0359?**
21  Q   Yeah.
22  **A   I'm sorry, repeat the question.**
23  Q   Part of the claim you're making against U.S.
24  Bank is with respect to this credit card ending in 0359;
25  correct?

Page 203

1  **A   Yes.**
2  Q   And what you said about this card is that you
3  paid it off, and you're unaware how there is any balance
4  on the card, and you have no idea what the collection
5  notices are for that account; is that correct?
6  **A   Yes.**
7  Q   Okay.
8  (Exhibit 199 was marked for
9  identification by the court reporter
10  and is attached hereto.)
11  Q   So I've just handed you what's been marked as
12  Exhibit 199, which is a letter addressed to Hardcore
13  Fitness Center at ▇▇▇▇▇▇▇▇▇▇▇▇ in Fullerton;
14  do you see that?
15  **A   Yes.**
16  Q   Okay.  And that's the right address for
17  Hardcore Fitness; right?
18  **A   Yes.**
19  Q   Did you just take every piece of mail that you
20  got at Hardcore Fitness and just tore it up and throw it
21  away?
22  **A   Not everything, but most of the statements**
23  **I -- I didn't read.**
24  Q   Okay.  Do you recall reading Exhibit 199?
25  **A   No.**

Page 204

1  Q   Do you recall reading any other letter similar
2  to Exhibit 199?
3  **A   No.**
4  (Exhibit 200 was marked for
5  identification by the court reporter
6  and is attached hereto.)
7  Q   So if you turn to the statement at the very
8  back of Exhibit 200, there is a document that says
9  April 25th statement?
10  **A   Which one?  April 25th?**
11  Q   Yeah, April.  Just the very last tab so
12  Page 101.
13  **A   Oh.**
14  Q   So not the last page, just the last tabs.
15  **A   Oh.**
16  Q   The piece of paper that's right behind --
17  **A   Okay.**
18  Q   Okay.  So can you tell me what this document
19  is?
20  **A   It's from the credit card.**
21  Q   Okay.  And it's a statement for U.S. Bank Flex
22  Perks Business Edge Travel Rewards card; right?
23  **A   Yes.**
24  Q   And you acknowledge that you opened this card
25  ending in 0359; right?

Page 205

1  **A   Yes.**
2  Q   Okay.  If you turn -- actually, I'm sorry.
3  Let's go off the record just for a second.
4  (Exhibit 201 was marked for
5  identification by the court reporter
6  and is attached hereto.)
7  THE VIDEOGRAPHER:  Off the record.  The time
8  is 1:57 p.m.
9  (Recess taken.)
10  THE VIDEOGRAPHER:  Back on the record.  The
11  time is 1:58 p.m.
12  BY MR. SHERMAN:
13  Q   All right.  So if we could go back to
14  Exhibit 200, which was the back at the side of your
15  binder, and go to the tab for May, please.
16  So you're on April.  If you could go back just
17  by one to May to Page 99 of Exhibit 200.  There are a
18  number of payments listed on Page 99 of Exhibit 200; do
19  you see those?
20  **A   Yes.**
21  Q   And did you make those payments?
22  **A   I don't know.**
23  Q   You don't know.  Okay.
24  Would anyone else have been paying your credit
25  card for you?

Page 206

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

1   A   No, I paid myself.
2   Q   Okay.  So if you look above the payments,
3   there is a single charge at Target in Fullerton,
4   California for $5.83; do you see that?
5   A   $8.51, and, yes, 5.83.
6   Q   And there are other charges at that Target; do
7   you see that?
8   A   Yes.
9   Q   Is that a Target that you shop at frequently?
10  A   Once in a while.
11  Q   Okay.  If you look at the first page of this
12  statement which is on Page 96 of Exhibit 200, you'll see
13  that the amount due is $5.83; do you see that?
14  A   Yes.
15  Q   Okay.  And that matches the amount of your --
16  well, of the purchase at Target; right?
17  A   Yes.
18  Q   Did you ever lose your card for this account?
19  A   I -- I don't -- I don't know.
20  Q   Okay.  I mean, can you tell me who it was, if
21  not you, that charged the 5.83 at Target?
22  A   I don't know.
23  Q   You see the balance on the account -- I
24  mean -- is the same as that charge that occurred on
25  April 30th; do you see that?

Page 207

1   existed at us U.S. Bank in your name ending in 5258; is
2   that right?
3   A   Yes.
4   Q   And with respect to that account, you say you
5   had absolutely no knowledge about this account, no
6   transaction made on this account was initiated by
7   Plaintiff or with Plaintiff's knowledge, consent
8   authorization or the like; is that right?
9   A   Yes, I never knew about the card at all.
10  Q   Okay.  And do you recall in May of 2016
11  starting a fraud case at U.S. Bank where you challenged
12  some cash advances?
13  A   Yes.
14  Q   Okay.
15      (Exhibit 202 was marked for
16      identification by the court reporter
17      and is attached hereto.)
18  Q   Just handed you what's been marked as
19  Exhibit 202.  Do you recognize Exhibit 202?
20  A   Yes.
21  Q   What's Exhibit 202?
22  A   The payment I made against the card that I
23  never used it or opened it.
24  Q   And is the handwriting kind of below the
25  address on Exhibit 202 your handwriting?

Page 209

1   A   Yes.
2   Q   Okay.  And that's after the last of the
3   payments that you made on this account; do you see that?
4   The last --
5       MR. RAHIMI:  Objection.  Assumes facts not in
6   evidence.
7       THE WITNESS:  I don't know.
8   BY MR. SHERMAN:
9   Q   Do you see that the last payment listed on the
10  statement is on April 29?
11  A   Yeah, I see it.
12  Q   Okay.  And do you have any reason to dispute
13  the accuracy of this statement?
14  A   I don't know.  I just called, I paid up the
15  card and that was it.
16  Q   Okay.  Is there any reason why you wouldn't be
17  responsible for that $5.83 charge at Target?
18  A   I don't know.
19  Q   You just --
20  A   Yeah, I don't know.
21  Q   I mean, why is that part of your claim against
22  U.S. Bank; can you explain it to me?
23  A   Well -- I can't explain it to you.
24  Q   Okay.  So I guess returning to Exhibit 190,
25  you're also challenging a credit card account that

Page 208

1   A   Yes.
2   Q   Okay.  So you filled out Exhibit 202; is that
3   right?
4   A   Yes.
5   Q   And then if you -- well, and then at the
6   bottom of the first page of Exhibit 202, that's your
7   signature; right?
8   A   Yes.
9   Q   Okay.  And then if you turn to the next page
10  which is marked 625, there is a list of transactions --
11  or two transactions there; is that right?
12  A   Yes.
13  Q   And those -- you understand that those
14  transactions are listed on those pages 'cause you had
15  identified to those -- excuse me.
16      The transactions are listed there because you
17  identified them to U.S. Bank as fraudulent; right?
18  A   Yes.
19  Q   Okay.  And you remember doing that?
20  A   Yes.
21  Q   Okay.  On the first page of Exhibit 202 you
22  wrote an explanation of why the transactions were
23  fraudulent; right?
24  A   Yes.
25  Q   And what you wrote was "I never used or opened

Page 210

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 62 of 139 Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1607

**Page 211**

1  this card.  I never have got any cash advances from any
2  of my credit cards."  Do you see that?
3      A   Yes.
4      Q   Okay.  And you testified to that this morning
5  that you'd never gotten a cash advance on the credit
6  card?
7      A   Yes.
8      Q   So I take it, since you've never had a cash
9  advance on a card credit, you certainly have never
10  called U.S. Bank and asked them to lower your rate on
11  cash advances?
12      A   I -- sorry, what was that?
13      Q   Have you ever -- well, let me just -- let's
14  move on to another account and then we'll come back.
15      A   Okay.
16      Q   Exhibit 190, Page 7 there is another credit
17  card you're challenging that ends 0949; is that
18  right?
19      A   Yes.
20      Q   Okay.  And what you write about the 0949
21  account is that "This was paid off in 2015 and never
22  used by the client again; therefore, any balance after
23  2015 was not incurred by the Plaintiff"?
24      A   Okay.
25      Q   Okay.

**Page 212**

1          (Exhibit 203 was marked for
2          identification by the court reporter
3          and is attached hereto.)
4      Q   Can you turn to the statement at the very back
5  of Exhibit 203?
6          Now, do you recall with respect -- well --
7  with respect to this card, this Platinum Visa card, that
8  you did have this card reported lost or stolen on a
9  couple of occasions?
10      A   0949?
11      Q   Correct.
12      A   I don't know.
13      Q   Is it possible that happened and you just
14  don't remember?
15      A   I remember cutting it up --
16          MR. RAHIMI:  Objection.  Calls for
17  speculation.
18  BY MR. SHERMAN:
19      Q   Well, let me just kind of show you what we
20  have here.  So if you turn to the front, on the very
21  first page the account number is 0949; do you see that?
22      A   Yes.
23      Q   And you acknowledge that's your account;
24  right?
25      A   Yes.

**Page 213**

1      Q   Okay.  If you turn to, let's say, July of
2  2015, the number back then ended in 1747; do you see
3  that?
4      A   Yes.
5      Q   Do you have any recollection of having a card
6  that ended in 1747 and a then reporting it as lost or
7  stolen?
8      A   I don't -- I don't remember.
9      Q   Do you think it's possible that you did?
10      A   I don't remember.
11      Q   And then if you go all the way back to where
12  we began in March of 2014 --
13      A   You said March of 2014?
14      Q   Yeah, it's the very last statement in the
15  binder.  And, I apologize, they're not holding
16  together --
17      A   It's okay.
18      Q   Here is account number is 2032; do you see
19  that?
20      A   Okay.  Yeah, I see it.
21      Q   And so do you think -- well, do you recall
22  having a card that ended in 2032?
23      A   I don't know.  I don't remember.
24      Q   Do you have reason to dispute that the 2032
25  and the 1747 and the 0949 are really all the same

**Page 214**

1  account, just --
2          MR. RAHIMI:  Objection.  Calls for
3  speculation.  Lack of personal knowledge.
4          THE WITNESS:  I don't know.
5  BY MR. SHERMAN:
6      Q   Okay.  So if we go back to the activity on
7  this card on March 10th of 2014, do you see that one of
8  the very first things that you did on this card was to
9  take out a cash advance?
10      A   I didn't -- I took out no cash advances.
11      Q   But you do see that the statement says that
12  there was a customer service cash advance on March 10th;
13  right?
14      A   Yes.
15      Q   And then you also see that you were charged a
16  phone cash advance fee of $35 on March 10th of 2014;
17  correct?
18      A   I see it here, yes.
19      Q   And that balance stayed on your card for --
20  for sometime, didn't it?
21      A   I -- I don't know.
22      Q   I'd like to play you another recording in a
23  little bit, but I need to get it ready so if we could go
24  off the record.
25          THE VIDEOGRAPHER:  Off the record.  The time

Samuel Soria Liera - CONFIDENTIAL          11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 63 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1608

**Page 215**

1   is 2:11 p.m.

2        (Recess taken.)

3        THE VIDEOGRAPHER:  Going back on the record.

4   The time is 2:16 p.m.

5        MR. SHERMAN:  All right.  So the court

6   reporter pointed out to us that we did not have an

7   exhibit number for the recording we played earlier.  So

8   let's go ahead and give that Number 204.

9        (Exhibit 204 was marked for

10       identification by the court reporter

11       and is attached hereto.)

12        MR. SHERMAN:  And I'll transmit that audio

13   file to the court reporter following the conclusion of

14   the deposition.  And now we'll play Exhibit 205.

15        (Exhibit 205 was marked for

16       identification by the court reporter

17       and is attached hereto.)

18        (Side discussion off the record.)

19   BY MR. SHERMAN:

20     Q   Mr. Liera, I take it, you don't have a

21   specific recollection of calling in to U.S. Bank on

22   April 29 of 2015 and talking to someone named Jasmine?

23     A   No.

24     Q   Okay.  Let's play it.

25        (Audio recording playing.)

**Page 216**

1     Q   You heard the voice on the recording; correct?

2     A   Yes.

3     Q   Is that your voice?

4     A   I believe so.

5     Q   Okay.  We'll continue.

6        (Audio recording playing.)

7     Q   So part of your claim against U.S. Bank is

8   also challenging some transactions on this 0949 account;

9   correct?

10     A   Yes.

11     Q   Okay.  And the specific transactions that

12   you're challenging are cash advances; is that right?

13     A   Yes.

14        (Exhibit 206 was marked for

15       identification by the court reporter

16       and is attached hereto.)

17     Q   Showing you what's been marked Exhibit 206.

18   Do you recognize Exhibit 206?

19     A   Yes.

20     Q   And 206 like Exhibit 202 before is a statement

21   of fraud; right?

22     A   Yes.

23     Q   And this is a document that was sent to you by

24   U.S. Bank after you challenged the cash advances on the

25   0949 account; is that right?

**Page 217**

1     A   Yes.

2     Q   And, again, if we look below the address on

3   here, that handwriting is yours?

4     A   Yes.

5     Q   And I should ask you:  Did you -- how did you

6   receive this form?

7     A   I don't remember.

8     Q   You don't remember?

9     A   Yeah, I don't.

10     Q   Well, it's addressed to you at ██████████

11   ████; do you see that?

12     A   Yes.

13     Q   Okay.  And so did you get it in the mail at

14   ███████████   or by mail forwarding?

15     A   I don't remember.  I don't know.

16     Q   Okay.  And in any event, your signature on the

17   first page of Exhibit 206 is yours; correct?

18     A   Yes.

19     Q   And the exhibit on the second page of

20   Exhibit 206 is yours; correct?

21        MR. RAHIMI:  Objection, confusing.

22        THE WITNESS:  I believe so.

23   BY MR. SHERMAN:

24     Q   I'm sorry?

25     A   I believe so.

**Page 218**

1     Q   Okay.  And you understood my question; right?

2     A   No.

3     Q   You didn't?  Okay.  Well, let's --

4        MR. RAHIMI:  Can we read that back?

5        MR. SHERMAN:  Okay.

6        (The following record was read by the

7   reporter:

8        "And the exhibit on the second page of

9   Exhibit 206 is yours; correct?")

10   BY MR. SHERMAN:

11     Q   Let's just go back and clear it up.

12     A   Okay.

13     Q   So Exhibit 206 consists of two pages; right?

14     A   Yes.

15     Q   The second page is marked USB 000116; correct?

16     A   Yes.

17     Q   And there is a signature on this page; right?

18     A   Yes.

19     Q   And that signature is your signature; correct?

20     A   Yes.

21     Q   Okay.  And you were challenging two cash

22   advances that happened on the 0949 account?

23     A   Yes.

24     Q   And we saw in the statements earlier that the

25   0949 account used to be called 1747; right?

Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 64 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1609

**Page 219**

1    A   I believe so.

2    Q   And, in fact, on the first page of

3    Exhibit 206, the account is called the 1747 account?

4    A   I -- I --

5    Q   Well, I'm just asking if you see it there

6    right above your name where it says "Dear, Samuel Liera

7    Soria" it says account number ending with 1747?

8    A   Yes.

9    Q   And, again, in your own handwriting you repeat

10   the statement that you -- well, you write "I never used

11   it since or have ever got any cash advance from this or

12   any credit card."  Right?

13   A   Yes.

14   Q   And that simply is not a true statement;

15   correct?

16       MR. RAHIMI:  Objection, argumentative.

17       THE WITNESS:  I never got any cash advances.

18   BY MR. SHERMAN:

19   Q   Okay.  You heard your voice on the tape

20   talking to somebody at U.S. Bank about lowering your

21   rate on cash advances; right?

22   A   I don't remember.

23   Q   You don't remember?

24   A   Yeah, I don't.

25   Q   So part of your claim is based on a letter

**Page 220**

1    that you sent to Equifax.  Do you remember sending

2    Equifax a letter?

3    A   I don't.

4    Q   You don't, okay.

5       (Exhibit 207 was marked for

6       identification by the court reporter

7       and is attached hereto.)

8    Q   So handing you what's been marked Exhibit 207.

9    Do you recognize Exhibit 207?

10   A   Yes.

11   Q   What's Exhibit 207?

12   A   The document I sent to Equifax.

13   Q   I'm sorry?

14   A   I -- I guess Equifax -- the letter I sent to

15   Equifax.

16   Q   Okay.  So does Exhibit 207 refresh your memory

17   that you sent a letter to Equifax?

18   A   I really don't remember.  I -- I don't.

19   Q   Did you write Exhibit 207?

20   A   I don't remember.

21   Q   Is it possible that somebody else wrote

22   Exhibit 207?

23   A   I -- I -- I don't remember.

24       MR. RAHIMI:  Objection.  Calls for

25   speculation.

**Page 221**

1    BY MR. SHERMAN:

2    Q   I mean, do you remember going to the post

3    office and mailing this to Equifax by certified mail?

4    A   I don't remember.

5    Q   Okay.  So I take it, since you don't remember

6    much about Exhibit 207, you couldn't tell me if you sent

7    any additional information to Equifax beyond what we see

8    here in Exhibit 207?

9    A   Yeah, I don't.

10       MR. RAHIMI:  Objection.  Misstates testimony.

11   Argumentative.

12       (Exhibit 208 was marked for

13       identification by the court reporter

14       and is attached hereto.)

15   Q   Handing you what's been marked Exhibit 208.

16   Do you recognize Exhibit 208?

17   A   No.

18   Q   No?  Can you tell me who wrote Exhibit 208?

19   A   I don't know.  I don't remember.

20   Q   Can you tell me how Exhibit 208 ended up

21   getting sent to U.S. Bank by certified mail?

22   A   I -- I don't remember.  I really don't

23   remember.

24   Q   Do you recall sending any letters like

25   Exhibit 208 to U.S. Bank in January of last year?

**Page 222**

1    A   I don't remember.  I don't remember sending

2    letters.  I don't remember.

3       (Exhibit 209 was marked for

4       identification by the court reporter

5       and is attached hereto.)

6    Q   Handing you what's been marked as Exhibit 209.

7    Do you recognize Exhibit 209?

8    A   I don't -- I forgot.

9    Q   Can you tell me whose handwriting is on

10   Exhibit 209?

11   A   No, I don't remember.

12   Q   Exhibit 209 is a document that your lawyers

13   gave us.  Can you tell me whether, you know, Exhibit 209

14   was ever provided to U.S. Bank other than by your

15   lawyers?

16   A   I don't know.

17   Q   Can you -- can you tell me anything about

18   Exhibit 209?

19   A   I really don't remember.  It's been so long, I

20   don't remember.

21   Q   Do you know who Diego Perez is?

22   A   No, I don't.

23   Q   How about Giovanni Lazzarinetti?

24       Sorry, let me ask that again since I got

25   interrupted by my computer, sorry.

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 65 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:2616

**Page 223**

1    Do you know anyone by the name of Giovanni
2  Lazzarinetti?
3    **A  No.**
4    Q  When -- when would you open accounts at U.S.
5  Bank, did you ever deal with anyone other than Dan
6  Berrera?
7    **A  No.**
8    Q  One person, I don't remember his name.
9        THE REPORTER:  I'm sorry, can you repeat the
10  name.
11       MR. SHERMAN:  Dan Berrera.
12    Q  Who's Tui -- and I'm sorry, I probably won't
13  pronounce this correctly, is it Tui Do?
14    **A  Oh, Tui Do?**
15    Q  Yeah.
16    **A  That's my wife's sister.**
17    Q  That's your wife's sister.  Okay.  How about
18  Guillermo Lang?
19    **A  That's her boyfriend.**
20    Q  And what does your sister-in-law know about
21  this case?
22    **A  A little bit, not too much.  I -- I don't --**
23    Q  How about -- how about Mr. Lang, what does he
24  know about the case?
25    **A  Mr. Lang.**

**Page 224**

1    Q  Who's -- did we talk about Hourash Rezai?
2    **A  He's one of our friends.**
3    Q  He's friends with you and Mr. Berrera from the
4  elementary school?
5    **A  Yes.**
6    Q  Okay.  Same thing with Paul Cortez; correct?
7    **A  Oh, Hourash I know him in I think high school**
8  **maybe, but Cortez knows him too.**
9    Q  Okay.  And is David and Anguiano also on that
10  list?
11    **A  Yeah, those are friends.**
12    Q  Okay.  How about Lou Smith?
13    **A  He's my (inaudible) coach.**
14    Q  Right.  He's the guy you train with; right?
15    **A  Yes.**
16    Q  We did talk about him.  How about Jo'el
17  Ramirez?
18    **A  He's my -- kind of manager for the fights.**
19    Q  Okay.  Have you talked to him about this case?
20    **A  A little bit.  The stuff I was dealing with.**
21    Q  I'm sorry?
22    **A  He -- he saw me a little stressed out so we**
23  **talked a little bit.**
24    Q  Okay.  How about Chris Vitasa?
25    **A  He's one of our friends.**

**Page 225**

1    Q  How do you know Mr. Vitasa?
2    **A  I known him since -- when I went to L.A.**
3  **Boxing in 2006.**
4    Q  And do you still see him on a regular basis?
5    **A  Yes.**
6    Q  About how often?
7    **A  Almost every day.  Yes.**
8    Q  Where do you see him?
9    **A  He works where my wife works and he teaches**
10  **classes here at my gym.**
11    Q  He does what at your gym?
12    **A  Teaches classes once in a while.**
13    Q  How about Becky Montero, who's that?
14    **A  That's -- she's a friend.  I -- I met her**
15  **through Kim and we always talk when we go to her office.**
16    Q  Sorry, whose office do you talk to?
17    **A  Kim's office.  She's right there.**
18    Q  Okay.  And what does she know about this case?
19    **A  A little bit.  She doesn't know too much.**
20    Q  How about Luis Gomez?
21    **A  Luis Gomez, he's a friend from -- from the**
22  **gym.**
23    Q  And what does he know about this case?
24    **A  A little bit.  He doesn't know too much.**
25       MR. SHERMAN:  All right.  Let's take a break.

**Page 226**

1       THE VIDEOGRAPHER:  Off the record.  The time
2  is 2:36 p.m.
3           (Recess taken.)
4       THE VIDEOGRAPHER:  Going back on the record.
5  The time is 2:52 p.m.
6  BY MR. SHERMAN:
7    Q  Mr. Liera, handing you what's been marked
8  Exhibit 210.
9           (Exhibit 210 was marked for
10          identification by the court reporter
11          and is attached hereto.).
12    Q  Exhibit 210 is a set of statements for a
13  business loan that was opened in the name of Hardcore
14  Fitness at U.S. Bank.  Could you turn to the last two
15  pages, and hopefully you're on the page marked 1629 of
16  Exhibit 210?
17    A  Yes.
18    Q  And the address that you see at the top of
19  that statement for Hardcore Fitness Center, that's
20  Hardcore Fitness Center's correct address; right?
21    A  Yes.
22    Q  Do you recall receiving Pages 1629 and 1630 of
23  Exhibit 210?
24    **A  No.**
25    Q  So you didn't receive this document around --

Samuel Soria Liera - CONFIDENTIAL  11/20/2018
Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 66 of 139  Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1611

1  **A  I didn't --**
2  Q  Sorry, let me finish my question, please --
3  you know, prior to August 1st of 2015?
4  **A  I never seen this document.**
5  Q  Never seen it?
6  **A  No.**
7  Q  Ever seen a statement like Pages 1629 and 1630
8  of 210?
9  MR. RAHIMI:  Objection.  Argumentative.  Calls
10  for speculation.  Misstates testimony.
11  THE WITNESS:  Not that I remember.  No.
12  BY MR. SHERMAN:
13  Q  Is it possible that the reason you've never
14  seen a document like that is your practice of taking
15  U.S. Bank mail and tearing it up and throwing it in the
16  garbage?
17  MR. RAHIMI:  Objection.  Argumentative.
18  Misstates testimony.
19  THE WITNESS:  I don't know.
20  BY MR. SHERMAN:
21  Q  Okay.  So I had showed you before the break
22  some letters that U.S. Bank received disputing your
23  accounts in January of 2017; do you recall seeing those
24  documents?
25  **A  Sorry, one more time.**

1  Q  I said, do you recall seeing some exhibits --
2  the earliest one exhibit I showed that was a letter to
3  U.S. Bank where you challenged certain accounts as
4  identity theft?
5  **A  I don't remember.**
6  Q  Showing you what's been marked as Exhibit 211.
7  (Exhibit 211 was marked for
8  identification by the court reporter
9  and is attached hereto.)
10  Q  Do you recognize 211?
11  **A  No.**
12  Q  Okay.  211 is a document that your lawyers
13  sent to us.
14  Do you recall that after you disputed the
15  accounts that we've been talking about today with U.S.
16  Bank, U.S. Bank responded to you?
17  **A  I -- I don't remember.**
18  Q  Okay.  So in this instance U.S. Bank, as you
19  can see from Exhibit 211, is responding to a dispute
20  that you initiated regarding a 6967 line of credit?
21  **A  I see that here, 6967.**
22  Q  And you recall that we listened to a phone
23  recording about that account?
24  **A  Yes.**
25  Q  So what U.S. Bank wrote to you here was that

1  based on its investigation -- reading from the second
2  paragraph now "We have determined the account
3  information submitted by U.S. Bank to the consumer
4  reporting agencies is accurate.  Our investigation
5  determined no fraud or identity theft claims have been
6  received on this account; therefore, no update to the
7  consumer reporting will be done at this time.  If you
8  would like to file a fraud or identity theft claim on
9  this account, please contact our fraud liaison center at
10  (877)595-6256."  Do you see that there?
11  **A  Yes.**
12  Q  Did you read this letter when it was sent to
13  you in late January of 2017?
14  **A  I don't remember.  To be honest, I don't.**
15  Q  So I take it that you didn't call U.S. Bank
16  and follow up and initiate a fraud claim on this
17  account?
18  MR. RAHIMI:  Objection.  Calls for
19  speculation.  Misstates testimony.
20  THE WITNESS:  I don't know.
21  BY MR. SHERMAN:
22  Q  I'm sorry?
23  **A  I don't know.**
24  Q  Do you recall reading any other similar
25  letters that you got from U.S. Bank in January or

1  February of 2017?
2  **A  I actually don't remember, I really don't.**
3  Q  Okay.  And did you think it was important to
4  follow up with U.S. Bank and provide additional
5  information about the claims you were making?
6  MR. RAHIMI:  Objection, argumentative.
7  THE WITNESS:  Yes.
8  BY MR. SHERMAN:
9  Q  Can you give me an example where you did that
10  in January or February of 2017?
11  **A  I don't know if I -- I don't remember.  I -- I**
12  **don't remember.**
13  MR. SHERMAN:  I have nothing further.
14  MR. RAHIMI:  I still have questions.
15
16  EXAMINATION
17  BY MR. RAHIMI:
18  Q  Mr. Soria, have you ever been deposed before?
19  **A  No.**
20  Q  This is your first time in a deposition?
21  **A  This is my first time.**
22  Q  Were you nervous today?
23  **A  Yes.**
24  Q  Okay.  I have no further questions.
25  We will designate the entire testimony today

Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 67 of 139 Page ID #:1612

1  as Confidential.

2      MR. SHERMAN:  Okay.  We'll join in that.

3      MR. RAHIMI:  All right.

4      THE REPORTER:  Counsel, do you need a copy of

5  the transcript?

6      MR. RAHIMI:  Yes, I'd like a copy of the

7  transcript, please, and video and audio.  Thank you.

8      THE VIDEOGRAPHER:  Off the record.  The time

9  is 2:49 p.m. -- I'm sorry -- 2:59 p.m.

10      THE REPORTER:  And, Counsel, you said you need

11  the transcript expedited?

12      MR. SHERMAN:  Yeah, I'd like to have it next

13  week expedited.

14          (TIME NOTED:  3:00 P.M.)

15

16

17

18

19

20

21

22

23

24

25

Page 231

Case 8:17-cv-00603-CJC-KES  Document 59-10  Filed 03/04/19  Page 68 of 139  Page ID #:1613

Samuel Soria Liera - CONFIDENTIAL - 11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

1

2

3

4        I, SAMUEL SORIA LIERA, do hereby declare under

5    penalty of perjury that I have read the foregoing

6    transcript; that I have made any corrections as appear

7    noted, in ink, initialed by me, or attached hereto; that

8    my testimony as contained herein, as corrected, is true

9    and correct.

10        Executed on this_____day of_____,

11    2018, at _____, _____.
                        (City)                    (State)

12

13

14

15

16                          _____

17                          SAMUEL SORIA LIERA

18

19

20

21

22

23

24

25

Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 69 of 139   Page ID
#:1514
Samuel Soria Liera - CONFIDENTIAL  -  11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

1

2

3

4        I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6        That the foregoing proceedings were taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14       I further certify that I am neither financially

15  interested in the action nor a relative or employee or

16  attorney of any of the parties.

17       IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated: 11/23/2018.

21

22

23        GEHANE CASSIS
          CSR No. 13020

24

25

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 70 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1615

## WORD INDEX

**< $ >**
**$100**  82:16  146:10, 14  149:1  152:19  153:7
**$1000**  152:18
**$121.56**  183:25
**$15,000**  18:19
**$1900**  199:19
**$2,018**  174:11
**$20,000**  117:24
**$200**  146:12  184:4
**$2000**  178:22  179:1  182:6  183:4  184:5, 11  187:12, 18  188:21
**$2018**  177:6  178:1
**$3000**  81:5
**$31,000**  112:6  133:4
**$33,405**  133:2
**$35**  214:16
**$35,000**  112:4
**$365.84**  176:22
**$5.83**  207:4, 13  208:17
**$50**  181:6
**$500-something**  146:11
**$59**  148:25
**$6,000**  150:11
**$60**  146:13
**$706**  179:21  180:3  181:17, 19
**$8.51**  207:5
**$856**  181:5

**< 0 >**
**000116**  218:15
**001406**  173:24
**00603CJC**  1:7  2:8
**0128**  37:18  177:1
**0359**  36:20, 21  203:17, 20, 24  205:25
**0367**  36:24
**09**  38:14
**0949**  38:14  163:14  164:7  211:17, 20  212:10, 21  213:25

**216:**8, 25  **218:**22, 25

**< 1 >**
**1**  9:22  169:23  180:3  197:4
**1.23**  188:4
**1:57**  206:8
**1:58**  206:11
**10:00**  19:13
**10:54**  115:1
**100**  153:5
**1000**  153:5, 7
**101**  3:17  205:12
**1040**  7:16, 20, 22  141:8
**108**  6:22
**109**  163:25  164:2
**1099-K**  7:11
**10th**  214:7, 12, 16
**11**  54:7  165:18  233:20
**11:03**  115:4
**110**  7:4
**1100**  116:5
**1120**  7:18
**113**  7:7
**12**  5:8  10:10  27:20  185:23
**12:33**  188:1
**130**  7:9
**13020**  1:22  2:25  233:24
**1303**  3:16
**131**  7:11
**134**  7:13
**137**  7:16
**138**  7:18
**139**  7:20
**14**  156:24  169:17
**1406**  173:18, 22  174:7  175:7  176:22  177:22
**1408**  175:9  185:16, 20
**1409**  178:20
**141**  7:22
**1410**  185:16
**1412**  183:21, 21, 23
**1440**  179:19, 23, 24  181:13, 19

**149**  8:4
**15**  164:1, 3
**15,000**  18:19
**150**  8:6
**1500**  4:8
**155**  8:8
**16**  9:12, 18  10:6  65:2  173:18
**1629**  226:15, 22  227:7
**1630**  226:22  227:7
**164**  8:10
**167**  47:19, 23  48:2  115:15, 16  204:13
**168**  8:16
**16th**  183:24
**17**  74:17  93:3  165:18
**170**  8:18
**172**  6:6  8:20  92:17, 18, 22  93:17
**173**  6:9  93:24, 25  94:3
**174**  6:12  95:10, 10, 11, 16  96:1
**1747**  213:2, 6, 25  218:25  219:3, 7
**175**  6:15  97:6, 9, 11  98:1, 9, 12
**176**  6:20  99:14, 17, 18  101:11  115:14
**177**  6:22  108:8, 12, 12
**178**  7:4  110:10, 14, 14, 16, 18, 21, 24  111:11, 18  112:1, 21
**179**  7:7  113:2, 6, 8, 15
**18**  74:17  165:20
**180**  7:9  8:23  130:23  131:2, 2, 4, 6, 8, 13, 15, 18, 22
**181**  7:11  9:4  131:24  132:3, 3, 8, 17, 23
**182**  7:13  134:19, 22, 24, 25  135:8, 16, 19  136:15
**183**  7:16  136:24  137:2, 3, 7, 13, 15, 21, 23  138:1, 8  142:6

**184**  7:18  138:12, 15, 16, 18, 20  139:9, 14
**185**  7:20  139:18, 21, 22, 24  140:1, 13, 16, 18, 20, 22, 25
**186**  7:22  141:4, 7, 15, 19, 23  142:6
**187**  8:4  149:17, 22, 22  150:4, 10, 17
**188**  8:6  150:24  151:2, 3, 7, 12, 16
**189**  8:8  155:16, 19, 20, 22, 24  156:5, 15, 19, 23  157:17, 18, 20, 25  160:21  162:16  163:9  164:1
**190**  8:10  164:20, 23, 24  165:8, 12, 17, 20, 24  166:5, 6  167:11  169:21, 21  170:5, 9  192:11, 12, 13  200:17  201:4  203:15  208:24  211:16
**1900**  116:3
**191**  8:16  168:7, 11, 11, 13, 18
**192**  8:18  170:16, 19  171:17  173:13  181:13  183:16, 23  185:21
**193**  8:20  9:6  172:15, 18, 19  173:4
**194**  8:23  9:8  180:12, 15, 16, 22  181:12, 16  184:24
**195**  9:4  181:24  182:2, 3, 5, 24  183:1  184:18, 21
**196**  9:6  193:16, 20, 20, 22
**197**  9:8  194:16, 19, 20  198:4  199:1, 16
**198**  9:10  202:2
**1983**  54:7
**199**  9:12  204:8, 12, 24  205:2
**1A**  132:25
**1st**  227:3

**< 2 >**

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 71 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1016

**2**  10:*4*  111:*18*
120:*12*  137:*15*
140:*18*  185:*23*
197:*4*
**2:11**  215:*1*
**2:16**  215:*4*
**2:36**  226:2
**2:49**  231:9
**2:52**  226:5
**2:59**  231:9
**20**  1:*18*  2:*23*  5:*3*
11:*1*  170:*13*
**200**  9:*14*  184:*11*
205:4, *8*  206:*14, 17,
18*  207:12
**2000**  2:22  11:*12*
**2003**  29:*15*
**2005**  57:9  59:7
60:*12*  85:*12*
**2006**  29:*15*  57:9, *9*
58:*17*  60:*19*  225:*3*
**2007**  58:7  85:*20, 22,
25*
**201**  9:*16*  206:*4*
**2010**  58:*18*  169:*24,
25*
**2011**  56:*13, 23*
**2012**  27:*14, 19, 20,
25*  56:*13*  112:*15*
123:*16, 20*
**2013**  169:*16*  170:7,
*11, 13, 23*  171:6
179:*18*
**2014**  8:*20*  169:25
172:*22*  173:*4, 15, 17,
19, 21*  174:*1*  175:18
183:*3, 19, 19*  185:6,
*11*  186:20  187:*4, 12*
188:*17, 22*  194:*5, 9*
195:2  196:8  197:*3*
213:*12, 13*  214:7, *16*
**2015**  7:*11*  9:*12*
48:*19*  54:*1*  65:2
129:*23, 23*  132:9, *14*
133:*12, 25*  137:6
138:6  169:*12*
198:*1, 2*  199:*8, 12,
13*  211:*21, 23*  213:2
215:22  227:*3*
**2015Form**  7:*16*

**2016**  7:*18, 20*  9:*18*
10:6  30:*13*  40:*15*
63:6, 7, 8, 9*  70:*14*
71:*3, 23*  72:22
73:*4*  74:*17*  86:22,
*23*  88:*11*  91:*23*
93:*3*  102:*20*
116:*16*  136:8
138:*19*  141:*1*
142:9  143:*18*
152:2  156:*24*
157:7  158:*4*
162:*13, 23, 23*
171:*20*  189:*6, 15*
192:*3, 6, 9*  202:*14*
209:*10*
**2017**  7:22  10:*10, 17*
53:*25*  54:*1*  58:*7*
71:*25*  72:*1*  75:6, *6*
93:*21*  96:6  113:*11,
13*  135:*1, 3*  141:8,
*24*  158:*4*  227:*23*
229:*13*  230:*1, 10*
**2018**  1:*18*  2:*23*
5:*3*  11:*1, 10*  60:22
232:*11*  233:*20*
**2019**  113:*19*
**202**  9:*10, 18*  209:*15,
19, 19, 21, 25*  210:2,
*6, 21*  216:20
**203**  9:*20*  212:*1, 5*
**2032**  213:*18, 22, 24*
**204**  9:*12, 22*  215:8,
*9*
**205**  9:*14*  10:*4*
215:*14, 15*
**206**  9:*16*  10:6
216:*14, 17, 18, 20*
217:*17, 20*  218:9, *13*
219:*3*
**207**  10:*8*  220:5, *8, 9,
11, 16, 19, 22*  221:6,
*8*
**208**  10:*10*  221:*12,
15, 16, 18, 20, 25*
**209**  9:*18*  10:*12*
222:*3, 6, 7, 10, 12, 13,
18*
**20th**  11:*10*  158:*4*
**21**  195:2, *3*

**210**  10:*15*  226:8, *9,
12, 16, 23*  227:*8*
**211**  10:*17*  228:6, *7,
10, 12, 19*
**212**  9:*20*
**215**  9:*22*  10:*4*
**216**  10:6
**217-2432**  54:*25*
**22**  185:*23*
**220**  10:*8*
**221**  10:*10*  48:*14*
**222**  10:*12*
**226**  10:*15*
**228**  10:*17*
**22nd**  203:*3*
**23**  233:*20*
**230**  5:9
**232**  158:*3*  159:*17,
22, 25*  160:*4, 11, 13,
20*  162:*11, 17, 19*
163:*1*
**250**  111:*19*
**251**  112:*3*
**256**  112:*17, 21*
**25th**  205:9, *10*
**26**  54:7  157:*25*
162:*17*
**26th**  162:*23*
**27th**  158:*4*
**28th**  60:*21*
**29**  208:*10*  215:22
**2nd**  178:*21*  179:*1*
183:*3, 19*  203:*1*

**< 3 >**
**3**  8:*20*  166:4  197:*4*
**3:00**  2:*23*  231:*14*
**30**  10:*17*
**30,000**  126:*13*
**300**  29:*17*
**3000**  81:*4*
**30th**  185:22  207:*25*
**3200**  117:*14*
**333**  3:*8*
**34**  61:*4*
**35,000**  112:*8, 10*
**395-1648**  67:*15*
**39630**  1:*23*
**3978**  37:*20*  163:*14*
164:7  192:*14, 25*

193:*23, 25*

**< 4 >**
**4**  197:*4*
**40**  61:*8*
**400**  120:*12*
**41**  156:22, *23*
**495-5619**  67:*11*

**< 5 >**
**5**  81:9  83:*23*
105:22  197:5
**5.83**  207:*5, 21*
**50**  4:7
**500**  121:2, *11*  146:8
151:*8*
**5000**  116:*23*  117:*11*
**500-something**  146:6
**52**  157:*16, 24*
**5258**  163:*14*  164:7
209:*1*
**547**  199:*15*
**55402**  4:9
**57**  55:9
**577**  198:*3, 5*
**579**  198:*8, 25*
**591.0535**  1:*25*
**591.9722**  1:*25*
**595-6256**  229:*10*
**597**  196:*12, 15*
**5th**  198:8

**< 6 >**
**6**  166:6  192:*12*
197:5
**6-**  81:9
**600**  2:*21*  11:*12*
**600-something**  146:7
**612.492.6609**  4:*10*
**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**  54:9
**625**  210:*10*
**650-2366**  32:9
**653**  147:*24, 25*
148:*1*
**657**  54:*25*
**6590**  35:*25*  202:6,
*25*  203:*8*
**6867**  201:6
**6876**  34:*11*  193:*10*
196:*25*  201:9, *16*
202:*25*

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 72 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1017

**6967** 38:*3, 4*  163:*14*
164:*7*  167:*14*
168:*2, 5, 21*  169:*4*
170:*20, 25*  171:*2, 7*
175:*1*  183:*7, 12, 24*
188:*17*  189:*3*
191:*16, 25*  192:*4*
194:*24*  196:*18, 22*
228:*20, 21*
**6S** 42:*20*

**< 7 >**
**7** 25:*5, 10*  156:*22*
166:*7, 12, 16*  167:*2,
10*  192:*13, 13*  197:*5*
200:*22*  201:*4*
203:*16*  211:*16*
**700** 179:*20*
**706** 181:*9*
**7136** 3:*7*
**714** 32:*9*  67:*9, 15*
**7282** 169:*25*  170:*14*
217:*10, 14*
**763** 1:*25*

**< 8 >**
**8** 166:*16*  167:*2*
169:*21, 22*  197:*5*
**8:17-cv** 2:*7*
**8:49** 2:*22*  11:*2, 11*
**800** 1:*25*
**800.400.6808** 3:*19*
**817-CV-0603-CJC-K
ES** 11:*16*
**818.510.0555** 3:*10*
**82** 163:*10, 10*
**846** 202:*14*
**877** 229:*10*

**< 9 >**
**9** 58:*18*  157:*16*
170:*5, 9*  176:*11*
**9:00** 19:*13*
**9:41** 57:*14*
**9:48** 57:*17*
**91406** 3:*9*
**92** 6:*6*
**92508** 53:*17, 18*
**92626** 11:*13*
**93420** 3:*18*

**94** 6:*9*
**95** 6:*12*
**9520** 53:*11*
**9591** 176:*10, 12*
**96** 207:*12*
**97** 6:*15*
**99** 6:*20*  206:*17, 18*

**< A >**
**a.m** 2:*22*  11:*2, 11*
57:*14, 17*  115:*1, 4*
**ability** 87:*25*  88:*11*
**able** 51:*10*  87:*17*
95:*1*  103:*20*  104:*2,
23, 23*  105:*2, 7, 8, 14*
106:*5*  108:*2*  109:*7*
110:*3*  113:*10*
114:*2, 3*  115:*11*
128:*16*  135:*11*
143:*22*  145:*21, 23*
**absolutely** 209:*5*
**Acacia** 48:*14, 18*
**access** 44:*2*  130:*7*
136:*14*  194:*12*
**accessed** 42:*13*
43:*13*
**account** 13:*13*  15:*3,
8, 9*  16:*12*  21:*23*
22:*12*  28:*2*  31:*14,
16*  32:*17, 18*  33:*2, 5,
6, 10, 17, 20, 23, 24*
34:*10, 15, 17, 20, 21*
35:*11, 18, 19*  36:*7*
37:*15, 22, 24, 24*
38:*5, 5, 8*  39:*19*
42:*13*  43:*13, 16*
52:*3*  136:*21*
142:*12, 19*  166:*7*
167:*13, 16, 24*
168:*21*  169:*3, 3, 6,
12, 15*  170:*20, 25*
171:*7, 10, 13, 25*
173:*19*  174:*2, 18, 24*
176:*22, 25*  177:*1*
179:*7*  181:*2*
182:*11, 14, 19, 19*
183:*6, 9, 12, 14, 14,
24*  184:*5, 11, 16*
185:*8, 10*  186:*9, 14,
20*  187:*13, 17, 18*
188:*17*  189:*4*

191:*15, 16, 19, 22, 25*
192:*14, 25*  193:*4, 9,
23, 24*  194:*4, 8, 24*
196:*1, 23*  197:*22*
199:*3, 5*  201:*10*
202:*6, 25, 25*  203:*7,
17*  204:*5*  207:*18, 23*
208:*3, 25*  209:*4, 5, 6*
211:*14, 21*  212:*21,
23*  213:*18*  214:*1*
216:*8, 25*  218:*22, 25*
219:*3, 3, 7*  228:*23*
229:*2, 6, 9, 17*
**accountant** 44:*22*
**accounts** 13:*11*
15:*14, 17, 17*  17:*13,
18, 20*  20:*14, 22*
21:*2, 16, 19, 22*
24:*11*  27:*22*  28:*4*
29:*21*  31:*7*  34:*1, 4*
35:*21*  36:*3, 15*
37:*6, 9, 11, 12*  38:*20,
21, 25*  39:*1*  40:*17,
19, 21*  44:*3, 19*
45:*17*  159:*20*
161:*17*  162:*9*
163:*13*  164:*7, 14, 18*
166:*17*  167:*3*
188:*7, 12, 13*  193:*11,
13*  194:*13*  196:*9*
197:*14*  201:*13*
223:*4*  227:*23*
228:*3, 15*
**accuracy** 208:*13*
**accurate** 140:*25*
141:*24*  157:*14*
174:*22*  229:*4*
233:*12*
**acknowledge** 169:*2*
192:*24*  197:*12*
201:*6*  205:*24*
212:*23*
**acknowledged**
184:*20*
**ACL** 85:*21*
**acting** 67:*13*
**Action** 6:*22*  7:*7*
8:*4, 6*  11:*8*  233:*15*
**activity** 197:*21*
214:*6*

**actual** 12:*19*  167:*6*
178:*5, 9*
**addition** 109:*18*
**additional** 221:*7*
230:*4*
**address** 28:*7*  32:*12*
47:*18*  48:*17, 21, 24*
49:*14*  53:*8*  55:*18*
64:*22, 23*  65:*8, 12*
66:*20*  67:*4*  106:*25*
111:*12, 16, 17*
116:*22*  147:*3*
170:*12*  172:*3, 10, 22*
173:*1, 1*  204:*16*
209:*25*  217:*2*
226:*18, 20*
**addressed** 47:*11, 22*
48:*1*  204:*12*  217:*10*
**addresses** 55:*1, 7*
**adjustment** 108:*22*
109:*4*
**administered** 12:*4*
**Administration**
107:*19*  108:*1*
113:*25*
**adrenal** 68:*21*
84:*10, 11, 14*  97:*14*
**advance** 45:*4, 7*
104:*11, 14*  106:*15,
19, 19*  108:*2*  109:*19*
110:*6*  178:*25*
211:*5, 9*  214:*9, 12,
16*  219:*11*
**advanced** 104:*22*
**advances** 209:*12*
211:*1, 11*  214:*10*
216:*12, 24*  218:*22*
219:*17, 21*
**Adverse** 8:*4, 6*
**advertise** 120:*8*
**Advertisement** 99:*13*
**advertising** 130:*17,
19*  133:*18*  134:*2*
**affect** 114:*12*
**Affidavit** 10:*13*
**afford** 128:*16*
143:*22*
**age** 61:*6*
**agencies** 229:*4*
**agent** 117:*17, 19*
119:*18*  120:*7*

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES    Document 59-10    Filed 03/04/19    Page 73 of 139    Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1618

**ago** 17:*14* 29:*8*
68:*16*
**agree** 171:*9* 183:*16*
196:*1*
**ahead** 53:*10*
160:*17* 166:*5* 215:*8*
**AIC** 198:*9*
**aid** 69:*11*
**air** 149:*13*
**al** 11:*14* 115:*20, 21*
**Alalaatoa** 46:*13*
**A-L-A-L-A-A-T-O-A**
46:*13*
**Albert** 117:*13, 15*
118:*15, 19* 119:*7, 9,
20*
**Albertons** 175:*18*
**Albert's** 117:*22*
**Albumin** 100:*3*
**Alejandro** 49:*8*
66:*9*
**Ali** 123:*14* 124:*17,
25* 125:*2, 13, 15, 21,
23* 126:*2, 4, 11*
**A-L-I** 124:*18*
**allegations** 156:*8*
**Allstate** 197:*25*
198:*11*
**altogether** 68:*23*
**Amateur** 60:*16*
**Amended** 8:*11*
**amount** 104:*7*
133:*1* 136:*4, 21*
142:*17* 146:*16, 17*
150:*11* 166:*8*
178:*22* 185:*22*
207:*13, 15*
**Ana** 21:*11* 41:*24*
179:*11, 15*
**Anaheim** 25:*9*
55:*14*
**analysis** 78:*25*
**Analytical** 6:*9*
**Andreas** 25:*17*
**Andriano** 25:*17*
**Anguiano** 224:*9*
**Anguino** 16:*22*
**A-N-G-U-I-N-O**
16:*22*
**annual** 112:*3, 6*

**answer** 14:*14* 16:*8*
23:*22* 24:*2, 4, 5*
33:*12* 55:*24* 89:*13,
19* 90:*4* 91:*17*
128:*12* 142:*24*
153:*24* 154:*4, 25*
155:*2* 160:*2* 163:*7*
166:*2, 12, 17* 167:*3*
169:*24* 178:*7*
182:*16* 188:*11*
192:*16* 201:*9, 16*
**answered** 160:*16*
163:*3* 165:*5* 191:*6*
**answering** 163:*4*
**answers** 152:*6*
165:*25*
**Anton** 2:*21* 11:*12*
**anxiety** 65:*15*
67:*17* 68:*6, 7, 8, 11,
15, 17, 19, 21* 69:*13,
14* 72:*7* 74:*12*
80:*18*
**anxious** 68:*3*
**anybody** 41:*1* 44:*2,
2, 15* 45:*2* 51:*7*
52:*12* 67:*24* 79:*2*
103:*2* 112:*16*
119:*6* 123:*12*
136:*17* 154:*6, 8*
155:*6, 11, 14* 189:*9*
**anymore** 46:*15*
79:*11* 103:*19*
112:*14* 114:*15*
116:*15* 133:*17, 24*
150:*15*
**anyway** 90:*8*
**apart** 82:*5* 103:*1*
**Apartment** 48:*14*
**apologize** 213:*15*
**app** 42:*11* 43:*3*
**appear** 136:*7* 141:*8*
232:*6*
**APPEARANCE** 3:*1*
4:*1*
**appears** 141:*11*
**appetite** 75:*22, 24,
25*
**Application** 7:*4*
109:*5* 110:*19, 21*
111:*5* 117:*1*
122:*18, 20* 133:*5*

143:*12* 151:*9*
152:*10, 13*
**applications** 142:*8*
**applied** 104:*13*
106:*19* 110:*6*
143:*17* 144:*16, 20*
**apply** 108:*22*
142:*15* 143:*11, 23*
152:*16*
**approval** 108:*3*
**approve** 153:*20*
156:*15* 157:*9*
**approved** 15:*25*
103:*10* 106:*10*
107:*16* 108:*15*
109:*22, 24* 110:*22*
113:*9, 25* 117:*9*
**approximate** 29:*13*
41:*25*
**approximately** 29:*8*
**apps** 42:*16, 21* 43:*6*
**April** 136:*8* 192:*9*
205:*9, 10, 11* 206:*16*
207:*25* 208:*10*
215:*22*
**area** 115:*12* 130:*21*
**argumentative**
33:*11* 163:*4* 173:*8*
196:*5* 219:*16*
221:*11* 227:*9, 17*
230:*6*
**arising** 153:*10*
154:*6*
**arm** 26:*24* 93:*23*
**arms** 94:*21* 95:*5*
**arranged** 194:*22*
**arrangement** 84:*23*
120:*1*
**arrived** 195:*6, 9*
**Arroyo** 3:*18*
**Arts** 46:*24* 144:*12,
13* 146:*20, 22* 147:*4,
5*
**asked** 21:*14* 46:*17*
104:*21* 142:*23*
163:*3* 166:*7, 22*
169:*22* 181:*5*
191:*5* 211:*10*
**asking** 14:*11, 18, 25*
89:*21* 94:*12*
118:*21* 132:*19*

142:*20* 150:*12*
161:*19* 163:*2*
177:*17* 201:*12*
219:*5*
**asks** 178:*9*
**associated** 44:*15*
72:*25*
**Association** 11:*23*
**assume** 14:*15* 189:*8*
**Assumes** 186:*16, 21*
208:*5*
**AST** 100:*5, 16, 20*
**athletes** 124:*4*
**attached** 92:*20*
94:*2* 95:*13* 97:*8*
99:*16* 108:*10*
110:*12* 113:*4*
130:*25* 132:*1*
134:*21* 137:*1*
138:*14* 139:*20*
141:*6* 149:*19*
151:*1* 155:*18*
164:*22* 168:*9*
170:*18* 172:*17*
180:*14* 182:*1*
189:*3* 193:*18*
194:*18* 202:*4*
204:*10* 205:*6*
206:*6* 209:*17*
212:*3* 215:*11, 17*
216:*16* 220:*7*
221:*14* 222:*5*
226:*11* 228:*9* 232:*7*
**attachments** 8:*21*
**attested** 89:*8*
**attesting** 165:*24*
**Attorney** 3:*6, 14*
4:*6* 11:*20* 22:*19*
106:*22* 125:*15*
233:*16*
**attorneys** 11:*9, 18*
14:*1, 7*
**attorney's** 24:*4*
**attribute** 90:*24*
**Audio** 9:*22* 10:*4*
189:*20* 191:*10*
215:*12, 25* 216:*6*
231:*7*
**August** 194:*5, 8*
195:*2, 3* 196:*8*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 74 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1019

197:3  199:11  227:3
**aunt** 87:1  103:12
**aunts** 15:19
**aunt's** 15:22  16:3
161:25
**authorities** 104:22
**Authorization** 7:5
21:4  22:13  107:7
209:8
**authorize** 167:25
168:4
**authorized** 30:1
34:15  169:2, 5
171:9  194:8
196:23  201:7, 19
**authorizing** 185:5
**automatic** 201:18
202:23
**available** 43:19, 24
116:15  122:14
**Avenue** 3:7, 16
47:21, 23  48:2
204:13
**aware** 22:11
100:23  189:2
**awareness** 106:3
156:18

< B >
**back** 17:23  19:14,
15, 15, 16  20:20
35:4, 9  57:16  58:6
73:19  101:8
103:20  104:5, 9, 19,
20, 24  105:2, 14
106:13  107:20
108:3  109:16, 20
110:3, 5  114:1
115:3  120:5
148:14, 16, 17
152:22  163:9
166:21, 23  169:20
170:22  171:24
174:17  175:23
176:21  179:18
181:6  185:17
187:12  188:3, 11
192:11  194:24
197:3  198:2
203:15  205:8
206:10, 13, 14, 16

211:14  212:4
213:2, 11  214:6
215:3  218:4, 11
226:4
**backed** 191:8
**bad** 18:17  71:2
80:23  86:13  92:5
93:13  117:5
**balance** 35:19
127:25  174:11, 18
177:6, 25  183:24
184:4  188:17
199:19  204:3
207:23  211:22
214:19
**ballpark** 89:25
**BANK** 1:8  2:8
8:18  9:8, 10, 14, 16,
20  10:15  11:14
15:1, 3  18:25
21:21  22:20  23:17
24:13  27:9, 10, 22
30:18  32:16, 19, 20
33:24  34:2  36:4,
13, 22  37:6  38:21,
23, 24  41:6  42:13
43:13  44:3, 6, 9, 13
45:7, 13  48:6, 11
51:4, 5  52:12
65:14  69:6  72:9,
18, 25  86:20  87:22,
24, 25  89:16, 21
90:25  91:11  93:9,
12  96:22  103:4, 6
104:1  114:8, 11
115:7  116:18
121:12, 20  127:6, 23
129:18  131:9
135:5  136:21
142:14  143:2
150:8, 14, 15, 22
155:6, 23  156:9
157:2  158:1, 2
159:12, 17, 23  160:1,
14  161:1  162:5, 20
163:2, 12, 13  164:5,
7, 14, 25  166:8, 17
167:3, 17  169:4
173:1, 4, 7  174:2
179:7, 10  180:19
182:10  183:4

185:10  187:7, 19
188:7, 18  189:9, 15
190:15  191:15
192:3  194:13
195:6, 13, 16  196:9
201:23  203:24
205:21  208:22
209:1, 11  210:17
211:10  215:21
216:7, 24  219:20
221:21, 25  222:14
223:5  226:14
227:15, 22  228:3, 16,
16, 18, 25  229:3, 15,
25  230:4
**banker** 16:8
**banking** 27:13
28:25  29:22
**banks** 38:21  42:6
142:24
**Bank's** 8:13  39:4, 8
**banned** 62:8, 22
**bar** 19:24  28:19
70:1, 3, 4
**barely** 149:11
**based** 219:25  229:1
**basic** 86:18
**basically** 35:17
61:8  194:22
**basis** 225:4
**basketball** 124:5
**Beach** 26:11, 13, 14
**Becky** 225:13
**bed** 67:22
**began** 213:12
**beginning** 2:22
161:16
**begins** 166:12
**behalf** 2:21  30:2
**believe** 18:19  19:21
21:5  25:5, 12
33:18  34:9  35:23
36:16, 23  38:4, 13,
16  39:17  43:23
53:24  56:13  62:4
64:1  66:15  75:5
77:24  78:20  79:18
82:21  85:21  91:24
92:11  97:10  100:9
113:14  123:17
137:8  147:18

153:7  157:12, 13
161:24  185:19
187:6  216:4
217:22, 25  219:1
**believed** 21:3  22:3
24:12
**bell** 34:11  36:1
37:18  38:15
**belonged** 164:8
**beneficial** 74:19
**Berrera** 19:23
20:22  21:3, 9  22:4,
12  24:12  25:4
27:3, 9, 13, 24  28:7,
25  30:4  32:1, 17
33:17, 21, 24  41:8,
15, 22  129:22  154:7
161:14, 17  162:3
166:18  167:4
169:5  171:1, 10, 14,
23  223:6, 11  224:3
**Berrera's** 31:19
174:4
**best** 72:20
**better** 20:18, 19, 19
71:15, 16  73:19
74:25  75:2, 3, 3, 4, 7
98:25
**Beverly** 77:9
**beyond** 221:7
**big** 59:24  60:1
74:21  116:2
**bigger** 115:12
116:11  134:14, 14
**biggest** 62:4
**Bilirubin** 100:3, 4
**bill** 24:7  90:15, 18,
21  147:13  158:19
**billing** 37:1
**bills** 47:1, 2  90:11
102:19  147:17
148:13, 17, 18
158:21, 23, 25  159:1,
2, 3, 7
**binder** 173:14
206:15  213:15
**birth** 12:21, 21, 23
54:6  190:18, 20
**bit** 13:10  17:23
80:23  88:5  149:13
214:23  223:22

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 75 of 139 Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1026

224:*20, 23*  225:*19,*
*24*

**Block**  140:*7*
**blocked**  32:*3*
**blood**  61:*16, 22*
  62:*4, 13*  64:*6, 13*
  76:*18, 20, 21*  78:*6,*
  *12, 14*  92:*8, 9, 11, 23,*
  *25*  93:*6, 14*  99:*19,*
  *20*  101:*6, 7*
**body**  72:*13, 16*
  77:*22*  101:*8*
**bodybuilding**  91:*15*
**bones**  93:*22*
**book**  171:*21*  184:*3*
**Booker**  115:*20, 22*
**B-O-O-K-E-R**
  115:*22*
**bookkeeper**  44:*24*
**books**  46:*25*
**borrowed**  24:*22, 25*
  184:*12*
**bottom**  111:*19*
  112:*18*  139:*1*
  162:*25*  164:*3*
  173:*22*  174:*7*
  177:*22*  210:*6*
**Boulevard**  2:*21*
  11:*12*
**Box**  132:*25*  138:*25*
**boxing**  46:*7*  56:*19*
  57:*3*  58:*7, 8, 9, 10,*
  *11, 12, 13, 14*  60:*3*
  112:*11*  128:*24*
  225:*3*
**boyfriend**  223:*19*
**branch**  21:*11, 13,*
  *14*  41:*24*  144:*20, 21*
  161:*6*  162:*8, 14*
  169:*10*  179:*10*
  180:*19*  183:*4*
**Brea**  67:*2*
**break**  57:*11, 19*
  85:*20*  112:*24*
  114:*23*  147:*19*
  187:*20, 23*  225:*25*
  227:*21*
**breaks**  85:*17*
**breath**  26:*23*
**bring**  27:*12*  73:*19,*

*20*
**broke**  90:*19*  188:*6*
**broken**  132:*12*
**brothers**  49:*4, 9, 14*
**brought**  105:*18*
  152:*19, 22*
**Brown**  103:*24*
  107:*5*
**Brown's**  106:*22*
**building**  115:*12, 12,*
  *23*  121:*5, 8, 8, 9, 10*
  122:*10*  126:*20*
**burns**  83:*9*
**Business**  7:*9*  10:*15*
  15:*6, 18, 20*  18:*24*
  20:*23, 24, 25*  21:*1,*
  *20*  22:*16*  27:*13, 16,*
  *19, 23*  28:*5, 19, 21,*
  *24*  31:*11, 11*  34:*18,*
  *19, 21*  36:*12, 12, 16,*
  *22*  37:*6, 12, 13, 23,*
  *24*  38:*1, 12, 17*  42:*4,*
  *5*  44:*16, 22*  46:*10,*
  *11*  51:*2, 11, 15*  52:*9*
  53:*5, 5*  54:*21, 21, 23*
  112:*15*  115:*8*
  117:*18*  118:*13*
  119:*19*  123:*3, 4, 13*
  124:*3, 23, 24*  125:*1,*
  *1, 7, 11, 13*  126:*7, 17*
  128:*4*  129:*15*
  130:*18, 19*  131:*3*
  133:*17*  143:*19*
  158:*15, 18*  186:*7*
  190:*7, 16*  192:*21*
  193:*7, 14*  195:*20*
  196:*25*  202:*6*
  205:*22*  226:*13*
**buy**  52:*20*  118:*5,*
  *12, 15*  121:*8*  123:*2*
  143:*20*  144:*3, 7*
  145:*16*  151:*24*
  152:*24*  153:*4*

**< C >**
**Cage**  59:*12, 22*
  60:*2*  73:*1*  82:*8*
**Calderon**  23:*14, 25*
  24:*7, 9*  158:*2*
**Calico**  53:*11, 12, 13*
**C-A-L-I-C-O**  53:*14*

**CALIFORNIA**  1:*2,*
  *17*  2:*2, 22*  3:*9, 18*
  11:*1, 13, 15*  67:*1*
  70:*4*  125:*20*  170:*1*
  207:*4*  233:*5*
**call**  14:*23*  16:*5, 16*
  17:*5*  18:*23*  23:*3,*
  *11*  28:*8*  54:*24*
  73:*18*  143:*12*
  156:*6*  158:*2, 18*
  161:*11, 19*  165:*8*
  229:*15*
**called**  15:*6, 6, 9, 11,*
  *22*  16:*9, 14, 17, 18,*
  *18, 19, 19*  17:*1, 9, 16*
  19:*9, 24*  23:*10*
  24:*15*  73:*12*  76:*22*
  77:*14*  80:*3*  83:*21*
  84:*2*  98:*5*  126:*4*
  159:*11*  161:*2*
  190:*18*  208:*14*
  211:*10*  218:*25*
  219:*3*
**caller**  191:*14*
**calling**  15:*3, 4, 9, 10*
  23:*7*  69:*7*  159:*19,*
  *23*  215:*21*
**calls**  15:*5*  54:*21*
  88:*24*  89:*18*  90:*1*
  91:*16*  128:*11*
  159:*3, 12, 15, 17, 18*
  160:*2, 4, 11, 13, 15*
  162:*11, 17, 19*  163:*1,*
  *4*  173:*8*  185:*2*
  188:*23*  190:*3, 9*
  191:*4*  200:*13*
  212:*16*  214:*2*
  220:*24*  227:*9*
  229:*18*
**cancel**  129:*7*
**car**  18:*16, 16*
  197:*24*
**Card**  8:*16*  9:*6*
  36:*12, 17, 21, 22*
  37:*2, 7*  45:*2, 5, 8, 12*
  50:*23, 24, 25*  52:*1, 6,*
  *7*  107:*7, 14*  108:*25*
  109:*8, 14*  132:*10, 11,*
  *13*  133:*1, 9*  135:*25*
  136:*3, 22*  142:*21, 21*
  143:*6*  145:*3, 17*

150:*2, 14*  152:*23*
  168:*15*  174:*24*
  175:*10*  176:*9, 11*
  186:*13*  187:*8*
  198:*14*  199:*1*
  203:*24*  204:*2, 4*
  205:*20, 22, 24*
  206:*25*  207:*18*
  208:*15, 25*  209:*9, 22*
  211:*1, 6, 9, 17*  212:*7,*
  *7, 8*  213:*5, 22*  214:*7,*
  *8, 19*  219:*12*
**cardio**  129:*1*
**cards**  36:*11*  38:*11*
  142:*24*  157:*3*
  203:*13*  211:*2*
**care**  30:*17*  31:*1, 5,*
  *7*  90:*21*  103:*13*
**career**  59:*7*
**Carlo**  130:*11*
**Carlos**  49:*6*
**carried**  144:*11*
**carries**  46:*21*
  197:*24*
**cart**  150:*8*
**Case**  1:*7*  2:*7*
  11:*13, 15*  23:*16, 20*
  35:*7*  153:*11*
  209:*11*  223:*21, 24*
  224:*19*  225:*18, 23*
**cash**  24:*18*  45:*4, 7*
  50:*17, 18*  52:*3, 6, 8,*
  *9, 11, 19*  90:*12, 13*
  181:*6*  209:*12*
  211:*1, 5, 8, 11*  214:*9,*
  *10, 12, 16*  216:*12, 24*
  218:*21*  219:*11, 17,*
  *21*
**CASSIS**  1:*22*  2:*24*
  11:*25*  233:*23*
**catch**  17:*25*  97:*24*
**Cause**  13:*3*  15:*24*
  16:*8, 9*  17:*18, 20*
  19:*1, 9, 13, 16*  20:*20*
  26:*23, 25*  28:*13*
  32:*22*  39:*12, 25*
  46:*18*  55:*24*  62:*18*
  70:*25*  72:*19*  73:*21*
  74:*22, 22, 23*  77:*21*
  80:*19*  82:*7*  85:*20*
  92:*4*  93:*13*  97:*23*

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 76 of 139   Page ID #:1621
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

98:*25*  99:*9*  100:*11,
25*  103:*12*  110:*4*
111:*4*  119:*1*
121:*21*  122:*1*
125:5  128:*18*
130:6  134:*3, 13*
140:*16*  143:*13*
152:*4*  153:*11*
178:*12*  195:22
202:*21*  210:*14*
**caused**  68:*20*  91:*1*
**causing**  77:*21*
**cease**  23:*18*
**cell**  54:*20, 22*
158:*13, 16, 19*
159:*13*  175:*23*
190:*7, 10*
**Center**  6:*17*  27:*17*
31:*18*  190:*23*
204:*13*  226:*19*
229:*9*
**Center's**  226:*20*
**CENTRAL**  1:2  2:2
11:*14*  37:*1*
**certain**  163:*13*
228:*3*
**certainly**  192:2
211:*9*
**certificate**  12:*21, 21,
24*
**Certified**  2:*24*
221:*3, 21*  233:*4*
**certify**  233:*5, 14*
**certifying**  111:*25*
**cetera**  89:*4*
**challenged**  209:*11*
216:*24*  228:*3*
**challenging**  164:*13*
208:*25*  211:*17*
216:*8, 12*  218:*21*
**change**  41:*18*
111:*17*
**changed**  32:*3*
39:*12*  40:6  133:*12*
**changes**  133:*21*
**charge**  35:*16*
120:*21*  146:*10, 12,
14*  207:*3, 24*  208:*17*
**charged**  207:*21*
214:*15*

**charges**  145:*25*
146:*1*  201:*17*  207:6
**check**  17:*17, 19*
18:*12*  51:*7, 8*
106:*23*  191:*19, 24*
**checked**  18:*13*
43:*21*
**checking**  21:*21, 23*
27:*23*  28:5, 6
32:*18*  34:*19, 21*
35:*18, 19, 21*  36:*16*
37:*10, 13, 14*  38:*4*
39:*19*  168:*20*
169:*3, 6, 15*  170:*20*
176:22  181:2
192:*25*  193:*3*  202:5
**checklist**  76:7
**Chlomib**  101:*20, 21*
102:*4, 7*
**C-H-L-O-M-I-B**
101:*24*
**choose**  41:*12*
**chorionic**  98:6
**chose**  39:*24*  41:*9,
13*
**C-H-R**  45:*24*
**Chris**  45:*22, 23*
46:*4, 6*  224:*24*
**circumstances**  12:*16*
**City**  232:*11*
**claim**  103:*3*  160:*1*
203:*13, 16, 23*
208:*21*  216:7
219:*25*  229:*8, 16*
**claiming**  65:*13*
103:6  115:6
166:*18*  167:*4*
**claims**  229:5  230:5
**class**  128:*18, 18, 20*
129:*1*
**classes**  26:*17*  88:6,
8*  128:*17*  129:*10*
225:*10, 12*
**clear**  14:*19, 19*
218:*11*
**client**  211:22
**clients**  50:*17, 17*
**Clinic**  6:*16*  63:*10,
12*  64:2  70:6, 8
**clinical**  74:9

**close**  62:7  72:*15*
87:*3*  94:22  133:*4*
161:5
**closed**  58:*17*  63:9
**Club**  56:9  57:*24*
198:*9*
**coach**  224:*13*
**Code**  53:*17*
**collection**  24:*15*
204:*4*
**collections**  15:*24*
23:*19*
**college**  26:6, 7, 9, *10*
28:*11, 12, 12, 15*
29:*11, 12, 14*  54:*14*
**colleges**  134:*3*
**come**  22:6  47:*15*
51:*19*  68:*18*  83:5
94:*19*  96:*1*  103:*20*
104:5, *19*  105:2
106:*13*  108:*3*
109:*16, 20*  110:*3*
119:22  140:*9*
158:*7, 10*  211:*14*
**comes**  52:*11*
**coming**  104:*20*
113:*20*  186:7
**common**  17:*19*
98:*17, 23*
**communicate**  32:*13*
**communicated**  31:2
**companies**  83:*10*
**company**  46:*23*
51:6  124:*17*
144:*14*  146:*24*
158:*11*  185:*19*
**compete**  72:*13*
**competing**  86:6
**competitions**  77:22
**Complaint**  8:8
10:*13*  156:6
**comprise**  135:*15*
**computer**  41:*14*
222:*25*
**concentration**  75:*20*
**concerning**  14:*1, 7*
**conclusion**  89:*19*
187:*15*  199:*25*
200:7  215:*13*
**conditioning**  123:*23*

124:7, *10*
**condo**  152:7
**CONFIDENTIAL**
1:*13*  153:*23*  231:*1*
**Confidentiality**
154:*24*
**confirm**  111:*12*
**Confusing**  200:*23*
217:*21*
**consent**  209:7
**consists**  218:*13*
**constantly**  88:*10*
91:*19*
**consult**  22:*18*
**Consumer**  8:*16*  9:6
229:*3, 7*
**contact**  25:*21*  229:*9*
**contacted**  189:*9*
**contacting**  160:*1*
**contained**  232:*8*
**containing**  184:*11*
**contains**  84:*1, 9*
156:*8*
**contend**  166:*9*
**contesting**  168:*20*
**context**  28:*18*
**continue**  49:*14*
216:5
**CONTINUED**  4:*1*
7:*1*  8:*1*  9:*1*  10:*1*
158:2
**continuing**  102:*9*
**contracted**  11:7
**contribute**  87:6
**control**  196:*9*
**Cool**  114:*24*
**Copy**  8:*23*  9:*4*
93:*19*  111:6  231:*4,
6*
**corner**  111:*19*
112:*18*  173:*23*
**corporation**  125:*16,
16*  138:*17*
**correct**  27:*10*
99:*23*  105:*19*
110:*25*  111:*13*
112:*1, 19*  113:*11, 13,
15*  132:*15*  141:*9, 13,
16, 19, 21, 25*  157:*4*
167:*14*  170:*1*
171:*11*  181:2

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 77 of 139 Page ID #:1022
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

183:*4*, *12*  184:*24*
185:*12*  187:*5, 8*
190:*18*  203:*19, 25*
204:*5*  212:*11*
214:*17*  216:*1, 9*
217:*17, 20*  218:*9, 15, 19*  219:*15*  224:*6*
226:*20*  232:*9*
**corrected** 232:*8*
**corrections** 232:*6*
**correctly** 223:*13*
**Cortez** 18:*1, 2*
25:*19*  224:*6, 8*
**C-O-R-T-E-Z** 18:*3*
**cost** 61:*9, 10*  62:*5*
146:*9*  147:*20*  148:*7*
**COSTA** 1:*17*  2:*22*
11:*1, 12*
**COUNSEL** 3:*1*
231:*4, 10*
**count** 15:*5*  60:*14*
**counter** 182:*7*
**counter-deposit**
180:*17*
**counting** 197:*4*
**country** 103:*21, 22*
105:*5, 14*  108:*3*
114:*3*
**County** 142:*13, 16*
143:*7, 13*  144:*17*
145:*3*  148:*8*  150:*21*
**couple** 17:*24*  156:*3*
164:*4*  198:*7*  212:*9*
**course** 27:*21*  90:*8*
**courses** 26:*7, 15, 19*
29:*14*
**COURT** 1:*1*  2:*1*
11:*24*  92:*19*  94:*1*
95:*12*  97:*7*  99:*15*
108:*9*  110:*11*
113:*3*  130:*24*
131:*25*  134:*20*
136:*25*  138:*13*
139:*19*  141:*5*
149:*18*  150:*25*
155:*17*  156:*9, 16, 19*
157:*10*  164:*21*
168:*8*  170:*17*
172:*16*  180:*13*
181:*25*  193:*17*
194:*17*  202:*3*

204:*9*  205:*5*  206:*5*
209:*16*  212:*2*
215:*5, 10, 13, 16*
216:*15*  220:*6*
221:*13*  222:*4*
226:*10*  228:*8*
**courthouse** 105:*4*
**covers** 183:*19*
**CPA** 140:*6*
**Craig** 4:*13*  11:*6*
**cramped** 94:*21*
**crazy** 71:*1*
**create** 131:*13*  137:*7*
**created** 131:*8*
**creating** 130:*9*
**Credit** 10:*8*  18:*17*
36:*11, 12, 17*  37:*2, 6*
38:*11*  45:*2, 4, 8, 12*
50:*24*  52:*1, 6, 7*
117:*5*  121:*10, 17, 21, 22, 22*  127:*11, 14, 17*
130:*2*  132:*10, 11, 13*
133:*9*  135:*25*
136:*3, 22*  142:*9, 10, 11, 11, 13, 13, 15, 16, 17, 20, 21, 21, 24*
143:*3, 4, 6, 7, 13, 17*
144:*17*  145:*3, 3, 17*
148:*8, 10, 19*  150:*1, 1, 7, 14, 21*  151:*8, 10, 15*  152:*1, 3, 21, 22*
153:*8*  157:*3*
163:*11, 17, 22*
203:*13, 24*  205:*20*
206:*24*  208:*25*
211:*2, 5, 9, 16*
219:*12*  228:*20*
**crime** 104:*8*
**CSR** 1:*22*  233:*24*
**curiosity** 39:*23*
**current** 114:*6, 10*
**currently** 107:*6*
**customer** 178:*21*
214:*12*
**customers** 50:*21*
**cut** 93:*14*
**cutting** 212:*15*

**< D >**
**DACA** 107:*21, 23*
108:*2, 4*  113:*11*

114:*7, 12, 14, 15, 16, 20*
**dad** 67:*12, 13*
**DADA** 113:*19*
**daddy** 130:*12, 13*
**daily** 100:*12*
**Dale** 48:*21, 23*
**damage** 89:*17*
**Damages** 8:*8*  88:*22*
**Dan** 28:*8*  223:*5, 11*
**Daniel** 16:*7, 14*
17:*4, 5*  18:*22*  19:*4, 11*  28:*9, 10*  38:*5, 6*
40:*9, 10, 14*  41:*2, 4*
66:*6*  129:*17*  169:*5*
171:*23*  196:*24*
**dash** 55:*3*
**date** 11:*10*  13:*21, 22*  22:*11*  41:*7*
50:*11*  54:*6*  85:*24*
190:*18, 20*  233:*17*
**dated** 8:*20*  9:*12, 18*
10:*6, 10, 17*  233:*20*
**David** 16:*17, 19*
17:*1, 1*  25:*17*  224:*9*
**David's** 16:*21*
**day** 15:*4, 6, 10, 12, 19, 22*  16:*2, 13*
17:*15*  19:*1, 5, 19*
30:*7, 9*  43:*10, 12*
67:*21*  69:*1, 2, 7*
76:*4*  161:*18, 25*
179:*4*  225:*7*  232:*10*
**days** 13:*14*  69:*3, 5*
76:*23*  103:*11*
**deal** 52:*10*  67:*20*
150:*15*  223:*5*
**dealing** 102:*23*
147:*2*  224:*20*
**deals** 203:*13*
**Dear** 219:*6*
**Deb** 185:*25*
**debit** 50:*24, 25*
174:*24*  175:*10*
176:*9, 11*  185:*11*
186:*13*  187:*7*
198:*8, 14*  199:*1*
**debt** 118:*8*  166:*8*
185:*23*
**December** 75:*8*
135:*3*

**decided** 64:*5*
145:*15*
**declare** 232:*4*
**Deer** 48:*16, 20*
**Defendant** 4:*3*  8:*12*
158:*1, 2*  164:*4*
**Defendants** 1:*9*
2:*10, 21*  11:*23*
**deficiency** 68:*21*
84:*14*
**define** 81:*10*
**degree** 26:*6, 20*
79:*15, 20*
**dehydrated** 92:*4*
**deleted** 31:*21*
**delinquent** 149:*24*
**denial** 152:*3*
**denials** 148:*10*
152:*1*  153:*8*
**denied** 149:*23*
150:*16*  151:*13*
152:*4*
**depending** 113:*24*
**Depends** 61:*1*  120:*3*
**DEPO** 1:*23*  11:*7, 25*
**deposed** 230:*18*
**deposit** 8:*23*  9:*4*
37:*7, 12*  135:*24*
179:*13, 20, 20*  180:*2, 2, 17, 20*  181:*9, 13, 19, 22*  182:*6*  184:*23*
185:*21*
**deposited** 136:*21*
**depositing** 181:*1*
**DEPOSITION** 1:*15*
2:*20*  6:*1*  11:*11, 17*
13:*9*  14:*10*  215:*14*
230:*20*
**deposits** 135:*23*
179:*6, 8, 12*  185:*18, 18*  197:*4*
**depressed** 88:*4*
**describe** 59:*14*
68:*18*  119:*19*
159:*18*
**DESCRIPTION** 6:*4*
7:*2*  8:*2*  9:*2*  10:*2*
**designate** 230:*25*
**Despite** 157:*25*

Samuel Soria Liera - CONFIDENTIAL
11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 78 of 139 Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1623

determine 12:17
114:19 202:19
determined 229:2, 5
DHEA 84:6, 14
diagnosis 75:9
77:23 96:13, 18
Diagnostic 6:20
Diamond 70:1, 3, 4
diaries 71:20
diary 71:19
died 87:1
Diego 87:16 222:21
dietary 82:25 83:4,
15
difference 118:8
125:6
different 12:14
13:4 39:14 59:11,
25 64:8, 11 66:24
91:6, 7, 20, 20 98:3
99:23 124:14
128:23 151:16
digits 33:16 36:6
37:16
dilated 61:16 62:3
64:12
diploma 26:3
Direct 185:23, 24, 25
direction 233:12
directly 54:22
158:3 190:9
discovered 157:2, 7
163:12
discussion 215:18
Discussions 7:9
131:3
diseases 61:17
dispute 169:14
173:3, 6 176:16
189:25 194:7
208:12 213:24
228:19
disputed 164:6
228:14
disputing 227:22
DISTRICT 1:1, 2
2:1, 2 11:14
Division 11:15
doctor 62:25 63:5,
19 64:9 70:16, 17,
19, 20 74:1 76:15

77:3 79:5, 13, 14
91:13, 18, 24 92:3, 6
96:10 100:7 103:2
doctors 63:23, 25
64:5, 11 74:4
82:19 90:7, 24
91:7, 20, 20, 22
102:19 103:3
doctor's 86:14
103:16
document 89:8
107:15 113:16
131:15, 18 132:25
155:23 205:8, 18
216:23 220:12
222:12 226:25
227:4, 14 228:12
documents 135:15
136:6 201:17
227:24
doing 52:4 76:3
123:23 133:18, 25
153:3 178:12
195:22 196:3
210:19
███████ 44:10
████████ 39:22
dollars 142:22
146:3 174:19
doping 101:6
DORSEY 4:4 11:22
Dot 55:4, 5
doubt 176:8 181:21
download 42:15
downloaded 43:3
Dr 6:15 63:21
64:10, 17, 18, 19, 20,
25 65:2, 4, 9 69:17,
18, 21, 25 70:10, 12,
16, 22 71:24, 25
73:8, 25 75:9
76:10, 12, 15 78:3, 3,
16, 17, 21 79:4, 5, 9,
15, 16, 19, 22, 24
80:7, 11, 12, 14, 15
83:19 84:16, 16, 17
92:23, 25 93:5, 12,
17 94:6, 17 95:18,
19, 24 97:12 100:19
101:3, 12, 25 102:6
draw 33:5 92:8

drawing 199:23
200:12
drink 32:23
drinks 28:13, 14
driver 13:6
driving 71:1
due 207:13

< E >
earlier 112:12
142:23 145:8
149:25 215:7
218:24
earliest 22:11
170:21 194:24
228:2
earn 26:3
ears 78:7
East 3:16
eat 176:1
Edge 205:22
Edison 202:23
EEG 61:15
effected 88:11
eight 25:5 88:7
either 17:21 48:22
74:23 102:12
123:1 124:5
126:16 127:1
167:25
EKG 61:15
Elavon 51:6, 6, 22,
23
elbow 93:21
electronic 169:11
185:21
Elementary 25:7, 9,
22 224:4
elevated 100:19
eligible 109:4
Ellingson 4:13 11:6
else's 123:5
email 31:6 32:10,
10, 12 55:1, 7, 18
147:14, 15, 19
emailed 31:6
emails 147:17
emotional 89:17
employed 58:3
employee 11:9

46:11 233:15
employees 45:19
Employment 7:4
56:8 107:6 112:9
133:5
ended 158:19
176:9 192:25
213:2, 6, 22 221:20
Endocrinologist
70:19 74:3, 4
ends 183:12 211:17
energy 83:8 97:16
engagement 23:24
English 26:16
enjoy 87:17, 19
88:1
ensure 199:4
enter 61:9, 10
entered 106:1
109:13
entire 230:25
entry 106:6 125:21
178:21 181:13
EQUIFAX 1:8 2:8
153:11, 14, 20 155:5
156:9 163:11, 14, 17,
22 164:15, 25 220:1,
2, 12, 14, 15, 17
221:3, 7
equipment 145:16
equity 118:8
ERIC 4:5 11:22
57:10 149:12
177:16
Espinoza 123:14, 15,
21 124:12 126:19,
24 127:1, 5, 9, 18
129:16 131:16
Espinoza's 126:14
establish 47:17
estate 117:17, 19
119:18, 18 120:7
estimate 52:5
estimated 133:5
Estradiol 100:6
estrogen 100:6
101:14
et 11:14 89:4
event 171:6 217:16
eventually 23:6
145:15

Samuel Soria Liera - CONFIDENTIAL                    11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**everybody** 86:*18*
120:*21*
**evidence** 109:*3*
184:*7* 186:*17, 22*
187:*10* 199:22
208:6
**exact** 146:*17*
**exactly** 22:*14* 60:2
77:*24* 146:*11*
160:*17*
**exam** 61:*16, 19*
64:*8* 78:*1, 4*
**EXAMINATION**
5:*5* 12:7 61:*14*
230:*16*
**examined** 12:*5*
**example** 171:*16*
179:*17* 185:*20*
198:*15* 230:*9*
**exams** 61:*23*
**exchange** 38:*7*
**Excuse** 17:7 129:*16*
134:*18* 157:*24*
162:*11* 179:*11*
210:*15*
**Executed** 232:*10*
**Exhibit** 6:*6, 9, 12,*
*15, 20, 22* 7:*4, 7, 9,*
*11, 13, 16, 18, 20, 22*
8:*4, 6, 8, 10, 16, 18,*
*20, 23* 9:*4, 6, 8, 10,*
*12, 14, 16, 18, 20, 22*
10:*4, 6, 8, 10, 12, 15,*
*17* 92:*18, 22* 93:*17,*
*25* 94:*3* 95:*10, 11,*
*16* 96:*1* 97:*6, 9, 11*
98:*1, 9, 12* 99:*14, 17,*
*18, 23* 101:*11* 108:*8,*
*12, 12* 110:*10, 14, 14,*
*16, 18, 21, 24* 111:*11,*
*18* 112:*1, 21* 113:*2,*
*6, 8, 15* 130:*23*
131:*2, 2, 4, 6, 8, 13,*
*15, 18, 22, 24* 132:*3,*
*3, 8, 23* 134:*19, 22,*
*24, 25* 135:*8, 16, 19,*
*22* 136:*15, 24* 137:*2,*
*3, 7, 13, 15, 21, 23*
138:*1, 8, 12, 15, 16,*
*18, 20* 139:*9, 14, 18,*
*21, 22, 24* 140:*1, 13,*

*16, 18, 20, 22, 25*
141:*4, 7, 15, 19, 23*
142:*6* 149:*17, 22, 22*
150:*4, 10, 17, 24*
151:*2, 3, 7, 12, 16*
155:*16, 19, 20, 22, 24*
156:*5, 15, 19, 23*
157:*17, 18, 20, 24, 25*
160:*21* 162:*16*
163:*9* 164:*1, 20, 23,*
*24* 165:*8, 12, 17, 20,*
*24* 166:*5, 6* 167:*11*
168:*7, 11, 11, 13, 18*
169:*21, 21* 170:*5, 9,*
*16, 19* 171:*17*
172:*15, 18, 19* 173:*4,*
*13* 174:*18* 180:*12,*
*15, 16, 22* 181:*12, 13,*
*16, 24* 182:*2, 3, 5, 24*
183:*1, 16, 23* 184:*18,*
*21, 24* 185:*21*
192:*11, 12, 13*
193:*16, 20, 20, 22*
194:*16, 19, 20* 198:*4*
199:*1, 16* 200:*17*
201:*4* 202:*2*
203:*12, 15* 204:*8, 12,*
*24* 205:*2, 4, 8* 206:*4,*
*14, 17, 18* 207:*12*
208:*24* 209:*15, 19,*
*19, 21, 25* 210:*2, 6,*
*21* 211:*16* 212:*1, 5*
215:*7, 9, 14, 15*
216:*14, 17, 18, 20*
217:*17, 19, 20* 218:*8,*
*9, 13* 219:*3* 220:*5, 8,*
*9, 11, 16, 19, 22*
221:*6, 8, 12, 15, 16,*
*18, 20, 25* 222:*3, 6, 7,*
*10, 12, 13, 18* 226:*8,*
*9, 12, 16, 23* 228:*2, 6,*
*7, 19*
**EXHIBITS** 6:*1* 7:*1*
8:*1* 9:*1* 10:*1* 228:*1*
**existed** 167:*23*
192:*19* 209:*1*
**expand** 130:*18*
**expedited** 231:*11, 13*
**expenses** 51:*14, 15*
82:*4* 89:*16* 112:*6*
**experience** 45:*16*

**experienced** 68:*25*
86:*21* 95:*8* 148:*10*
152:*1*
**experiencing** 67:*25*
68:*19*
**expires** 107:*13*
113:*19*
**explain** 12:*16* 68:*9*
163:*21* 184:*10*
208:*22, 23*
**explaining** 150:*18*
**explanation** 210:*22*
**explored** 123:*9*
**extended** 85:*17*
**extra** 111:*6* 145:*24*
146:*1, 11*
**eye** 61:*16*
**eyes** 61:*16* 62:*3*
64:*12*

**< F >**
**face** 20:*18*
**Facebook** 31:*5*
43:*1, 11, 12* 55:*16*
130:*20*
**fact** 101:2 107:*23*
110:*18* 139:*8*
164:*14* 184:*23*
188:*10* 219:2
**facts** 184:*6* 186:*16,*
*21* 208:*5*
**fair** 14:*15* 114:*8*
**fake** 110:*1*
**Fall** 72:*5*
**family** 19:*16*
**family's** 140:*25*
**far** 41:*16, 17* 72:*14*
106:*18* 119:*5*
122:*6* 124:*5*
126:*25* 179:*15*
196:*8, 10*
**Fargo** 28:*1* 42:*6*
44:*7* 45:*10, 14, 17*
142:*25* 143:*1, 2*
**fast** 24:*18*
**fat** 83:*9*
**fatigued** 72:*16*
80:*23*
**favorable** 150:*22*

**February** 136:*7*
189:*15* 192:*3*
230:*1, 10*
**fee** 120:*20, 22, 23*
214:*16*
**feel** 69:2
**feeling** 68:*3* 75:*16*
**feet** 116:*3, 23*
**felt** 88:*4* 92:*4*
**fence** 60:*9*
**fight** 59:*9* 60:*20, 25*
61:*9, 10, 20, 24, 25*
62:*6* 72:*15* 73:*4*
81:*1, 14, 15* 82:*15*
85:*11, 19* 86:*1*
90:*20* 94:*23, 24*
95:*7* 97:*19* 99:*12*
120:*13*
**fighter** 57:*5* 61:*6*
62:*17* 87:*10* 98:*12*
99:*9*
**fighters** 64:*4, 6*
98:*17* 99:2
**fighting** 59:*15, 19*
61:*7* 62:*1, 9* 80:*21*
82:*5* 85:*14, 18*
90:*21* 95:*1* 98:*17*
**fights** 60:*10, 13, 16*
62:*19* 72:*21* 76:*17*
80:*24* 81:*7* 84:*20*
94:*20, 25* 119:*23*
120:*11* 224:*18*
**figure** 26:*21* 89:*25*
91:*4, 8*
**file** 9:*22* 10:*4*
51:*17* 109:*4*
215:*13* 229:*8*
**filed** 11:*14* 53:*25*
110:*19* 137:*23*
138:*1, 5, 9* 139:*14*
140:*13* 154:*15*
156:*16, 19* 157:*10*
**fill** 111:*2* 137:*9*
**filled** 49:*21* 111:*10,*
*15, 16* 129:*9* 137:*13*
140:*1* 180:*20* 210:2
**filling** 52:*19* 139:*11*
**finally** 19:*12, 23*
23:*8*
**financial** 127:2

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 80 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1625

financially  11:7
233:14
financing  118:8
129:15
find  15:20  16:15
19:23  23:5  30:21
76:2  104:6  115:11
116:11  121:19
146:19, 21
finding  116:14
fine  20:10  76:1
103:21  106:14
109:21, 23  114:2
finish  55:23  227:2
first  13:19, 19  17:1
18:24  22:7, 15, 18
23:11  25:3, 11
27:12, 14, 15  39:7
47:17  61:25  64:18
68:2, 10, 14  69:21
70:12  71:23  80:15
100:2  106:6  135:8
141:13  155:24
161:1, 19  170:25
171:17, 20, 21
177:10  189:2
196:13  207:11
210:6, 21  212:21
214:8  217:17
219:2  230:20, 21
fists  72:15
Fitness  27:17  29:20
31:18  34:4  35:22
36:3  45:19  46:6, 9
47:15, 16  50:14
54:19  118:5
119:14  123:7
125:11  127:3
128:7, 9  132:14
133:8  185:22
190:23  195:6
203:8  204:13, 17, 20
226:14, 19, 20
five  61:21  71:12
fix  22:20  65:24, 24
66:2
fixed  65:8
flex  36:21  205:21
flip  112:18  134:22
185:17

floating  93:22
flyers  130:20  134:2
folks  83:5  129:3
follow  24:3  154:2
155:3  229:16  230:4
following  26:24
162:5  166:25
215:13  218:6
follows  12:5
foot  117:12
football  55:10
124:5
Force  59:12
foregoing  232:5
233:6, 8, 12
forget  100:22
forgot  33:18  73:12
104:7  222:8
Form  7:11, 18, 20,
22  49:22  51:23
114:22  137:24
140:14  141:8
159:7  168:24
190:11  196:5
197:19  200:23
217:6
forms  122:5
forth  19:14  233:7
forward  49:18
forwarded  172:7, 9
forwarding  217:14
found  15:18  16:11,
13  17:12, 14, 15, 21
18:18, 21  19:12, 24,
25  20:14  21:8
22:14  23:7  30:22
65:20, 23  69:6, 9
71:9  76:6  104:7
116:17  122:11, 12,
12  123:10  189:5
four  13:13  19:7
33:16  36:6, 18
50:10  60:25  61:21
164:17
fraud  45:16  65:20,
23  69:6  71:10
104:4  105:11
160:1  162:20
167:20  189:5
192:18  195:18

209:11  216:21
229:5, 8, 9, 16
fraudulent  210:17,
23
fraudulently  157:3
192:4
freeze  101:7
frequently  207:9
Friday  19:22
161:23
friend  16:17, 18
17:16, 19  123:16
225:14, 21
friends  16:9, 16
17:16  25:19  27:8
224:2, 3, 11, 25
friend's  16:12
front  184:3  194:25
212:20
Fullerton  47:24
48:2, 14  57:2, 4
67:2  105:4  115:16
175:18  176:3, 4
179:11, 13, 14
186:24  187:3
198:16, 20  204:13
207:3
Fulton  49:1, 2, 3, 13,
18, 19  50:2, 8
169:25  170:14
172:2, 4, 8, 21, 21, 25
217:10, 14
Funding  24:16, 20
25:1  154:10, 12, 13,
21  155:5
funds  167:20
192:17
funeral  15:19, 22
16:3  19:2, 14, 20
161:25
furnished  163:12
further  65:5, 6, 7
230:13, 24  233:12,
14

< G >
garbage  227:16
GEHANE  1:22
2:24  233:23
generally  87:19

generate  50:14
133:9
generates  51:11
gentlemen  131:21
getting  47:7  48:5
80:22  96:22  99:6
106:15  152:4
221:21
ghosted  133:20
gifts  152:24  153:4
Gigi  11:25
Giovanni  222:23
223:1
girlfriend  172:6
give  29:13  38:6
40:24  41:1  77:13,
23  78:4  81:16, 17,
19  83:11, 14  84:24,
24  86:16  89:25
92:10  102:12
120:2, 3  125:23
135:15  160:24
215:8  230:9
given  75:9  120:17
gives  62:16  78:5
83:8  85:3
giving  102:6
glands  84:10, 12
Glukman  64:16, 17,
18, 19, 20, 25  65:2, 4,
9
Glukman's  63:21
64:10
go  12:14, 17  13:1
14:9  17:17  19:1, 6,
12  20:8, 18  25:24
26:1  28:19  31:12
39:4  40:18  49:2
52:20  53:10  55:12
60:16  62:25  63:5
64:7, 10, 11, 20  65:8
66:16  69:5, 25
70:22  78:3  82:12,
16  86:17  90:12
92:24  93:14
102:21  103:11, 11,
12, 16, 19, 21  104:5,
19, 23  105:2  106:9,
13  109:16  110:2
111:4  124:13
130:6, 12, 13, 20

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 81 of 139 Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1026

134:2 136:*14*
142:5 144:*24*
149:*13* 151:*11*
156:22 157:*16*
160:*17* 163:*9*
166:*21* 169:20
171:24 173:*15*
176:*21* 179:*7, 17*
182:*10* 183:*18*
184:2 185:*17, 17*
187:23 188:*18*
189:*21* 191:*18, 24*
196:*13* 197:*13*
203:*15* 206:*3, 13, 15,*
*16* 213:*11* 214:*6, 23*
215:8 218:*11*
225:*15*
**goal** 59:*19*
**goes** 17:*3, 13* 20:*4,*
*4, 5, 9, 9, 15, 15* 51:5
54:20, 21 109:*3*
184:*3*
**going** 14:*11, 14*
15:*8, 23* 18:*12*
19:*14, 16* 20:8
24:*3* 31:*3* 33:*10*
39:7 46:*19* 57:*16*
68:*13* 87:*12* 91:*19*
92:*17* 93:*12* 95:*4*
96:*11* 97:*4* 103:*1,*
*12, 16* 104:*17*
112:*24* 114:*12*
115:*3* 117:*18, 19*
121:*7, 20* 125:*3*
126:*11* 128:*10, 22,*
*24* 134:*1* 148:*14*
149:2, *4* 150:*20, 21*
151:24 152:*4*
154:2, *17* 155:*3*
160:9 164:2
169:*10* 172:8
178:*15, 17* 188:*3*
189:*18* 192:*11*
197:22 215:*3*
221:2 226:*4*
**Golden** 26:*9, 10*
**Gomez** 225:20, *21*
**gonadotropin** 98:*6*
**gonna** 117:*11, 23*
121:*9* 149:*3, 7, 8*

**Good** 11:*5* 12:*9, 10*
27:8 54:*15* 134:*16*
195:*20*
**Google** 147:*5*
**gotten** 48:*10*
184:*11* 211:*5*
**government** 106:*16*
107:*16* 113:*16*
133:*6*
**grab** 134:*17*
**Grade** 25:*11*
**Grand** 3:*16*
**Grande** 3:*18*
**green** 108:*25* 109:*8,*
*14*
**grocery** 198:*17*
**Gross** 133:*1*
**ground** 14:*10*
**GROUP** 3:*12*
**growing** 115:*8*
**guarantee** 104:*23*
**guess** 13:*3* 18:*17,*
*18* 20:2 21:*17*
23:*16* 27:*13* 31:*8,*
*17* 32:23 42:*21*
43:2 50:*3* 61:*5, 5*
62:*1* 105:*1* 128:*3*
159:6 162:25
167:8 181:*15*
199:*3* 208:*24*
220:*14*
**guessing** 126:*8*, 9
**Guillermo** 223:*18*
**guy** 53:2 84:*18, 19*
121:*15* 130:7
133:*19* 137:*14*
224:*14*
**guys** 119:*3* 122:*5*
124:*15*
**gym** 26:*1* 43:*10, 12*
46:*18, 21, 25* 47:*8,*
*10* 52:20 56:*7, 18*
82:*17* 83:*5* 88:*14*
99:*10* 118:*6*
119:22 132:*9*
134:*14* 135:*1, 3*
136:*1, 4* 140:*11*
143:20 144:*4, 7, 8*
146:22 148:*12*
151:*18, 19, 21*

225:*10, 11, 22*
**gyms** 124:*14*

**< H >**
**Habra** 66:*15*
**half** 81:*24* 82:*1*
90:20
**halfway** 55:*24*
**hamstring** 80:*16, 17*
92:5 93:*13*
**hand** 90:*19* 94:22
135:*11* 173:23
**handed** 92:*21*
108:*11* 131:*1*
204:*11* 209:*18*
**handing** 110:*13*
132:2 137:2
138:*15* 139:*21*
141:7 151:2
155:*19* 164:23
168:*10* 172:*18*
180:*15* 182:2
193:*19* 194:*19*
220:8 221:*15*
222:*6* 226:7
**handle** 31:*9, 23*
142:2
**handles** 51:*1*
**handwriting** 209:*24,*
*25* 217:*3* 219:*9*
222:*9*
**hang** 26:2 28:*11, 13*
**hanging** 28:*21*
**hangs** 19:*8, 9*
**Hansen** 25:*9*
**happen** 84:*12*
**happened** 17:*3, 10*
18:*9* 19:*25* 21:*12*
72:8 88:2 91:*11*
93:*9, 11* 94:23
103:*18* 104:*1*
114:*8, 11* 139:*8*
162:23 178:25
179:*3* 212:*13*
218:22
**happens** 113:*24*
**hard** 26:*18* 88:*3, 3*
**Hardcore** 27:*17*
29:*20* 31:*18* 34:*4*
35:22 36:*3* 45:*19*
46:*6, 9* 47:*15, 16*

50:*13* 54:*18* 112:*9,*
*10* 118:*5, 16, 19*
119:*14* 123:7
125:*11* 127:2
128:*7, 9* 132:*14*
133:*8* 185:22
190:22 195:*6*
203:*8* 204:*12, 17, 20*
226:*13, 19, 20*
**harm** 148:*11*
**harmed** 65:*14*
103:*6*
**Harvest** 19:*24* 20:*1*
30:*8, 10, 16*
**Haskell** 3:*7*
**Hawaii** 87:*16*
**head** 34:*7* 90:*5*
**headed** 57:*10*
**heading** 167:*11*
**health** 65:*14* 72:8
74:*11* 92:*15*
**hear** 17:*8* 68:*10, 14*
149:*11* 189:*18*
**heard** 63:6 68:*16*
84:*7* 98:*5* 126:*4*
189:22 190:*17*
191:*14, 18, 21* 216:*1*
219:*19*
**HEG** 98:2, *3*
**held** 33:*21*
**help** 22:23 23:8
33:*10* 52:22 73:*19*
74:20 84:*14*
**helped** 29:*20* 32:24
34:*17* 41:2, *4*
124:*13* 133:20
**helping** 90:*25*
**helps** 69:*9*
**hereto** 92:20 94:2
95:*13* 97:8 99:*16*
108:*10* 110:*12*
113:*4* 130:25
132:*1* 134:*21*
137:*1* 138:*14*
139:20 141:6
149:*19* 151:*1*
155:*18* 164:22
168:9 170:*18*
172:*17* 180:*14*
182:*1* 193:*18*
194:*18* 202:*4*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 82 of 139 Page ID #:1627
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

204:*10* 205:*6* 206:*6* 209:*17* 212:*3* 215:*11*, *17* 216:*16* 220:*7* 221:*14* 222:*5* 228:*9* 232:*7*
**hereto.** 226:*11*
**herpes** 62:*16*
**Hfcfitness57@G-mail .com** 55:*8*
**hiding** 30:*20*
**high** 25:*24* 26:*3* 55:*10*, *12*, *13* 101:*15* 134:*3* 224:*7*
**higher** 149:*13*
**highlighted** 202:*15*
**highlighting** 201:*17*, *24*
**Hills** 77:*9*
**hire** 128:*23*
**hired** 64:*5*
**hold** 16:*7* 127:*8* 130:*8* 171:*10*
**holding** 213:*15*
**holidays** 152:*24* 153:*4*
**home** 48:*10*, *11* 77:*15*, *16*
**honest** 94:*15* 159:*24* 229:*14*
**honestly** 16:*4* 39:*13* 40:*13* 43:*25* 50:*15* 71:*17* 102:*5* 122:*15* 125:*14* 163:*23* 169:*13* 174:*23* 179:*9* 187:*14* 189:*24* 191:*3*
**hopefully** 151:*11* 198:*3* 226:*15*
**Hormone** 6:*10* 70:*17*, *19*, *20* 73:*25* 74:*4* 86:*9* 91:*14*, *20*, *22* 92:*3* 99:*3*
**hospital** 63:*11*
**hosted** 130:*10*
**Hotmail** 55:*19*
**hour** 71:*13*
**Hourash** 17:*19* 18:*4*, *5*, *6*, *8* 224:*1*, *7*
**hours** 65:*16*

**house** 19:*7*, *15*, *16*, *17* 30:*22*, *23*, *25* 31:*3* 52:*16* 111:*4* 147:*12* 195:*10*, *17*
**Human** 98:*5*
**hundred** 146:*3* 174:*19*
**hung** 15:*11* 27:*7*
**Huntington** 26:*11*, *13*, *14*
**hurt** 93:*21*
**hurting** 73:*24*

**< I >**
**I.D** 31:*8*
**I-130** 103:*10* 106:*10* 109:*25*
**I-797** 6:*22* 7:*7*
**idea** 20:*20* 24:*19* 50:*7* 102:*5* 117:*8* 135:*18* 140:*5* 156:*21* 204:*4*
**identically** 194:*23*
**identification** 92:*19* 94:*1* 95:*12* 97:*7* 99:*15* 108:*9* 110:*11* 113:*3* 130:*24* 131:*25* 134:*20* 136:*25* 138:*13* 139:*19* 141:*5* 149:*18* 150:*25* 155:*17* 164:*21* 168:*8* 170:*17* 172:*16* 180:*13* 181:*25* 193:*17* 194:*17* 202:*3* 204:*9* 205:*5* 206:*5* 209:*16* 212:*2* 215:*10*, *16* 216:*15* 220:*6* 221:*13* 222:*4* 226:*10* 228:*8*
**IDENTIFIED** 6:*4* 7:*2* 8:*2* 9:*2* 10:*2* 190:*22* 191:*15* 210:*15*, *17*
**identify** 129:*8* 166:*7* 191:*21*
**Identity** 10:*12* 166:*9*, *18* 167:*4*

201:*14* 228:*4* 229:*5*, *8*
**illegal** 106:*6*
**illegally** 106:*1* 109:*13*
**immediately** 162:*2*
**immigration** 103:*7* 104:*22*
**impact** 86:*8* 87:*22*, *25* 99:*3* 104:*2*
**important** 14:*10* 230:*3*
**improve** 98:*13*
**inability** 69:*16*
**inaccurate** 163:*12* 164:*5*
**inaudible** 17:*4*, *6*, *10* 41:*6* 85:*1* 114:*2* 121:*5* 224:*13*
**incident** 65:*16* 153:*10*
**income** 112:*4* 118:*18* 128:*2*, *6* 133:*5* 137:*4* 138:*17* 141:*1*, *24* 142:*3*
**Incorporated** 124:*20*
**increase** 142:*10*, *11*, *13*, *18* 145:*5* 150:*1*, *6*, *12* 151:*8*
**increased** 142:*20*
**incurred** 88:*22* 146:*2* 211:*23*
**indicates** 108:*21*
**indication** 141:*18*
**individual** 103:*2* 137:*4*
**individuals** 129:*8*
**INFORMATION** 1:*8* 2:*9* 64:*4* 110:*24* 111:*14*, *15* 125:*23* 127:*2*, *22* 132:*7* 152:*8* 163:*13* 164:*4* 221:*7* 229:*3* 230:*5*
**ingredients** 85:*7*
**initialed** 232:*7*
**initiate** 229:*16*
**initiated** 201:*19*, *19* 209:*6* 228:*20*

**inject** 101:*7*
**injured** 26:*23* 61:*2*
**injury** 90:*20*
**ink** 232:*7*
**Instagram** 31:*4*, *6*, *9*, *19* 42:*25* 43:*1*, *9* 130:*20*
**instance** 228:*18*
**instances** 159:*22*
**instructed** 155:*2*
**instruction** 24:*4* 154:*3* 155:*3*
**Instructions** 6:*18*
**insurance** 46:*18*, *19*, *21*, *23* 90:*21* 92:*15* 143:*20* 144:*8*, *9*, *11*, *14* 145:*18* 146:*2*, *9*, *20*, *22*, *25* 147:*4*, *5*, *8* 197:*24* 198:*11*
**interaction** 41:*16*, *22*
**interest** 35:*5* 146:*17*, *18* 148:*22*
**interested** 11:*8* 99:*7* 233:*15*
**INTERNATIONAL** 1:*23* 11:*7*, *25*
**Interrogatories** 8:*13* 165:*1*, *4*
**interrogatory** 166:*7* 167:*6* 169:*22* 192:*17* 201:*12*
**interrupted** 222:*25*
**interview** 109:*22*
**introduce** 11:*18*
**inventory** 76:*6*
**invest** 117:*18*, *20* 122:*1* 123:*13* 125:*4*, *4* 126:*12*
**investigating** 161:*7*
**investigation** 229:*1*, *4*
**investment** 117:*23* 121:*4*, *14* 122:*7* 126:*15*
**invite** 174:*16*
**involved** 82:*4* 87:*9*
**involvement** 153:*16*
**IPhone** 42:*20*, *20*, *22*
**Irrelevant** 196:*6*
**IRS** 137:*24* 138:*2*

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

139:*15*  140:*13*
**I-S**  45:*24*
**issue**  14:*19*  96:*11*
**issues**  96:*22*
**its**  229:*1*

**< J >**
**January**  10:*10, 17*
*136:7*  158:*4*
*169:23*  198:2, *8*
*221:25*  227:*23*
*229:13, 25*  230:*10*
**Japanese**  175:*25*
**Jasmine**  215:*22*
**JAY**  3:*4, 5*  11:*20*
*23:10, 11*
**Jimenez**  25:*17*
**J-I-M-E-N-E-Z**
*25:18*
**Jitsu**  128:*23, 25*
*129:1*
**Jiu**  128:*23, 25*
*129:1*
**JOB**  1:*23*  56:*24*
**Jo'el**  224:*16*
**join**  231:*2*
**joint**  32:*16, 18*  33:2,
*10, 17, 23*  38:5, *8*
*171:13*
**jointly**  33:*21*
*171:10*
**Juan**  189:*15*  191:*15*
**July**  8:*20*  113:*11,
13, 19*  157:*25*  158:*4*
*162:17, 23*  172:*22*
*173:4, 15, 17, 18, 21*
*174:1, 17*  178:*21*
*179:1*  183:*3, 19*
*184:2, 5*  185:*6, 11*
*186:20*  187:*4, 12*
*188:17, 22*  213:*1*
**jump**  55:*22*
**June**  9:*12*  27:*20,
25*  96:*5*  183:*21, 24*
*185:22*

**< K >**
**KAZEROUNI**  3:*12*
**keep**  25:*16*  38:*25*
*39:1*  52:*18*  62:*1*
*76:23*  82:*17*  95:*1*

102:*9*  112:*24*
*136:11, 17*  152:*4*
*188:16*  195:*25*
**keeps**  178:*12*
**kept**  15:*3, 4, 7*
*19:14, 15*  22:*21*
*23:7*  25:*21*  30:*22*
*41:20*  65:*25*  66:2,
3*  71:*18, 18*  88:*9*
*93:23*  102:*24*  160:*8*
**Kesler**  79:*13, 22, 24*
*80:7, 10*
**Kesler's**  79:*10*  80:*4,
5*
**KESx**  1:*7*  2:*8*
**kick**  59:*15, 17*
*151:25*
**kickboxing**  128:*24*
**kids**  16:*10*  128:*17,
18, 25*  129:*5*
**Kim**  22:*25*  23:*3, 5*
*40:5*  43:*6*  44:*5, 5,
8*  57:*20*  58:*5, 22*
*67:19*  87:*19*
*140:22*  225:*15*
**Kim's**  40:*2*  225:*17*
**kind**  12:*17*  13:*4*
*25:15*  27:2, *3*  30:*2*
*31:22*  40:*15, 19*
*42:19*  44:*19*  50:*10*
*55:9*  59:*14*  62:*5*
*76:6, 15*  77:*3*  79:*5*
*80:22*  83:*11*  85:*18,
25*  88:*1, 4, 12*  91:*20*
*98:19, 20*  104:*8*
*117:25*  124:*3, 15*
*125:5*  130:*17*
*133:9*  136:*17*
*142:11, 15, 19*
*144:24*  146:*14*
*151:23*  170:*20*
*209:24*  212:*19*
*224:18*
**King**  59:*12*  82:*7*
**knew**  20:*23, 24*
*22:15, 16*  33:*8*
*65:12*  67:*20*  93:*8*
*121:21, 21*  209:*9*
**knocking**  30:*22*
**know**  12:*17, 19*
*14:18*  15:*18, 24*

16:*10, 13*  17:*4, 13,
15, 21, 21*  18:*15*
*20:8, 21*  21:*22, 24,
25*  22:*9, 14, 16*
*24:14, 16, 21*  27:*12*
*29:8*  30:5, *5, 6, 7*
*31:20, 21*  32:*3, 12*
*33:4, 13, 18*  35:*7, 10,
15, 20*  36:*6, 25*  38:*7,
7, 17*  39:*2*  40:*18*
*41:2, 16, 17*  42:*15*
*43:15, 25*  44:*5, 11,
12, 21*  46:*14*  47:*9,
23*  48:*17, 24*  50:*15,
15*  51:*20*  53:*7*
*56:8, 23*  58:*2, 25*
*59:2, 3*  62:*10, 11, 15*
*63:4, 20*  64:*19, 23*
*65:17, 24*  66:*7, 19*
*67:4*  68:*1, 16, 23*
*69:22, 23*  70:*9, 13*
*71:12*  72:*13*  73:*18*
*75:19*  76:*16*  77:*3*
*78:7*  79:*6, 23, 24*
*80:8, 9*  82:*5*  83:*22,
24*  84:*3, 4*  85:*7*
*86:8, 11*  87:*4, 11*
*88:9*  89:*2, 5, 6, 22,
23*  91:*6*  93:*1*
*94:15, 16*  95:*18, 20,
23*  96:*2, 3, 4, 21*
*97:3, 14, 17*  98:*2, 3,
8, 10, 12, 21*  100:*2, 5,
13, 16*  101:*6, 12*
*102:15*  104:*1, 11, 13,
16*  106:*4, 17, 18, 18,
25*  107:*12, 19, 21*
*108:4, 12, 16*  109:*5,
9, 10*  110:*8, 9, 14*
*112:23*  116:*22, 25*
*118:2, 7, 10, 12*
*119:6, 12*  121:*15*
*122:6, 15, 16*  123:*8*
*125:2, 3, 6, 14, 15, 16,
22, 25, 25*  126:*2, 3, 8*
*127:5, 13, 25*  128:*2,
13*  129:*13*  132:*21,
22*  134:*10, 23*
*135:10, 10, 17, 18*
*136:8, 10, 15, 20*
*137:22, 23, 25*  138:*3,

3, 4, 4, 5, 10, 24*
*139:10, 13, 14, 16, 17*
*140:8, 15, 17, 23*
*141:2*  142:*1, 4, 19*
*143:1, 2*  144:*15, 16*
*146:3, 11, 16*  147:*1,
2, 23, 23*  148:*5, 5, 6,
9, 18, 23*  149:*5*
*150:23*  152:*3, 15*
*153:2, 9, 10, 18*
*154:16*  155:*10, 13*
*156:4, 17, 18, 20*
*157:22, 23*  158:*20,
20*  159:*2, 8, 8, 9, 16,
20, 24*  160:*2, 16, 23,
24*  161:*4, 5, 5*
*162:21, 22, 22*  163:*8,
16, 23*  164:*10, 19*
*165:1*  167:*16, 23*
*168:15, 19*  169:*17*
*171:4, 5*  172:*23, 24*
*173:2, 5, 11, 12*
*175:4, 5, 6, 14, 14, 15,
16*  176:*2, 9, 17*
*177:2*  179:*6, 9*
*180:18*  181:*5, 5, 15,
23*  182:*17, 21*  184:*8,
14, 15*  185:*5, 10*
*186:6*  187:*14*
*188:6, 14, 25*  189:*12,
24*  190:*2, 25*  191:*3,
13*  192:*1, 5, 8, 10, 20,
20*  193:*1, 2, 7, 7, 11*
*194:3, 4, 6, 10*
*195:21*  196:*8, 10, 16,
17, 18*  197:*2, 13, 21*
*198:16*  199:*2, 6*
*200:9, 15, 24*  201:*13*
*202:12*  203:*6, 10*
*206:22, 23*  207:*19,
22*  208:*7, 14, 18, 20*
*212:12*  213:*23*
*214:4, 21*  217:*15*
*221:19*  222:*13, 16,
21*  223:*1, 20, 24*
*224:7*  225:*1, 18, 19,
23, 24*  227:*3, 19*
*229:20, 23*  230:*11*
**knowing**  41:*16*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 84 of 139 Page ID #:1029
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**knowledge** 188:*24*
191:*5* 200:*1, 8*
209:*5, 7* 214:*3*
**known** 16:*9, 9* 58:*5*
119:*9* 123:*16, 20*
225:*2*
**knows** 224:*8*
**knuckle** 90:*20*

**< L >**
**L.A** 58:*6, 9, 10, 11,*
*14* 225:*2*
**La** 66:*15, 19, 21, 24*
67:*1, 2*
**L-A** 66:*22*
**lab** 6:*7, 13, 20*
**Laboratory** 6:*7, 12*
**lack** 73:*23* 188:*24*
200:*1* 214:*3*
**Lacks** 191:*5*
**land** 198:*3*
**landline** 54:*18*
**landlord** 50:2, *5*
115:*19* 116:*24*
123:*10*
**Lang** 223:*18, 23, 25*
**larger** 128:*16* 129:*4*
**late** 229:*13*
**latest** 194:*25*
**LAW** 3:*4, 6, 12, 14*
4:*4, 6* 106:*4* 107:*2,*
*4* 114:*1, 4, 5, 11*
**lawsuit** 89:*2* 115:*7*
154:*15, 17* 155:*11*
164:*13*
**lawyer** 13:*15* 23:*5,*
*7, 13, 15* 103:*18, 23*
104:*25* 155:*2*
**lawyers** 135:*11, 16,*
*19* 152:*6* 157:*21*
158:*24* 165:*5*
166:*13* 222:*12, 15*
228:*12*
**lawyer's** 154:*2*
**lazy** 88:*13*
**Lazzarinetti** 222:*23*
223:*2*
**league** 59:*10*
**learn** 21:2 125:*19*
132:*7*

**lease** 116:*6, 7, 8*
121:*8, 9* 123:*7*
**leasing** 121:*9*
**leave** 41:*15* 56:*14*
103:*20* 108:*3*
109:*19* 110:*3*
114:*3* 184:*16*
185:*7* 187:*18*
**leaving** 106:*5, 20*
**led** 15:*1*
**left** 56:*14, 23* 105:*5*
110:*4* 173:*23*
188:*12* 191:*9*
**left-hand** 111:*19*
112:*18*
**Legal** 89:*19* 97:*22*
110:*1* 187:*15*
199:*25* 200:*7*
**legally** 104:*20*
108:*19* 109:*17, 25*
110:*5*
**legs** 95:*5*
**lend** 29:*4, 16*
**lent** 29:*2, 18* 120:*15*
**Letter** 8:*20* 9:*12,*
*18* 10:*6, 10, 17*
23:*24* 103:*11*
157:*25* 162:*17*
204:*12* 205:*1*
219:*25* 220:*2, 14, 17*
228:*2* 229:*12*
**letters** 23:*17, 18*
221:*24* 222:*2*
227:*22* 229:*25*
**level** 75:*20* 100:*16,*
*20*
**levels** 73:*16, 19, 20*
86:*9* 91:*14* 99:*3*
101:*14*
**Lewis** 130:*11*
**LFA** 59:*12*
**liaison** 229:*9*
**license** 13:*6*
**lie** 122:*2*
**LIERA** 1:*5, 16* 2:*5,*
*20* 5:*6* 6:*2* 12:*3,*
*13, 15, 19* 13:*2, 6, 7*
31:*17* 47:*12* 48:*1*
49:*6, 8, 8* 54:*2, 3*
56:*3, 5, 6* 57:*5, 19*

66:*9* 215:*20* 219:*6*
226:*7* 232:*4, 16*
**Liera's** 8:*10*
**life** 25:*16* 87:*19*
88:*1* 155:*12* 185:*11*
**liked** 122:*13*
**likes** 32:*23*
**limit** 142:*22* 150:*1*
152:*18*
**line** 21:*25* 34:*23*
35:*1, 3* 162:*12, 25*
164:*3* 167:*17, 20, 22*
168:*1, 5, 22* 169:*7*
171:*25* 174:*8, 11, 14*
177:*5, 12, 14, 23*
179:*1* 184:*12, 13*
185:*6* 187:*13*
189:*3, 10* 191:*22, 25*
192:*4, 18, 19, 21*
193:*5, 6, 8, 9* 199:*16,*
*24* 200:*2, 6, 12*
228:*20*
**lines** 21:*21* 157:*3*
167:*11* 200:*18, 19*
201:*3*
**link** 100:*23*
**liquid** 86:*19*
**list** 62:*12* 106:*12*
110:*2* 157:*6, 14*
175:*10* 210:*10*
224:*10*
**listed** 98:*11* 180:*2*
199:*16* 201:*3*
206:*18* 208:*9*
210:*14, 16*
**listened** 228:*22*
**lists** 40:*19* 179:*20*
**litigation** 157:*10*
**little** 13:*10* 55:*4*
74:*22* 76:*23* 80:*23*
85:*20* 88:*5* 146:*17*
149:*13* 169:*11*
199:*19* 214:*23*
223:*22* 224:*20, 22,*
*23* 225:*19, 24*
**live** 28:*22* 48:*13, 15*
49:*14* 66:*14, 15*
179:*15* 185:*10*
**lived** 48:*16, 21, 24*
49:*3* 169:*23, 25*

170:*6, 6, 14*
**liver** 100:*7*
**living** 169:*16*
170:*10* 172:*4, 5, 21*
**LLC** 1:*8, 23* 2:*9*
123:*7* 125:*11*
**Loan** 10:*15* 20:*23,*
*24, 25* 21:*1* 22:*16*
118:*4, 10* 126:*17*
150:*11* 226:*13*
**loans** 15:*18, 21, 25*
16:*1* 18:*24* 21:*20*
66:*6* 129:*18, 25*
157:*2*
**located** 57:*1* 116:*13*
**locations** 115:*11*
**locking** 93:*23*
**log** 71:*19*
**logo** 99:*12* 120:*4*
**LOKER** 3:*13*
**long** 23:*1* 29:*9, 10*
53:*21* 58:*5, 25*
60:*18* 62:*11* 68:*16*
71:*7, 9, 11* 95:*7*
119:*9* 122:*14*
161:*16* 222:*19*
**longer** 61:*2*
**look** 19:*6* 22:*23*
43:*16* 78:*7* 108:*14*
119:*18* 122:*10*
136:*15* 147:*4*
156:*12* 161:*16*
171:*16* 174:*7, 16*
176:*21* 192:*22*
196:*11* 197:*13, 21*
198:*7* 199:*15*
203:*16* 207:*2, 11*
217:*2*
**looked** 18:*21* 19:*5*
20:*2* 135:*7* 142:*5*
181:*19* 184:*18*
194:*23* 195:*12, 15*
**looking** 16:*14* 19:*4*
20:*2* 120:*8* 122:*8,*
*9* 123:*12* 126:*20*
132:*25* 148:*19*
161:*14* 162:*2*
**looks** 180:*25* 181:*4*
183:*2* 184:*22, 23*
194:*3*

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Samuel S. Soria a/k/a Samuel Soria Liera vs. US Bank (N.A.), et al.

lose 81:15 82:2
83:6 207:18
losing 81:19, 23
lost 15:5 134:10, 12
212:8 213:6
lot 28:14 43:18
50:16 58:2 73:23
75:11 91:2 93:14
143:13 182:17, 18
Lou 224:12
loud 166:2
Lous 123:22, 24
L-O-U-S 123:25
low 73:21 75:10
lower 151:11
211:10
lowering 219:20
lowers 73:22
Luis 225:20, 21
lunch 187:23

< M >
M-A 66:22
machine 233:10
Macy's 152:16, 17,
23
mad 20:17 74:22
mail 47:5, 6, 7, 10
48:3 49:18, 25
50:1 77:17, 18
90:18 172:7, 9
204:19 217:13, 14
221:3, 21 227:15
mailed 173:7
mailing 221:3
making 146:18
156:8 175:12
177:16 178:13
181:22 185:5, 11, 18
186:19 197:7
203:23 230:5
male 97:16
man 46:4, 5 79:7, 8
Management 95:21
manager 21:15
58:1 224:18
March 93:3 136:8
192:6 202:14
203:1, 3 213:12, 13
214:7, 12, 16
mark 202:17

marked 92:18, 22
93:25 95:11 97:6
99:14, 17 108:8, 11
110:10, 13 111:19
112:3 113:2
130:23 131:1, 24
132:2 134:19
136:24 137:2
138:12, 15 139:18,
21 141:4, 7 149:17,
21 150:24 151:2
155:16, 19 164:20,
23 168:7, 10 170:16
172:15, 18 173:18
180:12, 15 181:24
182:2 193:16, 19
194:16, 19 202:2
204:8, 11 205:4
206:4 209:15, 18
210:10 212:1
215:9, 15 216:14, 17
218:15 220:5, 8
221:12, 15 222:3, 6
226:7, 9, 15 228:6, 7
marriage 110:1
married 23:1 40:1,
5 105:1, 3, 4 106:10
108:19 109:25
Martial 46:24
144:12, 13 146:20,
22 147:4, 5
Martin 52:25
137:14 140:2, 3, 6, 9
Martinez 53:1
Mas 123:14 124:17,
25 125:2, 13, 16, 21,
24 126:2, 5, 11
M-A-S 124:18
matches 181:12
183:14 207:15
Math 26:17
matter 14:2, 7
MATTHEW 3:13
Max 83:13 84:21,
23 85:2 86:16, 17
99:7
maximum 61:5
mean 17:4 20:3, 6
40:15 51:10 59:15
68:6 78:5 80:7
81:14 82:5 83:7

86:3 89:15, 25
91:4, 7 94:9, 9
100:1 114:17
118:3 121:14
123:6 127:16
139:6 140:18, 24
143:14, 16 144:3
153:19 155:8
159:3 160:3 161:5,
9 171:6 174:16
179:10 181:16, 21
185:9 187:10, 10, 16
189:13 191:11
192:2 193:13
195:19, 21, 22
196:22 197:3, 12
200:4 207:20, 24
208:21 221:2
means 31:3 35:10
94:14 95:16 109:5
118:12 127:13
meant 57:20
Medical 6:6, 12, 15
61:13 63:19 64:2,
8 69:12 72:11
79:15, 19 82:6
88:22 89:3, 16
medicals 61:11, 12
62:7 63:1 82:8, 12
medication 27:1
73:5, 13 97:12
101:17, 18, 19
medications 91:6
97:13
meet 13:15 19:11
25:6 123:21
meeting 124:12
melatonin 69:10
memory 32:6
170:6, 10 220:16
Mendoza 53:1
mental 74:11
mention 58:12 87:1
mentioned 15:21
17:24 64:15 71:8
76:8
merchant 185:19
Meredith 103:24
107:4 111:3, 15
Meridan 56:14

Meridian 56:9, 24
57:1, 24 58:3, 20, 22
59:1, 4
MESA 1:17 2:22
11:1, 12
messed 26:25
met 13:20, 23 14:1
25:3 58:6 123:22
225:14
methods 50:20
Mexico 13:3
103:11, 16 104:3, 5,
18, 19, 23 105:19
106:9 109:16 110:3
M-I 66:25
middle 25:24
millimeter 83:23
mind 57:11
mine 21:22 165:15
minimum 149:2, 3,
7, 9
Minneapolis 4:9
Minnesota 4:9
minute 72:14
169:20
minutes 71:12, 12
Mirada 66:19, 21,
24 67:1, 3
M-I-R-A-D-A 66:25
misleading 164:6
missing 136:7
misstates 167:5
184:6 201:1 202:7
221:10 227:10, 18
229:19
mistake 192:13
misunderstood
161:10
MMA 57:5 59:6
61:6 62:8 83:16
87:9 90:8 91:14
98:12, 17
mobile 42:11, 14
43:14 44:3 54:10
194:12, 14 197:5, 7
mom 67:14
moment 114:6
mom's 67:9
Monday 15:4
money 20:20 21:17
23:18 24:9, 22, 25

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 86 of 139 Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1631

29:2, 4, 16, 18  32:22, 23  33:3, 6, 10, 14 35:3, 8, 18  61:9, 10 62:2  81:17, 19 84:24  91:2, 9 120:2, 15, 17  133:9 143:24  145:10, 13, 16  148:14, 18  150:7, 13  159:19, 23  160:5, 8, 14  161:2, 12, 20 163:2  181:11 184:12, 13  187:16, 17  188:19  196:1

**monitor** 11:11

**Montero** 225:13

**month** 16:2  28:17 30:12  50:23  72:2 82:16  86:5, 5 117:14  121:2 132:13, 14  136:21, 22  146:13  147:25 148:25  149:1 171:19  174:20 186:11

**monthly** 43:16 50:23  145:20 148:24

**months** 61:22  62:3, 14  156:2, 3  173:14

**month-to-month** 116:9, 10

**mood** 71:2  88:13 133:23

**morning** 11:5  12:9, 10  13:17  21:6 194:11  195:5 202:5  211:4

**motivation** 134:10, 12

**Motor** 198:9

**mouth** 78:8  178:14

**move** 115:11 116:11  119:1 134:13  163:5 172:2  203:12 211:14

**moved** 48:18  49:13, 16  50:7, 10  172:13, 25

**moving** 49:22

**MRI** 61:15

**multiple** 157:2

**Muscle** 83:13 84:21, 23  85:3 86:16, 17  99:7

< N >

**N.A** 1:8  2:8

**N-A** 66:23

**name** 11:6, 13 12:11, 12, 14, 17, 19 13:3  16:12, 21 18:6  22:24  24:12 31:16, 19  40:2 46:12  51:6  53:6 56:3  63:4, 4, 13, 17 64:15, 18  69:21 70:8  73:13  84:25 95:25  103:23 107:2, 3  111:12, 16 115:21  121:6, 10 122:24, 25  123:1, 5, 7  127:8  137:10 140:3  141:11, 12 144:13  155:8 157:4  167:17 169:11  171:7, 22 173:19  174:4 189:12  209:1 219:6  223:1, 8, 10 226:13  233:18

**named** 23:13 189:15  215:22

**names** 17:18, 24 33:5  49:5  54:4 66:8  171:18

**National** 11:23 24:16, 20  25:1 154:10, 12, 13, 20 155:5

**natural** 97:15, 16

**nature** 117:22 124:11  128:15 143:12

**need** 17:5  20:4 35:3, 7  52:4  83:14 91:8  149:15 178:15, 17  214:23 231:4, 10

**needed** 27:21  91:8 103:13, 16  129:3

**negative** 163:12 184:17  185:8 187:17  188:8, 13

**negatively** 187:18

**neighborhood** 130:21  134:4

**Neither** 131:21 233:14

**nervous** 230:22

**netting** 60:8

**network** 133:1

**never** 15:17, 24 28:21  29:24, 25 43:13, 21  45:7, 10 74:13  77:11  83:15 86:12  90:15, 18 104:21  106:19 110:6  123:4  124:9 127:18, 20  172:9 174:18  184:13, 16 185:7, 8  187:14, 16, 17  188:7, 12, 12, 15, 15  189:13  194:12, 14  195:15  200:19 209:9, 23  210:25 211:1, 5, 8, 9, 21 219:10, 17  227:4, 5, 13

**new** 39:17  57:11 115:11  130:9 142:11  152:11, 14

**night** 19:5, 13 65:25  66:3  71:4, 5, 6  74:23

**nights** 71:8

**nine** 88:7

**No:8:17-cv** 1:7

**NOC** 56:19  57:3 58:12, 13

**normal** 73:17

**North** 47:21, 23 48:14  115:14, 16 204:13

**nose** 78:8

**notary** 11:6

**note** 103:16

**NOTED** 231:14 232:7

**Notice** 6:22  7:7 8:4, 6

**notices** 204:5

**notifying** 157:25

**NOVEMBER** 1:18 2:23  5:3  11:1, 10 169:12, 16  170:7, 11, 23  171:6, 20  179:18, 22  180:3

**Number** 3:8  6:4 7:2  8:2  9:2  10:2 11:16  14:11  32:3, 5, 7, 8, 9  33:19 46:14  54:8, 11, 21, 23  55:11  67:6, 9, 14 91:5  106:22, 23 146:12  156:1 158:7  160:25 166:7, 7  167:13, 16 169:3, 22  181:12 183:9, 12, 14  185:17 190:6  193:23, 25 196:19  202:24 206:18  212:21 213:2, 18  215:7, 8 219:7

**numbered** 168:21

**numbers** 13:13 34:8  51:19  54:15 137:11  141:12 149:24  183:15 185:25  190:14 196:18

**nutrition** 124:7, 9, 10

**nutritional** 83:10 98:20

**Nuys** 3:9

< O >

**o0o** 11:3

**oath** 12:4  165:24 192:16  233:9

**Object** 114:22 196:5

**Objection** 23:21 24:1  33:11  88:24 89:10, 18  90:1 91:16  128:11 135:13  153:23 154:24  160:15 163:3  168:24 173:8  182:13

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 87 of 139 Page ID #:1632
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

184:6  185:2
186:16, 21  187:15
188:23  190:3, 11
191:4  197:10, 19
199:25  200:7, 13, 23
202:7  208:5
212:16  214:2
217:21  219:16
220:24  221:10
227:9, 17  229:18
230:6
**objections**  166:13
178:16
**objective**  177:18
**obviously**  130:1
**OC**  125:11
**occasions**  212:9
**OCCU**  143:12, 14
148:11  151:10, 16
**occurred**  207:24
**occurrence**  62:19
**o'clock**  19:13
**octagon**  60:4, 5, 6
**offer**  99:11  191:1
**office**  49:21  77:6,
10, 11  79:9, 10  80:1,
2, 3  107:2  149:24
221:3  225:15, 16, 17
**OFFICES**  3:4  4:4
107:4  126:1
**Oh**  19:11  40:2
49:19  54:23  55:5
57:25  66:19  82:1
97:17  111:7
137:17  166:3
171:22  179:14
180:1  182:9  195:3
205:13, 15  223:14
224:7
**okay**  13:8, 8, 12, 15,
23  14:6, 9, 13, 20, 21,
25  15:13, 20  16:5
18:4, 8, 20  20:11
21:7, 12, 18  23:3, 5
24:11, 20, 22  25:3, 6,
15  26:8, 14  27:9, 17,
24  28:7, 10, 18
30:15, 21  31:14, 22,
25  32:10, 16, 19, 24
33:4, 9, 14, 16, 20, 23
34:3, 15, 19, 22  35:7,

21  36:9, 21  37:1, 5,
11, 15, 18, 25  38:6,
10, 14, 17  39:4, 10,
18  40:4, 11, 17
41:12, 15, 18  42:7,
25  43:3, 9, 23  44:1,
8, 15, 18  45:25  46:4,
25  47:5, 10, 14, 20
48:8, 10, 13, 23  49:9
50:2, 13, 18, 20  51:7,
14, 19, 23  52:5, 11,
17, 22  53:16, 18, 21
54:2, 23  55:12, 21
56:1, 1, 6, 17  57:25
58:5, 14, 16  59:1, 6
60:8, 18, 24  64:7
66:8  67:4, 6, 10, 12
68:2, 17, 24  69:4, 12,
15  71:14, 16, 23
72:7, 17, 21, 24  73:8
74:16, 18  75:13, 19
76:10  77:3, 10, 15,
20, 23  78:7, 12, 21
79:2, 5, 13  80:10, 14,
17, 17  81:1  82:1, 19
83:7  84:8, 19  85:7
86:14  87:13, 21
88:16, 19, 21  90:7,
11, 18  91:10, 18, 25
92:10, 15, 24  93:2, 5,
11, 21, 24  94:8, 11,
14, 17, 23  95:10
96:13, 17, 25  97:13,
25  98:11, 23  100:10
101:2, 6  102:4, 6, 14,
18, 18, 22  103:14, 25
104:17  105:13, 18,
23  106:8, 15, 22
107:11, 18  108:7
109:7  110:9
111:14, 24  112:11,
17, 23  113:10
114:24  115:10, 25
116:10, 16  117:11
118:7, 20  119:3, 6, 9,
11, 17  120:7  121:19,
23  122:16  123:6, 20
124:11, 22  125:5, 15
126:7, 11, 18  127:1,
9, 11, 13  129:21, 24
130:14, 17, 22  132:7,

12, 18, 25  134:17
135:7, 10, 18, 21
138:4, 11, 25  139:17
141:3, 23  142:2, 5, 8,
15  143:9, 16, 21
144:16, 21  145:5, 15
146:1, 19  148:3
149:4, 10, 16  150:4,
10, 17, 20  151:9, 12
152:13, 16, 20
154:17  155:5, 15
156:7, 12, 21  157:9,
13, 16, 23  158:9, 23
159:10, 22  160:3, 11
161:19  162:2, 16, 22,
25  163:9, 20, 25
164:17  165:4, 6, 7,
10, 16, 19, 22  166:4,
12, 20  167:5, 19
168:1, 10, 15, 20
169:10  170:3, 24
171:5, 13, 16, 22
172:7  173:13, 16
174:1, 3, 7, 16, 24
175:12  176:8, 18, 21,
25  177:5, 15, 19
178:3, 8, 11  179:6,
17  180:1, 5, 8, 11, 22
181:1, 4  182:9, 10,
23  183:3, 9, 18, 23
184:2, 4  185:9, 20
186:7  187:4, 24
189:2, 8, 14, 21, 25
190:14, 17, 25  191:9,
14, 24  192:2, 11, 23
193:15  194:7, 15
195:19  196:11, 25
197:7  198:20, 25
200:4  201:11, 16, 22
202:1, 19  203:3, 5,
14, 18  204:7, 16, 24
205:17, 18, 21  206:2,
23  207:2, 11, 15, 20
208:2, 12, 16, 24
209:10, 14  210:2, 9,
19, 21  211:4, 15, 20,
25  213:1, 17, 20
214:6  215:24
216:5, 11  217:13, 16
218:1, 3, 5, 12, 21
219:19  220:4, 16

221:5  223:17
224:6, 9, 12, 19, 24
225:18  227:21
228:12, 18  230:3, 24
231:2
**old**  25:3, 5  61:3
**oldest**  61:8
**Once**  13:25  23:16
28:12  30:9  61:19
62:2  63:9  65:11
78:22  92:1  148:8
152:25  207:10
225:12
**ones**  42:23  59:13
98:12  99:23  157:6
163:1  194:23, 24, 25
195:9
**online**  43:20, 22, 24
68:20  136:14
191:19, 24  197:13
**open**  15:16  17:18
20:15  21:16  28:2,
4  32:16  34:17
35:3  36:12, 15
38:20  47:6  64:5
116:15  161:3
164:16, 17  167:24
168:1, 4  169:11
174:14  192:24
195:11  200:2, 5
223:4
**opened**  16:11  21:3
22:12  24:12  27:14,
15, 19  34:16  35:22
39:9  42:3, 5  157:4
167:23  168:21
170:25  189:13
192:4  200:19
205:24  209:23
210:25  226:13
**opening**  33:1  169:3
185:6  193:3, 4
194:4, 8  196:23
201:7
**opens**  47:5
**Orange**  142:13, 16
143:6, 13  144:17
145:2  148:8  150:21
**order**  170:21
**ordered**  92:23  93:6,

Samuel Soria Liera - CONFIDENTIAL   11/20/2018
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

17  94:6, *18*

**organ**  96:*11*

**organization**  59:*10*
82:*11*  130:*14*
146:*20*

**organizations**  59:*11*

**organs**  96:*8*

**Osiel**  49:*8*

**O-S-I-E-L**  49:*8*

**ought**  89:*16*

**out-of-pocket**  89:*3*

**outside**  20:*13*

**overdraft**  35:*11, 13,
15*

**overdraw**  35:*10*
199:*5*

**owe**  161:*11*

**owed**  18:*18*  21:*17*
23:*18*  159:*19*  160:*8*

**ownership**  126:*16*

**owns**  125:*25*  126:2

**< P >**

**p.m**  2:*23*  188:*1, 4*
206:*8, 11*  215:*1, 4*
226:2, *5*  231:*9, 9, 14*

**pace**  88:*9*

**Pacific**  6:*12*

**pad**  169:*11*

**pads**  151:*25, 25, 25*

**page**  99:22  100:2
101:*11*  111:*18, 20*
112:*3, 17, 21*  135:*8*
137:*15*  140:*18*
141:*13*  156:22
157:*16*  164:*1, 3*
165:*7, 11, 17, 24*
166:*4, 6, 12, 16*
167:2, *10*  169:*21, 24*
170:*5, 9*  171:*17*
173:22  174:*7*
175:*7, 9*  176:22
177:*11, 22*  178:*20,
24*  179:*19, 23*
181:*13, 19*  183:*21,
23*  185:*16, 20*
192:*12, 13*  196:*12,
13, 13, 15*  198:*3, 25*
199:*15*  200:*21, 22*
201:*4*  202:*14, 17, 24*
203:*16*  205:*12, 14*

206:*17, 18*  207:*11,
12*  210:*6, 9, 21*
211:*16*  212:*21*
217:*17, 19*  218:*8, 15,
17*  219:2  226:*15*

**pages**  165:*20*  175:*9*
198:*7*  210:*14*
218:*13*  226:*15, 22*
227:*7*

**paid**  51:2  91:*9*
120:*12*  133:22
135:*25*  146:*13*
148:*1*  204:*3*  207:*1*
208:*14*  211:*21*

**pain**  27:*1*  88:*23*
89:*3*  95:*21*

**Pandora**  42:*24*

**paper**  147:*8*  205:*16*

**papers**  30:*1*  147:*7*

**paperwork**  103:*15*
105:2  106:*11*

**paragraph**  108:*14*
156:22, *23*  157:*16,
24*  163:*10, 10, 25*
164:2  229:2

**paragraphs**  156:*13*

**parents**  66:*1, 8*
67:*16*  105:*18*

**Park**  48:*16, 20*

**parole**  104:*11, 14*
106:*20*  110:*7*

**part**  82:*24*  83:*16*
118:*5, 6, 12, 16*
203:*13, 15, 23*
208:*21*  216:*7*
219:*25*

**particular**  12:*18*
26:*20*  59:*10*
136:*12*  198:*6*

**parties**  11:*9*  233:*16*

**partner**  46:*10, 11*
117:*13, 15*  125:*4*

**partners**  124:*15*

**party**  133:*1*

**pass**  114:*1, 4, 5*
116:*18*  130:*20*
134:2

**passed**  63:*6, 7, 8*
114:*11*

**password**  40:*25*
41:2, *5, 8, 12, 13, 16,
20*  44:*9, 11, 12*

**patently**  164:*5*

**Paul**  17:*19, 25*  18:*1,
8*  25:*19*  224:*6*

**pay**  20:*19*  22:22
24:*9*  31:*6*  35:*4, 5*
46:*19*  47:2  50:*16,
18, 23*  51:*7, 8*  61:*11*
62:2  82:*6, 11, 12, 16*
89:*16, 21*  90:*12, 13,
16*  91:*7, 8*  102:*21*
111:*4, 5*  120:*5, 10*
143:*19, 24*  144:*7, 9*
145:*10, 13, 17, 18, 24*
146:2, *9, 13*  147:*20*
148:*3, 8, 12, 12, 14,
16, 17, 18*  149:2, *3, 4,
7, 8, 9*  150:*8*  160:*7,
9, 14*  161:2  163:2

**paying**  82:*8*  145:*9*
186:*12*  206:*24*

**Payment**  7:*13*  35:*8*
50:*21*  133:*1*
145:*21*  148:*5, 24*
149:2, *3, 7*  202:*23*
208:*9*  209:*22*

**payments**  39:*3*
145:*19*  146:*18*
201:*18*  206:*18, 21*
207:2  208:*3*

**pays**  47:*1*  61:*12*
120:22, 23

**Pedro**  63:*16*  64:*21,
25*

**pee**  76:22

**penalty**  111:*25*
232:*5*

**people**  25:*15*  50:*16,
18, 22*  54:*24*  62:*15*
65:*8*  83:*6*  88:*4*
99:*10*  108:2  120:2
128:*23*  135:*25*

**Peps**  19:*9*

**Perez**  222:*21*

**perform**  72:*20*
78:*1*  98:*25*

**performance**  73:*1*

**period**  25:*16*  50:*11*
55:*4*  56:*12, 22*
173:*18*  195:2

**perjury**  111:*25*
232:*5*

**Perks**  36:*21*  205:22

**permission**  104:*22*
106:*15, 19*  109:*19*

**permit**  110:*17, 19*

**perse**  80:*24*  81:*7,
11, 13*

**person**  13:*20, 24*
14:2  15:*10*  30:*19*
59:*20*  108:*21*
124:*25*  125:*7, 9, 13*
126:*4*  190:*17*  223:*8*

**personal**  15:*6*  28:*6*
37:*9, 12, 14, 24*  38:*1,
10, 12, 18, 19*  188:*24*
190:*12, 16*  191:*5*
193:*14*  200:*1, 8*
214:*3*

**personally**  47:*11*

**personnel**  162:*8*

**petition**  108:*15, 20*

**petitioning**  108:*21*

**phone**  14:*6*  15:*5*
16:*5*  32:*9, 15*
42:*14, 17, 19*  43:*7,
14*  44:*3*  46:*14*
53:*9*  54:*15, 20, 22*
67:*6, 7, 13*  106:22
158:*8, 9, 10, 13, 16,
19*  159:*3, 6, 7, 8, 10,
13*  160:22, *24*  163:*1*
175:*23*  186:*13*
190:*7, 10, 14*  194:*12,
14*  214:*16*  228:22

**phonetically**  45:*22*

**physical**  61:*18*  78:*1,
4*  89:*17*  124:*7*

**pick**  160:22

**picked**  160:*23*

**pictures**  31:*11, 13*

**piece**  204:*19*  205:*16*

**pieces**  93:22

**pissed**  20:*18*

**place**  19:*9*  41:*23*
64:*12, 13*  106:*6*
123:*10*  136:*12*

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 89 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1934

152:*11*  175:*25*
233:*7*
**placed**  233:*9*
**places**  112:*12*
169:*23*  176:*18*
186:*12*
**Plaintiff**  1:*6*  2:*6*
3:*1*  8:*10*  11:*21*
156:*24*  158:*3*
163:*11*  164:*8*
209:*7*  211:*23*
**Plaintiff's**  158:*1*
209:*7*
**Plan**  7:*9*  128:*15, 17*
130:*18*  131:*3*
145:*22*  148:*16*
151:*23*
**Platinum**  212:*7*
**play**  189:*17*  214:*22*
215:*14, 24*
**played**  55:*10*  191:*2*
215:*7*
**playing**  189:*20*
191:*10*  215:*25*
216:*6*
**please**  11:*18*  12:*1,*
*11*  14:*18*  17:*7*
19:*18*  64:*14*  144:*2*
149:*10*  161:*10*
177:*17*  180:*6*
195:*1*  198:*1, 7*
206:*15*  227:*2*
229:*9*  231:*7*
**pleasure**  76:*3*
**point**  20:*21*  152:*5*
153:*19*  171:*9*
174:*4*  180:*5*  185:*9*
186:*1*  187:*11*
196:*22*
**pointed**  215:*6*
**policy**  147:*8*
**popped**  26:*23*
**portion**  123:*3*
**positive**  62:*22*
**possible**  159:*25*
185:*1*  193:*4*
212:*13*  213:*9*
220:*21*  227:*13*
**post**  31:*11*  49:*21*
221:*2*
**powder**  97:*18*

**practice**  195:*20*
227:*14*
**prasterone**  84:*2*
**precede**  165:*20*
**Precision**  6:*9*
**precursor**  83:*24*
102:*16*
**premium**  146:*15*
147:*20, 22*
**prepare**  13:*9*  52:*23*
140:*9*
**prepared**  138:*22*
139:*1, 7*  141:*18*
**prepares**  53:*18*
140:*4*
**prescribe**  73:*11*
**prescribed**  73:*8, 12*
101:*25*
**prescribing**  101:*3, 3*
**presence**  109:*8*
**present**  4:*12*  90:*15*
**President**  108:*1*
**pressure**  78:*6, 12*
**pretended**  19:*10*
**pretty**  26:*17*  60:*1*
62:*11*  79:*21*  88:*10*
96:*24*  98:*22*
**prevented**  153:*2*
**preventing**  115:*7*
123:*6*
**previous**  67:*14*
**pre-workout**  86:*19*
**primary**  63:*5*
**prior**  91:*22*  227:*3*
233:*8*
**private**  50:*17*
**privilege**  135:*13*
**privileged**  23:*21*
24:*1*  89:*10*
**probably**  13:*4*
24:*18*  25:*11*  29:*15*
30:*12*  39:*16*  41:*17*
48:*19*  53:*22*  54:*14*
68:*17*  71:*25*  73:*6*
81:*4*  86:*5*  88:*7*
91:*18*  129:*23*
148:*25*  223:*12*
**problem**  76:*11*
79:*3*  106:*8*  129:*19*
**problems**  90:*25*
**proceed**  167:*6*

**proceedings**  233:*6,*
*8, 10*
**process**  91:*14*
153:*17*
**product**  89:*11*
**products**  84:*24, 25*
85:*2*
**professional**  60:*17,*
*18*  61:*15*  69:*12*
74:*12*
**promote**  83:*4*
**promotion**  61:*12*
**promotional**  83:*12*
**prompt**  20:*11*
**prompted**  131:*13*
**pronounce**  223:*13*
**proof**  190:*25*
199:*22*  200:*5*
**proportion**  52:*6*
**proposing**  123:*2*
**protein**  83:*14*  85:*6*
86:*18*
**provide**  230:*4*
**provided**  158:*23*
201:*17*  222:*14*
**provides**  46:*23*
144:*14*  146:*20, 25*
**psychiatrist**  74:*7*
**psychologist**  74:*5*
**public**  11:*6*
**pull**  121:*17*  127:*11,*
*14*  188:*18*
**pulled**  80:*15, 17*
92:*5*  93:*13*
**pulling**  163:*17*
**punch**  59:*16, 17*
**punching**  151:*25*
**purchase**  207:*16*
**purchased**  185:*12*
**purchases**  186:*19*
198:*14*  199:*1*
**purpose**  12:*18*
77:*20*
**purposes**  13:*1*
43:*10*  121:*14*
**pursuit**  26:*19*
**put**  12:*20*  13:*4, 4*
31:*12*  35:*8*  42:*23*
43:*2*  50:*22*  51:*20*
52:*12, 14, 15*  73:*5*
83:*19*  84:*25*  88:*21*

89:*9*  97:*12, 16*
114:*1*  117:*24*
119:*3*  120:*3, 4*
121:*5, 10*  122:*25*
123:*1, 4*  140:*3*
145:*17, 21*  165:*16*
203:*12*
**puts**  43:*6*
**putting**  71:*1*  76:*23*
120:*5*  122:*23*
123:*7*  178:*13*

**< Q >**
**qualify**  129:*18, 24,*
*25*  130:*2*
**quantify**  73:*3*
**Quest**  6:*20*
**question**  14:*14, 17*
24:*4, 5*  55:*23, 25*
144:*1*  153:*24*
156:*14*  162:*12*
164:*11*  166:*22*
178:*5, 10*  189:*22*
203:*22*  218:*1*  227:*2*
**questions**  14:*12*
75:*14*  76:*7*  152:*6*
165:*5*  177:*17*
187:*22*  230:*14, 24*
**quick**  55:*22*
**Quickbooks**  44:*20*
**Quicken**  44:*19*
**quite**  17:*24*

**< R >**
**Rafa**  16:*18, 19, 23*
17:*14, 14, 21*
**Rafael**  16:*25*  18:*14,*
*17*
**RAHIMI**  3:*4, 5*  5:*9*
11:*20, 20*  13:*16, 20,*
*23*  23:*21*  24:*1, 5*
33:*11*  55:*22*  57:*10*
81:*10*  88:*24*  89:*10,*
*18*  90:*1*  91:*16*
111:*6, 8*  112:*23*
113:*1*  114:*22, 24*
128:*11*  135:*13*
149:*12, 15*  153:*23*
154:*4, 24*  160:*15*
163:*3*  164:*11*
166:*21, 24*  167:*5*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 90 of 139 Page ID #:1035
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

168:24  173:8
177:16, 20  178:4, 7,
9, 12, 17  182:13
184:6  185:2
186:16, 21  187:15,
20, 22  188:23  190:3,
11  191:4  196:5
197:10, 19  199:9, 12,
25  200:7, 13, 23
201:1  202:7  208:5
212:16  214:2
217:21  218:4
219:16  220:24
221:10  227:9, 17
229:18  230:6, 14, 17
231:3, 6
**Raigoza**  52:25  53:2
**R-A-I-G-O-Z-A**  53:4
**Ralphs**  175:20
198:15, 15, 17, 19
**Ramirez**  224:17
**Rarely**  197:15, 16
**rate**  148:22  211:10
219:21
**Raymond**  47:21, 23
48:2  115:16
116:22  204:13
**Razei**  18:5
**R-A-Z-E-I**  18:7
**reach**  154:20
**reached**  153:14
**read**  76:19  94:16
111:10  165:19
166:23, 25  188:11
201:9  204:23
218:4, 6  229:12
232:5
**reading**  68:12, 20,
22  132:8  204:24
205:1  229:1, 24
**ready**  103:19
214:23
**real**  55:22  117:17,
19  119:17, 18  120:7
**really**  13:10  27:8
31:10, 12  35:6
39:1  43:18, 21
51:9  70:25  73:24
85:11  86:7  87:5
88:15  93:13  94:21,
21  101:15  119:1, 21

122:13  133:12, 17
134:12  136:20
195:25  213:25
220:18  221:22
222:19  230:2
**reapply**  113:22
**reapproved**  114:7,
12
**reason**  33:1  39:23
43:23  70:23  92:2,
6  104:6, 17  105:17
121:7  130:1
133:16  134:8
140:3  173:3, 6
181:21  189:25
194:7  208:12, 16
213:24  227:13
**reasons**  105:13
151:15
**recall**  21:18  31:22
43:19  48:5  96:5
101:12  153:12
176:9, 14  182:20
189:14  194:4
197:2  201:12, 23
202:11  204:24
205:1  209:10
212:6  213:21
221:24  226:22
227:23  228:1, 14, 22
229:24
**receipts**  132:13
136:4, 22
**receive**  50:1  217:6
226:25
**received**  181:7
227:22  229:6
**receiving**  226:22
**receptionist**  63:21,
22  64:2
**Recess**  57:15  115:2
188:2  206:9  215:2
226:3
**recite**  190:18
**recognize**  94:3
95:10  97:9  113:6
139:22  151:3
155:20  168:11
182:3  193:20
194:20  209:19
216:18  220:9

221:16  222:7
228:10
**recollection**  139:11
157:11  213:5
215:21
**recommend**  144:25
**record**  11:6  12:12
57:13, 16  90:23
114:25  115:3
159:15, 16  166:25
177:17  187:25
188:3, 10  206:3, 7,
10  214:24, 25  215:3,
18  218:6  226:1, 4
231:8  233:10
**recorded**  162:20
**Recording**  9:22
10:4  189:17, 20, 23
190:1  191:2, 10, 12
214:22  215:7, 25
216:1, 6  228:23
**records**  158:8, 9, 10
159:6, 7, 9, 10
160:14
**rectangular**  60:4
**reenter**  104:2
106:5, 8, 20
**reference**  15:13
98:8  174:8
**referenced**  192:14
**referred**  160:21
**refers**  95:18
**reflect**  147:8
**reflected**  132:17
184:24  198:25
**reflection**  140:25
141:24
**refresh**  170:5, 10
220:16
**regarding**  127:2
163:13  228:20
**regular**  120:20
225:4
**relation**  96:21
**relationship**  27:3
119:19  124:12
**relative**  11:8  233:15
**rely**  69:11  102:11
**remember**  13:21, 22,
22  16:2, 4  19:19
23:12  29:7  30:5,

15  32:5, 6  33:16
34:7  36:18  37:7,
16  38:11  39:10, 12,
13, 14  40:1, 11, 13
41:7, 25  42:9
48:18, 21  50:5
56:23  59:13  63:13,
15, 17  65:1, 3  71:17
72:2, 4, 6, 23  73:7
75:11, 12  76:9
77:24  83:21  85:23
91:2  92:7, 13, 14
93:16, 18  95:9, 23,
25  96:10, 15, 17
97:14  106:21
119:13  131:5, 10, 11,
12, 14  135:20
142:17  143:10
144:23  152:8
155:25  159:24
163:16, 17, 19, 20, 24
169:10, 13, 17, 19
171:12  172:4
174:23  175:3
177:3  183:8  185:1,
7, 13, 14  188:8, 11
193:3, 4, 12  203:9,
11  210:19  212:14,
15  213:8, 10, 23
217:7, 8, 15  219:22,
23  220:1, 18, 20, 23
221:2, 4, 5, 19, 22, 23
222:1, 1, 2, 11, 19, 20
223:8  227:11
228:5, 17  229:14
230:2, 11, 12
**remind**  194:11
**Rene**  123:14, 15
124:23  125:1, 25
126:13
**renew**  110:19
**renewed**  107:11
113:13, 17
**rent**  50:3  115:25
116:1, 4, 5  117:1, 11
152:11, 14
**repeat**  144:1
166:22  170:8
202:22  203:22
219:9  223:9

Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 91 of 139 Page ID #:1036

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

rephrase 14:*19*
replace 108:*5*
Report 10:*8* 94:*9*
127:*17* 163:*11, 18,*
*22* 192:*3*
REPORTED 1:*22*
164:*14* 212:*8*
Reporter 2:*24*
11:*24* 12:*1* 17:*7*
19:*18* 64:*14* 92:*19*
94:*1* 95:*12* 97:*7*
99:*15* 108:*9*
110:*11* 113:*3*
130:*24* 131:*25*
134:*20* 136:*25*
138:*13* 139:*19*
141:*5* 149:*6, 10, 18*
150:*25* 155:*17*
164:*21* 167:*1*
168:*8* 170:*17*
172:*16* 180:*13*
181:*25* 193:*17*
194:*17* 202:*3, 22*
204:*9* 205:*5* 206:*5*
209:*16* 212:*2*
215:*6, 10, 13, 16*
216:*15* 218:*7*
220:*6* 221:*13*
222:*4* 223:*9*
226:*10* 228:*8*
231:*4, 10* 233:*5*
reporting 164:*5*
213:*6* 229:*4, 7*
represent 11:*19*
representation 158:*1*
requested 150:*11*
require 61:*15*
required 61:*13*
reserve 21:*21, 25*
34:*23, 25* 35:*3*
157:*3* 167:*11, 17, 20,*
*22* 168:*1, 5, 22*
169:*7* 171:*25*
174:*8, 11, 14* 177:*5,*
*12, 14, 23* 178:*25*
184:*12, 13* 185:*6*
187:*12* 189:*3, 10*
191:*22, 25* 192:*3, 18,*
*19, 21* 193:*5, 6, 8, 9*
199:*16, 23* 200:*2, 18,*

*19* 201:*3*
residence 152:*14*
respect 61:*13*
107:*19* 108:*1*
199:*3* 203:*16, 24*
209:*4* 212:*6, 7*
responded 228:*16*
responding 228:*19*
Responses 8:*12*
responsibility 164:*8*
responsible 208:*17*
result 72:*9* 96:*18*
103:*3* 166:*9*
results 6:*7, 13, 20*
76:*20, 24* 92:*12*
93:*16, 19* 94:*9, 9*
99:*20* 100:*1* 101:*13*
resume 191:*8*
return 51:*20* 52:*23*
53:*25* 137:*4* 138:*5,*
*9, 17, 22* 139:*4, 6, 25*
returning 173:*13*
208:*24*
returns 51:*17*
53:*19* 132:*4* 140:*4*
142:*4*
revenue 50:*13*
51:*11*
reverse 170:*21*
review 157:*9*
163:*22*
reviewing 163:*11*
Rewards 205:*22*
Rezai 224:*1*
rib 26:*23*
right 15:*11, 12*
16:*19* 19:*3* 22:*18*
24:*15* 25:*13* 27:*21*
30:*13* 31:*14* 33:*19*
34:*5* 35:*8* 36:*11*
37:*5, 16* 39:*18*
45:*20* 47:*24* 48:*3,*
*5* 55:*16* 57:*6* 59:*7,*
*20, 22* 62:*18* 69:*17*
74:*1* 81:*10* 82:*6*
85:*13* 88:*7, 17*
90:*5, 17* 93:*9*
94:*10* 99:*2, 4, 7, 20*
101:*4* 107:*23*
112:*4* 113:*25*
114:*19* 115:*13, 14,*

*17* 116:*5* 118:*10*
119:*2* 121:*12*
122:*3, 18* 123:*3*
125:*7, 11* 127:*14, 18*
128:*7, 19* 129:*4*
133:*2, 6, 20* 135:*5*
138:*20, 23* 140:*14*
144:*4* 145:*18*
148:*25* 150:*2*
151:*13* 153:*11*
154:*9* 156:*25*
157:*18, 21* 158:*16*
160:*5* 161:*12, 20, 23,*
*25* 162:*6, 9, 14, 17,*
*20* 163:*15* 164:*9*
165:*1* 166:*18*
167:*4, 11, 17* 168:*18,*
*21* 169:*7, 8* 171:*1, 7,*
*18, 25* 174:*5, 25*
175:*6, 7, 10, 13*
176:*19, 23* 177:*10*
179:*4, 7, 11* 180:*7*
181:*10, 14, 17* 183:*7*
184:*5, 18* 185:*11*
186:*3, 7, 9, 14, 15*
189:*11* 190:*7, 20, 23*
191:*12, 16, 19, 22*
192:*4, 7, 11, 19, 25*
193:*10, 24* 195:*4, 7,*
*23* 196:*9, 23* 197:*1,*
*8, 14* 198:*11, 23*
199:*1, 17* 200:*20*
201:*4, 7, 14, 20*
204:*16, 17* 205:*16,*
*22, 25* 206:*13*
207:*16* 209:*2, 8*
210:*3, 7, 11, 17, 23*
211:*18* 212:*24*
214:*13* 215:*5*
216:*12, 21, 25* 218:*1,*
*13, 17, 25* 219:*6, 12,*
*21* 224:*14, 14*
225:*17, 25* 226:*20*
231:*3*
right-hand 173:*23*
ring 34:*11* 35:*25*
37:*18* 38:*15*
rings 158:*15* 190:*7*
rink 60:*3*
rip 48:*9*

Rise 24:*14, 14, 17,*
*23*
risk 104:*6, 10*
Riverside 53:*17*
roles 129:*9*
rolled 26:*24*
Rosa 63:*19, 22* 64:*2*
Rosa's 63:*17*
Rose 63:*4* 64:*8, 25*
65:*2, 5, 10, 11*
roughly 191:*9*
round 80:*22, 22*
81:*2*
routine 47:*14*
row 71:*8*
rule 14:*10*
running 195:*19*

< S >
safe 17:*20*
sales 52:*1, 3, 6, 6*
Sam 12:*19* 31:*17*
47:*11, 23* 48:*1*
55:*22* 56:*3, 3, 5, 6*
125:*9* 149:*15*
Sam1.57@hotmail.co
m 55:*2*
sample 77:*12*
samples 78:*14*
SAMUEL 1:*4, 4, 16*
2:*5, 5, 20* 5:*6* 6:*2*
8:*10* 11:*13, 17, 21*
12:*3, 13, 15, 22, 24*
13:*1, 5, 6, 7* 47:*11*
54:*2, 3* 178:*4*
219:*6* 232:*4, 16*
San 63:*16* 64:*21,*
*25* 87:*16*
Sansai 175:*25*
Santa 21:*11* 41:*24*
179:*11, 15*
Saturday 15:*5* 21:*6*
162:*6*
save 32:*22, 23* 33:*3,*
*10, 13* 143:*24*
145:*13, 15* 148:*18*
saved 91:*9*
saving 145:*10*
savings 27:*23* 28:*5,*
*6* 37:*10, 13, 14, 15*
176:*25*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 92 of 139 Page ID #:2037
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

saw 30:*16*, *19* 65:*1*, *5*, *11* 70:12 71:*24*, *25* 76:12 77:*11* 78:5 80:*15* 91:*6*, *24* 92:13 94:20 101:2 155:*24* 181:*13* 218:*24* 224:22

saying 20:*12* 72:9 110:*4* 116:*18* 121:7 145:9 146:*15* 161:*11* 167:*19*

says 12:*24* 75:*25* 93:2 95:*21* 106:*4* 107:*16* 108:*15*, *20* 133:*1*, *2* 138:22 139:*1*, *3* 150:*11* 156:*23* 157:*25* 162:*16* 163:*10* 164:*2* 173:*24* 177:*23*, *25* 181:*6* 182:7 185:*21*, *23*, *25* 205:8 214:*11* 219:*6*, *7*

Scabo 155:8

S-C-A-B-O 155:9

scared 20:*3*

school 25:*7*, *22*, *24*, *24* 26:*3* 55:*10*, *12*, *13* 224:*4*, *7*

schools 134:*3*, *4*

screen 40:*18*

searched 125:*19*

second 30:*21* 80:*21* 108:*14* 151:9 192:22 206:*3* 217:*19* 218:8, *15* 229:*1*

seconds 191:*8*

Secretary 125:*20*

security 54:*8* 141:*12*

see 28:*16* 30:*4* 40:22 63:*10* 64:*11*, *20*, *24* 65:8 68:*12*, *17*, *20*, *22* 69:*12*, *15*, *25* 70:*1*, *10*, *22* 74:*13*, *14* 75:*13* 77:*10*, *21* 78:*16* 80:*10*, *14*, *18* 84:*13*

87:5 91:*13*, *18*, *19*, *22* 92:24 93:2, *12* 94:*17*, *19* 97:*4* 99:*12* 108:*23* 111:*20* 127:*17* 132:*12* 134:*23* 135:8 137:*18* 138:*25* 139:*3* 140:*19* 141:22 158:*4* 165:*11* 166:*9*, *14*, *16* 167:2 168:*13* 170:*12* 171:*17* 173:*20*, *23* 174:8, *8*, *12*, *19* 177:*22*, *25* 178:*21*, *24* 179:*19*, *21* 180:2, *4*, *9*, *22* 181:*6* 182:*7*, *23* 183:*10*, *15*, *25* 186:*3* 188:*19* 192:*13* 193:24 196:*20* 197:*5* 198:8, *25* 199:*15*, *16*, *20* 202:*15*, *24* 203:*1* 204:*14* 206:*19* 207:*4*, *7*, *12*, *13*, *23*, *25* 208:*3*, *9*, *11* 211:2 212:*21* 213:2, *18*, *20* 214:*7*, *11*, *15*, *18* 217:*11* 219:*5* 221:*7* 225:*4*, *8* 226:*18* 228:*19*, *21* 229:*10*

seeing 170:*5*, *9* 227:*23* 228:*1*

seek 129:*14*, *15*

seeking 89:2 151:*15*

seen 30:9 61:*8* 65:2, *4* 74:*11* 76:*10* 79:2 82:*19* 89:*8* 90:*7*, *8* 95:*24* 102:*19* 131:*21* 172:*19* 227:*4*, *5*, *7*, *14*

Self-prepared 139:*3*, *6*

sell 128:*10*

send 15:*23* 24:7 64:*11*, *12* 76:*24*, *24* 77:*18* 90:*11* 99:*10* 147:*10* 165:*5*

sending 23:*18* 220:*1* 221:*24* 222:*1*

sense 40:*4* 196:*14*

sent 76:*18*, *18* 77:*16* 96:7 97:*3* 106:9 113:*16* 149:23 150:*17* 151:*12* 173:*4* 216:*23* 220:*1*, *12*, *14*, *17* 221:*6*, *21* 228:*13* 229:*12*

sentence 108:*20*

September 60:*21* 199:*8*

service 214:*12*

SERVICES 1:*8* 2:9

Set 8:*13* 41:2, *4* 50:22 125:*6* 226:*12* 233:7

settlement 153:*14*, *17*, *20* 154:*20*, *23*

S-H-A-H 69:*19*

Shah's 6:*15*

shaped 59:*24*

share 118:*18*

shared 131:*16*, *19*

Shaw 69:*18*, *21*, *25* 70:*10*, *12*, *16*, *22* 71:*24*, *25* 73:*8*, *25* 75:9 76:*10* 78:*3*, *3*, *16*, *17* 83:*19* 97:*12* 100:*19* 101:*3*, *12*, *25* 102:*6*

S-H-A-W 69:*20*

She'd 58:*24*

sheet 127:*25*

Sheih 76:*12*, *13*, *15* 78:*21* 79:*15*, *16* 94:*6*, *17*

S-H-E-I-H 76:*14*

SHERMAN 4:*5* 5:*8* 11:*22*, *22* 12:*8* 23:*23* 24:*3*, *6* 33:*12*, *15* 56:*2* 57:*12*, *18* 81:*12* 89:*1*, *12*, *20* 90:*3* 91:*21* 111:*7*, *9* 112:*25* 113:*5* 114:*23* 115:*5* 128:*14* 135:*14* 149:*14*, *20* 154:*1*, *5*

155:*1* 160:*19* 163:*6* 164:*12* 166:*23* 167:*7* 169:*1* 173:*10* 177:*19*, *21* 178:*15*, *19* 182:*15* 184:*9* 185:*4* 186:*18* 187:*1*, *21*, *24* 188:*5* 189:*1* 190:*5*, *13* 191:*7* 196:*7* 197:*11*, *20* 199:*10*, *13*, *14* 200:*3*, *10*, *16* 201:2 202:*9* 206:*12* 208:*8* 212:*18* 214:*5* 215:*5*, *12*, *19* 217:*23* 218:*5*, *10* 219:*18* 221:*1* 223:*11* 225:*25* 226:*6* 227:*12*, *20* 229:*21* 230:*8*, *13* 231:2, *12*

shirts 120:*4*

shoots 99:*5*

shop 175:*17*, *17* 176:*4* 186:*23* 187:*3* 198:*15*, *19*, *23*, *24* 207:*9*

shopped 176:*19*

shopping 186:*11*

short 16:*23*

Shorthand 2:*24* 233:*4*, *11*

shorts 84:*25* 120:*4*, *6*, *6*

shot 83:*23*

shots 98:*3* 102:*3*, *3*, *13*

shoulder 26:*25*

show 212:*19*

showed 30:*24* 227:*21* 228:2

Showing 99:*17* 149:*21* 216:*17* 228:*6*

shows 51:*24* 104:*20* 135:22 136:*3* 183:*23*

shut 77:22 133:*19*

shuts 72:*13*

sic 64:*8*

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 93 of 139   Page ID
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.
#:1038

side 206:14  215:18
sides  60:8
sign  20:7  23:24
  30:1  140:16, 22
  152:13  182:21
Signature  8:16  9:6
  111:20, 22  112:19
  139:1  140:19, 19
  165:11, 16  168:13,
  15, 17  180:22, 24, 25
  182:23  183:1, 2
  184:20, 21, 22
  193:24  194:2, 3
  210:7  217:16
  218:17, 19, 19
signatures  137:16,
  20
signed  15:17
  138:20  141:15
significance  55:9
signing  111:25
  165:23  169:11
similar  184:23
  205:1  229:24
simple  86:18
simply  219:14
single  202:15  207:3
Sir  12:9
sister  223:16, 17
sister-in-law  223:20
sisters  49:11
sit  26:25  36:4
  89:15  148:6  160:3
sitting  201:23
situation  22:19
  86:20  114:10
  127:6, 23
six  53:22, 23  61:22
  62:2, 13  70:11
  78:19, 19, 21  119:10
Sixth  4:7
size  60:2
sizes  59:25
skip  166:5
sleep  65:25  67:22
  69:8, 11, 16  71:8
  73:19, 23  74:22, 23
sleeping  65:16, 19
  69:5  70:25  71:4,
  14, 15, 16  72:19

73:22  74:25  75:3,
  4, 7, 14
sleeplessness  67:17
  68:4, 24, 25  69:13,
  14  70:23, 24, 24
  72:7, 24  74:12
  76:11  80:18  82:20
  87:7, 21
slept  65:17  69:3
  71:12  73:22
slight  85:21
slip  8:23  9:4
  180:20  182:21
  183:10
slow  19:18  64:14
small  52:9  60:1
smart  42:17
Smith  224:12
SoCal  202:23
soccer  124:5
social  54:8  74:9
  141:12
Sociology  26:16
software  44:19
Solutions  7:13
somebody  22:23
  62:19  103:13
  123:4  128:25
  140:11  144:25
  195:19  219:20
  220:21
son  119:8, 12, 22
  120:19, 23
Soni  95:18, 19, 24
Sonisk  95:21
soon  71:23
SORIA  1:4, 16  2:5,
  20  5:6  6:2  11:13,
  17, 21  12:3, 13, 20,
  22, 24  13:6  14:22,
  23  47:11, 23  54:2, 3
  56:4  65:13  66:11
  92:21  115:6  125:9
  131:1  187:10
  188:6  191:11
  193:19  219:7
  230:18  232:4, 16
S-O-R-I-A  12:13
  66:13
sorry  26:12  31:6
  34:13  46:3  57:10

58:7, 8  64:15
  65:22  66:19, 25
  68:9, 14  70:2, 18
  81:11  82:9, 11
  84:17  87:23  105:5
  111:7  114:9
  115:16, 21  123:18
  132:5  133:14
  135:2  143:25
  144:1  146:8  149:6,
  12  151:5  154:11
  166:5, 21  168:23
  169:18  170:8
  176:17  177:13
  182:16  185:24
  187:2  192:12
  199:9, 10  200:22
  201:8  202:22
  203:22  206:2
  211:12  217:24
  220:13  222:24, 25
  223:9, 12  224:21
  225:16  227:2, 25
  229:22  231:9
sort  22:3  68:25
  70:16  104:21
  136:18  145:5
Soto  119:20  121:3,
  12  122:23  127:1, 20
  129:16  131:19
sound  178:13
sources  86:21
  129:15
South  4:7
Southern  11:15
Southwestern  6:6
space  116:2, 11, 13,
  14, 17, 21  117:2, 12
  122:18, 21  128:16,
  20  129:4  134:11, 14
speak  17:7  18:24
  21:14  149:10, 15
speaking  178:15
specific  129:8
  160:25  215:21
  216:11
specifics  167:8
speculation  88:25
  89:19  90:2  91:17
  128:12  160:16
  163:4  173:9  185:3

188:24  190:4
  191:5  200:1, 8, 14
  212:17  214:3
  220:25  227:10
  229:19
spell  12:11  18:2, 6
  45:23  53:3  66:21
  76:13  101:23
  123:24
spend  39:2, 2  52:13,
  18, 20  82:14
spent  90:24  91:2
  103:3
spoke  21:15  23:15
  160:6
Sponsor  83:13
  84:18  120:2, 10
sponsored  119:23
  120:6
Sponsoring  84:20
  99:8
sponsorships  120:18
Sports  56:9  57:24
  79:14
spot  134:16
Spotify  42:24
spread  146:14
Spring  72:4
Sprouts  176:6
  186:19, 23  187:3
  198:22, 24
square  116:3, 23
  117:12
Stanton  48:25
  170:1
start  39:7  52:4
  58:22  65:18  68:2
  69:4  71:16  75:7
  160:12  164:3
  177:17
started  22:7  26:22
  56:7, 18  57:8  58:6
  59:7  75:3, 4  80:22
  85:12  161:6, 14
  162:2
starting  183:21
  209:11
state  11:19  12:11
  130:2  232:11  233:5
statement  48:6
  128:2, 7  135:7

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 94 of 139 Page ID #:1039
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

171:7 173:*18*
174:*1, 17* 179:*19*
183:*18* 184:2
195:*13* 196:*14*
199:7 202:*14*
205:7, 9, 21 207:*12*
208:*10, 13* 212:4
213:*14* 214:*11*
216:20 219:*10, 14*
226:*19* 227:7
**Statements** 7:*14*
8:*18* 9:8, *10, 14, 16,*
*20* 43:*17, 21, 22*
48:*11* 135:4 136:7,
*11* 170:*19, 21* 174:*5,*
*17* 177:*16* 178:*18*
183:*15* 188:*19*
192:22 194:*21, 22*
195:6, *11, 16* 201:*23*
204:22 218:*24*
226:*12*
**STATES** 1:*1* 2:*1*
12:*20* 104:*3* 106:*1,*
*5, 16, 20* 108:22
109:*13* 114:*17*
146:25
**State's** 125:*20*
**status** 103:7 107:*21,*
*23* 108:2, *23* 109:*5,*
*8* 113:*11, 19* 114:*7,*
*20*
**stayed** 214:*19*
**steps** 199:*4*
**Steroid** 62:*10*
83:*18, 19, 24* 97:*21*
98:22, *23* 102:*11, 15*
**steroids** 99:*3*
**stolen** 212:*8* 213:7
**stop** 15:*8* 46:*16*
61:7 68:*8* 94:*24,*
*25* 178:*16, 18*
**stopped** 88:*3*
129:*20* 133:*18, 18*
152:*4*
**store** 198:*17*
**straight** 71:*6*
**Street** 4:*7*
**stress** 86:*21* 87:*9,*
*11* 97:*1, 2, 4*
**stressed** 65:*20*

100:*8* 224:*22*
**stresses** 100:*12*
**stressing** 71:*1* 74:*21*
**Strike** 59:*12* 160:*12*
**strip** 76:*23*
**studied** 13:*10*
**study** 13:*12*
**stuff** 30:*18* 52:*20,*
*21* 62:*10* 65:*20*
66:*1, 4* 74:*21* 86:7,
*15* 102:*23* 127:7
136:*18* 143:*20, 22*
144:*4, 7* 145:*13*
148:*12* 151:*18, 19,*
*21* 224:*20*
**style** 59:*14*
**submissions** 59:*17*
**submitted** 229:*3*
**subscribed** 233:*17*
**substance** 62:*23*
84:2 98:*5*
**substances** 62:*8*
98:*11*
**sue** 15:*1, 2*
**sued** 131:*9* 153:*11*
154:*6, 8* 155:*6, 11,*
*14*
**suffering** 88:*23*
89:*3*
**suggested** 164:*6*
**Suite** 2:*21* 3:*17*
4:*8* 11:*12*
**summarize** 27:*2*
**Summary** 6:*10*
**Summer** 72:*4*
**supervision** 86:*15*
**Supplement** 6:*17*
83:*8* 98:*20*
**Supplemental** 8:*11*
**supplements** 82:*25*
83:*4, 11, 15* 85:*5, 8*
86:*4, 8* 98:*18, 19*
100:*14, 24* 101:*1, 4*
**supposed** 13:*7*
73:*15, 18* 103:*10*
**sure** 17:*17* 19:*21,*
*22* 22:*1* 35:*23*
37:*23, 25* 45:*14*
51:2 55:*23* 57:*12*
60:*1* 61:*17* 62:*11*
67:*8* 68:*10* 71:*11*

75:*8* 79:*21* 80:*13*
81:*13* 96:*11, 24*
97:*5* 98:22 147:*21*
148:*21* 149:*14, 14*
156:*3* 160:*23*
189:*18* 198:*13*
**surprise** 125:*19*
**suspected** 20:22
**suspend** 97:*23*
**swear** 12:*1*
**switched** 42:*6*
**sworn** 10:*3, 17*
**Sylvina** 66:*11*
**S-Y-L-V-I-N-A**
66:*12*
**symptoms** 67:*25*
68:*21*
**System** 123:*22*
**Systems** 124:*1*

**< T >**
**tab** 179:*25* 198:*1*
205:*11* 206:*15*
**table** 125:*6*
**tabs** 173:*14* 205:*14*
**take** 23:*16, 19, 20*
27:*1* 30:*17* 31:*5, 7*
35:*4, 16* 37:*15*
41:*23* 44:*18* 51:*22*
52:*17* 56:*24* 57:*11*
62:*18* 82:*24* 85:*4,*
*5, 8, 10* 86:*6, 16*
90:*21* 94:*7* 97:*20*
98:*13, 17, 21* 99:*2*
101:*1* 102:*2, 8, 13*
103:*13* 108:*25*
114:*14, 16, 18, 23*
129:*19* 153:*19*
155:*3* 157:*17*
159:*7* 160:*10*
179:*17* 187:*23*
199:*4* 204:*19*
211:*8* 214:*9*
215:*20* 221:*5*
225:*25* 229:*15*
**taken** 2:*20* 11:*12*
26:*5* 45:*4, 7, 10*
52:*1* 57:*15* 83:*15,*
*18* 84:*1, 8* 85:*17*
87:*13* 115:2 188:2

206:*9* 215:2 226:*3*
233:*6*
**takes** 61:*2* 78:*12, 14*
**talk** 20:*4* 25:*23*
34:*1* 36:*11* 37:*5*
38:*10* 46:*15* 67:*16,*
*18, 24* 76:*17* 100:22
118:*3* 119:*21*
122:*5, 6, 9, 23*
129:*13* 142:*3*
224:*1, 16* 225:*15, 16*
**talked** 14:*6* 20:*5,*
*17, 17* 27:*8* 100:*19,*
*21* 101:*12* 104:*25*
112:*12* 126:*16*
129:*12, 17, 22*
161:22 162:*8*
186:*12* 198:22
202:*5* 224:*19, 23*
**talking** 20:*13* 37:*2*
46:*16* 59:*6* 69:*17*
79:*4* 118:*1* 150:*4*
159:*21* 189:*14*
200:*18* 215:*22*
219:*20* 228:*15*
**tape** 219:*19*
**Target** 176:*3, 4*
207:*3, 6, 9, 16, 21*
208:*17*
**taught** 88:*16*
**tax** 51:*17, 20* 52:*23*
53:2, *18, 25* 132:*4*
137:*4, 5, 14* 138:*5, 9,*
*17, 18* 139:*25* 140:*4,*
*12* 141:*1, 8* 142:*4*
**taxes** 50:*16* 51:*21,*
*22* 52:*24* 53:*20*
54:*1* 132:*6* 140:*10*
**teach** 88:*3, 6, 7, 11,*
*12, 13* 128:*23, 25*
129:*1, 1*
**teaches** 46:*7* 225:*9,*
*12*
**teaching** 46:*18*
112:*11*
**tear** 85:*21* 195:*7*
**tearing** 227:*15*
**Telephonically** 3:*15*
**tell** 14:*25* 15:*14*
17:*2* 18:*8, 14*
19:*10* 20:*19* 41:*8*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 95 of 139 Page ID #:1646
Samuel S. Soria a/k/a Samuel Liera vs. US Bank (N.A.), et al.

51:*11* 68:5 74:*16, 18* 90:*16* 92:6, *22* 94:*8, 14, 18* 95:*15* 99:*18, 25* 100:*10* 101:*16* 102:6 103:2, *25* 115:*10, 10* 128:9 132:22 134:*23* 135:*21* 137:*20* 138:*8* 140:*24* 141:*23* 143:*16* 148:7 151:*7, 13* 153:*16* 156:5 160:*4* 161:*10* 163:*1* 164:*24* 172:*12* 180:*16* 186:5 205:*18* 207:*20* 221:6, *18, 20* 222:*9, 13, 17*

telling 15:*7, 13* 22:*21* 31:5 66:*1, 4* 160:*8*

ten 71:*12* 97:*19*

term 34:22 37:*1* 68:*10* 116:*8*

terms 56:*15, 16* 117:*25* 122:7 126:*14* 150:*20* 154:*23*

test 76:22 93:*15, 17* 94:*6, 7, 18* 99:*19, 20*

tested 62:22

testified 12:5 195:5 211:*4*

testify 194:*11*

testifying 233:*9*

testimony 161:*10* 188:*8* 201:*1* 202:*8* 221:*10* 227:*10, 18* 229:*19* 230:*25* 232:*8*

**Testing** 6:*10* 94:*10*

**testosterone** 73:*16, 20, 23* 75:*10* 97:*19* 98:*14* 99:5 102:*3, 9, 15*

text 31:*25* 32:2, 7

**Thank** 177:*20* 231:7

**Thanks** 111:*8*

**Theft** 10:*12* 166:*9, 18* 167:*4* 201:*14* 228:*4* 229:5, *8*

thereof 233:*13*

**Thermos** 79:*4, 5, 9, 19* 80:*11, 12, 14, 15* 84:*16, 17* 92:*23, 25* 93:5, *12, 17*

thing 17:*14* 18:*9* 22:*4, 15* 32:2 40:*9, 10, 14* 62:4 64:5 65:*19* 70:25 82:*10* 83:*12* 97:25 100:*21* 224:6

things 58:*1* 68:22 72:25 75:*11* 76:*3, 7* 86:*18, 18* 106:*11* 133:25 136:*15* 214:*8*

think 12:*20* 15:*4* 19:*13* 21:5 22:6 23:*15* 24:*14* 30:*11* 32:*3* 35:*16, 23* 36:*17* 38:*19* 39:*9* 40:*23* 48:*12* 49:*19* 51:5 55:*20* 57:*9* 59:*12* 61:7 64:*4* 65:*19* 66:*15* 71:7 72:*17, 24* 73:5 76:*9* 77:*9* 78:*19* 80:*12* 83:*17* 85:*20, 23* 86:*12* 89:*16* 91:*12* 93:*20* 96:7 101:*18* 104:*15* 106:*17* 107:*4* 121:*11* 131:*7, 23* 135:6 137:*25* 138:*1* 142:*21, 23* 145:7 146:*7, 10, 16* 149:*25* 152:*3* 154:*10* 155:*13, 13* 158:*22* 161:22 167:5 173:*6* 187:*19* 188:*21* 195:*5, 20* 196:*12* 198:*12, 22* 213:*9, 21* 224:*7* 230:*3*

thinking 66:*3* 68:*8*

third 80:22 99:22 101:*11* 133:*1*

167:*10*

**Thirty-five** 60:*13*

**Thirty-three** 60:*11, 11*

thought 74:*18* 100:*10* 101:*16*

thousand 62:7 142:*22* 145:7

three 19:7 23:2 25:*21* 49:*10* 69:*3, 5* 71:8 76:23 80:*12* 103:*17* 163:*5* 201:*3*

throw 48:9 195:7 204:*20*

throwing 227:*15*

**Thursday** 79:*12, 12*

**Thyroid** 6:*16*

tight 94:22

till 58:*17*

time 11:*10* 13:*19, 22* 14:*17* 27:*1* 29:*5, 9, 10* 30:*15, 21* 38:*20* 41:20 50:*11* 56:*12, 22* 57:*13, 17* 58:*23* 60:20 62:25 64:*9, 24* 65:*1* 66:*1* 68:*16* 70:*12* 71:24 78:*24* 83:*20* 90:*19* 97:*20* 102:*21* 105:*23* 112:*23* 114:*25* 116:*16* 124:*4* 128:*19, 21* 129:*2, 21* 130:*3* 133:*10* 145:2 146:2, *9* 148:*3* 151:*16* 155:*24* 160:*24* 161:*1* 170:*8* 172:5 187:*25* 188:*4* 196:*22* 197:*18, 18* 206:*7, 11* 214:*25* 215:*4* 226:*1, 5* 227:*25* 229:7 230:*20, 21* 231:*8, 14* 233:7

timeframe 129:*6*

times 13:*23* 19:7 29:*4* 60:25 70:*10, 11* 78:*16, 19, 19, 21* 80:*10, 12* 158:*3*

159:*25* 160:*20, 21* 163:*5*

timing 41:*25*

tired 99:*1, 6* 134:*15*

**T-Mobile** 158:*12, 13, 19* 159:*1, 2, 3, 11, 13* 160:*13* 175:22 186:*13*

today 11:*24* 13:*9* 14:*23* 36:*4* 48:*13* 59:*4* 60:*12* 89:*15* 128:*10* 134:5 195:*12, 14, 15* 228:*15* 230:*22, 25*

**Today's** 11:*10* 14:*10*

told 15:*8, 16, 23, 25* 17:*5, 9, 10, 11, 11, 16, 19* 18:*15, 22* 19:*11, 12* 20:*3, 6, 16* 21:*16, 19* 22:*22, 22* 35:2 74:*13, 14, 17* 80:*20* 100:*7, 25* 101:*18* 102:*2, 8* 103:*18* 106:*7* 109:*12, 15, 18* 113:*16* 117:*13* 121:*22, 24, 25* 127:*7* 140:*11* 152:7 159:*20, 21*

top 34:*7* 90:5 93:2 226:*18*

topic 57:*11*

tore 204:*20*

total 37:*12* 102:*24* 132:*10, 13* 147:22, *24* 158:*3* 181:9, *16*

touch 32:*24*

track 38:25 39:*1* 44:*18* 51:*14* 71:*18* 102:*24* 136:*17* 188:*16* 195:25

**Trail** 53:*11, 14*

train 82:*12* 119:*8* 120:*24* 124:*13* 224:*14*

trained 119:*11, 15* 120:*19*

trainer 56:*11, 21*

**training** 82:*14, 17, 18, 24* 88:4 90:9

Samuel Soria Liera - CONFIDENTIAL    11/20/2018
Case 8:17-cv-00603-CJC-KES   Document 59-10   Filed 03/04/19   Page 96 of 139   Page ID
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.
#:1641

91:*14*  123:22
124:*1, 13, 15*
**trains**  120:*21*  124:*4*
**transaction**  133:2
167:*19*  192:*17*
198:6, *8*  202:*15*
209:6
**transactions**  51:*1*
132:*10, 11*  133:*10*
166:8  175:*10, 13*
179:*3*  201:*13, 18, 24*
202:*20*  210:*10, 11,
14, 16, 22*  216:8, *11*
**transcribed**  233:*11*
**TRANSCRIPT**  1:*13*
231:5, *7, 11*  232:6
**transcription**  233:*13*
**transfer**  150:*7, 8, 13,
15*
**transfers**  196:*19*
197:5, *8*  201:*18*
202:*24*  203:5
**transmit**  215:12
**trash**  48:*9*
**Travel**  205:22
**Treatment**  6:*16*
96:*18*
**tried**  18:*16, 16*
23:6  65:24  69:*10,
10*  129:*17*  143:*23*
151:*11*
**trouble**  47:7  71:*3*
102:*10, 13*  116:*14*
**true**  110:24  112:*1*
165:25  170:*3*
219:*14*  232:8
**Trump**  103:*17*
107:*19*  113:*24*
**Trump's**  108:*1*
**try**  14:*18*  23:*18*
117:6  143:*21*
159:23  160:*4*
**trying**  16:7  22:*20*
26:*21*  30:*17*  66:2
68:22  77:21  84:*13*
122:*1*  134:*11*
150:6  152:*4, 7*
160:7, *7*
**TUESDAY**  1:*18*
2:23  5:3  11:*1*
**Tui**  223:*12, 13, 14*

**turn**  99:22  101:*11*
112:*17*  137:*15*
140:*18*  163:*10, 25*
165:7  166:*4*
169:*24*  170:22
175:9  178:*20, 24*
183:*19, 20*  185:*16*
189:*18*  192:*12*
195:*1*  198:*1, 8*
199:7, *10*  202:*13, 13,
14*  205:7  206:2
210:9  212:*4, 20*
213:*1*  226:*14*
**turning**  199:*9*
**Tustin**  79:*10*
**TV**  99:*12, 12*
**twice**  28:*17*  30:*9*
168:*17*
**two**  21:*20*  37:*11,
11*  39:*17, 17*  60:*13,
15*  65:*16*  71:6
80:*12*  97:*24*  98:*3*
99:*23*  103:*11*
126:*1*  134:*3*  175:9
200:*19*  202:25
210:*11*  218:*13, 21*
226:*14*
**type**  41:*14*  83:*18*
**typical**  81:7  82:*1*
133:*8*
**typically**  31:*25*

< U >
**U.S**  8:*12, 18*  9:8,
*10, 14, 16, 20*  10:*15*
11:*14, 23*  15:*1, 3*
18:*25*  21:*21*  22:20
23:*17*  24:*13*  27:*10*
30:*18*  32:*20*  33:*24*
34:2  36:*4, 13, 22*
37:6  38:*21, 23, 24*
39:*4, 7*  41:6  42:*13*
43:*13*  44:*3, 5, 9, 13*
45:*7, 13*  48:*6, 10*
51:5  65:*14*  72:*9,
18, 25*  86:*20*  87:*22,
24, 25*  89:*16*  90:25
91:*11*  93:*9, 12*
96:22  103:*4, 6*
104:*1, 20*  109:*17*
110:*4, 4*  114:8, *11*

115:7  116:*18*
121:*20*  127:6, *23*
129:*17*  131:*9*
135:5  143:2  150:*8,
14, 15, 22*  155:6, *23*
156:*9*  157:2  158:*1,
2*  159:*12, 17, 23*
160:*1, 14*  161:*1*
162:5, *20*  163:2, *12,
13*  164:5, *6, 14, 25*
166:8, *17*  167:*3, 17*
169:*4*  173:*1, 4, 7*
174:2  180:*19*
182:*10*  183:*4*
187:7  188:7  189:*9,
15*  190:*15*  191:*15*
192:*3*  194:*13*
195:*15*  196:*9*
203:23  205:*21*
208:22  209:*1, 11*
210:*17*  211:*10*
215:*21*  216:7, *24*
219:20  221:*21, 25*
222:*14*  223:*4*
226:*14*  227:*15, 22*
228:*3, 15, 16, 18, 25*
229:*3, 15, 25*  230:*4*
**Uber**  43:2
**Uh-huh**  72:*12*
**ultrasound**  96:5, *7,
14, 19, 23*  97:2
**unauthorized**  169:*8,
9*
**unaware**  167:22
192:*18*  204:*3*
**underscore**  55:*3*
**undersigned**  233:*4*
**understand**  14:*17*
33:*4*  35:6, *17*  37:2
68:6  81:*14*  109:7
111:*24*  143:*14*
156:*10, 25*  203:7
210:*13*
**understanding**
34:25  35:*13*
107:*18, 25*  132:*20*
161:*11*
**understood**  14:*15*
165:*23*  218:*1*
**Union**  142:*14*
143:*3, 4, 7, 13*

144:*17*  145:*3*
150:*21*
**UNITED**  1:*1*  2:*1*
104:*3*  106:*1, 5, 16,
20*  108:22  109:*13*
114:*17*  146:*25*
**unpack**  12:*23*
**update**  173:*1*  229:6
**upfront**  90:*12*
102:*21*  145:*24*
146:*12*
**upset**  129:7
**urine**  77:*1, 12*
78:*25*  92:*10*  94:7
**USB**  111:*19*  173:*18,
24*  178:*20*  218:*15*
**use**  31:*10*  39:*18*
42:*21*  43:9  45:2
50:*21*  54:*16*  55:*7,
18*  56:*3*  129:*4*
152:*23*
**user**  31:*8*
**username**  39:*10*
40:*12, 25*  41:*2, 5*
44:*8*
**usernames**  39:*14*
40:6
**usual**  61:5, *7*  62:*18*
**usually**  28:*18*
47:*15*  50:25  60:25
67:*14*  73:22  76:*3*
81:*9*  82:7  99:9, *12*
111:*4*

< V >
**vacations**  52:*21*
87:*13*
**vague**  182:*13*
**valid**  107:*9*
**value**  88:*21*  89:9
112:*3*
**Van**  3:*9*
**Vasquez**  16:*18, 25*
22:2
**verbatim**  233:*9*
**Verification**  165:*9*
**verify**  157:*14*
**versus**  11:*14*
155:23  164:*25*
**victim**  22:*3*  105:*10*
**Victim's**  10:*12*

**video** 11:*11*, *11*
231:7
**Videographer** 4:*13*
11:5, *24*  57:*13*, *16*
114:25  115:*3*
187:25  188:*3*
206:7, *10*  214:25
215:*3*  226:*1, 4*
231:8
**VIDEOTAPED**
1:*15*  11:*17*
**view** 22:6
**Vince** 46:*10, 16*
**Vince's** 46:*12, 14*
**visa** 105:23, *24, 25*
212:7
**visit** 66:*16*  103:*12*
**visits** 91:*11*
**Vitamin** 84:*16, 18*,
*19*  97:*15, 15, 16, 18*
99:*9*
**vitamins** 83:*14*
85:6  86:*19*  98:*19*,
*21*
**Vitasa** 45:*22*
224:*24*  225:*1*
**V-I-T-I-S-A** 46:*3*
**V-I-T-S-A** 46:*1, 2*
**voice** 189:*23*  190:*1*
191:*12*  216:*1, 3*
219:*19*
**volition** 144:*24*
**Volume** 11:*16*
189:*18*
**volunteered** 127:*22*
**vs** 1:7  2:7

**< W >**
**W-2** 51:*22*  112:*12*
**wait** 83:6  161:*9, 16*
**waiting** 108:5
**Walgreen's** 198:*20*
**walked** 13:*17*
**walking** 74:*23*
**want** 15:2  28:*13*
35:2, 6  62:*1, 15*
83:6  88:*14, 14*
98:*25*  102:2, *8, 9, 10,*
*11*  104:6, *9*  119:*1*
122:2, *25*  125:5
133:*23*  134:*13*

145:*23*  150:7, *8, 8,*
*14, 15*  166:*23*
189:*21*  196:*13*
198:7
**wanted** 26:*21*  33:*3,*
*7, 13*  94:7  118:*6, 7,*
*15, 22*  134:6  142:*2,*
*22*  143:*19*  144:*3, 6*
145:*17, 18, 24*
146:*19*  150:*1*
151:*21*  156:*12*
**wants** 32:*23*
**way** 32:*13, 24*  49:*1,*
*2, 3, 13, 18, 19*  50:*2,*
*8*  104:*19*  148:*11*
157:*17*  167:*10*
169:*25*  170:*14*
172:2, *5, 8, 21, 25*
179:*18*  198:2
213:*11*  217:*11, 14*
**web** 147:*3*
**website** 39:*5, 8*
40:*18*  44:*13*
125:*20*  130:*5, 7, 10,*
*15*  133:*19, 20, 21*
**weeding** 62:*20*
**week** 19:*19*  71:6
88:*6, 8*  231:*13*
**weeks** 71:6  97:*19*
103:*17*
**weight** 93:*14*
**Well** 15:2  16:*10*
17:*12*  22:*20*  27:7
47:*17*  56:*21*  59:*25*
75:*14*  82:7  88:*12*
94:*20*  97:*3*  98:*20,*
*21*  104:*4, 25*  106:7
109:*21*  114:*14*
117:*13, 17*  122:*12*
129:*14*  132:*19*
133:*19, 21*  138:*25*
140:*18*  143:*11, 23*
145:*10*  152:2
171:*13, 23*  175:6
178:*17*  179:*20*
183:9  189:*12*
191:*14*  192:2
201:3, *9*  207:*16*
208:*23*  210:5
211:*13*  212:6, *19*

213:*21*  217:*10*
218:*3*  219:*5, 10*
**Wellness** 6:*15*
**Wells** 28:*1*  42:6
44:7  45:*10, 14, 17*
142:*25*  143:*1, 2*
**went** 18:*18*  19:7, *8,*
*8, 14, 15, 15*  20:*13*
21:5, *10*  41:6
49:*21*  63:9  64:7
70:22  76:*17*  92:2
93:5  94:*17, 20*
95:7  133:*13*  143:*4*
144:*20, 21*  152:*21*
153:5  161:6  162:*5,*
*13*  183:*3*  197:*18*
225:2
**We're** 11:5  20:*13*
25:*19*  57:*10*  99:6
134:*3*  196:*14*  197:*4*
**West** 26:*9, 10*
**Western** 55:*13, 14*
**we've** 142:5  228:*15*
**WHEREOF** 233:*17*
**WHITNEY** 4:*4*
11:*22*
**wife** 18:*16*  22:22
39:*25*  42:*23*  48:*16*
54:*20*  66:*1, 4*
74:*15*  111:*3*  119:*8,*
*11, 22*  120:*19, 23*
130:*8*  131:*7*
139:*25*  172:5  225:*9*
**wife's** 22:*24*  141:*12*
223:*16, 17*
**willing** 118:*24*
**win** 81:*15*
**winning** 81:*17*  82:7
**winter** 72:*4*
**withdraw** 33:6
187:*17*
**withdrawal** 178:*21*
182:8, *11, 21*  183:*10*
**withdrawals** 182:*17,*
*18, 20*  201:*19*
**withdrawing** 184:5
200:*6*
**withdrew** 183:*4*
187:*12*
**WITNESS** 5:5
12:2  33:*13*  56:*1*

91:*18*  128:*13*
149:8, *16*  160:*18*
178:6, *8, 11*  184:*8*
186:*23*  187:*16*
188:*25*  190:*12*
200:2, *9, 15, 24*
208:7  214:*4*
217:22  219:*17*
227:*11, 19*  229:*20*
230:7  233:*17*
**witnesses** 233:*8*
**woman** 46:*4*  79:7
**won** 73:*4*  81:*3*
**wondered** 92:*4*
**word** 68:*15*  200:*4*
**words** 15:*1*  164:*4*
178:*13*
**work** 48:6  49:*24*
56:8, *17*  57:*21, 23*
58:*14, 19*  59:*1, 9*
61:*16*  62:*4, 13*
64:*13*  73:*17*  76:*18*
88:*19*  89:*10*  92:*23,*
*25*  93:6  110:*17, 19*
112:*11, 14, 15*  119:*4,*
*25*  120:*1*  121:*3*
128:*19*  129:5, *6*
140:6  190:22
**worked** 21:6, *9*
27:9  29:24, *25*
46:8, *10*  56:9, *19*
58:*17*  63:20, *23, 25*
64:*3*  73:6  112:*16*
**worker** 74:9
**working** 27:*24*
58:*24*  85:*18*  86:*1*
**works** 57:22, *24*
59:*4*  61:22  64:6
225:9, *9*
**world** 26:*10*  103:2
**worries** 111:*8*
**worry** 20:5, *6, 7, 9,*
*12, 15*
**worse** 65:*15*
**worth** 128:*9*
**wrestle** 59:*17*
**wrestling** 26:22
**write** 157:*17*
211:*20*  219:*10*
220:*19*

Samuel Soria Liera - CONFIDENTIAL 11/20/2018
Case 8:17-cv-00603-CJC-KES Document 59-10 Filed 03/04/19 Page 98 of 139 Page ID #:1043
Samuel S. Soria a/k/a Samuel S. Liera vs. US Bank (N.A.), et al.

**writing** 119:*4*
126:*21, 23*
**written** 116:*6, 7*
131:*4* 152:*6*
157:*20* 165:*4*
177:*10* 183:*10*
**wrong** 91:*9*
**wrote** 23:*17* 31:*4*
131:*6* 210:*22, 25*
220:*21* 221:*18*
228:*25*

**< Y >**
**Yeah** 14:*24* 15:*16*
17:*9* 18:*1, 3, 5*
20:*15* 21:*1* 23:*6*
25:*19* 27:*6* 29:*23*
32:*2* 33:*3* 34:*10,*
*17, 21* 36:*10* 39:*2*
40:*3* 43:*1* 46:*18*
47:*15* 49:*2, 19*
51:*5* 52:*2, 2, 9*
53:*10, 13* 55:*6, 12*
57:*12* 58:*11, 13*
59:*17* 63:*8, 23*
64:*3, 17* 71:*5, 22*
73:*10, 17, 21, 23*
77:*16, 19* 78:*5, 18,*
*24* 79:*17* 80:*2, 6, 8*
81:*22* 85:*6, 15*
86:*24* 91:*12* 96:*7*
99:*5* 100:*5* 101:*9,*
*14* 102:*2, 8* 105:*9*
109:*15, 21* 110:*2*
112:*14* 113:*1*
114:*18* 116:*7*
118:*23* 122:*1, 12*
123:*19* 125:*10*
126:*10* 128:*4, 5*
129:*11, 20* 131:*12*
138:*24* 141:*22*
144:*3* 145:*23*
147:*16, 23* 149:*12*
150:*13* 151:*11*
152:*8* 153:*1, 4*
158:*22* 159:*1, 4*
160:*18* 166:*24*
170:*9, 12, 14* 171:*3,*
*22, 22* 173:*12, 22*
174:*21* 175:*2, 5*
176:*17* 177:*4, 9, 12,*

*14* 178:*6* 179:*10, 15,*
*23* 180:*17* 181:*16*
182:*19, 19* 184:*16*
186:*23* 187:*21*
188:*12* 195:*4, 17*
198:*6, 18, 19, 24*
199:*13* 203:*4, 11, 21*
205:*11* 208:*11, 20*
213:*14, 20* 217:*9*
219:*24* 221:*9*
223:*15* 224:*11*
231:*12*
**year** 26:*24* 39:*25*
50:*14* 51:*12, 17, 24*
53:*25* 60:*21* 61:*1*
75:*4, 5, 6* 107:*13*
128:*3* 132:*9, 14*
135:*1, 3* 137:*5*
138:*18* 141:*8*
146:*5, 7, 9* 147:*22*
148:*1, 2* 152:*25*
221:*25*
**years** 23:*2* 25:*5*
27:*4* 29:*8, 13*
53:*22, 23* 54:*13*
61:*21, 22* 97:*24*
119:*10*
**younger** 87:*4*

**< Z >**
**Zip** 53:*17*

# EXHIBIT B

1  F. Jay Rahimi, Esq. (SBN: 305286)
2  jay@jrahimilaw.com
   **LAW OFFICE OF F. JAY RAHIMI**
3  7136 Haskell Ave. Suite 333
   Van Nuys, CA 91406
4  Telephone: (818) 835-4005
5  Facsimile: (866) 543-4345

6

7  *Attorneys for the Plaintiff*
   Samuel Liera Soria

8

9

10          **UNITED STATES DISTRICT COURT**
        **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**
11

| | |
|---|---|
| SAMUEL LIERA SORIA a/k/a SAMUEL S. LIERA, <br><br> Plaintiff, <br><br> v. <br><br> US BANK (N.A.), AND EQUIFAX INFORMATION SERVICES, LLC, <br><br> Defendant(s). | **Case No.: 8:17-cv-00603-CJC-KES** <br><br> **PLAINTIFF SAMUEL S. LIERA'S AMENDED SUPPLEMENTAL RESPONSES TO DEFENDANT U.S. BANK'S INTERROGATORIES, SET ONE** |

12
13
14
15
16
17
18
19
20
21

22  Propounding Party:    DEFENDANT, **US BANK (N.A.)**
23  Responding Party:     PLAINTIFF, **SAMUEL L. SORIA**
24  Set No.:              **ONE (1)**
25  / / /
26  / / /
27  / / /
28  / / /

COMPLAINT                    - 1 of 18 -

1        To DEFENDANT **US BANK (N.A.)** and its attorneys of record:

2   **Comes now PLAINTIFF, SAMUEL LIERA SORIA ("PLAINTIFF"), by**

3   **and through counsel, hereby responds as follows to DEFENDANT US**

4   **BANK (N.A.)'S ("DEFENDANT") INTERROGATORIES to**

5   **PLAINTIFF, Set One, heretofore served in this case, without in any way**

6   **waiving or intending to waive, but on the contrary intending to reserve**

7   **and reserving:**

8        (a) All questions and objections as to competency, relevancy,

9        materiality, privilege admissibility as evidence for any purpose in any

10       subsequent proceeding in, or the hearing of this action, of any of these

11       answers or the subject matter thereof;

12       (b) The right to object to the use of any of said answers, or the subject

13       matter thereof, in any subsequent proceeding, in or the hearing of this

14       action, on any grounds;

15       (c) The right to object on any grounds or at any time to demand for

16       further response to these or other discovery documents or other

17       discovery procedures involved or related to the subject matter of the

18       requests for admissions herein answered; and

19       (d) The right at any time, to revise, correct, add to or clarify any of

20       said answers propounded herein.

21       **RESPONSES TO INTERROGATORIES**

22  **INTERROGATORY NO. 1:**

23       State your full name.

24  **RESPONSE TO INTERROGATORY NO. 1:**

25       Plaintiff objects to this interrogatory because it is vague and ambiguous as

26  phrased, and confusing to Plaintiff.

27  / / /

28  / / /

1    Without waiving said objection, Plaintiff responds as follows: Plaintiff's full

2  name varies on which culture you refer to. On Mexican birth certificates, the

3  mother's last name goes after the father's last name giving the appearance

4  **SUPPELMENTAL RESPONSE TO INTERROGATORY NO. 1:**

5  Samuel Liera Soria a/k/a Samuel Soria Liera.

6  **INTERROGATORY NO. 2:**

7    Identify by account number each account with U.S. Bank that you gave

8  your authorization to open between July 1, 2013, and the present.

9  **RESPONSE TO INTERROGATORY NO. 2:**

10  1) Credit Card Account ending in XX-0949

11  2) Credit card  Account ending in XX-5506

12  3) Credit card Account ending in XX-0367

13  4) Checking Account ending in XX-6967

14  5) Checking Account ending in XX-3978

15  6) Checking Account ending in XX-6876

16  7) Reserve Line ending in XX-6876

17  **AMENDED RESPONSE TO INTERROGATORY NO. 2:**

18  1) Credit Card Account ending in XX-0949

19  2) Credit card  Account ending in XX-5506

20  3) Credit card Account ending in XX-0359

21  4) Checking Account ending in XX-6967

22  5) Checking Account ending in XX-3978

23  6) Checking Account ending in XX-6876

24  7) Reserve Line ending in XX-6876

25  **INTERROGATORY NO. 3:**

26    For each U.S. Bank account that you identified in response to Interrogatory

27  Number 3, identify by date, description of transaction, and amount each

28  transaction that you did not authorize.

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff objects to this interrogatory on the grounds that it is incomplete and unintelligible.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff objects to this interrogatory on the grounds that it is incomplete and unintelligible. Interrogatory number does not seek the identification of accounts. This is interrogatory number 3.

**INTERROGATORY NO. 4:**

Identify by account number each account with U.S. Bank for which you authorized the addition of Daniel Barrera as a joint account holder.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects tot his request on the grounds that it is irrelevant and not reasonably calculated to the lead to the discovery of admissible evidence. Without waiving said objections, Plaintiff responds as follows: Checking Account ending: XX-6967

**INTERROGATORY NO. 5:**

Identify by account number each account with Wells Fargo Bank, N.A., that you gave your authorization to open between January 1, 2010, and July 1, 2013.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this interrogatory on the grounds that it is irrelevant and serves no discoverable purpose beyond harassing the Plaintiff. Additionally, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence as Wells Fargo is not a party to this action, nor is any Wells Fargo account at issue in this case. Plaintiff further objects to this request on the grounds that it violates Plaintiff's right to privacy by requesting account information regarding an account unrelated to any allegations in Plaintiff's complaint and involving an entity, Wells Fargo, that is not at all related in any way, or a party to, this case.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to this interrogatory on the grounds that it is irrelevant and serves no discoverable purpose beyond harassing the Plaintiff.

Additionally, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence as Wells Fargo is not a party to this action, nor is any Wells Fargo account at issue in this case. Plaintiff further objects to this request on the grounds that it violates Plaintiff's right to privacy by requesting account information regarding an account unrelated to any allegations in Plaintiff's complaint and involving an entity, Wells Fargo, 1hat is not at all related in ay way, or a party to, this case.

Without waiving the foregoing objections, Plaintiff responds as follows: ████8638.

**INTERROGATORY NO. 6:**

For each account that you identified in response to Interrogatory Number 5, state whether the account was opened by Daniel Barrera and whether Daniel Barrera was a joint account holder.

**RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory on the grounds that it is compound. Plaintiff further objects on the grounds that this interrogatory is irrelevant as it serves no discoverable purpose beyond harassing the Plaintiff. Additionally, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence as Wells Fargo is not a party to this action, nor is any Wells Fargo account at issue in this case. Plaintiff further objects to this request on the grounds that it violates Plaintiff's right to privacy by requesting account information regarding an account unrelated to any allegations in Plaintiff's complaint and involving an entity, Wells Fargo, that is not at all related in any way, or a party to, this case. Plaintiff objects to the term "opened by" as vague and ambiguous.

/ / /

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

Plaintiff objects to this interrogatory on the grounds that it is compound., vague and ambiguous as written. Plaintiff further objects on the grounds that this interrogatory is irrelevant as it serves no discoverable purpose beyond harassing the Plaintiff. Additionally, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence as Wells Fargo is not a party to this action, nor is any Wells Fargo account at issue in this case. Plaintiff further objects to this request on the grounds that it violates Plaintiff's right to privacy by requesting account information regarding an account unrelated to any allegations in Plaintiff's complaint and involving an entity, Wells Fargo, that is not at all related in any way, or a party to, this case. Plaintiff objects to the term "opened by" as vague and ambiguous.

Without waiving said objections, Plaintiff responds as follows: As Plaintiff's banker, Daniel Barrera helped Plaintiff open the account identified in Respond to Interrogatory 5, but Daniel Barrera was not a joint account holder.

**INTERROGATORY NO. 7:**

Identify by U.S. Bank account number, transaction(s), and amount, each debt that YOU contend was a result of identity theft.

**RESPONSE TO INTERROGATORY NO. 7:**

Plaintiff objects to this response on the grounds that it is overly broad and unduly burdensome insofar that it requires the information regarding each and every unauthorized transaction, which is information that is readily available to U.S. Bank.

Without waiving said objections, Plaintiff responds as follows: The following amounts are total amounts of charges or spending that were not incurred, or authorized, by Plaintiff.

/ / /

/ / /

<div align="center">Checking Accounts</div>

1) XX-6876: Plaintiff has provided documents in response to this question highlighting all charges, transactions, payments, transfers or automatic withdrawals initiated by, or authorized to be initiated by, Plaintiff.

2) xx-6967 - Plaintiff never used this joint checking account. Any amount deposited/withdrawn was done so by Daniel Barrera, the joint account holder.

<div align="center">Reserve Lines</div>

1) XX-6967: Amount of $3,204.27 - any transaction made using funds from this reserve line was fraud. Plaintiff was unaware any reserve line was ever even opened and did not know that it existed.

2) XX-3978: Amount of $1,909.41 - any transaction made using funds from this reserve line was fraud. Plaintiff was unaware this reserve line even existed.

3) XX-6876: Plaintiff has provided documents in response to this question highlighting all charges, transactions, payments, transfers or automatic withdrawals initiated by, or authorized to be initiated by, Plaintiff.

<div align="center">Credit Cards</div>

1) XX-5258: Amount of $563.00 - Plaintiff had absolutely no knowledge about this account. No transaction made on this account was initiated by Plaintiff or with Plaintiff's knowledge, consent, authorization, or the like.

2) XX-0359: Amount of $5.83 - Plaintiff paid off this card. Plaintiff is unaware how there is any balance on this card. Plaintiff has no idea what the collection notices are.

3) XX-0949: Amount of $1,192.43 - this was paid off in 2015 and never used by the client again. Therefore any balance after 2015 was not incurred by the Plaintiff.

/ / /

Loans

1) Rise Account ████7039: Amount of $4,209.63 -Plaintiff did not take out this loan, nor did he make any payments on it. This entire amount is the result of fraud and/or identity theft.

2) National Funding Account #████0801: Amount of $28,819.01 Plaintiff did not take out this loan, nor did he make any payments on it. This entire amount is the result of fraud and/or identity theft.

3) US Bank Account #2658: Amount of $22,223.15 - Plaintiff did not take out this loan, nor did he make any payments on it. This entire amount is the result of fraud and/ or identity theft.

4) US Bank Account #8284: Amount of $8,864.53 - Plaintiff did not take out this loan, nor did he make any payments on it. This entire amount is the result of fraud and/or identity theft.

Discovery and investigation is still ongoing, Plaintiff reserves the right to supplement this response.

**INTERROGATORY NO. 8:**

State your residence addresses since January 1, 2010, the dates you resided at the address, and the name, last known phone number, and last known residence address for all persons who resided at the address with you.

**RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff objects to this request on the grounds that it is compound, irrelevant, overly broad and not reasonably calculated to lead to admissible evidence with respect to addresses that were not Plaintiff's last known address at the time of the relevant conduct that gave rise to any causes of action Plaintiff's Complaint. Further, Plaintiff objects to this request on the grounds that it violates third party privacy rights.

/ / /

/ / /

COMPLAINT                                   - 8 of 18 -

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Plaintiff objects to this request on the grounds that it is compound, irrelevant, overly broad and not reasonably calculated to lead to admissible evidence with respect to addresses that were not Plaintiff's last known address at the time of the relevant conduct that gave rise to any causes of action in Plaintiff's Complaint. Further, Plaintiff objects to this request on the grounds that it violates third party privacy rights.

From 2010 - 2014, Plaintiff lived at ███████████ Stanton, CA 90680. Plaintiff may be contacted through Plaintiff's counsel. Plaintiff lived with his brothers Oriel and Carlos Liera whose numbers are ███████ and ███████, respectively.

From 2014 to 2016, Plaintiff lived at ███████████, Stanton, CA 92831, and then ███████████, Fullerton, CA 92831. Osiel and Carlos Liera, as well as Plaintiff's mother and father (identified in the 26(a) initial disclosures (with phone numbers)) lived at the ██████ address. Plaintiff lived with Kim Do at the ██████ address. Her number may be found in the 26(a) initial disclosures

From 2016 to present Plaintiff resides at ███████████ Fullerton, CA 92831 with his wife Kim Do.

**INTERROGATORY NO. 9:**

State your actual damages incurred as a result of the conduct you allege against U.S. Bank in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 9:**

Plaintiff objects to this interrogatory on the grounds that it is subject to the attorney-client privilege and is protected work-product. Further, Plaintiff objects to this interrogatory on the grounds that it improperly calls for a legal conclusion, and improperly seeks Plaintiff's legal contentions. Further, Plaintiff objects because this request calls for the premature disclosure of expert witnesses.

1 Plaintiff objects to this request on the grounds that it is vague and ambiguous as
2 phrased.

3     Without waiving said objections, Plaintiff responds as follows: Plaintiff
4 suffered actual damages including credit denials, mental and emotional distress
5 and pain and suffering, medical expenses and physiological damages, immigration
6 issues, loss of opportunities, lost income.

7     Discovery is ongoing and Plaintiff reserves the right to supplement or
8 amend this response.

9 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

10     Plaintiff objects to this interrogatory on the grounds that it is subject to the
11 attorney-client privilege and is protected work-product. Further, Plaintiff objects
12 to this interrogatory on the grounds that it improperly calls for a legal conclusion,
13 and improperly seeks Plaintiff's legal contentions. Further, Plaintiff objects
14 because this request calls for the premature disclosure of expert witnesses.
15 Plaintiff objects to this request on the grounds that it is vague and ambiguous as
16 phrased.

17     Without waiving said objections, Plaintiff responds as follows:

18     Approximately $365,920.00 in lost financing and lost income due to
19 inaccurate credit reporting and debt collection, and this number continuing to
20 accrue.

21     Approximately $681,020.00 in out of pocket medical expenses, emotional
22 and mental distress, physical anguish, deterioration in physical health, and this
23 number continues to accrue.

24     These numbers do not include any available statutory or punitive damages,
25 including attorneys fees and costs

26 Discovery is ongoing and Plaintiff reserves the right to supplement or amend this
27 response.

28 ///

**INTERROGATORY NO. 10:**

State all material facts in support of your contention that you suffered denials of credit as a result of the conduct you allege against U.S. Bank in the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff objects to this interrogatory on the grounds that it is subject to the attorney-client privilege and is protected work-product. Further, Plaintiff objects to this interrogatory on the grounds that it improperly calls for a legal conclusion, and improperly seeks Plaintiff's legal contentions. Further, Plaintiff objects because this request calls for the premature disclosure of expert witnesses. Plaintiff objects to this request on the grounds that it is vague and ambiguous with respect to the undefined terms. "suffered denials of credit,"

Without waiving said objections, Plaintiff responds as follows: Plaintiff suffered denials of credit as a result negative impact to his credit due to U.S. Bank's conduct as alleged against U.S. Bank in the COMPLAINT.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Plaintiff objects to this interrogatory on the grounds that it is subject to the attorney-client privilege and is protected work-product. Further, Plaintiff objects to this interrogatory on the grounds that it improperly calls for a legal conclusion, and improperly seeks Plaintiff's legal contentions. Plaintiff is not required to prepare Defendant's case. Further, Plaintiff objects because this request calls for the premature disclosure of expert witnesses. Plaintiff objects to this request on the grounds that it is vague and ambiguous with respect to the undefined terms. "suffered denials of credit,"

Without waiving said objections, Plaintiff responds as follows: Plaintiff suffered denials of credit as a result negative impact to his credit due to U.S. Bank's conduct as alleged against U.S. Bank in the COMPLAINT. Included with Plaintiff's Document production was several credit denials from Orange County

1    Credit Union, as well as a credit limit decrease of his Macy's credit cared as a

2    result of a low credit score. Adverse credit information results in a low credit

3    score. US Bank furnished inaccurate adverse credit information to the credit

4    bureaus, which appeared on Plaintiff's credit report and resulted in a lower credit

5    score leading to denials of credit.

6    **INTERROGATORY NO. 11:**

7        State all material facts in support of your contention that your immigration

8    status was impacted as a result of the conduct you allege against U.S. Bank in the

9    COMPLAINT.

10    **RESPONSE TO INTERROGATORY NO. 11:**

11        Plaintiff objects to this interrogatory on the grounds that it is subject to t**he**

12    attorney-client privilege and is protected work-product. Further, Plaintiff objects

13    to this interrogatory on the grounds that it improperly calls for a legal conclusion.

14    Further, Plaintiff objects because this request calls for the premature disclosure of

15    expert witnesses. Plaintiff objects to this request on the grounds that it is vague

16    and ambiguous with respect to the phrase "impacted."

17        Without waiving said objections, Plaintiff responds as follows: Plaintiff's

18    immigration status was negatively impacted due to U.S. Bank's conduct as alleged

19    against U.S. Bank in the COMPLAINT. Attorney Meredith Brown advised

20    Responding Party that his immigration status is affected due to the conduct of US

21    Bank. Investigation and discovery are ongoing, and Responding Party Reserves

22    the right to supplement this response.

23    **INTERROGATORY NO. 12:**

24        State all material facts in support of your contention that your business was

25    impacted as a result of the conduct you allege against U.S. Bank in the

26    COMPLAINT.

27    **RESPONSE TO INTERROGATORY NO. 12:**

28

1    Plaintiff objects to this interrogatory on the grounds that it is subject to the

2    attorney-client privilege and is protected work-product. Further, Plaintiff objects

3    to this interrogatory on the grounds that it improperly calls for a legal conclusion.

4    Further, Plaintiff objects because this request calls for the premature disclosure of

5    expert witnesses. Plaintiff objects to this request on the grounds that it is vague

6    and ambiguous with respect to the phrase "impacted."

7    Without waiving said objections, Plaintiff responds as follows: Plaintiff's

8    business was negatively impacted due to U.S. Bank's conduct as alleged against

9    U.S. Bank in the COMPLAINT.

10   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

11   Plaintiff objects to this interrogatory on the grounds 1hat it is subject to the

12   attorney-client privilege and is protected work-product. Further, Plaintiff objects

13   to 1his interrogatory on the grounds that it improperly calls for a legal conclusion.

14   Further, Plaintiff objects because this request calls for the premature disclosure of

15   expert witnesses. Plaintiff objects to this request on the grounds that it is vague

16   and ambiguous with respect to the phrase "impacted."

17   Without waiving said objections, Plaintiff responds as follows: Plaintiff's

18   business was negatively impacted due to U.S. Bank's conduct as alleged against

19   U.S. Bank in the COMPLAINT. US Bank failed to acknowledge the identity theft.

20   Plaintiff feared he might lose his business. His feeling of hopelessness and stress

21   diminished his performance at work. The adverse impact on his credit, coupled

22   wi1h the non-stop debt collection resulted in losing investors, which resulted in

23   lost income. Discovery and investigation are ongoing

24   **INTERROGATORY NO. 13:**

25   State all material facts in support of YOUR claim in the COMPLAINT that

26   U.S. Bank violated the Rosenthal Fair Debt Collection Practices Act.

27   **RESPONSE TO INTERROGATORY NO. 13:**

28

COMPLAINT                                                    - 13 of 18 -

Plaintiff objects to this interrogatory on the grounds that it seeks the legal reasoning and theories of Plaintiff's contentions.    Plaintiff further objects to this interrogatory on the grounds that it is subject to the attorney-client privilege and is protected work-product.

Without waiving said objections, Plaintiff responds as follows: Please refer to Plaintiff's Complaint.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Plaintiff objects to this interrogatory on the grounds that it seeks the legal reasoning and theories of Plaintiff's contentions. Plaintiff further objects to this interrogatory on the grounds that it is subject to the attorney client privilege and is protected work-product.

Without waiving said objections, Plaintiff responds as follows: Plaintiff incorporates herein by reference Paragraphs 9-120 of Plaintiff's operative Complaint. Attorney David Calderon, on behalf of Plaintiff, sent two letters to Defendant stating that Plaintiff was represented. One such letter even demanded that Defendant cease contacting the Plaintiff. Further, Plaintiff put Defendant on notice in writing that the debt did not belong to him. Plaintiff submitted a police report and a fraud affidavit to defendant explaining that it did not owe· Defendant certain debt, because the debt was the result of fraud and identity theft. Defendant continued to contact Plaintiff to collect debt despite having received all of the aforementioned information. Defendant regularly collects debts on behalf of itself. Plaintiff is a consumer.

Investigation and discovery is ongoing and Plaintiff reserves the right to supplement or amend this response.

**INTERROGATORY NO. 14:**

State all material facts in support of YOUR claim in the COMPLAINT that U.S. Bank violated the California Consumer Credit Reporting Agencies Act.

**RESPONSE TO INTERROGATORY NO. 14:**

1  Plaintiff objects to this interrogatory on the grounds that it seeks the legal
2  reasoning and theories of Plaintiff's contentions.    Plaintiff further objects to this
3  interrogatory on the grounds that it is subject to the attorney-client privilege and is
4  protected work-product.

5  Without waiving said objections, Plaintiff responds as follows: Please refer
6  to Plaintiff's Complaint. Investigation and discovery is ongoing and Plaintiff
7  reserves the right to supplement or amend this response.

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

9  Plaintiff objects to this interrogatory on the grounds that it seeks the legal
10  reasoning and theories of Plaintiff's contentions. Plaintiff further objects to this
11  interrogatory on the grounds that it is subject to the attorney client privilege and is
12  protected work-product.

13  Without waiving said objections, Plaintiff responds as follows: Plaintiff
14  incorporates herein by reference Paragraphs 9-120 of Plaintiff's operative
15  Complaint. Attorney David Calderon, on behalf of Plaintiff, sent two letters
16  (which have been produced in discovery, and which Defendant already possessed
17  prior to the initiation of this action) explaining that Plaintiff had not opened
18  certain accounts with US Bank. Further, Plaintiff: on numerous occasions,
19  explained to Defendant that it had not opened certain accounts with US Bank. US
20  Bank reported inaccurate credit information regarding these certain accounts to
21  the credit bureaus, including Equifax. Plaintiff submitted a police report and a
22  fraud affidavit to defendant which explained that these certain accounts did not
23  belong to Plaintiff. Defendant continued to knowingly furnish this inaccurate
24  information to the credit bureaus, and this inaccurate information appeared on
25  Plaintiff's consumer credit reports.

26  Investigation and discovery is ongoing and Plaintiff reserves the right to
27  supplement or amend this response.

28  **INTERROGATORY NO. 15:**

COMPLAINT                                     - 15 of 18 -

1      State all material facts in support of YOUR claim in the COMPLAINT that

2      U.S. Bank violated California Civil Code sections 1798.92-1798.97

3      **RESPONSE TO INTERROGATORY NO. 15:**

4          Plaintiff objects to this interrogatory on the grounds that it seeks the legal

5      reasoning and theories of Plaintiff's contentions. Plaintiff further objects to this

6      interrogatory on the grounds that it is subject to the attorney-client privilege and is

7      protected work-product.

8          Without waiving said objections, Plaintiff responds as follows: Please refer

9      to Plaintiff's Complaint.

10     **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:**

11         Plaintiff objects to this interrogatory on the grounds that it seeks the legal

12     reasoning and theories of Plaintiff's contentions. Plaintiff further objects to this

13     interrogatory on the grounds that it is subject to the attorney-client privilege and is

14     protected work-product.

15         Without waiving said objections, Plaintiff responds as follows: Plaintiff

16     incorporates herein by reference Paragraphs 9-120 of Plaintiff's operative

17     Complaint. Attorney David Calderon, on behalf of Plaintiff: sent two letters to

18     Defendant stating that Plaintiff was represented. One such letter even demanded

19     that Defendant cease contacting the Plaintiff. Further, Plaintiff put Defendant on

20     notice in writing that the debt did not belong to him. Plaintiff submitted a police

21     report and a fraud affidavit to defendant explaining that it did not owe Defendant

22     certain debt, because the debt was the result of fraud and identity theft. Defendant

23     continued to contact Plaintiff to collect debt despite having received all of the

24     aforementioned information.

25         Investigation and discovery is ongoing and Plaintiff reserves the right to

26     supplement or amend this response.

27     / / /

28     / / /

**INTERROGATORY NO. 16:**

State all material facts in support of YOUR claim in the COMPLAINT that U.S. Bank violated the Fair Credit Reporting Act.

**RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff objects to this interrogatory on the grounds that it seeks the legal reasoning and theories of Plaintiff's contentions. Plaintiff further objects to this interrogatory on the grounds that it is subject to the attorney-client privilege and is protected work-product.

Without waiving said objections, Plaintiff responds as follows: Please refer to Plaintiff's Complaint.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

Plaintiff objects to this interrogatory on the grounds that it seeks the legal reasoning and theories of Plaintiff's contentions. P l a in ti ff further objects to this interrogatory on the grounds that it is subject to the attorney client privilege and is protected work-product.

Without waiving said objections, Plaintiff responds as follows: Plaintiff incorporates herein by reference Paragraphs 9-120 of Plaintiff's operative Complaint. Sometime in September of 2016, Plaintiff reviewed his Equifax credit report. He discovered inaccurate information was being furnished by US Bank regarding accounts ending in 5258, 0949, 6967, and 3978. This information is inaccurate because either these accounts were never opened by Plaintiff, or because the accounts had been tampered with. Plaintiff sent Equifax a dispute letter dated November 4, 2016. Plaintiff received dispute reinvestigation results from Equifax on or about December 6, 2016, and the disputed accounts remained on the credit report. These accounts remained despite the fact that US Bank had in its possession a Fraud affidavit, a police report, and numerous telephone calls and letters from either Plaintiff or his attorney David Calderon the these accounts did not belong to him, or were tampered with.

1   Investigation and discovery are ongoing, Plaintiff reserves the right to

2   supplement this response.

3   **INTERROGATORY NO. 17:**

4   State whether you have been convicted of any crime(s) in the past ten (10)

5   years, and if so, state the city and state where you were convicted, the date of the

6   conviction, the offense, and the court and case number.

7   **RESPONSE TO INTERROGATORY NO. 17:**

8   Plaintiff objects to this interrogatory on the grounds that it is irrelevant  and

9   not reasonably calculated to lead to admissible evidence, and serves no

10   discoverable purpose beyond harassing the Plaintiff. Plaintiff further objects to

11   this interrogatory on the grounds that it seeks to violate the Plaintiff's right to

12   privacy.

13   Without waiving said objections, Plaintiff responds as follows: Plaintiff has

14   not been convicted of any crimes in the past 10 years.

15

16   Dated: November 16, 2018          **THE LAW OFFICES OF F. JAY RAHIMI**

17

18   By**:** s/F. Jay Rahimi_____

19   F. Jay Rahimi, Esq.
          Attorneys for the Plaintiff

20

21

22

23

24

25

26

27

28

## Samuel L. Soria v.
## US Bank (N.A.), et al.

**Court Name: United States District Court, Central District of California**

**Case No.:**   8:17-cv-00603-CJC-KES

### VERIFICATION

I am the Plaintiff in the above-captioned matter. I am familiar with the
contents of the foregoing:

- **PLAINTIFF Samuel L. Soria's Amended
  Supplemental Responses to US Bank (N.A.)'s
  Interrogatories, Set One.**

The information supplied therein is based on my own personal knowledge
and/or has been supplied by my attorneys or other agents and is therefore
provided as required by law. The information contained in the
foregoing document(s) is true, except as to the matters, which were
provided by my attorneys or other agents, and as to those matters, I am
informed and believe that they are true.

I declare, under the penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Executed on   11 / 17 / 18   , at   Fullerton, CA .
                (Date)                      (City, State)

_Samuel L. Soria_ (signature)

Samuel L. Soria

# EXHIBIT C

1   F. Jay Rahimi, Esq. (SBN: 305286)
2   jay@jrahimilaw.com
    **LAW OFFICE OF F. JAY RAHIMI**
3   7136 Haskell Ave. Suite 333
4   Van Nuys, CA 91406
    Telephone: (818) 835-4005
5   Facsimile: (866) 543-4345

6

7   *Attorneys for the Plaintiff*
    Samuel Liera Soria
8

9

10              **UNITED STATES DISTRICT COURT**
        **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**
11

| | |
|---|---|
| 12  SAMUEL LIERA SORIA a/k/a<br>13  SAMUEL S. LIERA,<br><br>14<br>15       Plaintiff,<br>16  v.<br>17  US BANK (N.A.), AND EQUIFAX<br>    INFORMATION SERVICES, LLC,<br>18<br>19       Defendant(s).<br>20 | **Case No.: 8:17-cv-00603-CJC-KES**<br><br>**PLAINTIFF SAMUEL L. SORIA'S SECOND SUPPLEMENTAL AND AMENDED RESPONSES TO DEFENDANT U.S. BANK'S INTERROGATORIES, SET TWO** |

21
22   Propounding Party:      DEFENDANT, **US BANK (N.A.)**
23   Responding Party:      PLAINTIFF, **SAMUEL L. SORIA**
24   Set No.:               **TWO (2)**
25   / / /
26   / / /
27   / / /
28   / / /

COMPLAINT                        - 1 of 9 -

To DEFENDANT **US BANK (N.A.),** and its attorneys of record:

Comes now PLAINTIFF, **SAMUEL L. SORIA ("PLAINTIFF" or "RESPONDING PARTY")**, by and through counsel, hereby responds as follows to DEFENDANT **US BANK (N.A.)'S ("DEFENDANT" or "PROPOUNDING PARTY")** INTERROGATORIES, SET TWO,  to PLAINTIFF, heretofore filed in this case, without in any way waiving or intending to waive, but on the contrary intending to reserve and reserving:

(a) All questions and objections as to competency, relevancy, materiality, privilege admissibility as evidence for any purpose in any subsequent proceeding in, or the hearing of this action, of any of these answers or the subject matter thereof;

(b) The right to object to the use of any of said answers, or the subject matter thereof, in any subsequent proceeding, in or the hearing of this action, on any grounds;

(c) The right to object on any grounds or at any time to demand for further response to these or other discovery documents or other discovery procedures involved or related to the subject matter of the requests for admissions herein answered; and

(d) The right at any time, to revise, correct, add to or clarify any of said answers propounded herein.

## <u>RESPONSES TO INTERROGATORIES</u>

## <u>INTERROGATORY NO. 18:</u>

Identify every hospital, clinic, and other medical institution from which and every doctor, dentist, chiropractor, physical therapist, psychotherapist or other health care professional from whom you sought and/or received medical or mental health care or treatment within the last seven years. For each such person or institution, state the date or dates upon which Plaintiff was admitted, treated, or

examined; the reason he sought admission, treatment, or examination; and the treatment provided.

**RESPONSE TO INTERROGATORY NO. 18:**

Objection: Responding party objects to this request on the grounds that it is irrelevant and not calculated to lead to the discovery of admissible evidence. Further, Responding Party objects to this request on the grounds that is overly broad, and not limited in time and scope and seeks information that is outside of the relevant time periods at issue in this case. Further, Responding Party objects to this on the grounds that it violates Responding Party's privacy rights. Responding Party also objects to this interrogatory on the grounds that it is duplicative, and the information has already been provided to Propounding Party. Responding party objects to this interrogatory on the grounds that it only seeks to harass and annoy the Plaintiff.

Without waiving said objections, Responding Party responds as follows: Responding Party's document production bates numbered 000081USB - 000105USB. Responding Party saw a Dr. Thermos in late 2015 after breaking his knuckle. Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 18:**

Objection: Responding party objects to this request on the grounds that it is irrelevant and not calculated to lead to the discovery of admissible evidence because Responding Party is not seeking damages for dental issues, and only seeks damages for mental and emotional distress or physical issues that have already been produced in discovery. Further, Responding Party objects to this request on the grounds that  it is overly broad, and not limited in time and scope and seeks information that is outside of the relevant time periods at issue in this case. Further, Responding Party objects to this on the grounds that it violates Responding Party's privacy rights. Responding Party also objects to this

COMPLAINT                                          - 3 of 9 -

interrogatory on the grounds that it is duplicative, and the information has already been provided to Propounding Party. Responding party objects to this interrogatory on the grounds that it only seeks to harass and annoy the Plaintiff.

Without waiving said objections, Responding Party responds as follows: Responding Party's document production bates numbered 000081USB - 000105USB. Responding Party provides information for the limited and relevant time period of 2015 to the present. Responding party saw a Dr. Thermos in late 2015 after pulling his hamstring in one of his MMA fights, and hormone levels were checked as well. Responding Party has seen Dr. Richard S. Gluckman, Richard S. Gluckman, Inc., at 1360 W 6th St. #350, San Pedro, CA 90732 for post-fight evaluations in 2015 and 2016, but is unsure of how many visits there were or when they occurred exactly. Dr. Gluckman's office would perform post-fight blood work, EKG's, MRI's and psychological evaluations to clear fighters.  Responding party visited the Kerlan-Jobe orthopaedic clinic in October of 2017 for an MRI on his elbow. Responding party then had elbow surgery performed by Dr. Kvitne of the Kerlan-Jobe clinic on October 19, 2017. Dr. Kvitne's address is 6801 Park Terrace #400, Los Angeles, CA 90045.   Responding party currently sees Dr. Kessler, a sports and physical therapy doctor, once a week for routine sports and physical therapy. Dr. Kessler's office: 1431 E. Warner Ave suite D. Tustin CA 92780 714-258-7116. This is the extent of Responding Party's recollection at this time. Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response, and will supplement this response upon the discovery and acquisition of additional information.

**INTERROGATORY NO. 19:**

Identify the business opportunity and every person from whom you would have received any portion of the "[a]pproximately $365,920.00 in lost financing and lost income due to inaccurate credit reporting and debt collection" described in your supplemental answer to Interrogatory No. 9.

**RESPONSE TO INTERROGATORY NO. 19**

Objection: Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous and confusing as written.

Without waiving said objections, Responding Party responds as follows: Responding Party had an opportunity to receive loans or investments from Albert Soto,  Renee Espinoza and Ali Mas Inc. in order to expand his fitness/gym business, Hardcore Fitness Center LLC, and get a larger location for the business. Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 19**

Objection: Responding Party objects to this interrogatory on the grounds that it is vague, ambiguous and confusing as written.

Without waiving said objections, Responding Party responds as follows: Responding Party had an opportunity to receive loans or investments from Albert Soto,  Renee Espinoza and Ali Mas Inc. in order to expand his fitness/gym business, Hardcore Fitness Center O.C. LLC, and get a larger location for the business. Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response.

**INTERROGATORY NO. 20:**

For each person identified in your answer to Interrogatory No. 19 from whom you would have received financing, state the amount of financing lost, the date(s) on which you applied for such financing, the type of financing (debt, equity, etc.), and describe in detail the use(s), if any, to which you intended to put the financing.

**RESPONSE TO INTERROGATORY NO. 20:**

Albert Soto - $20,000.00, investment - would have been put towards location for Hardcore Fitness Center LLC and equipment.

Renee Espinoza and Ali Mas Inc. - $30,000.00, investment or loan - would have been put towards location for Hardcore Fitness Center LLC and equipment.

Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Albert Soto - $20,000.00, investment - would have been put towards location for Hardcore Fitness Center LLC and equipment.

Renee Espinoza and Ali Mas Inc. - $30,000.00, investment or loan - would have been put towards location for Hardcore Fitness Center O.C. LLC and equipment. The contact info for Ali Mas Inc. is: 949.534.2677.

Investigation and discovery continue. Responding Party reserves the right to supplement or amend this response.

**INTERROGATORY NO. 21:**

For each person identified in your answer to Interrogatory No. 19 from whom you would have received income, describe in detail what you did or would have done to earn the income.

**RESPONSE TO INTERROGATORY NO. 21:**

Objection: Responding party objects to this request on the grounds that it is irrelevant and not calculated to lead to the discovery of admissible evidence. Further, Responding Party objects to this request on the grounds that is overly broad, vague and ambiguous as written. Responding Party objects to this interrogatory on the grounds that it misstates the facts.

Without waiving said objections, Responding Party responds as follows: Responding Party never stated he would ever receive any income from anyone. Responding stated he would receive investments to move to a bigger location, expand his gym/fitness business, Hardcore Fitness Center LLC, which would have led to increased income. Discovery and investigation continue. Responding Party reserves the right to supplement and/or amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 21:**

Objection: Responding party objects to this request on the grounds that it is irrelevant and not calculated to lead to the discovery of admissible evidence. Further, Responding Party objects to this request on the grounds that is overly broad, vague and ambiguous as written. Responding Party objects to this interrogatory on the grounds that it misstates the facts.

Without waiving said objections, Responding Party responds as follows: Responding Party never stated he would ever receive any income from anyone. Responding stated he would receive investments to move to a bigger location, expand his gym/fitness business, Hardcore Fitness Center O.C. LLC, which would have led to increased income. Discovery and investigation continue. Responding Party reserves the right to supplement and/or amend this response.

**INTERROGATORY NO. 22:**

Identify the date, Plaintiff's reasons for seek credit, and the entity that denied Plaintiff's credit application in all instances of "credit denials," as that term is used in Plaintiff's First Amended Complaint Prayer for Relief.

**RESPONSE TO INTERROGATORY NO. 22:**

Objection: Responding party objects to this request on the grounds that it is duplicative and thus only seeks to harass and annoy the Responding party.

Without waiving said objections, Responding Party responds as follows: Responding Party has already responded to this inquiry. Responding Party identifies Responding Party's Responses to Propounding Party's Requests for Production of Documents, Set One. Further, responding party was denied rental of a condominium in May of 2018 and identifies document bates numbered 000106USB. Investigation and discovery continue. Responding Party reserves the right to supplement and/or amend this response.

**AMENDED SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:**

Objection: Responding party objects to this request on the grounds that it is duplicative and thus only seeks to harass and annoy the Responding party.

Without waiving said objections, Responding Party responds as follows: Responding Party has already responded to this inquiry. Responding Party identifies Responding Party's Responses to Propounding Party's Requests for Production of Documents, Set One. Responding Party already received credit from Macy's, and his credit limit was lowered due to US Bank's furnishing inaccurate information about Responding Party to the credit bureaus. Responding Party attempted to obtain credit from Orange County Credit Union to purchase more equipment for his business, Hardcore Fitness Center O.C., LLC, as well as to help pay for insurance and a music license for this business. Responding Party tried to obtain an investment and/or loan from Ali Mas Inc., Renee Espinoza and Albert Soto to expand his gym, but was unable to secure this because of conduct of US Bank as alleged in the operative complaint. Investigation and discovery continue. Responding Party reserves the right to supplement and/or amend this response.

**INTERROGATORY NO. 23:**

Identify the investors lost by you or your business(es) as described in supplement answer to interrogator No.12.

**RESPONSE TO INTERROGATORY NO. 23:**

Objection: Responding party objects to this request on the grounds that it is duplicative and thus only seeks to harass and annoy the Responding party.

Without waiving said objections, responding party responds as follows: Albert Soto - $20,000.00, investment - would have been put towards location for Hardcore Fitness Center LLC and equipment.

Renee Espinoza and Ali Mas Inc. - $30,000.00, investment or loan - would have been put towards location for Hardcore Fitness Center LLC and equipment.

1  Investigation and discovery continue. Responding Party reserves the right to
2  supplement or amend this response.

3  **INTERROGATORY NO. 24:**

4  Identify the date, Plaintiff's reasons for seek credit, and the entity that
5  denied Plaintiff's credit application in all instances of "credit denials," as that
6  term is used in Plaintiff's First Amended Complaint Prayer for Relief.

7  **RESPONSE TO INTERROGATORY NO. 24:**

8  Objection: Responding party objects to this request on the grounds that  it is
9  overly broad, vague, ambiguous, and not limited in time and scope.

10  Without waiving said objections, Responding Party responds as follows:
11  Responding Party: Responding Party is a DACA recipient, and has had an I-130
12  approved, but is currently unable to to apply for citizenship until new legislation
13  is passed.   Responding Party's immigration attorney, Meredith Brown, urged
14  Responding Party to applying for Advance Parole prior to President Trump getting
15  sworn in,   after which he could then apply for lawful permanent residence.
16  However, due to the conduct of US Bank as alleged in this action, Meredith
17  Brown advised against his leaving the country, because there was a chance he
18  would not be led back in due to the conduct of US Bank. When President Trump
19  was sworn in, he eliminated Advance Parole for DACA recipients. Investigation
20  and discovery continue. Responding Party reserves the right to supplement and/or
21  amend this response.

22  Date: November 17, 2018

23  s/ F. Jay Rahimi
24  F. Jay Rahimi, Esq.
   Attorney for Samuel L. Soria

25

26

27

28

COMPLAINT                                          - 9 of 9 -

## Samuel L. Soria v.
## US Bank (N.A.), et al.

**Court Name: United States District Court, Central District of California**

**Case No.:**   8:17-cv-00603-CJC-KES

### VERIFICATION

I am the Plaintiff in the above-captioned matter. I am familiar with the contents of the foregoing:

- **PLAINTIFF Samuel L. Soria's Scond Supplemental and Amended Responses to US Bank (N.A.)'s Interrogatories, Set Two.**

The information supplied therein is based on my own personal knowledge and/or has been supplied by my attorneys or other agents and is therefore provided as required by law. The information contained in the foregoing document(s) is true, except as to the matters, which were provided by my attorneys or other agents, and as to those matters, I am informed and believe that they are true.

I declare, under the penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on ___11_/_17_/_18___ , at _Fullerton, CA_ .
　　　　　　　　(Date)　　　　　　　(City, State)

_Samuel Soria_ (signature)

**Samuel L. Soria**

# EXHIBIT H

# BARTHCALDERON LLP
### ATTORNEYS

**333 City Boulevard West, Suite 2050**
**Orange, California 92868-2944**

| | |
|---|---|
| **TELEPHONE** | **E-MAIL** |
| (714) 704-4828 | david@barthattorneys.com |
| **FACSIMILE** | **WEBSITE** |
| (714) 704-1513 | www.barthattorneys.com |

**David R. Calderon, Esq.**

**VIA FACSIMILE**
**(866) 405-0852**
**AND U.S. MAIL**

July 26, 2016

US Bancorp Fraud Service Center
c/o Employee # 1542208
1200 Energy Park Dr.
St. Paul, MN 55108

      **Re:**    **Identity Theft Involving Samuel Liera**

Dear "Joe":

Thank your taking the time to discuss Mr. Liera's case with me.

As you are aware, Mr. Liera's identity was stolen by a former US Bank employee in your Santa Ana, California branch named Daniel Barrera, and used by Mr. Barrera to take out multiple loans and credit cards with US Bank and others.

Mr. Liera has already filed claims with US Bank, and from what I understand, he has forwarded a copy of the police report and other information to US Bank's fraud department. Despite this, he received approximately 20 telephone calls a day hounding him to make payments on the loans and credit cards fraudulently obtained by Mr. Barrera. **Please do whatever you can to stop this and any other collection activity pending the resolution of this matter.**

You informed me that someone from your corporate security office may be in touch with my office to discuss this matter further. In the meantime, we hope that you come to a speedy resolution of this claim, and do whatever is necessary to close the affected accounts and repair Mr. Liera's damaged credit.

If you have any questions regarding this correspondence, or if you need any additional information from our office or Mr. Liera, please feel free to contact the undersigned at your convenience.

US Bancorp Fraud Service Center
c/o Employee No. 1542208
Re:  **Identity Theft Involving Samuel Liera**
July 26, 2016
Page 2 of 2

Thank you for your prompt attention to this extremely pressing and serious matter.

Very truly yours,

**BARTHCALDERON** LLP

David R. Calderon, Esq.

DRC:  jb

Cc:    Samuel Liera

# BARTH CALDERON LLP
## ATTORNEYS

**333 City Boulevard West, Suite 2050**
**Orange, California 92868-2944**

| | |
|---|---|
| **TELEPHONE** | **E-MAIL** |
| (714) 704-4828 | david@barthattorneys.com |
| **FACSIMILE** | **WEBSITE** |
| (714) 704-1513 | www.barthattorneys.com |

**David R. Calderon, Esq.**

**VIA FACSIMILE**
**(866) 405-0852**
**AND U.S. MAIL**

August 29, 2016

US Bancorp Fraud Service Center
c/o Employee # 1542208
1200 Energy Park Dr.
St. Paul, MN 55108

      **Re:**   **Identity Theft Involving Samuel Liera aka Samuel Liera Soria**

Dear "Joe":

Attached is a copy of correspondence sent on July 26, 2016 regarding the above-referenced matter. I have also attached a copy of declaration sent to US Bank regarding the identity theft and fraudulent loan contracts that were entered into by a former US Bank employee (while he worked for US Bank) continue to be a major problem for Mr. Liera to deal with.

He is still being harassed at all hours of the day by people looking to collect on US Bank loans and credit cards. **These calls need to stop immediately.**

Mr. Liera has suffered severe financial damage and damage to his credit as a result of the actions of US Bank and its' former employee Daniel Barrera. And while your investigation drags on, the harassment of Mr. Liera continues and the damages he has suffered continue to mount.

If the situation is not addressed and rectified immediately, Mr. Liera will have no other option but to pursue his remedies under Federal and California law.

US Bancorp Fraud Service Center
c/o Employee No. 1542208
**Re:  Identity Theft Involving Samuel Liera**
August 29, 2016
Page 2 of 2

Please contact us and/or Mr. Liera immediately to apprise us and/or him of the status of your investigation.  And in the meantime, please stop harassing him to collect on these fraudulent debts.

Very truly yours,

**BARTHCALDERON** LLP

David R. Calderon, Esq.

Enclosures
DRC:  jb

Cc:    Samuel Liera

# BARTHCALDERON LLP
## ATTORNEYS
**333 City Boulevard West, Suite 2050**
**Orange, California 92868-2944**

**TELEPHONE**
(714) 704-4828
**FACSIMILE**
(714) 704-1513

**E-MAIL**
david@barthattorneys.com
**WEBSITE**
www.barthattorneys.com

**David R. Calderon, Esq.**

**VIA FACSIMILE**
**(866) 405-0852**
**AND U.S. MAIL**

July 26, 2016

US Bancorp Fraud Service Center
c/o Employee # 1542208
1200 Energy Park Dr.
St. Paul, MN 55108

    Re:    **Identity Theft Involving Samuel Liera**

Dear "Joe":

Thank your taking the time to discuss Mr. Liera's case with me.

As you are aware, Mr. Liera's identity was stolen by a former US Bank employee in your Santa Ana, California branch named Daniel Barrera, and used by Mr. Barrera to take out multiple loans and credit cards with US Bank and others.

Mr. Liera has already filed claims with US Bank, and from what I understand, he has forwarded a copy of the police report and other information to US Bank's fraud department.  Despite this, he received approximately 20 telephone calls a day hounding him to make payments on the loans and credit cards fraudulently obtained by Mr. Barrera.  **Please do whatever you can to stop this and any other collection activity pending the resolution of this matter.**

You informed me that someone from your corporate security office may be in touch with my office to discuss this matter further.  In the meantime, we hope that you come to a speedy resolution of this claim, and do whatever is necessary to close the affected accounts and repair Mr. Liera's damaged credit.

If you have any questions regarding this correspondence, or if you need any additional information from our office or Mr. Liera, please feel free to contact the undersigned at your convenience.

US Bancorp Fraud Service Center
c/o Employee No. 1542208
Re:  **Identity Theft Involving Samuel Liera**
July 26, 2016
Page 2 of 2

Thank you for your prompt attention to this extremely pressing and serious matter.

Very truly yours,

**BARTHCALDERON** LLP

David R. Calderon, Esq.

DRC:  jb

Cc:    Samuel Liera

May 31, 2016



usbank.com

SAMUEL LIERA SORIA

FULLERTON CA 92831-4609

Loan Account Number Ending In: 2658 and 8284

Dear Samuel Soria:

We have received your recent claim regarding identity theft. Enclosed are copies of the signed loan agreements for your review. Please complete this letter and mail with a copy of a filed police report, a copy of state issued identification and a second form of identification to:

> **U.S. Bank**
> **Attn: Loss Prevention**
> **1850 Osborn Avenue**
> **Oshkosh, WI 54902**

The signature endorsed on the face of said loan contracts are forged and were not written nor authorized nor procured to be written by the undersigned, but were written by some person unknown to the undersigned, and they have not received money to be paid to them by the said loans nor any part thereof. The undersigned is willing to assist in the prosecution of the person(s) who committed this fraud. The undersigned declares under penalty of perjury the information provided in this affidavit is true and correct to the best of their knowledge. Knowingly submitting false information on this form could subject the undersigned to criminal prosecution for perjury.

_____     6/8/16
Customer Signature                                 Date

This instrument was acknowledged before me on this 8th day of June, 2016.

ALEX VARGAS RUIZ
Commission # 2129328
Notary Public - California
Orange County
My Comm. Expires Nov 3, 2019

_____
Notary Public
My Commission Expiration Date Nov 3, 2019

If you have further questions please contact U.S. Bank Loss Prevention at 866.790.5822.

At U.S. Bank, our commitment to best-in-class customer service means each U.S. Bank employee is here to listen and connect you with the information, resources and products you need to reach your banking goals.

Sincerely,

Shaqueta Iwuji
Fraud Analyst
U.S. Bank Consumer Loan and Lease Operations
kls
Enclosures


EQUAL HOUSING LENDER  Member FDIC

1850 Osborn Avenue, Oshkosh, WI 54902

MMWR-78377
12/15//2015

# EXHIBIT 45

Last login: 10-25-2016 12:35:28

e-OSCAR » Welcome Barbara Clements

Training Home Demo Help Logout

User Profile | Notifications | Archive | Reports

ACDV Report
AUD Report
Activity Report
AUD Details
AUD Summary
Audit Report
Report Card
Management

Screen Help View Report Export CSV

▪ AUD Activity Report - Selection Criteria

Date Created: 10 - 01 - 2016 To 10 - 24 - 2016
AUD Control Number:
Created by User ID:
Submitted by User ID:
AUD Correction Indicator:

Account Number: [redacted]2658
Created by User Name:
Submitted by User Name:

▪ AUD Activity Report

| View Details | AUD Control Number | Account Number | Consumer First Name | Middle Name | Last Name | Account Status Code | Consumer Zip Code | Date Sent | Date Retrieved by NCRA EFX | EXP | INN | TUN | AUD Correction Indicator |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| View | 81434661 | [redacted]2658 | SAMUEL | LIERA | SORIA | DF | 928314609 | 10-11-2016 | 10-11-2016 | 10-11-2016 | 10-11-2016 | 10-12-2016 | 7 |

Copyright © 2016 Online Data Exchange LLC 3.06